## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Law Offices of Bruce J. Chasan, LLC
1500 JFK Boulevard, Suite 312
Philadelphia, PA 19102

Bruce J. Chasan, Esq.
1500 JFK Boulevard, Suite 312
Philadelphia, PA 19102

       Plaintiffs

    vs.

Pierce Bainbridge Beck Price &
   Hecht, LLP
355 S. Grand Avenue, 44th Floor
Los Angeles, CA 90071

John M. Pierce, Esq.
c/o Pierce Bainbridge Trial Lawyers
355 S. Grand Avenue, 44th Floor
Los Angeles, CA 90071

James Bainbridge, Esq.
c/o Pierce Bainbridge Trial Lawyers
355 S. Grand Avenue, 44th Floor
Los Angeles, CA 90071

Carolynn Beck, Esq.
c/o Pierce Bainbridge Trial Lawyers
601 Pennsylvania Avenue NW
South Tower, Suite 700
Washington, DC 20004

Maxim Price, Esq.
c/o Pierce Bainbridge Trial Lawyers
277 Park Avenue, 45th Floor
New York, NY 10172

…continued…

Civil Action No. 2020-cv-1338

FILED

MAR 0 9 2020

KATE BARKMAN, Clerk
By_____Dep. Clerk

**<u>JURY TRIAL DEMANDED</u>**

David L. Hecht, Esq.
c/o Pierce Bainbridge Trial Lawyers
277 Park Avenue, 45th Floor
New York, NY 10172

Pravati Capital LLC
7154 E. Stetson Drive, Suite 210
Scottsdale, AZ 85251

Defendants

## COMPLAINT

1.     Nature of Action:  This action is brought in federal court based on diversity of citizenship and an amount in controversy greater than $75,000.   Plaintiffs seek damages for Defendants' tortious interference with contractual relations and for unjust enrichment.

## PARTIES

2.     Law Offices of Bruce J. Chasan, LLC ("BJC Law") is a Pennsylvania limited liability company organized in 2012.  BJC Law has offices at 1500 JFK Boulevard, Suite 312, Philadelphia, PA 19102.

3.     Bruce J. Chasan, Esq. ("Chasan") is an attorney at law licensed in Pennsylvania since 1979, and a resident of Pennsylvania.  Chasan was first admitted to the bar in Massachusetts in 1972.  Chasan is the sole member of BJC Law and has offices at 1500 JFK Boulevard, Suite 312, Philadelphia, PA 19102.

4.     Pierce Bainbridge Beck Price & Hecht, LLP ("PBBPH Law") is a California limited liability partnership, formed in 2018.  PBBPH Law has its

main offices at 355 S. Grand Avenue, 44th Floor, Los Angeles, CA 90071.
PBBPH Law also has offices in Ohio, Massachusetts, New York City, and
Washington, D.C. (but not in Pennsylvania).

5.     John M. Pierce, Esq. ("Pierce") is the global managing partner of
PBBPH Law and has offices at 355 S. Grand Avenue, 44th Floor, Los Angeles,
CA 90071.  Pierce is a resident of California.

6.     James Bainbridge, Esq. ("Bainbridge") is a co-managing partner
at PBBPH Law and has offices at 355 S. Grand Avenue, 44th Floor, Los
Angeles, CA 90071.  Bainbridge is a resident of California and uses the name
"Jim."

7.     Carolynn Beck, Esq. ("Beck") is a co-managing partner at PBBPH
Law's Washington, D.C. location, and has offices at 601 Pennsylvania
Avenue NW, South Tower, Suite 700, Washington, DC 20004.  Beck serves
as the general counsel of PBBPH Law.  She is a resident of the District of
Columbia or Maryland or Virginia (not Pennsylvania).

8.     Maxim Price, Esq. ("Price") is a founding partner at PBBPH Law
and serves as co-partner in charge of the firm's New York City office.  Price
has offices at 277 Park Avenue, 45th Floor, New York, NY 10172.  Price is a
resident of New York or New Jersey (not Pennsylvania).

9.     David L. Hecht, Esq. ("Hecht") is a founding partner at PBBPH
Law and serves as co-partner in charge of the firm's New York City office.
Hecht has offices at 277 Park Avenue, 45th Floor, New York, NY 10172.

Hecht is a resident of New York or New Jersey (not Pennsylvania).

10.    Pravati Capital LLC ("Pravati") is a Delaware limited liability company, founded in 2013, with principal offices and a place of business at 7154 E. Stetson Drive., Suite 210, Scottsdale, AZ 85251.  Pravati has offices in Arizona, California, Florida and New York City (but not Pennsylvania). Pravati is a third-party litigation funding company and, as described below, it has or had a contractual relationship with PBBPH Law at the relevant time.

**BACKGROUND**

## I.  THE CONTRACT AND INTERFERING TERMINATION

11.    Lenwood "Skip" Hamilton ("Hamilton") contracted with BJC Law on December 31, 2016 by signing an "Engagement Letter" drafted by Chasan on December 30, 2016, whereby Hamilton retained BJC Law to represent him in a "right of publicity" case in which Hamilton would allege that the creators of the Gears of War ("GOW") video game series used his voice and likeness without authority and without compensation.  A true copy of the Engagement Letter signed by Hamilton is attached as **Exh. A**.

12.    The Engagement Letter (**Exh. A**) contemplated a lawsuit against the creators of the GOW video games, namely Epic Games, Inc. and Microsoft, Inc. (*i.e.*, Microsoft Corporation), and certain Microsoft affiliates, and Lester Speight, whom the creators of the GOW video games had publicly identified as the voiceover actor for the avatar Augusts Cole ("Cole Train") depicted in the GOW video games.

13.    In ¶ 2 of the Engagement Letter, BJC Law recited that Chasan's hourly rate for litigation matters was $450, but added: "HOWEVER, WE HAVE AGREED TO TAKE THIS MATTER ON A CONTINGENT FEE BASIS OF 40%, PROVIDED YOU [HAMILTON] ARE RESPONSIBLE FOR ALL COSTS AND EXPENSES."

14.    Also, ¶ 4 of the Engagement Letter stated BJC Law would bill Hamilton on a monthly basis (albeit Hamilton was not required to pay the monthly bills due to the contingent nature of the representation).

15.    Paragraphs 10-11 of the Engagement Letter stated in part:

10.    Special Considerations.   As stated above, this case is being handled on a contingent fee basis, with the attorney's fee being 40 percent of the net recovery (if any) obtained by verdict or settlement.  If funds are obtained in settlement or via verdict, all expenses will be reimbursed off the top.  The net left over sum will be split 60-40.    Should you reject a reasonable settlement offer against our recommendation, we reserve the right to withdraw, while retaining a quantum meruit interest in whatever verdict or settlement is later obtained.

11.    Commencement and Termination.  This engagement may be terminated at any time by any party, subject to our obligations under the Rules of Professional Conduct.  If our engagement terminates, you remain obligated to pay us in full at our regular hourly rates and/or fixed fees for all of our past services and expenses, in accordance with the terms of this letter.

16.    Paragraph 11 of the Engagement Letter also requested Hamilton to advance a $1000 retainer for costs and expenses (in connection with the filing fee and service fees for the complaint that was being contemplated, and other expenses), and as a further condition of his agreement to the

terms of the Engagement Letter, Hamilton remitted a cashier's check to BJC Law for $1000 on or about 1/8/2017.

17.   From time to time until March 2018, Hamilton remitted an additional $2100 to BJC Law to cover expenses for the services of a copy service and other vendors, that were utilized by BJC Law in the handling of Hamilton's case.  However, some of these funds were contributed by Hamilton's friends, Dr. Ray Abdallah, a Doctor of Chiropractic ("Abdallah"), and Kevin Conrad, Esq. ("Conrad"), as Hamilton often did not have the cash.

18.   As will be elaborated below, Hamilton lacked resources to fund retention of expert witnesses, pay for depositions, and/or otherwise fund the litigation through trial.

19.   BJC Law provided Hamilton with monthly invoices for several reasons, including but not limited to (a) accounting for expenses; (b) apprising Hamilton of the tasks, time and effort expended by Chasan on his behalf; and (c) supporting any potential claim for attorney's fees that might be made in the litigation pursuant to any fee-shifting statute, such as the Lanham Act.   Chasan used his customary billing rate of $450 per hour.

20.   On March 28, 2018, Beck, at the request of Pierce, emailed to Chasan a copy of a "Termination Letter" signed by Hamilton, dated March 27, 2018 (**Exh. B** hereto).   The body of this letter stated in full:

> Dear Mr. Chasan,
>
> This letter is to terminate my engagement with you, effective as soon as substitution of counsel Pierce Bainbridge Beck

Price & Hecht can be finalized.  Thank you for your efforts to date in my matter.

Please send a copy of my legal file as soon as possible to Pierce Bainbridge Beck Price & Hecht LLP 600 Wilshire Blvd., Suite 500, Los Angeles, CA 90017 [former address of PBBPH Law in Los Angeles].  This should include all hard copy materials, including any thumb drives and documents you have retained in my case.  Please send all electronic materials to john@piercebainbridge.com, carolynn@piercebainbridge.com and grace@piercebainbridge.com.

21.    As of 3/28/2018, when Beck forwarded the "Termination Letter," neither Hamilton nor PBBPH Law nor Pierce nor Beck had paid BJC Law anything for the value of Chasan's time (then over $300,000 according to invoices and timesheets), or discussed quantum meruit, or discussed a division of any proceeds that might be received via settlement or judgment.

22.    As will be elaborated in the following paragraphs, any value of Hamilton's case as of 3/28/2018 was due solely to the advocacy of BJC Law and Chasan on Hamilton's behalf.

23.    As will be elaborated below, PBBPH Law and Pierce and his partners saw an opportunity to take over the handling of Hamilton's case and seized it, without concern for fair compensation of BJC Law and Chasan.

## II.  BJC LAW'S HANDLING OF HAMILTON'S CASE BEFORE THE ARRIVAL OF PIERCE AND PBBPH LAW

24.    Hamilton first met with Chasan on 12/29/2016 at the offices of BJC Law to discuss Hamilton's case.  Chasan and Hamilton were strangers at the time.  Hamilton was referred to Chasan by another attorney.

25.    Hamilton presented Chasan with a thumb drive which included, *inter alia*, background information on his Soul City Wrestling organization (which had been active between 1996 and 2011), the involvement of Lester Speight with Soul City Wrestling in 1998, and a report by a forensic voice examiner, Tom Owen, dated 4/29/2016, concluding that the voice of "Cole Train" in the GOW video games was Hamilton's voice.

26.    The next day Chasan conferred further with Conrad, who had been advising and assisting Hamilton.  Chasan decided he would take the case and drafted an Engagement Letter.

27.    In the next few days Chasan conferred further with Conrad and Abdallah and determined that Hamilton had first discovered the use of his voice in the GOW video games on January 11, 2015.  Several tort claims that might serve as a basis for Hamilton's lawsuit had a two-year statute of limitations, which meant that Chasan would have to file Hamilton's Complaint no later than January 11, 2017 to avoid a time bar of certain tort claims.

28.    On 1/11/2017, Chasan filed Hamilton's Complaint in Federal Court in Philadelphia, relying on the Lanham Act and diversity of citizenship for Federal Court jurisdiction.  The Complaint was captioned *Lenwood Hamilton v. Lester Speight, Epic Games, Inc., Microsoft, Inc., Microsoft Studios, and The Coalition, a division or subsidiary of Microsoft, Inc.*, No. 17-cv-0169-AB.  The Complaint was assigned to Hon. Anita B. Brody, U.S.

District Judge.

29.    In preparing the Complaint, Chasan received information and materials from Hamilton, Attorney Conrad, and Abdallah.

30.    It was apparent that Conrad and Abdallah were mentoring and assisting Hamilton in every way possible.

31.    Hamilton, Conrad and Abdallah all mentioned to Chasan that Hamilton had solicited a number of attorneys in Philadelphia and elsewhere before approaching Chasan, and all had declined his case.  Law firms that had been solicited included, but were not limited to: Panitch Schwarze Belisario & Nadel, LLP; Duane Morris LLP; Caesar Rivise, P.C.; Buchanan Ingersoll & Rooney, P.C.; Zarwin Baum DeVito Kaplan Schaer Toddy, P.C.; Boies Schiller Flexner LLP; Gibson Dunn & Crutcher LLP; Sprague and Sprague; McCausland Keen + Buckman; Braverman Kaskey, P.C.; and Charles Campbell, Esq.  Some, but not all, of these law firms were disclosed to Chasan at the time of his first meeting with Hamilton.

32.    The Complaint filed by Chasan on 1/11/2017 alleged six Counts: (I) Unauthorized Use of Name or Likeness (Including Voice) in Violation of 42 Pa. C. S. A. § 8316; (II) Lanham Act, § 43(a)(1)(A); (III) Lanham Act, § 43(a)(1)(B); (IV) Unjust Enrichment; (V) Misappropriation of Publicity (*i.e.*, a common law right of publicity claim); and (VI) Invasion of Privacy (*i.e.* common law invasion of privacy count).

33.    The Complaint alleged that the GOW video games had achieved

over $1,000,000,000 in sales worldwide between 2006 and 2017.   This was based on publicly available information.

34.   Chasan promptly arranged service of process on the Defendants.

35.   Beginning 1/12/2017, Chasan began to contact third-party litigation funders to discuss funding the expenses of the case, as Hamilton lacked funds to do it himself.

36.   Also beginning 1/12/2017, Chasan began contacting damages experts to discuss how they would go about analyzing damages and what they expected the probable expense of their services was likely to be.

37.   On 1/16/2017, Chasan discussed with Hamilton and Abdallah by telephone how third-party litigation funding works, and how third-party funders invest in cases.   On that date, Hamilton signed a non-disclosure agreement with Rembrandt IP Management, LLC ("Rembrandt"), a potential third-party litigation funding organization.   Chasan, with promotional literature from Rembrandt, had explained to Hamilton how third-party litigation funders finance cases, on a non-recourse basis, but seek a 300 percent return on their investment from the settlement or judgment. Hamilton was supportive of getting a third-party litigation funder on board.

38.   On 1/19/2017, Chasan prepared an estimated budget for anticipated litigation expenses (including expert witness fees, but nothing for attorney's fees) to submit to Rembrandt.   At the time, Chasan's preliminary, good-faith estimate was $358,000.

39.   On 1/23/2017, Chasan had a telephone conversation with Abdallah in which the subjects of attorney-client privilege and waiver were discussed.  Chasan informed Abdallah that communications to Hamilton through Abdallah had to be curbed because Abdallah was neither the client nor an attorney, and his involvement almost certainly risked waiver of the attorney-client privilege.  Chasan also mentioned this concern to Hamilton.

40.   Efforts to restrict communications through Abdallah were short-lived for numerous reasons including (1) Hamilton was a frequent visitor to Abdallah's chiropractic offices in Bridgeport, PA; (2) Hamilton did not have a computer or an email address, so numerous communications from Chasan to Hamilton, and *vice versa*, were sent back and forth via emails to and from Abdallah (who would print the emails and attachments and provide them to Hamilton), and also send information to Chasan; and (3) Hamilton wanted Abdallah involved and frequently sought Abdallah's layman's counsel, as Hamilton viewed Abdallah as a trusted friend and advisor.   Hamilton conversed regularly with Abdallah (and others) about his case.

41.   On 1/24/2017, Chasan made an initial contact to Wes Anson and his colleagues at CONSOR, of La Jolla, California.  Anson and CONSOR are perhaps the most experienced U.S. experts with regard to damages in "right of publicity" cases.  Anson and colleagues had testified as expert witnesses numerous times in the prior 30 years and had written and published on the principles of valuation in "right of publicity" cases.

42.    Anson and CONSOR were interested in working on Hamilton's case, especially since the commercial success of the GOW video games hinted at a possible respectable large damages assessment.

43.    Anson and CONSOR estimated the cost of evaluating discovery, preparing expert reports, appearing at expert depositions, and appearing at trial, was likely to be between $175,000 and $250,000.  Of course, they could not predict damages with any precision before doing the work.

44.    Anson and his CONSOR colleagues forwarded to Chasan their curricula vitae, which Chasan in turn forwarded to Rembrandt.

45.    Chasan met with Hamilton and various witnesses at Abdallah's Bridgeport, PA offices on 1/24/2017.  (Chasan would later meet with Hamilton again at Abdallah's offices on at least the following dates: 2/11/2017; 2/13/2017; 2/18/2017; 3/4/2017; 3/18/2017; 1/13/2018; 1/27/2018; 3/3/2018; and 3/10/2018, always driving there in his own car).

46.    On 1/27/2017, Chasan sent information to Rembrandt concerning Wes Anson and CONSOR, and stated he would submit a revised estimated budget.

47.    On 1/30/2017, Chasan was contacted by retained counsel for Microsoft and Lester Speight, namely Elizabeth McNamara, Esq. ("McNamara"), who requested an extension until March 8, 2017 to respond to Hamilton's Complaint.  Chasan agreed.   On 1/31/2017, Chasan was contacted by retained counsel for Epic Games, namely Robert Van Arnam,

Esq. ("Van Arnam") who also requested an extension until March 8, 2017. Chasan agreed.

48.   On 1/31/2017, Chasan sent Rembrandt a revised estimated litigation budget of $570,000 to handle all expert witnesses and depositions and bring the case to trial.

49.   On 2/7/2017, a representative of Rembrandt advised Chasan that it was a "No" for Rembrandt, but he also provided contacts for four other third-party funders that might be interested.  Chasan began to reach out to other third-party funding organizations.

50.   On 2/14/2017, Chasan filed an Amended Complaint (ECF 16)[1] which was based on additional information he had obtained from Hamilton, and additional research into the GOW video games, and additional legal research.   The Amended Complaint included the same six counts set forth in the original complaint.

51.   On 2/24/2017, through an attorney friend, Chasan was introduced to another attorney who provided names of attorneys in other law firms who might be interested in serving as co-counsel with Chasan and bringing financing to the case.  Chasan began to pursue these contacts while at the same time speaking with several third-party funding organizations, in order to arrange financing for Hamilton's case.

---

[1] All references to "ECF____" in this Complaint are to docket filings in *Hamilton v. Speight, et al.*, No. 17-cv-0169-AB, assigned to Judge Brody.

52.    On 3/8/2017, Chasan served Hamilton's First Sets of Requests for Production of Documents to Epic Games, Microsoft, and Speight.

53.    Also on 3/8/2017, Defendants Epic Games, Microsoft and Speight filed a Motion to Dismiss the Amended Complaint (ECF 25) pursuant to Fed. R. Civ. P. 12(b)(6).

54.    Judge Brody had scheduled a pre-trial conference with counsel to be held on March 29, 2017.  Her procedures required Hamilton to submit a settlement demand to Defendants.

55.    On 3/22/2017, Defendants Epic Games, Microsoft, and Speight filed a motion to stay discovery (ECF 28).

56.    Notwithstanding that it was difficult to frame a settlement demand in Hamilton's case before discovery had occurred, Chasan, with Hamilton's authorization, sent a letter to Van Arnam and McNamara on 3/24/2017, communicating Hamilton's settlement demand of $7,500,000, without prejudice to revision after discovery had occurred.  Chasan stated in his letter that he believed the Defendants' motion to dismiss would be denied in part and granted in part, but with leave to amend.  Chasan predicted the case would proceed.

57.    On 3/28/2017, McNamara responded in writing to Chasan's 3/24/2017 settlement demand letter on behalf of Defendants Epic Games, Microsoft and Speight.  Among other things, McNamara stated the $7,500,000 settlement demand had taken them aback, that their motion to

14

dismiss had merit, and that they had not found any evidence whatsoever that Hamilton had anything to do with the development of the "Cole Train" character in the GOW video games.  McNamara concluded her letter, stating, "we do not believe it would be constructive to respond with an offer in response to a $7.5 million demand."

58.    Also on 3/28/2018, Chasan filed a brief in opposition (ECF 30) to the Defendants' Motion to Dismiss.   Chasan stated in the brief that Hamilton intended to amend the complaint again, assuming leave to amend would be granted.

59.    Counsel appeared before Judge Brody in her Chambers on 3/29/2017 for the scheduled pre-trial conference.   McNamara and Van Arnam also appeared and outlined the Defendants' position as to why they believed the Amended Complaint should be dismissed.  McNamara stated the parties were very far apart regarding settlement, and that trying to force negotiations at that stage would not be productive.  Judge Brody said she would grant Hamilton leave to amend his complaint again, and the Defendants could then decide if they wanted to renew their motion to dismiss.  She also stated that she would stay discovery.  After considering the parties' scheduling concerns, she issued a revised scheduling order (ECF 31) that memorialized her rulings in Chambers and set new deadlines.

60.    Chasan filed Hamilton's Second Amended Complaint (SAC) on 4/14/2017 (ECF 33).  The SAC asserted five counts, as Hamilton, on

Chasan's recommendation, decided to withdraw the Lanham Act count based on § 43(a)(1)(B).  But significantly, the SAC added allegations that Microsoft had sold the GOW video games bundled with the Xbox One console, relying on the image and voice of "Cole Train."  This allegation of commercial exploitation was devised solely by Chasan, based on research done by Chasan, and without any input from Hamilton, Conrad, Abdallah or anyone else.

61.   Defendants filed a Motion to Dismiss the SAC on 4/28/2017 (ECF 35).  Chasan filed Hamilton's opposition brief (ECF 36).  The Defendants filed a reply brief (ECF 39), and with leave of court, Chasan filed Hamilton's sur-reply brief (ECF 42).

62.   During the months Defendants' Motion to Dismiss the SAC was pending, Chasan suspended efforts to enlist a third-party litigation funder and/or a co-counsel who could bring financing to the case because, obviously, everyone wanted to know what the ruling would be on the motion to dismiss.

63.   In an Order entered December 18, 2017, Judge Brody denied the motion to dismiss (ECF 43), and she issued another order setting case management and discovery deadlines (ECF 44).  In a footnote in ECF 43, Judge Brody held there were factual issues regarding Defendants' two main contentions (First Amendment, and laches), and they could not be decided on a motion to dismiss.  Judge Brody did not dismiss any of the five counts

in the SAC.

64.     Beginning 12/19/2017, Chasan reactivated his efforts to enlist a third-party litigation funder and/or a co-counsel who could bring funding to the case.

65.     To the extent Chasan sought to enlist a co-counsel, it was always on the basis that the 40 percent contingency of any settlement or judgment would be split on an equal basis (20/20), with BJC Law and the co-counsel splitting the work evenly going forward.

66.     On 12/28/2017, Chasan had a conference call with defense counsel.  It was agreed that Defendants could have an extension until 1/8/2018 to answer the SAC; that the parties would exchange their initial Rule 26(a) disclosures on 1/17/2018; that Defendants would respond to Hamilton's First Sets of Requests for Production of Documents by 1/17/2018, and that Defendants would take the lead in drafting a confidentiality order for submission to the court.

67.     On 1/7/2018, counsel for the parties participated in a conference call with U.S. Magistrate Judge David Strawbridge (who had been designated by Judge Brody to oversee settlement discussions).  Microsoft's counsel, McNamara, stated the Defendants had strong defenses, and they were interested in pursuing discovery at that point, not an early settlement conference.  Magistrate Judge Strawbridge declined to set up an early settlement conference.

68.   On 1/8/2018, the Defendants filed their Answers and Affirmative Defenses (ECF 47, ECF 48).  Generally, they asserted Lester Speight was the voice actor for the "Cole Train" video game character, and that Hamilton was not involved and was unknown to both Epic Games and Microsoft.

69.   On 1/9/2018, Defendants served their First Set of Interrogatories and First Set of Requests for Production of Documents to Hamilton.  In the ensuing weeks, Chasan met with Hamilton several times to prepare responses to the Defendants' discovery requests.

70.   On 1/17/2018, the parties served their Initial Rule 26(a) disclosures.

71.   Also on 1/17/2018, Defendants served their objections and responses to Hamilton's First Set of Requests for Production of Documents, but no documents were physically produced at that time to Plaintiff.

72.   On 1/19/2018, Chasan served Hamilton's Second Set of Requests for Production of Documents to Lester Speight.

73.   On 1/25/2018, Van Arnam and McNamara emailed a "nasty" letter to Chasan which asserted, *inter alia*, that Hamilton's case was baseless, that Hamilton and the forensic voice expert were falsely or fraudulently asserting that Hamilton's voice was used in the GOW video games, and that Hamilton and Chasan should dismiss the case or face sanctions and/or possibly a later case for wrongful use of civil proceedings. This letter is attached hereto as **Exh. C**.

74.     On 1/26/2018, Chasan emailed a responsive letter to Van Arnam and McNamara, bluntly telling them, *inter alia*, they were a pair of bullies, that they were embarrassed because they lost their motion to dismiss, that Hamilton was sincere in his belief that it was his voice in the video games, that the forensic voice expert was also sincere in his opinions, that neither Hamilton nor the voice expert was guilty of any fraud, that the threats against Hamilton and Chasan were baseless, that Defendants could challenge the voice expert's opinions at trial, that Chasan had done nothing wrong in representing Hamilton so he could have his day in court, and that it was Defense Counsel who elected to pursue expensive discovery rather than explore an early settlement.  Further, Chasan complained that their baseless threats of sanctions and/or an action for wrongful use of civil proceedings had caused him to put his malpractice carrier on notice of a potential claim. This letter is attached hereto as **Exh. D**.

75.     Later, but also on 1/26/2018, one of Microsoft's counsel sent Chasan an email with a draft confidentiality order.

76.     Between 1/29/2018 and 2/15/2018, counsel for the parties negotiated their differences on the draft confidentiality order, eventually coming to agreement, and submitting it to the Court on 2/15/2018.   Judge Brody entered it as an Order of the Court on 2/20/2018 (ECF 50), clearing the way for the parties to exchange their document productions, with "Confidential" or "Confidential – Attorney's Eyes Only" designations.

77.    On 2/7/2018, Chasan served Hamilton's Objections and Answers to Defendant's First Set of Interrogatories and First Set of Requests for Production of Documents.  In Hamilton's Answer to Interrogatory No. 3, Hamilton identified over 50 witnesses who would testify that when they hear the voice of "Cole Train," they are hearing Hamilton.

78.    On 2/15/2018, Chasan served Hamilton's Second Set of Requests for Production to Microsoft.   This set of document requests focused mainly on the volume and value of sales of the GOW video games bundled with the Xbox One console, and also "Cole Train" merchandise and memorabilia, such as figurines.

79.    During February 2018, counsel for the parties discussed a proposed extension of discovery deadlines.  There was agreement that there should be an extension, but disagreement as to how much of an extension there should be.  Plaintiff Hamilton sought more generous extensions, and the Defendants wanted them shorter.

80.    On 2/16/2018, Chasan mailed a letter to Judge Brody with a proposal for an extension of discovery deadlines (also stating Defendants' position), and emailed copies to the Judge's law clerk and opposing counsel.

81.    On 2/20/2018, Speight served responses to Hamilton's Second Set of Requests for Production of Documents to Speight.

82.    On 2/22/2018, Defendants filed a letter agreeing to the proposed extensions suggested by Chasan (ECF 52).  Their agreement was

motivated in part by the fact that Chasan had fractured a rib on 2/19/2018 in a fall while skiing.

83.   On 2/26/2018, the parties exchanged their document productions.  Chasan sent identical thumb drives of Hamilton's and the voice expert's materials to counsel for Epic Games and Microsoft, and also to their local counsel.  Van Arnam sent a thumb drive with Epic Games' document production.   Microsoft counsel sent an external hard drive with Microsoft's document production.  All parties marked numerous documents "Confidential" under the Confidentiality Order.

84.   On 2/27/2018, Chasan reviewed Epic Games' document production and was concerned that Epic Games had not made a complete production.

85.   On 2/28/2018, Chasan prepared Hamilton's Second Set of Requests for Production to Epic Games and served it.

86.   On 2/28/2018, Judge Brody entered an amended scheduling order (ECF 53) which set June 29, 2018 as the close of fact discovery, and July 16, 2018 as the deadline for Plaintiff's expert reports.  These were the dates suggested by Chasan and agreed to by Defendants.

87.   On 3/1/2018, Chasan sent a "meet and confer" letter to Van Arnam complaining about perceived deficiencies in Epic Games' document production.

88.   On 3/2/2018, Chasan began reviewing Microsoft's document

production, but needed assistance in navigating the materials on the external hard drive.  Chasan arranged a conversation on 3/5/2018 with a paralegal working for Microsoft to discuss accessing Microsoft's documents.

89.    As of 3/2/2018, Chasan had contacted numerous third-party litigation funders about funding Hamilton's case, and had provided pertinent case materials including pleadings, the briefing on the motion to dismiss, the order denying the motion to dismiss, information about CONSOR and Wes Anson as the potential damages experts, and the parties' non-confidential discovery responses.

90.    Chasan could not tell the third-party litigation funders exactly what the potential damages were because the expert analysis had not yet been done.  This made it difficult for the third-party litigation funders to evaluate the risk-reward potential of the case.

91.    As of 3/2/2018, Chasan had been turned down by the following third-party litigation funders:  Rembrandt, Lake Whillans, Burford, Therium, Bentham IMF, Lex Shares, Contractor Litigation Funding, Woodsford, and Benchwalk.   Benchwalk had been located through Hamilton's own efforts.

92.    As of 3/2/2018, Chasan had discussed bringing in co-counsel with funding with approximately seven different law firms, on the basis of evenly splitting the contingency fee of any settlement or judgment but had been unsuccessful.  But as of 3/2/2018, one of the law firms was still considering it, and was doing its due diligence investigation.

93.    Between 12/19/2017 and 3/2/2018, Chasan concentrated efforts on soliciting five different law firms across the United States, including: (a) Diamond McCarthy LLP; (b) Massey & Gail LLP; (c) Susman Godfrey LLP; (d) Siprut P.C.; and (e) Ruyak Cherian, LLP.   As of 3/2/2018, the only one of these five law firms still considering it was Ruyak Cherian, LLP.

94.    To assist the solicited law firms in their due diligence evaluations, Chasan arranged for separate conference calls for three of them with Wes Anson and other CONSOR personnel to discuss how CONSOR would go about evaluating damages in Hamilton's case, based on discovery to be produced by the Defendants, if CONSOR was retained.

95.    As of 3/2/2018, and to the best of Chasan's knowledge, the Defendants were totally unaware of his efforts to enlist a third-party litigation funding company and/or co-counsel who could provide funding for Hamilton's case, and were also unaware of his lack of success.

96.    On 3/3/2018, Chasan met with Hamilton at Abdallah's office and discussed the status of discovery and other matters.

97.    On 3/7/2018, an attorney from Ruyak Cherian, LLP contacted Chasan and advised they were declining, but he gave Chasan the name of Eva Shang at Legalist, Inc. (and her email address), another third-party litigation funder, who he thought might be interested.

98.    Chasan sent Eva Shang an email on 3/7/2018 stating he was referred to her by the attorney at Ruyak Cherian, LLP and wanted to set up a

phone call to discuss Hamilton's matter.

99.    Also on 3/7/2018, Chasan received an unsolicited voice mail message and an unsolicited email from an in-house attorney at Microsoft, Isabella Fu, Esq., who wanted to discuss the case with Chasan.

100.   Chasan returned the call to Isabella Fu.  Ms. Fu stated she wanted to open a dialog about resolving the case.  She was apologetic about the "nasty" letter sent by Van Arnam and McNamara on 1/25/2018, and she wanted to put it behind and start fresh.  She stated that if a reasonable number could be agreed to, there was a possibility of Microsoft settling the case.  She also stated that if the Plaintiff wanted an excessive number, there would be no choice but to keep litigating.   The conversation was cordial and productive, and Chasan stated he would meet with his client the next Saturday (March 10) and get back to Fu the next week.

101.   Later, also on 3/7/2018, Chasan received an email from Eva Shang inquiring about setting up a telephone call the next day.  Chasan responded by email, confirming his availability, and sent Shang and her Senior Legal Assistant, Shannon Lingren, PDF copies of the SAC (and all of its exhibits) (ECF 33), the order denying the motion to dismiss (ECF 43), and the revised case management order (ECF 53).

102.  On 3/8/2018, Shannon Lingren contacted Chasan by phone and discussed Hamilton's case.  As a result of the conversation, Chasan emailed additional materials to Lingren including BJC Law's Engagement Letter with

Hamilton, Wes Anson's CV and other information about CONSOR, all the memoranda of law in support of and opposing the motion to dismiss (ECF 35, ECF 36, ECF 39, ECF 42), Hamilton's Rule 26(a) Initial Disclosures and discovery responses, the Defendants' Answers (ECF 47, ECF 48), and the "nasty" correspondence exchanged between counsel on Jan. 25-26, 2018.

103.  On 3/10/2018, Chasan met with Hamilton in the presence of Abdallah at Abdallah's chiropractic offices in Bridgeport, PA.  Chasan explained that the overture from Microsoft's in-house counsel presented a chance to settle the case and get something for it, especially since up until then Chasan had had no success in enlisting the aid of a third-party funding company.  Chasan also explained that without funding, there was no chance of getting a competent expert witness on damages before the close of discovery, and then Hamilton would be facing summary judgment and/or outright dismissal of his case.  Chasan proposed submitting a demand to Microsoft's in-house counsel of $950,000, explaining he doubted it would be accepted, but he felt it would be low enough to invite a counter-offer, and the parties could negotiate something in between.

104.  Hamilton, in Abdallah's presence, was not receptive to Chasan's analysis or suggestions.  Hamilton stated his case was worth millions and millions, and he would not authorize any settlement demand of less than $7,500,000.  Chasan said that that was the prior demand in March 2017, and it was promptly rejected then, and it would be rejected again, and there

would be no counter-offer.  Chasan stressed that the demand had to be low enough to invite a counter-offer, as otherwise the settlement negotiations would shut down immediately, and Hamilton would have no path forward. Chasan stressed that Microsoft had opened the door to settlement, and Hamilton's posturing would slam it shut.

105.  The discussion between Chasan and Hamilton (in Abdallah's presence) got heated and palpably angry.  Chasan thought Hamilton was being foolish and said so.  Chasan threatened to write a letter to Judge Brody asking for permission to withdraw based on a "fundamental disagreement" with his client.

106.  Later, also on 3/10/2018, Chasan did draft a letter to Judge Brody and sent it via email to Abdallah to give to Hamilton.  However, Chasan never did send it to Judge Brody, and hoped the draft letter by itself would encourage Hamilton to be more realistic.

107.  Soon after the 3/10/2018 argument between Chasan and Hamilton, Hamilton began to "pound the pavement" in the Philadelphia area in search of another attorney who would step in and take his case to trial, seeking the millions and millions he thought it was worth.  This effort by Hamilton began immediately after the 3/10/2018 meeting with Chasan, and continued until March 19, 2018.  He did not get anyone.

108.  On 3/12/2018, Chasan wrote another letter (**Exh. E** hereto) to Hamilton, which he emailed to Abdallah to give to Hamilton, to memorialize

the discussion and argument they had had on Saturday, March 10, regarding settlement.  Portions of the letter were blunt.  But among other things, Chasan said he would not seek to withdraw because Legalist, Inc. still had the request for financing under consideration.  Abdallah advised that Hamilton did not pick up the letter for several days.

109.  Notwithstanding the friction between Chasan and Hamilton, Chasan, in pursuit of diligent efforts on Hamilton's behalf, reached out to Legalist, Inc. personnel on Monday, 3/12/2018 to ascertain the status of their evaluation.

110.  Also, on 3/12/2018, Chasan had another telephone call with Eva Shang and Shannon Lingren of Legalist, Inc. regarding details of Hamilton's case.  Shang said she had in mind introducing Chasan to another attorney to partner with.

111.  Also, on 3/12/2018, Chasan emailed a message to Isabella Fu, Microsoft's in-house counsel, stating the he did not yet have a number from Hamilton.  What Chasan meant, but did not actually write, was that he did not have a number from Hamilton that would further settlement negotiations.

### III.  THE COMING OF JOHN PIERCE AND PBBPH LAW

112.  On 3/13/2018, Eva Shang sent an email to Chasan, stating: "Just introducing you to John Pierce.  He's got an impressive resume and has dealt with many high profile cases in the past.

www.pierceburnsllp/team/john-m-pierce.php.  I'll let you two connect from here."  Shang copied Pierce on the email.   As reflected in Pierce's email address, he was with Pierce Burns LLP.

113.   Later, also on 3/13/2018, Chasan had a 20-minute phone call with Pierce and his partner Beck about Hamilton's case and the need for third-party funding.  Chasan stated he was willing to work with a co-counsel on the basis of a 20/20 split of the 40 percent contingency if the co-counsel could bring funding for the case.  Pierce said he was interested, and also stated he would contact Shannon Lingren to request that she forward the materials that Chasan had sent to Legalist, Inc.

114.  On 3/14/2018, Pierce sent Chasan an email, stating: "We are definitely interested in partnering up with you on this case.  Do you have time for a call around 4 pm or so to discuss further?  I can definitely help on the litigation finance front working with Legalist and/or other funders."

115.  Chasan responded he was available at 4 PM, and Pierce replied, copying his partners Price and Beck, who would likely join the call.

116.   As a result of Pierce's interest, Chasan shelved the dispute he had had with Hamilton over settlement possibilities, and intended to join the call with Pierce, Price and Beck to present Hamilton's case favorably, but also with honesty in view of the risks.

117.   At the time of the 4 PM conference call with Pierce, Price and Beck on 3/14/2018, it was clear that Pierce and colleagues had read a lot of

materials forwarded by Chasan to Legalist, Inc.   Pierce and colleagues were enthusiastic to get on board.  Price mentioned that he was familiar with the GOW video games and the "Cole Train" character.  Chasan discussed the need for a top-notch damages expert and mentioned his contacts with Wes Anson and CONSOR.  Chasan said that CONSOR needed a $25,000 retainer, albeit the work on an expert report might run between $175,000 and $250,000.   Chasan said he estimated the expenses to bring the case to trial were between $400,000 and $500,000.  Chasan also mentioned the case management order and discovery deadlines and emphasized there was no time to lose.  Chasan and Pierce agreed to get back in touch with Eva Shang at Legalist, Inc.

118.  On 3/15/2018, Chasan emailed a message to Eva Shang that he and Pierce were ready to move forward, and they wanted to finalize arrangements with Legalist, Inc.  Chasan copied Pierce on the email.

119.  Later, on 3/16/2018, Eva Shang responded with an email apologizing for the confusion, and stating "We [Legalist, Inc.] are at present not able to fund the case because of the uncertain damages proposition and the high request, which is why we made the introduction to John, who would be able to help lift some of the burden off you as co-counsel instead." Shang copied Pierce on the email.

120.  Later, on 3/16/2018, Pierce emailed Chasan stating that his firm could advance the funding, and that he had other sources of funding as well,

and he would draft an Engagement Agreement to reflect this.

121.   Chasan was very pleasantly surprised by Pierce's enthusiasm, especially because in the 48 hours that Pierce had been looking into Hamilton's case, he could not have had the time to do the extensive due diligence that five other law firms did in declining Chasan's efforts to recruit their participation as co-counsel.  For example, Pierce did not speak with Wes Anson and CONSOR personnel to get their insights into the damages evaluation.

122.   Later, on 3/16/2018, Pierce and Chasan had a telephone conversation.  Pierce said he would be in New York City on March 19 for a mediation, and he would like to go to Philadelphia on March 20 to meet with Chasan and Hamilton and get an Engagement Agreement signed.

123.   Chasan followed the conversation with an email on 3/16/2018 supplying Pierce with some sample motions for *pro hac vice* admission to the Federal Court in Philadelphia, and he urged speedy preparation of the *pro hac vice* motions, in view of the 6/29/2018 discovery deadline.   Chasan said he was looking forward to reviewing with Hamilton the draft Engagement Agreement that Pierce would send.   Chasan mentioned the necessity of sending a $25,000 retainer to CONSOR, so that the damages experts could get started.

124.   Pierce responded with an email on 3/16/2018 stating he intended to send a draft Engagement Agreement that day, and that he could

get the $25,000 retainer wired to CONSOR by the end of the month, if not before.

125.  At 7:08 PM EDT on 3/16/2018, Pierce emailed the draft Engagement Agreement to Chasan.  A copy is attached as **Exh. F**.  It stated it was an engagement between Hamilton and Pierce Bainbridge Beck Price & Hecht LLP.  Pierce stated in his email: "Looking forward to getting on board with you!"  Pierce followed with another email, explaining: "Note our firm name is changing due to our extraordinary growth.  The new web site will go live next weekend."

126.  Chasan emailed the draft PBBPH Law Engagement Agreement to Abdallah and Conrad and requested that Abdallah supply it to Hamilton, and let Hamilton know that there is now a source of funding, and that Chasan needed to meet with Hamilton on 3/17/2018.

127.  After a preliminary review of the draft PBBPH Law Engagement Agreement, Chasan emailed some comments to Pierce on 3/16/2018, including that it "should probably state how it dovetails with my agreement with Hamilton."  This was mentioned because the draft Engagement Agreement stated PBBPH Law would get a 20% contingency of the net recovery, but it made no mention of BJC Law's Engagement Letter with Hamilton.  Pierce followed with another email stating that changes could be made easily, and it could specify dovetailing.   He added: "Feel free to redline."

128.   Chasan sent Pierce an email on 3/17/2018 with detailed comments on the draft Engagement Agreement and attached copies of BJC Law's Engagement Letter with Hamilton, and the Court's Confidentiality Order (ECF 50).  Chasan made the following comments (among others):

> 1.  It's really a three-way agreement, not a two-way agreement.  Reading my EL [Engagement Letter] and your EA [Engagement Agreement] together, Skip gives up 40 percent to me and 20 percent to you.  Now that is not what we intend.  So we have to make it read like we intend…..
>
> 2.  One area of conflict is Para. 10.  You provide the client has the absolute right to accept or reject a settlement.  My EL states that if he refuses a settlement offer that I recommend, I have the right to withdraw.  So we have to harmonize this…..
>
> 5.  On communications with the client, Skip does not own a computer, and does not have an email account.  He has a smart phone, but all email communications are routed thru Ray Abdallah's chiropractic office.
>
> 6.  Who is the primary contact with Skip going forward?  Me or you?  This is something on which we have to be on the same page.  We don't want disputes based on Skip saying Chasan told me X but Pierce told me Y.  (See para. 4 of your draft EA.)….
>
> 8.  On paragraph 8, costs and expenses, Hamilton to date has paid out about $6700 in costs.  Would you reimburse that?  If not, probably you should have a sentence excluding his advances (but noting he gets his expenses reimbursed from a settlement or judgment off the top).
>
> 9.  Also on paragraph 8, I think you should mention that estimated expenses to take the case to trial are $400,000 to $500,000.  If I were you, I would ask for a 150 percent return on your advances to compensate for the risk.  Frankly, I think Skip would accept that, because he knows litigation funders get 300 percent return.

10.     You should probably put in a term that you reserve the right to transfer the expense disbursements to any willing third-party funder, and the client should expect the third party funder to expect a return of 300 percent.

11.     You should probably have a sentence that the advances of expenses are without recourse if (unhappily) the case goes south.

12.     On conclusion of services, you should probably mention that client is not entitled to receive the defendants' confidential documents that are produced in discovery under the Confidentiality Agreement.  See attached Confidentiality Agreement.

129.  Chasan did not meet with Hamilton on 3/17/2018 and was unable to reach him by phone.  However, Conrad was able to reach Hamilton on 3/19/2018, and advised Chasan that Hamilton wanted to bring his friend John Henderson (who is not an attorney) to the meeting with Pierce on 3/20/2018, but Henderson was unavailable, so Hamilton wanted the meeting postponed.  Chasan requested Conrad to tell Hamilton that Pierce was coming from California, that the meeting could not be postponed, and he should not bring anyone to the meeting who was not his attorney.  Conrad relayed this message.

130.  Microsoft's in-house counsel Isabella Fu emailed Chasan on 3/19/2018, requesting whether there was any update from Hamilton. Chasan, aware of the scheduled meeting with Pierce on Tuesday, March 20, responded to Fu: "Nothing yet.  There may be something by Wednesday or Thursday."

131.  Chasan reached Hamilton by phone at about noon on

3/20/2018.  Hamilton confirmed he would be at the meeting with Pierce later that afternoon but stated he might bring someone.  Chasan said he should not bring anyone who was not his attorney.

132.  Hamilton arrived at Chasan's office at about 3:00 PM on 3/20/2018, accompanied by his friend Troy Davis.  Davis is not an attorney, but Hamilton said he wanted Davis there to take notes.   Davis had been listed as a potential lay person voice identification witness in Hamilton's answers to interrogatories.

133.  Pierce arrived at Chasan's office approximately a half hour after Hamilton and Davis, and all four met in the office suite conference room for approximately 90 minutes.  Particulars of Hamilton's case were discussed, and particulars of the Engagement Agreement were discussed.  Pierce stated his firm was capable of advancing $400,000 to $500,000 for litigation expenses, even if a third-party litigation funder was not located.  Pierce stated his firm would likely reimburse Hamilton for the $6700 in expenses that Hamilton had funded to date.  (The $6700 included over $3500 that Hamilton had paid his voice identification expert, Tom Owen.)  Hamilton reacted well to Pierce, and Pierce acknowledged the Engagement Agreement needed revision.  Davis listened, but did not take any notes.

134.  After Hamilton and Davis left Chasan's offices, Pierce asked if there was a notary present in the suite who could attest his signature on a contract.   There was, and the notary did attest Pierce's signature on the

contract that Pierce provided.  Chasan was present when the contract was signed and attested.  Pierce asked Chasan to scan the contract and email it to him as a PDF, and Chasan did so.     The particular contract is attached as **Exh. G**.  It is a contract between Pravati Capital, LLC and PBBPH LLP, and is titled "Law Firm Legal Funding Contract & Security Agreement."  Chasan did not read it at the time.  Soon thereafter, Pierce left for the Philadelphia airport.

135.  Later in the evening on 3/20/2018, Microsoft's counsel served Microsoft's Objections and Answers to Hamilton's Second Set of Requests for Production of Documents to Microsoft.   Chasan did an initial review of Microsoft's responses, and then forwarded the document via email to Pierce, stating he was not satisfied with Microsoft's responses to Requests Nos. 2, 6, 7, 18 and 19, as Microsoft stated it would not fully respond to those requests.

136.  On 3/21/2018, Chasan drafted a "Meet-and-Confer" letter to Microsoft's counsel, in connection with Microsoft's objections to Hamilton's Second Set of Requests for Production, as a preliminary to any discovery motion.  Chasan emailed the draft letter to Pierce, stating he wanted to send it out by March 23, but he also wanted to give Pierce an opportunity to review it and make comments, as they would be working together.

137.  Hamilton left Chasan two voicemails early on 3/22/2018, stating he wanted to have another conference with Pierce and Chasan and his

"team," which would include John Henderson, his publicist, Jonathan Bridges (a financial advisor), and his friend Nicholas Epps.  After discussing all issues in a conference call or another meeting, he wanted to make the decisions relating to his case.   He also said he had left a voice mail for Pierce.

138.  Later, on 3/22/2018, Chasan spoke by phone with Pierce, and expressed concern about Hamilton wanting to bring in his "team" of non-lawyers.  They also talked about revising the engagement agreement, and getting it finalized, and Pierce said he intended to make revisions that day.

139.  Later, on 3/22/2018, Chasan reached Hamilton by phone. Hamilton confirmed he wanted his "team" involved, but Chasan stated he should rely solely on his lawyers.  Hamilton said he would be able to sign the revised engagement agreement as soon as Pierce sent it.

140.  As of 3/23/2018, Chasan had not received a revised engagement agreement from Pierce, nor had he received any comments on the draft "meet and confer" letter to Microsoft counsel.  Chasan emailed Pierce requesting the status, and Pierce responded late in the day that he was swamped but would get to it later that evening or the next day.

141.  Also on 3/23/2018, Isabella Fu emailed Chasan again asking if they could talk Monday (March 26).  She stated: "I think it would be good to talk before further investment in this case."  Following exchange of emails on scheduling, Chasan and Fu agreed to speak at 11:30 AM EDT on Tuesday, March 27.

142.  On 3/24/2018 at 12:50 EDT, Pierce emailed Chasan, stating: "I need to be out on the East Coast again next week.  Can I swing by your office first thing Monday to nail everything down?  Will review meet and confer letter this weekend."   Chasan responded that he had an appointment Monday morning, but he was available beginning at 2 PM, and asked Pierce to send the revised draft engagement agreement ASAP.

143.  Chasan sent Pierce another email on 3/25/2018, stating: "We need to finalize the agreement.  We cannot expect any agreement from defendants on another discovery extension.  Just over three months to go.  No more time to lose.  Make it short and simple.  Incorporate my engagement letter and put in the bare minimum to make it work.  Thanks."

144.  Pierce responded via email on 3/25/2018: "I will look at letter today so we can get [it] out tomorrow but let's nail down engagement stuff in afternoon in person. Can we meet at your office at something like 2 pm just me and you for a couple hours?"  Chasan replied, "Yes."

145.  Pierce arrived at Chasan's office shortly after 2 PM EDT on March 26.  He did not have a revised engagement agreement.  He stated he had had telephone conversations with Hamilton, and Hamilton wanted him to take over the lead on the case.  It was unclear whether Chasan would remain as local counsel, but that possibility was discussed, and various scenarios were discussed concerning the division of the contingent fee.  Chasan explained to Pierce that Hamilton's recent dissatisfaction with

Chasan stemmed from their disagreement over how to posture a settlement demand in response to the overture from Microsoft's in-house counsel. Chasan allowed Pierce to listen to a number of voice mail messages from Hamilton in which Hamilton complained that a million dollars was not good enough, and he needed a much more substantial sum.  Chasan also gave Pierce a copy of his 3/12/2018 letter to Hamilton (**Exh. E,** hereto).

146.    Chasan also explained to Pierce the considerable professional efforts he had made on behalf of Hamilton, and he provided Pierce with the BJC Law monthly invoice to Hamilton, dated 3/8/2018, for accrued fees as of 2/28/2018, showing $295,127.35 owed to BJC Law.

147.  Chasan stated that despite his disagreement with Hamilton on how to posture settlement negotiations, he had diligently presented Hamilton's case to Legalist, Inc., and to Pierce, in an effort to secure litigation funding.

148.  Chasan told Pierce he had solicited approximately 10 third-party litigation funders, and all had turned him down.  Chasan named many of the third-party litigation funders, and Pierce said he was unfamiliar with Benchwalk, and wrote it down for future reference.

149.  On the merits of the case, Chasan told Pierce that the Defendants had evidence that Speight was the actual voice over actor for "Cole Train," and thus Hamilton's case most likely had to be postured as a "sound alike" case, alleging that Speight had imitated Hamilton's voice.

150.  The engagement agreement was not finalized.  The "meet-and-confer" letter was not finalized.

151.  Chasan mentioned that he had a scheduled call to Microsoft's in-house counsel, Isabella Fu, the next day, and suggested he needed to postpone it.

152.  Chasan and Pierce walked over to the Marathon Grill at 16th and Sansom Streets in Philadelphia to get a bite to eat.  Pierce discussed working with Chasan on other matters in the future.   Pierce invited Chasan to consider joining his growing firm as a contract attorney or employee.  Pierce stated he was looking to bolster his staff of attorneys with additional experienced litigators.

153.  Pierce departed Chasan's offices later in the afternoon on 3/26/2018, stating he was taking Uber to the Philadelphia airport.

154.  Later, on 3/26/2018, at 7:33 PM, *The American Lawyer* posted an article online, titled "Ex-Big Law Partner's Boutique Has Both a New Name, Office," by Meghan Tribe (**Exh. H**).  The article featured a photograph of Pierce and described his prior sojourns with K&L Gates and Quinn Emanuel, and stated his new firm, now known as Pierce Bainbridge Beck Price & Hecht "has set up shop in New York after adding former Jones Day and Quinn Emanuel associate Maxim Price…."   It stated Pierce's boutique had "brought on Beverly Hills-based solo practitioner James Bainbridge."

155.  *The American Lawyer* article also stated Pierce had left K&L

Gates in 2016 to form Pierce Sergenian, "a boutique seeking to make a name for itself on several high stakes contingency matters, including a battle against Snapchat….."

156.  *The American Lawyer* article also stated Pierce Sergenian had "struck a deal with Scottsdale, Arizona-based litigation financier Pravati Capital to become perhaps the first public example of a litigation funder investing in a firm's current and future contingency fee cases that it has against large companies like Snap."

157.  *The American Lawyer* article quoted Pierce: "[We're] being very aggressive in taking big contingency fee cases using litigation funding in a pioneering way, which we're doing."

158.  *The American Lawyer* article also quoted Pierce on the expansion plans of PBBPH Law: "We're looking for Navy Seal, Army Ranger types – really aggressive litigators who want to be on a great platform and litigate great cases."

159.  The "Pierce Bainbridge Trial Lawyers" web site went "live" on or about 3/26/2018.   Pierce's biography on the web site (**Exh. I**) stated he was the managing partner and quoted several articles extolling his acumen as a trial lawyer.  It also stated: "Mr. Pierce has successfully handled contingent and alternative fee matters, often working with third party litigation funders who assist individual and corporate clients to finance large, meritorious plaintiff-side claims."

160.  On 3/27/2018, Chasan emailed Isabella Fu, stating that he had to postpone their scheduled conference call due to an emergency.  It was a pretext, but Chasan had nothing to propose.   Chasan also emailed to Pierce, stating, *inter alia*, he had postponed the call with Ms. Fu, and adding: "Of course, I still did not send the Meet-and-Confer letter that I had intended to send last Friday.  Getting a speedy resolution of the representation issues with Skip Hamilton is an absolute necessity, as every minute of delay prejudices his ability to complete discovery [to] put on an effective case."

161.  Later, on 3/27/2018, Chasan sent another email to Pierce stating: "I am still his only counsel of record.  I am well aware of the case management deadlines and discovery deadlines.  I would have sent the Meet and Confer letter to Microsoft last Friday, but delayed to give you an opportunity to review and provide any input.  I wasn't expecting a lot of input, but I wanted to give you the courtesy….   So tomorrow I am sending [Microsoft trial counsel] Ambika Doran the Meet and Confer letter and I will remind her that the document production is overdue.   I see no reason to delay any more, especially when I have no idea how long it will take to sort out Plaintiff's arrangements."

162.  Pierce responded that evening with an email of his own, stating: "Hi Bruce. Sorry for the delay in responding.  Skip has actually decided to cut ties altogether.  He has signed a letter terminating the engagement and would like us to take things over, including revising and sending the meet

and confer letter.  He has asked me to send the termination letter along, which I will do tonight or first thing in the morning."

163.  The next morning, 3/28/2018, Beck emailed Chasan, attaching Hamilton's termination letter (**Exh. B**).  *See ante*, ¶ 20.

164.  Hamilton's termination letter made no provision for payment of BJC Law.

165.  In transmitting Hamilton's termination letter, neither Pierce, Beck, nor PBBPH Law made any provision for any payment to BJC Law.

166.  Neither Hamilton, Pierce, Beck nor PBBPH Law made any provision for division of a contingency fee with BJC Law in the event of a verdict or settlement of Hamilton's case.

167.  On 3/28/2018, after receipt of Hamilton's termination letter, Chasan sent the following email to Beck and Pierce:

Carolynn and John,

1.     Most of my file is electronic.   Probably the way to do this is to copy it to an external hard drive and send you the hard drive.  However, there is a problem.  My file includes the defendants' confidential document productions.  I cannot forward those materials to you until you have entered your appearances.  Otherwise I would be in violation of the Confidentiality Order.  In any event, I would want payment for my time and expenses.

2.     There are some paper materials that can be boxed and shipped.  But again, I want payment for my time and expenses.

3.     There is another problem, and a bigger problem.  Per my Engagement Letter with Mr. Hamilton (copy attached), he is "obligated to pay us in full at our regular hourly rates and/or fixed fees for all of our past services and expenses."  See paragraph 11.  Skip's Termination Letter does not address how

he will accomplish this.    In my meeting with John on Monday
[March 26], we discussed in general terms a buyout, but did not
put anything down in writing.  So we need to discuss this, and
very fast.    I may be amenable to releasing all claims against
Skip and Pierce Bainbridge in return for full payment of my law
firm's outstanding invoices and current billings (currently
estimated to be between $320,000 and $330,000).

4.    I anticipate that even after you receive my file, you will
need to speak to me about particulars in the file for a period of
time, perhaps a month or more.  That could be very time
consuming on my part.  I am amenable to working with you as
needed, but at sufficient hourly rates.

So, John, let's continue the discussion we started on Monday,
and work this out.   Thanks.

168.  It was unknown to Chasan at the time, but Chasan learned later

from Conrad that Pierce had had a meeting with Hamilton and his "team"

(reportedly including John Henderson and Nicholas Epps) at the Marriott in

West Conshohocken, PA on or about 3/26/2018.  Pierce did not mention this

to Chasan.

169.  Conrad also reported to Chasan in due course that Pierce had

paid Hamilton approximately $6700 for his litigation costs (including

reimbursement of the $3500+ fee paid to Tom Owen, the forensic voice

expert), and had set him up with an email account (and presumably a

computer), and paid for temporary housing for Hamilton in Los Angeles,

where he could work with Hamilton near his offices.

170.  On 3/29/2018, Isabella Fu emailed Chasan again about possible

settlement, and inviting Chasan to get in touch.  Chasan responded to the

email that day as follows: "Thank you for your patience.  I am sorry I have

to be so obtuse (assuming 'obtuse' is a word that fits the situation).  At this time Mr. Hamilton has not authorized me to communicate a settlement demand.  I don't know what else to say."

171.   On 4/2/2018, Chasan emailed Pierce and Beck a copy of Hamilton's invoice for the month of March 2018, showing an outstanding cumulative indebtedness of $319,240.78.  In another email sent that day, Chasan again requested Pierce and Beck to resolve the issues mentioned in Chasan's 3/28/2018 email. *See ante*, ¶ 167.

172.   On 4/4/2018, Pierce sent an email to Chasan, with a copy to Beck, stating: "I have an idea for wrapping up your engagement, and we need to get admitted and substituted in. We will reach out to Microsoft's counsel as well. What time works for you prior to 12:30 pm Eastern?"

173.   Pierce called Chasan later on 4/4/2018.  He said PBBPH Law did not have the money to pay Chasan's fees, but he had an idea.  The idea was to purchase an insurance policy that would fund Chasan's fees at the conclusion of the case.

174.   To Chasan, Pierce's statement, that his firm did not have the money to pay the attorney's fees of BJC Law, was inconsistent with his representation that the firm would fund $400,000 to $500,000 in litigation expenses to take Hamilton's case to trial.

175.   After the call, Pierce sent an email to Brett McDonald and James Blick of The Judge Global Group, copying Chasan, and stating: "Would like

you to explain ATE products to him [Chasan]. We are taking a case over from him (that Gears of War case I sent you the WaPo article on), and I want to help client find a way to make sure the value of his time is compensated. I think an ATE policy may be at least a part of a potential solution here. Also, can you please shoot to Bruce some literature on ATE insurance generally and perhaps on The Judge as well?"

176.   On 4/5/2018, Chasan had a brief conference call with Van Arnam and McNamara in response to their request to discuss the next steps in discovery. McNamara advised she had received a voice mail message several days before from Carolynn Beck advising that there would be a substitution of counsel. Chasan stated it was his understanding that it would be a complete substitution.

177.   On 4/5/2018, Chasan had a 45-minute telephone call with Messrs. McDonald and Blick and came away with the impression that the types of insurance they marketed were not a solution for payment of Chasan's legal fees. But they mentioned that Pierce had not yet submitted an application, so nothing had been submitted to underwriting.

178.   Later, on 4/5/2018, Chasan sent an email to Pierce with a memo summarizing the outcome of his conversation with Messrs. McDonald and Blick. As the insurance avenue did not look promising, Chasan suggested that PBBPH Law and its partners pay the $319,240.78 in unpaid fees, but on an instalment basis over 12 months, and with personal

guarantees of the partners.   Chasan offered to give PBBPH Law and its partners a full release.  Chasan also proposed venue for any collection suit in Philadelphia, with the creditor having the right to be awarded reasonable attorney's fees.

179.   Chasan stated in the 4/5/2018 memo that if PBBPH Law was willing to finance the case with $400,000 to $500,000 of funding, for a 20 percent stake in the contingency, then the firm should be willing to pay an additional $320,000 to BJC Law for a full 40 percent stake in the contingency.

180.   On 4/9/2018, Chasan emailed Pierce regarding the status of the request for payment of attorney's fees, but Pierce did not respond.

181.   On 4/11/2018, McNamara emailed Chasan that she had had a conversation on 4/9/2018 with Beck, and Beck confirmed there would be a substitution of counsel.

182.   On 4/12/2018, Brett McDonald emailed Chasan, in response to Chasan's inquiry, that Pierce had not yet submitted an insurance application, and he (McDonald) believed the attorney's fee indebtedness would not be insurable.

183.   On 4/12/2018, Chasan emailed Pierce and Beck inquiring, *inter alia*, about payment of his attorney's fees, when they intended to enter their appearances in Hamilton's case, and requesting to set up a telephone call. Neither Pierce nor Beck responded.

184.   On 4/19/2018, Chasan emailed Pierce and Beck again, inquiring whether they intended to resolve the attorney's fees issue amicably.  This time Pierce responded, stating that his firm had no contractual relationship with Chasan, and anything he did to assist Chasan in getting paid was "gratuitous."  As a result of this exchange, which was obviously impolite, Chasan concluded that Pierce and PBBPH Law had no intentions of paying his attorney's fees.

185.   On 4/20/2018 two attorneys from Stradley Ronon Stevens & Young, LLP (Joe N. Nguyen, partner, and Benjamin E. Gordon, associate), of Philadelphia, entered appearances for Lenwood Hamilton (ECF 54, ECF 55).

186.   Based on custom and practice, it is inferable that the Stradley Ronon attorneys would not be working on contingency, but instead at hourly rates, and would earn substantial attorney's fees while working as local counsel for Hamilton.

187.   According to their respective law firm web sites biographies, both Joe N. Nguyen and Beck are members of the National Asian Pacific American Bar Association, and it is thus inferred that their participation in that organization led to the referral of the Hamilton case to Nguyen.

188.   Hamilton has no resources to pay hourly rates; it is therefore inferred the Stradley Ronon lawyers were retained directly by PBBPH Law.

189.   On 4/26/2018, the Stradley Ronon attorneys filed motions for *pro hac vice* admission in Hamilton's "right of publicity" case for Pierce, Beck

and Price (ECF 56, ECF 57, and ECF 58), respectively.  Later they would do so for other PBBPH lawyers, including Hecht (ECF 93, 94).

190.  On 4/26/2018, Chasan filed his Withdrawal of Appearance on behalf of Hamilton (ECF 59).

## IV.  THE PRAVATI – PBBPH LAW AGREEMENT

191.  While the Pravati - PBBPH Law Agreement (**Exh. G**) is attached as an exhibit to this Complaint, and speaks for itself, certain key provisions are summarized here, without prejudice to the entire Agreement, to give greater context to Plaintiffs' claims.

192.  It is assumed that Pravati countersigned the Agreement (which is obviously one of its own forms) after Pierce affixed his signature on 3/20/2018 in Philadelphia before a public notary.

193.  Based on *The American Lawyer* article (**Exh. H**), the Pravati – PBBPH Law Agreement appears to be a re-do of similar agreements that Pravati had with Pierce's prior law firms, including Pierce Sergenian and Pierce Burns.

194.  In the Agreement (**Exh. G**), Pravati agreed to make legal funding to PBBPH Law secured by contingency fees and expense reimbursements in connection with a portfolio of current and future cases. (**Exh. G**, p. 1; p. 6, ¶ 5).  PBBPH Law granted Pravati a perfected first priority security interest in the proceeds from the portfolio.  (***Id.***).  PBBPH Law had the right and responsibility to make all legal and strategic decisions

in the handling or settlement of the portfolio.  (***Id.***).

195.   Page 18 of the Agreement had "Schedule B" which comprised a list of 19 matters (clients) then being handled by PBBPH Law that were subject to Pravati's security interest, and said list could be amended from time to time.  In fact, PBBPH Law was required to revise and update Schedule B when it acquired additional future cases.  (**Exh. G**, p. 6, ¶ 5).

196.   Pages 3-4 of the Agreement defined circumstances (i – xiv) when PBBPH Law would be in default.  No. (ii) refers to circumstances when PBBPH Law transfers or encumbers its interest in any case to another law firm, including the right to fees; but it is not a default if PBBPH Law abandons a client, or if the client terminates PBBPH Law and grants to another law firm a contingency fee, provided PBBPH Law "continues thereafter in good faith and in a commercially reasonable manner to pursue collection of the contingency fee earned by [PBBPH Law] in connection with such Case prior to such abandonment or termination."

197.   Page 8, ¶ 10 further specified Pravati's remedies in the event PBBPH Law is discharged from a case.  It states "PRAVATI shall have the right to protect its interest ... in the continuation of the Client's case ensuring that PRAVATI automatically and immediately receives any fees and costs payable to [PBBPH Law]."

198.   Page 5, ¶¶ 3-4 of the Agreement made clear that advances and payments from Pravati to PBBPH Law may be used for, *inter alia*, the law

firm's operating expenses, or to refinance the law firm's existing debt, or to pay federal, state and/or local taxes.

199.   At pages 6-7, ¶ 6, the Agreement provided that PBBPH Law and Pravati each receive 50 percent of the proceeds earned on each case.

200.   At page 14, ¶ 25, the Agreement specified that PBBPH Law will indemnify and defend Pravati, and hold Pravati harmless "against any and all liability....damages....causes of action, claims and/or judgments ..."

201.   Schedule A ("Term Sheet"), at p. 17 of the Agreement, listed the total advanced to PBBPH Law as $327,700 "Per This Agreement," and "Total Amount Funded Thus Far Per All Prior Agreements Against the Collateral List of Cases in Schedule B - $1,172,200.00."

202.   Pages 20-25 of the Agreement was Schedule D, a "Limited Guarantee Agreement" signed by Pierce.

203.   Pages 26-27 of the Agreement was Schedule E, "Non-Disclosure Agreement."

204.   On information and belief, based on published materials which became known to Chasan much, much later, Pierce and Beck provided Pravati Capital with a memorandum on or about May 6, 2018, stating that Hamilton's "right of publicity" case was worth a huge sum of money, possibly $1,000,000,000 ($1 billion) in damages.  Pierce used this memorandum to solicit funding from Pravati Capital to support the financing of Hamilton's case, and also to fund salaries of attorneys then at PBBPH Law and also

attorneys that PBBPH Law intended to hire.

205.   Also on information and belief, based on published materials which became known to Chasan much, much later, Pierce and partners used the May 6, 2018 memorandum to Pravati Capital as a recruitment tool in soliciting other attorneys to join PBBPH Law.

206.  In Chasan's view, and upon information and belief, the May 6, 2018 memorandum that Pierce submitted to Pravati Capital grossly exaggerated the merit and value of Hamilton's "right of publicity" case.  Also on information and belief, Pierce did not provide Pravati Capital with more sober assessments of the case, such as the Van Arnum-McNamara "nasty" letter dated January 25, 2018 (**Exh. C**), or Chasan's March 12, 2018 letter addressed to Hamilton (**Exh. E**).

## IV.   FAILED SETTLEMENT NEGOTIATIONS; THREATS

207.  On 4/27/2018, Chasan notified Pierce by email that he and BJC Law were preparing to file a complaint against at least PBBPH Law to recover legal fees for BJC Law's representation of Hamilton.

208.   On 4/30/2018, Pierce initiated settlement negotiations to dissuade Chasan from filing suit.   His email began with a threat: "This e-mail is to advise you that Skip Hamilton has now authorized Pierce Bainbridge to file, on his behalf, a multi-million dollar, eight-figure legal malpractice action against you."

209.  On 4/30/2018, Chasan responded to Pierce's email, stating: "If

you are not already aware, a malpractice case in Pennsylvania has to be supported by a certificate of merit.  I am doubtful you will ever be able to get such a certificate from a detached, qualified professional."  But further, Chasan outlined specific terms for a settlement.

210.  On 5/1/2018, Pierce sent a lengthy email to Chasan which included a counter-proposal for settlement.   However, the email also made mention of "Mr. Hamilton's [potential] malpractice and breach of fiduciary duty lawsuit against you [Chasan]."

211.  On 5/11/2018, per agreement and appointment with PBBPH Law, Chasan met with attorneys from Stradley Ronon to transfer his paper and electronic files relating to Hamilton's case.  At that point, *pro hac vice* admissions had been granted, and the PBBPH Law and Stradley Ronon attorneys were all bound by the Confidentiality Order (ECF 50).

212.  Over the next several weeks, Chasan and Pierce traded differing settlement proposals.  In a memo to Chasan dated 5/21/2018, Pierce outlined another threat if the parties did not settle:  "[W]e will likely defend against you by filing a cross-complaint, claiming, among other things, that your failure to bring the critical causes of action for fraud, intentional concealment, and negligent misrepresentation with a concomitant demand for disgorgement of unjust enrichment (profits), plus pre-judgment interest – all based on these three new causes of action – combined with your failure to discover critical information through the discovery process, has seriously

harmed the case and overall recovery," and thus, Chasan would be "entitled to nothing."

213.  Chasan responded via email on 5/21/2018: "if you and Hamilton believe that Epic Games, Microsoft and/or Speight are guilty of fraud, intentional concealment, and/or negligent misrepresentation, you are welcome to serve discovery to them now to obtain evidence (and take depositions) to support those theories of recovery, and you are welcome to file a motion for leave to amend the Second Amended Complaint once again. I am not stopping you.  Discovery is still open.  Good luck with those far-fetched theories."

214.  After 5/21/2018, Chasan and Pierce continued to trade settlement proposals.

215.  On 6/15/2018, just 14 days before the fact-discovery cut-off date, Pierce filed a motion and declaration in Hamilton's "right of publicity" case seeking an extension of discovery deadlines for several months to enable himself and his PBBPH Law colleagues to develop evidence that would support a Third Amended Complaint alleging fraud, intentional concealment and negligent misrepresentation.  (ECF 63, ECF 63-1, ¶¶ 4-5).

216.  In the Memorandum of Law in support of the motion for discovery extensions, Pierce argued, *inter alia*, that Hamilton's request was occasioned by an injury to his former counsel (Chasan): (1) "In late February 2018, former counsel for the plaintiff notified the court that he had

suffered an injury, could not engage in discovery, and requested a short continuance to accommodate his condition." (ECF 63-2 at page 4 of 9); and (2) "[T]he defendants were not disabled...from continuing to engage in discovery while plaintiff's prior counsel was disabled for approximately 70 days..." (ECF 63-2 at page 5 of 9).

217. Pierce also argued: "The plaintiff's new counsel believes there is much needed evidence that will be obtained from discovery that is related to the above-stated three new causes of action, *which plaintiff's prior counsel [Chasan] had not directly explored*." (ECF 63-2 at page 8 of 9) (italics added).

218. Pierce's statements that Hamilton was hampered in discovery for 70 days due to Chasan's injury were knowingly false.

219. Chasan had proposed an extension of discovery deadlines via a letter to Judge Brody on 2/16/2018. (ECF 51 at pages 3, 4, and 5). *See ante*, ¶¶ 79-80. On 2/21/2018, Chasan notified Judge Brody and opposing counsel via email that he suffered a broken rib in a skiing accident on Monday, 2/19/2018. (ECF 51 at page 1 of 5). Chasan's email said he had some pain, but it did not say he was disabled from participating in discovery. (*Id.*). Per letter dated 2/22/2018, counsel for defendants agreed to the revised proposed deadlines in Chasan's 2/16/2018 letter to Judge Brody. (ECF 52). *See ante*, ¶ 82.

220. Chasan produced Hamilton's document production on 2/26/2018

and sent a "meet and confer" to counsel for Epic Games on 3/1/2018.   *See ante* at ¶¶ 83-84, 87.   Chasan also drafted a "meet and confer" letter to Microsoft's counsel on 3/21/2018.   *See ante* at ¶¶ 135-136.   Chasan met with Pierce in person on 3/20/2018 and again on 3/26/2018.   *See ante* at ¶¶ 133, 145.   Chasan was not in any disabling condition due to the broken rib he suffered on 2/19/2018, and Pierce could readily see that.   In fact, on 3/26/2018, Chasan and Pierce left Chasan's office at 1500 JFK Boulevard and walked to the Marathon Grill at 16th and Sansom Streets, where they ordered food.   *See ante* at ¶ 152.   The representation to the court by Pierce that Chasan was "disabled for approximately 70 days" was entirely and knowingly false.

221.   Chasan did no further work on discovery as of the time he was terminated by Hamilton on 3/28/2018.   In fact, later that day, Microsoft emailed Chasan with directions for accessing Microsoft's documents "in the cloud" produced in response to Hamilton's Second Set of Requests for Production of Documents and Things, which Chasan had served on 2/15/2016.   *See ante* at ¶ 78.   Chasan saved the 3/28/2018 email message from Microsoft in his "Hamilton" file but did not look at the documents produced by Microsoft because he had been terminated.   Chasan's decision not to look at the documents had nothing to do with his non-disabling fractured rib, which was healing as expected.

222.   Pierce's seeking a discovery extension only two weeks before

the cut-off of fact discovery was premised on his false statement that Chasan was unable to work on discovery due to his rib fracture, and on an implicit argument that Chasan had been negligent in not pursuing discovery relevant to fraud, intentional concealment, and negligent misrepresentation, and thus Hamilton was prejudiced by Chasan's alleged negligence (in addition to the skiing injury), in the event Judge Brody did not grant the requested, belated extension of discovery deadlines.

223.   Pierce's motivation in falsely representing that Chasan was physically disabled from pursuing discovery for 70 days was to cover his own failure to pursue discovery promptly upon Chasan's termination by Hamilton, while he searched for a new local counsel, moved for his own *pro hac vice* admission, and arranged the transfer of Chasan's "Hamilton" file.

224.   Had Pierce wanted to work with Chasan, as Chasan had invited in March 2018, his *pro hac vice* application could have been filed by Chasan before the end of March 2018.

225.   Any prejudice to Hamilton due to Pierce's weeks-later retention of Stradley Ronon, and his weeks-later filing for *pro hac vice* admission, and his weeks-later acquisition of Hamilton's file transferred by Chasan, was due solely to litigation choices made by Pierce.

226.   On June 28, 2018, Judge Brody entered an Order granting in part Hamilton's motion for an extension of discovery deadlines (ECF 65), and on July 2, 2018, she entered an amended scheduling order (ECF 66)

extending the deadline for fact discovery to September 28, 2018.

227.   Thereafter PBBPH Law assigned numerous attorneys to conduct depositions of Lester Speight and past and present employees of Epic Games and Microsoft, and to aggressively pursue additional document discovery from the Defendants.   In a brief in support of a discovery motion, filed on 8/31/2018, Pierce and PBBPH Law asserted "the damages ... are therefore in the nine figures," especially in view of sales of the GOW video games with bundled products.   (ECF 77-16 at 15).

228.   On September 15, 2018, it appeared that Chasan and Pierce had agreed to settle Chasan's claim for attorney's fees for $160,000. However, in later weeks, this "settlement" foundered over disagreements about mutual releases.

229.   On October 25, 2018, after the close of fact discovery, Pierce, Beck, Price and Hecht filed Hamilton's Motion for Leave to File a Third Amended Complaint (ECF 95), and included a Memorandum of Law (ECF 95-1) and Affidavit by Pierce (ECF 95-2) with a mark-up of Hamilton's First Amended Complaint that was proposed as the Third Amended Complaint. The mark-up deleted the Lanham Act counts and proposed the addition of a new Count for "Intentional Non-Disclosure."  The proposed Third Amended Complaint also included language regarding Microsoft's sale of GOW games bundled with Xbox One consoles, as had been alleged in the SAC.

230.   The proposed new Count for "Intentional Non-Disclosure" was

akin to the cause of action for "intentional concealment" that Chasan had allegedly negligently failed to plead, as outlined in Pierce's May 21, 2018 email to Chasan ("failure to bring the critical causes of action for fraud, intentional concealment, and negligent misrepresentation"), *ante at* ¶ 212. The proposed Third Amended Complaint did not include counts for "fraud" or "negligent misrepresentation," presumably because the discovery conducted by PBBPH Law did not develop evidence to support such claims.

231.   On October 30, 2018, in exchanging emails with Chasan about mutual releases regarding payment by PBBPH Law of $160,000 to BJC Law, to settle Chasan's claims for attorney's fees, Bainbridge proposed that Chasan kickback $30,000 to Hamilton to make the deal more palatable to Hamilton, and to secure Hamilton's signature on a mutual release.

232.   Chasan regarded the $30,000 kickback suggestion as meritless and ridiculous, as Chasan did not consider that Hamilton had any viable claim for malpractice against him.   Nevertheless, in an effort to move the matter to a conclusion, on November 2, 2018, Chasan emailed to Bainbridge that he was willing to pay Hamilton a $10,000 kickback just to get it done, and asked Bainbridge to propose this to Hamilton.

233.   On November 15, 2018, Pierce emailed Chasan advising that the settlement negotiations had failed because Hamilton supposedly refused to sign a mutual release.

234.   On December 18, 2018, Judge Brody heard oral argument in

open court on Hamilton's motion for leave to file a Third Amended

Complaint.  Hecht argued the motion for Hamilton.

235.   On January 10, 2019, Judge Brody entered an Order and

Memorandum Opinion holding that Hamilton was granted leave to drop the

Lanham Act count in the SAC, but denying leave to amend to add a count for

"Intentional Non-Disclosure," as Hamilton had not shown there was evidence

to meet all the elements of such a claim.  (ECF 105, 106).

236.   On February 1, 2019, the Defendants filed a Motion for

Summary Judgment.  (ECF 109, 110, 111).  One of the attachments was the

transcript of the September 21, 2018 deposition of Lenwood Hamilton (ECF

110-6).  Pierce had defended Hamilton's deposition.

237.   Disclosures in Hamilton's deposition included that Pierce was

paying him $1000 periodically to serve as his "driver" (pp. 38, 42, 257-258).

Also, he didn't have any money and had started a GoFundMe page when he

was looking for an attorney to take his case (pp. 259, 314).  It took him

nearly two years to find an attorney and he wouldn't have had anything filed

without Mr. Chasan (pp. 143-144, 253-254).  Chasan introduced him to

Pierce and he moved to Los Angeles after he retained Pierce (pp. 38-42,

257-258).  He fired Chasan because Chasan "brought me a document

saying Microsoft wanted to settle with me for a million dollars and ….. I

didn't trust him anymore" (p. 256).

238.   Judge Brody heard oral argument in open court on September

25, 2019 on the Defendants' motion for summary judgment.  Hecht argued on behalf of Hamilton.

239.  Judge Brody entered an Order and Memorandum Opinion on September 26, 2019 granting the Defendants' motion for summary judgment on First Amendment grounds and dismissing Hamilton's SAC. (ECF 123, 124).  Her Memorandum Opinion quoted admissions made by Hamilton in his deposition.

240.  The filings in support of and in opposition to the Speight-Epic Games-Microsoft motion for summary judgment included excerpts of depositions of at least nine fact witnesses, and at least three expert witnesses.  The expert witnesses retained by PBBPH Law to support Hamilton's case included Dr. Benham Bavarian, M.D. (facial recognition expert), Edward Primeau (voice identification expert), and Barbara Carole Luna (damages expert).  PBBPH Law did not use Hamilton's original voice identification expert, Tom Owen, or the damages expert recommended by Chasan (Wes Anson of CONSOR).

241.  Hamilton filed a timely notice of appeal on October 25, 2019 (ECF 128).

242.   Hamilton filed his appellate brief in the Third Circuit Court of Appeals on February 20, 2020, represented by PBBPH Law.  Per the Certificate of Compliance in his brief, the word count was 8755, considerably less than the 13,000 allowed by Federal Rule of Appellate Procedure

32(a)(7)(B).

243.   Hamilton did not appeal the denial of his motion for leave to amend the SAC to add a count for "Intentional Non-Disclosure," as Judge Brody had ruled on January 10, 2019 (ECF 105, 106), even though he had "space" in his brief in view of the applicable word limit.  As such, Hamilton (and PBBPH Law) waived their ability to assert a claim for "Intentional Non-Disclosure," which was the only remaining basis of Attorney Chasan's alleged "malpractice" touted by Pierce in his May 21, 2018 email to Chasan (*see ante* at ¶ 212).

244.   However, Hamilton's appeal brief argues that Judge Brody erred in granting summary judgment on First Amendment grounds, and it relies on the same arguments crafted by Attorney Chasan in the Memorandum of Law filed by Chasan in Opposition to the Motion to Dismiss the SAC (ECF 36-1), including many of the same case authorities.

245.   Of particular interest is that Hamilton's appeal brief argues that Judge Brody erred because Hamilton's likeness was used by the defendants (especially Microsoft) for commercial purposes, such as promoting the bundled sale of Xbox One consoles, and the First Amendment does not protect exploitation of someone's likeness for commercial purposes.   This argument germinated out of allegations that Attorney Chasan (and Chasan alone) inserted into the SAC, and Chasan advocated in the brief opposing dismissal of the SAC (ECF 36-1).  For example, Hamilton's appeal brief relies

heavily on the case of *Jordan v. Jewel Food Stores*, 743 F.3d 509 (7th Cir. 2014), which Chasan had cited in the brief opposing dismissal of the SAC.

246.     PBBPH Law and its partners have profited and continue to seek to profit from Attorney Chasan's legal work on Hamilton's behalf, without having paid Chasan or BJC Law a single penny for Chasan's labors.

## JURSIDICTION AND VENUE

247.   Jurisdiction is based on 28 U.S.C. § 1332(a)(1) because all of the Plaintiffs are Pennsylvania citizens, and none of the Defendants are Pennsylvania citizens or residents, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

248.   The Court has personal jurisdiction over PBBPH Law and its partners because they voluntarily came to the Eastern District of Pennsylvania to litigate Hamilton's "right of publicity" case in this District, No. 17-cv-0169-AB.  The Court also has personal jurisdiction over Pravati because Pravati has or had an agreement with PBBPH Law to split the net recovery in Hamilton's "right-of-publicity" case on a 50-50 basis, and thus Pravati is or was financially interested in the result in Hamilton's lawsuit in Philadelphia.

249.   Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §§1391(b)(2) and (c)(2) because, among other things, the contract between BJC Law and Lenwood Hamilton was made in Philadelphia,

Pennsylvania; Hamilton's "right of publicity" lawsuit was filed in the Eastern District of Pennsylvania, No. 2017-cv-0169-AB; Plaintiffs BJC Law and Chasan maintain their principal place of business in this District; and Plaintiff Chasan and Defendant Pierce had two meetings at the offices of BJC Law in Philadelphia, including one in which Hamilton was present.

## COUNT I – TORTIOUS INTERFERENCE WITH CONTRACT
### (Against PBBPH Law, Pierce, Bainbridge, Beck, Price and Hecht)

250.  All of the foregoing averments are incorporated by reference and realleged as if fully set forth.

251.  This Count is based on the Restatement (Second) of Torts, § 766, which was adopted by the Pennsylvania Supreme Court in *Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 393 A.2d 1175, 1181-82 (Pa. 1978), *cert. den.*, 442 U.S. 907 (1979).

252.  There is (or was) a contract between Plaintiff BJC Law and a third party, Lenwood Hamilton (**Exh. A**), as described above in ¶¶ 11-16.

253.  Defendants PBBPH Law, Pierce, Bainbridge, Beck, Price and Hecht intentionally interfered with Hamilton's performance of the contract by inducing or otherwise causing Hamilton to terminate Plaintiffs' representation and make a new contract with PBBPH Law, as described in **Exh. B**, and above in ¶¶ 20, 162-163.

254.  Plaintiffs BJC Law and Chasan suffered damages as a result of Hamilton's termination of the representation in that BJC Law lost the value of Chasan's billable hours ($319,240.78) as of 3/31/2018, and also lost a

potentially greater sum amounting to the 40 percent contingency of any verdict or settlement in Hamilton's "right of publicity" case.

255.    Defendants PBBPH Law, Pierce, Bainbridge, Beck, Price and Hecht are liable to Plaintiffs for damages for their tortious interference with contract because their actions in causing or inducing Hamilton to terminate Chasan's representation were improper for numerous reasons, as described below, without limitation.   These actions by Defendants are not sanctioned by the "rules of the game" which society has adopted.

256.    Defendants' actions were improper because Chasan invited Pierce and his law firm to be co-counsel with BJC Law on the condition that BJC Law and Pierce's law firm would split the 40 percent contingency on a 20/20 basis, provided Pierce's law firm could bring financing and complete future litigation work on a roughly 50-50 basis going forward (where Hamilton had fully supported Chasan's search for a third-party funder). Instead, Pierce and his law firm persuaded Hamilton to discharge BJC Law and go completely with PBBPH Law.  Had Chasan and BJC Law had a crystal ball and foreseen what Pierce and PBBPH Law would do, in derogation of the condition that was the basis for the invitation to Pierce, Chasan would never have introduced Pierce to Hamilton.

257.   Defendants' actions were improper because they induced Hamilton to discharge Chasan without any payment for Chasan's considerable legal work on behalf of Hamilton, as invoiced by BJC Law.

Although a client has a right to discharge a lawyer at any time, that right is subject to liability for payment of the lawyer's services.  Defendants knew Hamilton lacked resources to compensate BJC Law and Chasan.  Defendants nevertheless facilitated Hamilton's discharge of Chasan by hiring replacement attorneys from the Stradley Ronon law firm, at Defendants' own expense, to serve as local docket counsel for Hamilton, without making arrangements for any payment to BJC Law.

258.   Defendants' actions were improper because they have made no arrangement for a division of any contingent fee with a quantum meruit portion, or any appropriate percentage, going to BJC Law and Chasan. Plaintiffs are certainly entitled to a portion, as Plaintiffs filed Hamilton's Complaint when no other law firm would do so and avoided a time bar as to certain tort claims; Plaintiffs also amended the Complaint twice and defeated the motion to dismiss the SAC filed by Epic Games, Microsoft and Speight; and Plaintiffs also initiated discovery on behalf of Hamilton and marshaled Hamilton's responses to the discovery served by Epic Games, Microsoft and Speight.  But for the efforts of BJC Law and Chasan, Hamilton would have had no case at all.  Notably, the Pravati - PBBPH Law Agreement provides that if PBBPH Law is substituted out of a contingent fee case, PBBPH Law is required to take commercially reasonable steps to secure its portion of any contingent fee earned by settlement or judgment. *See ante*, ¶ 196.  But here, with the shoe on the other foot, PBBPH Law and its partners have

made no effort to allocate any portion of a potential recovery to BJC Law and Chasan, or to compensate BJC Law and Chasan for their considerable efforts of Hamilton's behalf.

259.   Defendants' actions were improper because Hamilton's upset at Chasan over their dispute regarding what settlement demand to convey to Microsoft does not provide cover to Defendants for simultaneously agreeing to represent Hamilton and pushing out Chasan and BJC Law.  There are disputes every day in the United States between plaintiffs with jackpot expectations and their contingent fee lawyers who take a more sober view of the evidence, the legal issues and the risks of litigation.   Instead of stroking Hamilton with money and benefits, the proper course for Defendants would have been to remind Hamilton of all that Chasan had accomplished for him, to remind him that Chasan had detailed knowledge of the case (as opposed to Defendants' then-superficial knowledge), and most importantly, that despite their disagreement as to how to posture a settlement negotiation, Chasan, in fact, had continued to work diligently to find a third-party funder for the case, and had succeeded!   Moreover, Chasan was agreeable in March 2018 to going forward with Pierce and PBBPH Law, as proposed, on the basis of a 20/20 split of the 40 percent contingency, with PBBPH Law arranging the financing of the litigation expenses.

260.   Pierce was motivated to take over the whole case because if PBBPH Law had a 20/20 split with BJC Law on the contingency, PBBPH Law

would have to split its share with Pravati on a 50-50 basis, such that PBBPH Law would net only 10 percent of any settlement or judgment, net of expenses.

261.  Pierce was motivated to take over the whole case for his own marketing purposes, as he likes portraying himself as an aggressive trial counsel and "Goliath-slayer" of mammoth defendants such as Epic Games and (especially) Microsoft.

262.  Pierce was motivated to take over the whole case because he did not want to share decision-making with Chasan.  Pierce wanted to be "Captain of the Ship" and avoid strategy disputes with Chasan on discovery, selection of experts, trial tactics, settlement and everything else.

263.  Pierce was motivated to take over the whole case because he had law firm funding from Pravati, win or lose, and thus he was more prone to risk it all at trial than Chasan.  This is another reason he wanted to avoid disputes with Chasan over any settlement posture of the case.

264.  Pierce was motivated to take over the whole case because he wanted to use it as a marketing tool to attract litigation funding and new hires for PBBPH Law, and partners Bainbridge, Beck, Price and Hecht went along with this plan and participated in it and supported it.

265.  Pierce and PBBPH Law had no knowledge let alone investment in Hamilton's "right of publicity" case prior to 3/13/2018, when Eva Shang of Legalist, Inc. introduced Pierce and Chasan via an email sent to both.

266.   Pierce, being a stranger to Chasan, had little or no inhibition about offending Chasan by taking over Hamilton's case.  It is unlikely he would have done such a thing with another attorney he knew well for 10 or 15 years, or that he would have threatened a long-time attorney acquaintance with an eight-figure malpractice action.

267.   Bainbridge, Beck, Price, and Hecht, being the partners in PBBPH Law and partners with Pierce on 3/27/2018 when Hamilton "terminated" Chasan and BJC Law, and retained PBBPH Law, are equally liable with Pierce regardless of their degree of involvement in the decision making, and regardless of the extent of their involvement in taking steps and measures to effectuate the termination of BJC Law and Chasan.  Defendants are all agents for one another, and they all ratified Chasan's termination.

268.   The conduct of Defendants was and is outrageous, and subjects them to appropriate punitive damages.

WHEREFORE, on Count I, Plaintiffs demand judgment in their favor and against Defendants PBBPH Law, Pierce, Bainbridge, Beck, Price and Hecht, jointly and severally, or on any appropriate fair share basis, for a sum of at least $319,240.78, being the value of Plaintiffs' legal services on behalf of Hamilton, or a quantum meruit share of any settlement or judgment obtained by Hamilton in his "right of publicity" case, if greater, plus punitive damages to be assessed by a jury, plus costs and expenses and any other appropriate relief.

## COUNT II – COMMON LAW UNJUST ENRICHMENT
### (Against PBBPH Law, Pierce, Bainbridge, Beck, Price, and Hecht)

269.    All of the foregoing averments are incorporated by reference and realleged as if fully set forth.

270.    By taking over the value of Chasan's and BJC Law's labors on behalf Hamilton, Defendants PBBPH Law, Pierce, Bainbridge, Beck, Price, and Hecht, have been unjustly enriched to the substantial detriment of Plaintiffs; Plaintiffs have a claim for unjust enrichment against Defendants under the holding of *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone and Middleman, P.C.*, 179 A.2d 1093 (Pa. 2018).

271.   Benefits conferred by Plaintiffs include at least all of the following:  (a) taking Hamilton's case when at least ten other law firms declined it; (b) filing Hamilton's complaint on 1/11/2017, just one day before a time bar of two of Hamilton's tort claims, based on discovery on 1/11/2015; (c) doing research into the history of the Gears of War videogames, and legal research, and amending the Complaint twice, to allege alternative grounds for liability based on "sound-alike," and for additional damages based on sales of "Cole Train" memorabilia and merchandise, and also bundled sales of the GOW videogames with Xbox One consoles; (d) opposing and defeating the motion to dismiss filed by Speight, Epic Games, and Microsoft; (e) initiating discovery to Speight, Epic Games and Microsoft, by requesting production of documents; and (f) responding to

discovery served to Hamilton, including interrogatories and requests for production of documents and things.

272.   In particular, Plaintiffs (and Plaintiffs alone) added substantial potential value to Hamilton's claims for damages by virtue of the amendments in the SAC relating to sales of "Cole Train" memorabilia and merchandise, and the bundled sales of the GOW videogames with Xbox One consoles.

273.   In particular, Plaintiffs (and Plaintiffs alone) added substantial potential value to Hamilton's claims in the Amended Complaint and in the SAC, by virtue of amendments to allege "sound-alike" liability, and by including the internet post by Robert Geary.

274.   The motions for *pro hac vice* admission filed on behalf of Pierce, Beck and Price were granted on 4/30/2018 by Judge Brody.  On 5/5/2018, Beck emailed Chasan seeking expeditious transfer of BJC Law's and Chasan's entire Lenwood Hamilton file.  PBBPH Law recognized the benefits it would receive from transfer of Chasan's voluminous file and work product on behalf of Hamilton, and Chasan was obligated to transfer the file.

275.   Chasan was agreeable to an expeditious transfer of his entire Hamilton file and estimated that it would take approximately 8 hours of work to assemble boxes and prepare inventories of items in the boxes, and ready his electronic files for transfer by copying.

276.   Chasan requested PBBPH Law to compensate BJC Law for the 8

estimated hours at Chasan's customary hourly rate, and PBBPH Law agreed.
This compensation was solely for the labor involved in transferring the
voluminous file, and it did not reflect the value of the work product in the
file.

277.   The transfer of Chasan's complete Hamilton files was
effectuated on 5/11/2018 at the premises of BJC Law in a two-hour meeting
between Chasan and Stradley Ronon's Benjamin Gordon (Hamilton's "new"
local counsel).   Nine boxes were transferred, and the inventory of each box
was reviewed by Gordon.  Also, Chasan's electronic file for Hamilton was
copied to an external hard drive supplied by Gordon.

278.   PBBPH Law benefitted from the receipt of Chasan's work
product, which included, *inter alia*, written materials pertaining to witness
interviews, contacts with potential expert witnesses, legal research files,
contacts with Kevin Conrad, Esq. and Ray Abdallah, case-related documents,
discovery materials, and much more.

279.  Defendants have retained the benefits of Chasan's and BJC Law's
labors under such circumstances as make it unjust and inequitable to retain
them without paying Plaintiffs the value of the benefits they unjustly
acquired.

WHEREFORE, on Count II, Plaintiffs BJC Law and Chasan request that
this Court enter judgment in their favor and against Defendants PBBPH Law,
Pierce, Bainbridge, Beck, Price and Hecht, together with an award of all

compensatory damages, but not less than $319,240.78, being the value of

Plaintiffs' legal services on behalf of Hamilton on the basis of hourly rates

and hours worked, or a quantum meruit share of any settlement or

judgment obtained by Hamilton in his "right of publicity" case, if greater, up

to a maximum of 20 percent of the total settlement or judgment net of

expenses, plus costs and expenses of this case, and any other appropriate

relief.

### COUNT III – COMMON LAW UNJUST ENRICHMENT
### (Against Pravati)

280.   All of the foregoing averments are incorporated by reference

and realleged as if fully set forth.

281.   Pravati has benefitted as well from Chasan's labors and

Chasan's work product, as reflected in Chasan's Hamilton file, by virtue of its

arrangement with PBBPH Law.

282.   By virtue of the Pravati-PBBPH Law Agreement (**Exh. G**),

Pravati had a 50-50 agreement with PBBPH Law regarding the profits from

cases Pravati funded for PBBPH Law.

283.   In or about April or May 2019, Pravati and PBBPH Law

terminated their relationship, and Pravati received repayment of litigation

funding monies advanced to PBBPH Law, plus a return on investment,

yielding a significant profit.  Pierce was quoted in an online article published

by Portfolio Media, Inc.'s LAW360, on May 17, 2019, as stating the

repayment to Pravati "was completed long ago" (**Exh. J**).

284.   Some of the return on investment that Pravati received was in form of receivables, as to which Pravati filed UCC liens against PBBPH Law and numerous of its partners.  Many of the UCC liens specifically reference the "Gears of War" litigation, which is Hamilton's "right of publicity" case.

285.   Upon information and belief, a significant percentage of Pravati's return on investment for the litigation funding monies that it advanced to PBBPH Law were and are attributable to Hamilton's "right of publicity" case.

286.   Pravati has retained the benefits of Chasan's and BJC Law's labors under such circumstances as make it unjust and inequitable to retain them without paying Plaintiffs the value of the benefits they unjustly acquired.

WHEREFORE, on Count III, Plaintiffs BJC Law and Chasan request that this Court enter judgment in their favor and against Defendant Pravati Capital together with an award of all compensatory damages, but not less than $319,240.78, being the value of Plaintiffs' legal services on behalf of Hamilton on the basis of hourly rates and hours worked, or a quantum meruit share of any settlement or judgment obtained by Hamilton in his "right of publicity" case, if greater, up to a maximum of 20 percent of the total settlement or judgment net of expenses, plus costs and expenses of this case, and any other appropriate relief.

## JURY DEMAND

287.   Plaintiffs demand a trial by jury as to all issues triable to a jury.

Respectfully submitted,

Bruce J. Chasan, Esq. (Atty I.D. No. 29227)
1500 JFK Boulevard, Suite 312
Philadelphia, PA 19102
215-567-4400
bjchasan@brucechasanlaw.com

Clifford E. Haines, Esq. (Atty. I.D. No. 9882)
Haines & Associates, P.C.
The Widener Building – 5th Floor
1339 Chestnut Street
Philadelphia, PA 19107-3520
215-246-2201
chaines@haines-law.com

*Attorneys for Plaintiffs*

# Exhibit A

# BRUCE J. CHASAN, ESQ.
## LAW OFFICES OF BRUCE J. CHASAN, LLC

1500 JFK BOULEVARD
TWO PENN CENTER, SUITE 312
PHILADELPHIA, PA 19102

BJCHASAN@BRUCECHASANLAW.COM
WWW.BRUCECHASANLAW.COM
T 215.567.4400
F 215.565.2882

ADMITTED IN PA, MA, VA, DC, AND
UNITED STATES PATENT AND TRADEMARK OFFICE

December 30, 2016

Lenwood "Skip" Hamilton                   PRIVILEGED AND CONFIDENTIAL
1201 Willow, Apt. 5
Norristown, PA 19401

(tel. 484-686-6996)

   **RE:   Engagement**

Dear Mr. Hamilton:

        This will confirm that you have engaged the Law Offices of Bruce J. Chasan, LLC to represent you in connection with various intellectual property matters, especially the wrongful use of your likeness and voice in various video games known as the "Gears of War" series.    The adverse parties are Epic Games, Inc., Microsoft, Inc., Microsoft Studios, The Coalition, and Lester Speight.  The Pennsylvania Rules of Professional Conduct for lawyers require that we advise you in writing of the basis on which we have been engaged.

        1.      Responsible Attorneys and Paralegals.   I will be primarily responsible for your matter and will oversee critical developments as well as review services performed on your behalf. This firm may from time to time engage contract attorneys on an "as needed" basis.  To ensure that you receive maximum attention, our firm utilizes a "team approach" with respect to attorneys and paralegals who are responsible for your matter. This means that more than one attorney may be assigned to your "case team." In addition, I will designate other attorneys to be members of your case team.  These attorneys may represent you in a variety of ways, such as attending meetings, court conferences or hearings. Further, paralegals with expertise in certain areas may be called upon to assist in your case. We reserve the right to assign responsibility for your matter to other attorneys and paralegals in the best exercise of our professional judgment. Please feel free to contact any member of your case team with your questions or concerns.

        2.      Fees.  This firm's charges for legal services are based primarily upon the hourly rates in effect at the time services are rendered, determined at a minimum of one-tenth of an hour.  My present hourly rate is $450 for litigation matters.  HOWEVER, WE HAVE AGREED TO TAKE THIS MATTER ON A CONTINGENT FEE BASIS OF 40%, PROVIDED YOU ARE RESPONSIBLE FOR ALL COSTS AND EXPENSES.  Qualified contract attorneys and paralegals, if needed, may also be used on your matter, at billing rates that may be the same or lower.  The firm's hourly rates are subject to change from time to time, generally in

Engagement Letter
December 30, 2016
Page 2

January.  Please understand that we try to have the work done at the level which will be most efficient in terms of rates and costs for you.  The time charged includes not only meetings with you and court appearances, but also drafting and reviewing pleadings and correspondence, intra-office conferences, telephone conversations with you, telephone conversations with attorneys and other parties, time spent with witnesses, legal research, and travel.  We reserve the option to substitute a fixed fee in lieu of hourly rates if we believe it makes sense for both the client and our law firm.

3.    Costs.  In addition to fees for our attorneys' time, you will also be responsible to pay on a current basis all expenses and costs associated with your case, including without limitation, court filing and master's fees, transcripts, depositions, photocopies, subpoenas, long distance telephone calls, investigative expenses, photographs, courier charges, computerized legal research, staff overtime, travel, postage, messenger service and similar other items, at our normal rates for such other services.  The firm's service charges are subject to change from time to time, generally in January.  You will be responsible to reimburse directly all third party vendors who perform services in connection with this representation (e.g., court reporter services, copying services, etc.) in the event the vendor is owed more than $1,000 in any month.  You will also be responsible to pay all fees and costs charged by expert witnesses who have rendered services on behalf of your case

4.    Monthly Billing.  Because we have learned from experience that clients prefer to be billed timely, the firm will send monthly bills.  By the same token, we ask that you review our bills promptly upon receipt, and advise us immediately if there are any questions respecting the details of our bills, so that we may investigate such questions and respond to them while memories remain fresh.  Bills are payable within 30 days of the date of the bill.  If a bill is not questioned by the time payment becomes due, we will rely on our understanding that the amount and details of the bill are self-explanatory and satisfactory.  If a particular charge or item is questioned, you will pay the undisputed items in the bill without awaiting resolution of any disputed ones.  Interest will be charged on any overdue balance at the rate of one and one-half percent per month and you will be responsible for any costs, including legal fees, we incur in collecting any overdue balance.  If our bills are not paid when due, you authorize us to withdraw as your counsel and agree promptly to hire other counsel to represent you in this matter.

5.    Retainer.  It is often customary with respect to work of this kind that you pay our firm an advance retainer.  See Special Considerations, infra, ¶ 10.  Of course, at the conclusion of our engagement, we will return to you any unused portion of this advance.  Finally, in the event your initial retainer is consumed, your case goes to trial, an unforeseen issue arises or appeals are taken, we reserve the right to require an additional retainer.  We also can elect to proceed without a retainer for the convenience of long-established clients

Engagement Letter
December 30, 2016
Page 3

and in other special circumstances, and later require a retainer in the event expenses are anticipated to become significant.

6.  <u>Unpredictability of Fees/Costs and Result</u>.  Unfortunately, it is not possible to estimate the total amount of time that will have to be devoted to your case.  That will depend upon a variety of factors, primarily upon whether hearings or a trial will be necessary, the time and effort required, the nature and complexity of the issues involved and the degree of cooperation from you, and actions of the opposing parties' attorney(s). Similarly, we cannot guarantee the results that will be obtained, particularly because we cannot predict what a court may do in a particular case.

7.  <u>Telephone Calls and Messages</u>.  There will be times when I will be in court, in meetings, or otherwise unavailable to answer your call.  At such times, please feel free to talk with my receptionist and/or secretary, another attorney assigned to the case, or the secretary who works with another attorney involved in the case.  If you are passing on information, the receptionist and/or secretaries can deliver such information without the necessity of your waiting for a return call.  If you have a question that requires an answer, it is far easier for a secretary to obtain the background information from you, bring the matter to my attention when I am free, and either the secretary or I will have a response for you.  If it is necessary that you speak with me directly, I will attempt to return your call as soon as possible.  Please remember that litigation is time consuming, and on any given date I may be in court pursuing matters for other clients.

8.  <u>Communications</u>.  While we will not disclose privileged or confidential information regarding our representation of your interests, I understand that you authorize us to disclose to persons outside this firm the fact that we represent you as legal counsel.  In addition, unless you instruct us otherwise, you authorize us to send written privileged and confidential communications via facsimile and e-mail, and to communicate orally on cell phones.

9.  <u>Conflicts</u>.  We are aware of no conflict that would preclude our representation of you in this matter and you have not provided us with any information revealing any conflict.  Thus, we perceive no conflict that would require us to decline this engagement.  It is important to note, however, that no conflict checking system works perfectly all the time.  It is always possible that a conflict will arise, or will become apparent for the first time, during the course of our representation of you.  Further, not all conflicts are waivable, despite the best intentions of those involved.  It is possible that an irreconcilable, nonwaivable conflict, or a conflict that you do not wish to waive, might arise during the course of this engagement and that, as a result, under certain circumstances you or we may determine that it is in your interest, or required by applicable ethical standards,

Engagement Letter
December 30, 2016
Page 4

that we withdraw from representing you.  Needless to say, we and you will address every reasonable effort toward avoiding the development of any such conflict.

You have also engaged us with the knowledge that from time to time this firm may represent persons or companies that compete with you or your employer.  It is understood that the present representation will never preclude us from representing such persons or companies without your knowledge or consent except (a) in specific matters where we represent or have represented you, and (b) in matters in which we have been asked, while the present engagement is still in effect, to take a position directly adverse to you.  If our representation of you terminates, we will be free to represent other clients even in matters directly adverse to you without your consent, except where such matters are substantially related to the matters in which we have represented you in the past.  Of course, we are never entitled to disclose non-public information obtained from a client in the course of our representation, except under compulsion of law, without the client's express consent.

10.     <u>Special Considerations</u>.   As stated above, this case is being handled on a contingent fee basis, with the attorney's fee being 40 percent of the net recovery (if any) obtained by verdict or settlement.  If funds are obtained in settlement or via verdict, all expenses will be reimbursed off the top.  The net left over sum will be split 60-40.   Should you reject a reasonable settlement offer against our recommendation, we reserve the right to withdraw, while retaining a quantum meruit interest in whatever verdict or settlement is later obtained.

11.     <u>Commencement and Termination</u>.  This engagement may be terminated at any time by any party, subject to our obligations under the Rules of Professional Conduct.  If our engagement terminates, you remain obligated to pay us in full at our regular hourly rates and/or fixed fees for all of our past services and expenses, in accordance with the terms of this letter.  I will stress at this time our offer for contingent representation in this matter is based on our initial review of materials you provided on Dec. 29, 2016, and information received from prior counsel Kevin Conrad, Esq., in a telephone conversation on Dec. 30, 2016.    Should our assessment of this case change materially between now and Jan. 15, 2017, we reserve the right to withdraw and return any retainer you have provided.

We look forward to representing you.   At this time we are requesting an advance retainer of $1000 payable to the Law Offices of Bruce J. Chasan, LLC, to cover initial expenses such as filing and service of process fees.   You may supply this on or before January 10, 2017.  (NOTE: I will be away Jan. 2-6, 2017, and I will return to the office on Jan. 9, 2017.)   Receipt of your retainer will serve as your acknowledgment and agreement to the terms of this Engagement Letter.  If your retainer payment is not received by us as requested, we will undertake no work on your behalf, close our file on the matter and

Engagement Letter
December 30, 2016
Page 5

assume that you have made alternative arrangements. If you have any questions regarding the above, please do not hesitate to call or meet with us.

Very truly yours,

Bruce J. Chasan

Accepted: _____   Date: 12-31-16

cc: Kevin Conrad, Esq. (via email)

# Exhibit B

Lenwood "Skip" Hamilton
1201 Willow, Apt. 5
Norristown, PA 19401

3/27/2018
Bruce Chasan
1500 JFK Boulevard
Two Penn Center, Suite 312
Philadelphia, PA 19102

Re: Termination Letter

Dear Mr. Chasan,

This letter is to terminate my engagement with you, effective as soon as substitution of counsel
Pierce Bainbridge Beck Price & Hecht can be finalized.  Thank you for your efforts to date in my
matter.
Please send a copy of my legal file as soon as possible to Pierce Bainbridge Beck Price & Hecht
LLP 600 Wilshire Blvd., Suite 500, Los Angeles, CA 90017. This should include all hard copy
materials, including any thumb drives and documents you have retained in my case.
Please send any electronic materials to john@piercebainbridge.com,
carolynn@piercebainbridge.com, and grace@piercebainbridge.com.

Sincerely,

Skip Hamilton

# Exhibit C



**Davis Wright Tremaine LLP**

21st Floor
1251 Avenue of the Americas
New York, NY  10020-1104

**Elizabeth A. McNamara**
212.603.6437 tel
212.489.8340 fax

lizmcnamara@dwt.com

January 25, 2018

<u>**VIA ELECTRONIC MAIL**</u>

Bruce J. Chasan, Esq.
Law Offices of Bruce J. Chasan, Esq.
1500 J.F.K. Boulevard
Two Penn Center, Suite 312
Philadelphia, PA 19102
bjchasan@brucechasanlaw.com

Re:    ***Hamilton v. Speight et al.***, No. 2:17-cv-0169-AB (E.D. Pa.)

Dear Bruce:

On behalf of the Defendants in this matter, we write to respectfully ask that Mr. Hamilton dismiss his complaint.

From the beginning of this case, we have repeatedly advised you that your client's claims lack any basis in law or fact.  Nevertheless, your client has persisted, arguing that he is entitled to discovery that might reveal a basis for the claims.  The Court's ruling denying the Motion to Dismiss without prejudice does not change the matter, as our continuing investigation and due diligence have revealed that no witness for the Defendants (other than Speight) has ever heard of your client.  More recently, Defendants searched comprehensively for documents responsive to your requests.  Other than your demand letter to Epic, Defendants have been unable to find a single document in their possession, custody, or control that preceded the complaint and reflects any communication with or reference to your client, his wrestling persona, or his "Soul City Wrestling" organization.  This lack of evidence confirms that your client had nothing to do with the creation and development of the "Cole Train" character in *Gears of War*.

There is, therefore, no good-faith basis for you or your client to pursue these claims.  In particular, we are troubled that you continue to allege and represent to the Court that the *Gears* games use your client's ***actual*** voice, when you and your client know (or should know) that is false.  Indeed, your complaint quotes from a video interview with Mr. Speight, available on YouTube and included in the bonus materials for *Gears 2*, which includes footage of Speight recording dialogue in-studio for the Gears games.  *See* SAC ¶ 44; *see also* https://www.youtube.com/watch?v=kXRQwWkZ_UI; https://www.

January 25, 2018
Page 2

youtube.com/watch?v=kXRQwWkZ_UI.  Defendants will produce additional documents that make clear that Mr. Speight, not your client, provided the voice of "Cole Train."

The purported expert report you have proffered from Mr. Owens cannot support these false claims.  In fact, counsel for Microsoft recently secured a decision in the federal district court in New York dismissing the plaintiff's case under Rule 11 as a "fraud upon the court" where the plaintiff pursued knowingly false claims and used a purported "expert" to manufacture an issue of fact.  *Almeciga v. Center for Investigative Reporting*, 185 F. Supp. 3d 401 (S.D.N.Y. 2016).  In *Almeciga*, the court rejected a handwriting expert's analysis offered to claim that the plaintiff's signature had been forged.   In particular, the court criticized the expert for relying on "known" handwriting samples created by the plaintiff for the expert's review after the dispute arose, leaving the expert no way to rule out that the plaintiff had intentionally disguised her handwriting to obtain a favorable opinion.

Mr. Owens's report suffers from the same problem.  As in *Almeciga*, Mr. Owens conducted his analysis without referring to pre-existing samples of your client's voice, much less the recordings and videotapes of local interviews from the 1990s that you claim are the source of audio for the voice of "Cole Train."[1]  Instead, the report indicates that Plaintiff "was asked to speak a number of sentences and 'shouts'" from the *Gears* games (Complaint, Ex. O at 1), and that Mr. Owen compared the voice of "Cole Train" to "the voice of Mr. Hamilton *speaking the same phrases in the same manner.*" *Id.* at 6 (emphasis added).  In other words, the report may show only that your client is capable of imitating Mr. Speight's voice as "Cole Train."  In short, we anticipate that the Court will readily reject your expert report and your client's allegations will remain based on nothing more than fantasy supported by no evidence.

As you know, the Complaint indicates you are at least the fourth attorney Mr. Hamilton has contacted about this matter, and the only one who chose to file a complaint.  We suspect that the others rightly declined this engagement after recognizing that it was without merit.  If you did not have the same realization before, we would hope you do now.  Please immediately withdraw Plaintiff's claims in their entirety.  If you do not and you continue to litigate this case in an unreasonable manner, when this case is dismissed, Defendants will seek all available remedies, including but not limited to: (a) an award of fees and costs under the Lanham Act, 15 U.S.C. § 1117(a), *see Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 315 (3d Cir. 2014) (district court may award fees to the prevailing party under the Lanham Act, when there is an unusual discrepancy in the merits of the positions taken by the parties, or the losing party has litigated the case in an unreasonable manner); (b) sanctions and attorneys' fees under federal or

---

[1] *See* SAC ¶¶ 17, 25, 30.  Your complaint does not explain how Defendants allegedly came into possession of these "recordings," much less how they could possibly contain the dialogue for video games scripted decades later.  As Defendants' search of their documents confirms, they have never received audio recordings of your client.
4828-7343-0362v.4 0025936-002594

January 25, 2018
Page 3

state laws governing frivolous claims; and (c) a claim for wrongful use of civil proceedings under 42 Pa. C.S.A. § 8351 *et seq.* (the Dragonetti Act).

This letter is without prejudice to Defendants' rights and remedies, all of which are expressly reserved.

Sincerely,


/s/  Elizabeth A. McNamara
Elizabeth A. McNamara
*Counsel for Defendants Microsoft Corporation and Lester Speight*


/s/  Robert C. Van Arnam
Robert C. Van Arnam
*Counsel for Defendant Epic Games*


cc:     All counsel of record

# Exhibit D

## BRUCE J. CHASAN, ESQ.
LAW OFFICES OF BRUCE J. CHASAN, LLC

1500 JFK BOULEVARD
TWO PENN CENTER, SUITE 312
PHILADELPHIA, PA 19102

BJCHASAN@BRUCECHASANLAW.COM
WWW.BRUCECHASANLAW.COM
T 215.567.4400
F 215.565.2882

ADMITTED IN PA, MA, VA, DC AND
UNITED STATES PATENT AND TRADEMARK OFFICE

January 26, 2018

### SETTLEMENT COMMUNICATION PURSUANT TO F.R.E. 408

Robert Van Arnam, Esq.
Williams, Mullen
301 Fayetteville Street, Suite 1700
Raleigh, NC 27601                                    (via email)

Elizabeth McNamara, Esq.
Davis Wright Tremaine, LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020                    (via email)

Dear Counsel:

### Re: *Lenwood Hamilton v. Lester Speight et al.,*
### No. 2:17-cv-0169-AB (E.D. Pa.)

Prior to receipt of your 25 January 2018 letter, I thought I was dealing with high-caliber opposing counsel.  Now your letter makes me wonder whether the two of you are just a couple of bullies.

I will discuss your letter with Mr. Hamilton.   As you can certainly appreciate, I have no authority to dismiss the Complaint without direction from my client.

Regarding your assertion that there is "no good faith basis" for me or my client to pursue the case, let me point out to you that Mr. Hamilton first came to see me on Dec. 29, 2016.  He had an expert report by Mr. Owen from April 2016 that supported his belief that it is his voice in the videogames.  Not only that, he was and is sincere in his belief that it is his voice, likeness and mannerisms that are used in the videogames.  I determined that the statute of limitations on certain tort claims was January 11, 2017.  I was leaving January 1, 2017 for a week for an out-of-state CLE

1

meeting.  When I returned, I filed Mr. Hamilton's Complaint on January 11, 2017 to make sure that his claims were not lost due to any dereliction of duty by counsel.  My conduct was ethical and responsible and in the best interests of my client, who is entitled to his day in court.

You cite that I am the fourth attorney who was contacted by Mr. Hamilton, and allegedly three others had turned him down, so I must be decidedly wrong in my assessment of the case, as the other three attorneys supposedly had good grounds for declining the case.  Let me disabuse you of your assumptions.  Mr. Tecce is an IP attorney, and he could have declined the case for any number of reasons.  There was no voice expert report in existence when Mr. Tecce declined the case.  Mr. Campbell is not an IP attorney, and there was no voice expert report in existence when he corresponded with Epic Games in 2015.  Mr. Conrad is not an IP attorney, but he has been supportive of Mr. Hamilton and he advanced the funds for the voice expert report (and was repaid by Mr. Hamilton).  Mr. Conrad remains supportive to this day.

Your letter has two paragraphs discussing the *Almeciga* case.  You cited that case in Defendants' Reply Brief in support of the Motion to Dismiss the Second Amended Complaint ("SAC") (ECF 39), and I discussed it as well in Plaintiff's Sur-Reply Brief (ECF 42).   No doubt Judge Brody saw it, and she was not persuaded that it required dismissal of the SAC.  I am not going to rehash the arguments.

Your suggestion that there is "fraud" on the part of Mr. Hamilton and/or Mr. Owen is not well-taken.  To date, you have produced no documents, there have been no depositions, and you have produced no opposing expert reports.   You have no evidence of any fraudulent intent on anyone's part.  Your suggestion that Mr. Hamilton intentionally disguised his voice to trick the forensic voice examiner is absurd and preposterous.  I look forward to you making that argument to the jury!

I am quite sure that you told your respective clients that you expected to get the SAC dismissed, and now you are embarrassed because you did not succeed in that endeavor.[1]  So now your clients have to spend money on the case, win or lose.  Usually when defendants lose a motion to dismiss, they evaluate whether they should seek an early settlement to limit litigation expenses and potential risk.  But no, you are not doing that.

---

[1] Although you argued for dismissal of each of the five counts in the SAC, Judge Brody did not dismiss any of them.  (*See* ECF 43.)

2

When we had the conference call with Magistrate Judge David Strawbridge on January 8, 2018 to discuss possible settlement, as directed by Judge Brody (ECF 44), I advocated an early mediation to see if the parties could reach a settlement; but the both you said no, you wanted to do discovery, and did not believe early settlement discussions were worthwhile. So you clearly elected to procced with the expense of discovery. You elected to spend your clients' money on discovery by turning down the opportunity for an early mediation.

You are threatening to seek attorney's fees for the prevailing party under the Lanham Act, 15 USC §1117(a). Well, go ahead. First you have to prevail at trial, and then you have to persuade the Court that this is an "exceptional case" under the *Octane Fitness* criteria. Assuming you can meet both of those hurdles, it doesn't get you anything. Mr. Hamilton is of extremely limited net worth, and for all intents and purposes, he is judgment proof. You will run up your clients' expenses for nothing.

You are also threatening to seek fees and damages under Rule 11, state statutory law, and/or the Dragonetti Act, 42 Pa.C.S.A. § 8351 et seq., pertaining to wrongful use of civil proceedings. I don't appreciate your threats, as now I have to report them to my insurance carrier.

Let's address the Dragonetti Act first. This case first has to go all the way to termination, and Defendants have to be the prevailing parties. Then you have to prove the Complaint was filed by the attorney without probable cause or that the attorney acted in a grossly negligent manner. Well, good luck with that! You don't have evidence to prove either one of those criteria. It just doesn't exist.

Rule 11 does not provide for compensatory damages. Sanctions under Rule 11 are intended to impose the minimum penalty required to prevent repetitive wrongful conduct in the signing of pleadings and written motions. You can't meet the requirements of Rule 11(b). Also, you never served a 21-day notice letter under Rule 11(c)(2) to withdraw the Complaint, the Amended Complaint, or the SAC.

As for state law remedies, you have similar difficulties in attempting to prove that Mr. Hamilton's or my conduct in filing the Complaint(s) was vexatious, arbitrary or in bad faith, for the same reasons that a Dragonetti case would be a waste of time.

You assert that Mr. Owen's expert report is "false" and a "fraud upon the court." Falsity and fraud require scienter. What you are really arguing is that you hope to prove Mr. Owen's report is mistaken or legally

3

insufficient, not "false," and not "fraudulent." If you can prove mistake, it may help you win the case. But that is a far cry from "fraud." And by the way, the affirmative defenses in your respective Answers (ECF 47, ECF 48) do not allege "fraud." You have no basis to amend, either.

Your letter focuses on whether Hamilton's "actual voice" was used in the videogames, conveniently ignoring the allegations that it could be a "sound-alike," and you also ignore other allegations pertaining to physical appearance and accoutrements (such as the derby hat and the wrist cuffs).

You allege I am litigating the case in an "unreasonable manner." How so? I filed a Complaint and amended it twice, and it has withstood Defendants' motion to dismiss. I served discovery. I sought an early settlement conference, which you refused. I am in the process of preparing responses to Defendants' discovery requests, and I am assembling materials for the Plaintiff to produce in response to Defendants' requests for production of documents. I have been practicing law for 45 years. I fail to see anything that supports your assertion that I am litigating this case in an "unreasonable manner." You won't talk settlement, so I am compelled to litigate on behalf of my client. It is you who have ordained "millions for defense, not one cent for tribute."[2] Go ahead and waste your clients' money.

And while you allege I am litigating this case in an "unreasonable manner," you still have not produced the promised draft of a stipulated protective order, nor supplied any responsive documents in discovery. Instead, you are making unfounded accusations of "fraud," and using your baseless "nuclear option" of threatening me with a Dragonetti action.

As mentioned at the start of this letter, I am appalled by your bullying, and I think your ethics leave something to be desired. I have done nothing improper, unethical, or unprofessional in helping Mr. Hamilton present his claims to the Court.

I will not copy Judge Brody on this letter, but I will copy Magistrate Judge Strawbridge (along with a copy of your letter), who I trust will retain it in confidence until such time as a settlement conference is convened.

---

[2] I recall Magistrate Judge Strawbridge inquiring in the Jan. 8 conference call whether the Defendants wanted to make a "nuisance" settlement offer, and you even declined that, preferring to forge ahead with discovery. Be sure to tell the General Counsels of your respective clients that you preferred spending hundreds of thousands of dollars on discovery instead of exploring a "nuisance" value settlement.

Very truly yours,

Bruce J. Chasan
Attorney for Lenwood Hamilton

cc:  William Hangley, Esq. (via email)
     Bonnie Hoffman, Esq. (via email)
     U.S. Magistrate Judge David Strawbridge (via First Class U.S. Mail)

5

# Exhibit E

# BRUCE J. CHASAN, ESQ.

LAW OFFICES OF BRUCE J. CHASAN, LLC

1500 JFK BOULEVARD
TWO PENN CENTER, SUITE 312
PHILADELPHIA, PA 19102

BJCHASAN@BRUCECHASANLAW.COM
WWW.BRUCECHASANLAW.COM
T 215.567.4400
F 215.565.2882

ADMITTED IN PA, MA, VA, DC AND
UNITED STATES PATENT AND TRADEMARK OFFICE

March 12, 2018

PRIVILEGED AND CONFIDENTIAL

Lenwood "Skip" Hamilton
1201 Willow, Apt. 5
Norristown, PA 19401

(tel. 484-686-6996)

RE:   **Hamilton v. Speight**

Dear Mr. Hamilton (Skip):

I have decided to delay sending a letter to Judge Brody seeking leave of court to withdraw for two reasons:   (1) If you retain another attorney, the other attorney can enter his or her appearance, and then I can withdraw; and (2) third-party financing is still being evaluated by Legalist, Inc., pursuant to an inquiry I initiated last week.

The likelihood of you finding a replacement attorney for me is not high.  You cannot pay anyone's hourly rates.  At least six experienced attorneys have been invited to co-counsel with me in the handling of your case, and share in the contingent fee, and all have declined.  They therefore think your matter is high risk and the likelihood they will recover fees commensurate with their time is dubious.

Also, I am not confident that Legalist, Inc. will agree to fund your case.  We have been turned down by seven or eight third party funders to date, and it is apparent that they believe your case is high risk, and they prefer not to advance up to $500,000 in litigation expenses, because they have strong concerns there will not be any recovery.  I have spent a lot of time trying to get a third-party funder for your case, and I have not succeeded.  I do not wish to spend any more time doing this (without payment for my time), as I believe it is fruitless.  When 7 or 8 third party funders say no, it should tell you something.

You are adamant that I should not submit a settlement demand to Microsoft and the other defendants of less than $7,500,000.   I will not do so.  We did that last year, and the defendants thought it was outlandish.  They will have the same viewpoint today.  Were I to submit that demand again, I believe there will be no counter-proposal, and all settlement discussions will be dead.  The defendants will view you (and me) as intransigent, and they will continue to litigate the case.

1

[Type here]

If we had an expert report that said your damages are $10 to $15 million, it might be justifiable to submit a high settlement demand.  But we do not have the funds to hire an expert on damages.  As I told you before, your case is worth zero without a qualified expert on damages.

We also have no funds for litigation expenses, such as depositions.  As I have explained to you, each deposition costs about $3000 to $4000 for court reporters and videographers.

You should be jumping at Microsoft's invitation on March 7 to submit a reasonable settlement demand, which I believe would be in the range of $900,000 to $950,000.  Such a demand will not be accepted, but it will likely invite a counter-offer if it is explained well.  Any counter-offer is good, as then the parties can negotiate something in the middle.

Microsoft is motivated by their perception that I am an aggressive attorney (I am), and their belief that I have funding for your case.  It is to your advantage right now that they do not realize that neither you nor I has any funding.  If they knew that, they would not have issued a settlement overture.  They would just sit back and let us implode.  (They will find this out in a matter of weeks, anyway, if we do not seize their settlement overture right now.)

So you are squandering your chance to engage in meaningful settlement negotiations.  If you don't agree to lower your expectations within the next 24-48 hours, the case is essentially over.   I will stop working on it (and only do the minimum), and I will turn my energies elsewhere, where I hope to be compensated for my legal work and acumen.  I reserve my option to write to Judge Brody seeking leave to withdraw.

You should recognize that through my efforts, you have survived a motion to dismiss, and moved Microsoft to the point where they are willing to offer some money to settle the case.  That is HUGE!  But you are unrealistic, and you exaggerate the value of your case, and you also exaggerate the strength of the merits of your case.   You are acting like a pig, and if I may say so, pigs get slaughtered.   Passing up realistic settlement negotiations this week means you are likely to get zero.

I know you have discussed this with Kevin Conrad, and Kevin agrees with my assessment.  We are both disappointed that you are so obstinate, and downright foolish.

Finally, in listening to your justifications on Saturday as to why you will not lower your settlement demand, I had the distinct impression that you are delusional and off the rails.  If that is how you come across in your deposition (if it ever occurs), you will not serve yourself well.  I am sorry if you are offended, but it is necessary for me to be blunt.

[Type here]

Very truly yours,

Bruce J. Chasan

cc: Kevin Conrad, Esq. (via email)

# Exhibit F

**Pierce Bainbridge Beck Price & Hecht LLP**
600 Wilshire Boulevard, Suite 500
Los Angeles, California 90017-3212
(213) 262-9333

March 19, 2018

# Engagement Agreement

Pierce Bainbridge Beck Price & Hecht LLP ("Attorney") and Lenwood Hamilton ("Client") hereby agree that Attorney will provide legal services to Client on the terms set forth in this Engagement Agreement ("Agreement").

1. **Conditions**
   This Agreement will not take effect, and Attorney will have no obligation to provide legal services, until: (a) Client returns a signed copy of this Agreement; and (b) Attorney acknowledges acceptance of representation by counter-signing this Agreement and returning a fully executed copy to Client. Upon satisfaction of these conditions, this Agreement will be deemed to take effect as of March 19, 2018.

2. **Scope of Services and Attorney's Duties**
   Client hires Attorney to provide legal services in the following matter: prosecution of claims in *Lenwood Hamilton v. Microsoft, Inc. et al.*, Case No. 2:17-cv-0169-AB (E.D. Pa.) (the "Engagement").

   Attorney will provide those legal services reasonably required to represent Client. Attorney will take reasonable steps to keep Client informed of progress and to respond to Client's inquiries. This Agreement does not cover representation in any court action or arbitration, on appeal or in collection proceedings after judgment or proceedings regarding renewal of a judgment. A separate written agreement for these services or services in any other matter not described above will be required. Attorney's services will be limited to the representation of Client in the Engagement. Attorney's services will not extend to other business, person, or legal affairs of Client, or to any other aspect of its activities. Attorney's receipt or use of confidential

– 1 –

or other information from Client or others in the course of this representation does not mean that Attorney will render any other advice or services either to Client or any other person or entity. Similarly, Client will not look to or rely upon Attorney for any investment, accounting, financial, or other non-legal advice, including without limitation any advice regarding the character or credit of any person with whom Client may be dealing.

This Engagement is on behalf of Client only. Attorney will not be representing any other officer, director, employee, owner, founder, member, shareholder, or partner of, or any other person affiliated with Client; or any subsidiary, parent, or other affiliate of Client. If any of these persons or entitles believe that that may require counsel, Attorney would be happy to discuss with them whether it might be able to represent them as well, but any such representation would need to be covered by a separate engagement agreement, and would depend on a review by Attorney and disclosure to all concerned of the conflicts of interest that would arise in connection with any such concurrent representation, and on appropriate consents being obtained from Client and from those seeking such additional representation.

Unless Client specifically directs Attorney to the contrary, for the purposes of this Engagement, it is agreed that it is appropriate for Attorney to use email in the course of the Engagement without any encryption or other special protections. Client may notify Attorney if it has any other requests or requirements in connection with the methods of telecommunication relating to the Engagement.

3. **Insurance Coverage and Claims**
Client understands and agrees that Attorney is not being engaged to advise regarding the existence of any insurance coverage in connection with the circumstances of the Engagement or to advise or assist in the formulation or submission of any insurance claim in connection with the Engagement. If Client has not done so already, Client should consider tendering this matter to its insurer(s) in order to determine whether there is insurance coverage for any of the claims asserted.

Pierce Bainbridge Beck Price & Hecht LLP Attorney-Client Agreement

### 4. Client's Duties

In order to effectively represent Client, it is important that Client provide Attorney with complete and accurate information regarding the subject matter of the Engagement, and that Client keep Attorney informed on a timely basis of all relevant developments. In addition, it is important that Client and its officers and employees provide Attorney with timely assistance and cooperation in connection with the Engagement.

Client agrees to be truthful with Attorney and not withhold information. Further, Client agrees to cooperate, to keep Attorney informed of any information or developments which may come to Client's attention, to abide by this Agreement, to pay Attorney's bills on time, and to keep Attorney advised of Client's address, telephone number, and whereabouts. Client will assist Attorney by timely providing necessary information and documents. Client agrees to appear at all legal proceedings when Attorney deems it necessary, and generally to cooperate fully with Attorney in all matters related to the preparation and presentation of Client's claims.

An understanding of the duties of preservation and discovery of electronically stored information ("ESI") is an essential prerequisite to the development of a successful litigation strategy for every Clients. Because the duty to preserve potentially relevant information is triggered when litigation is reasonably anticipated or commenced, and because the failure to comply with federal or state rules relating to discovery of ESI can have dire consequences (including sanctions ranging from monetary penalties, to Clients' action being dismissed), Attorney has prepared written guidelines explaining in detail these rules, their operation, and the consequences of failing to adhere to them. In the event Clients have not already issued a litigation hold in this manner, Attorney requests that Clients immediately do so, which Attorney will be happy to prepare.

### 5. Future Conflicts of Interest

Attorney has several lawyers. Attorney may currently or in the future represent one or more other clients in matters involving Client. Attorney is undertaking this Engagement on condition that Client

Pierce Bainbridge Beck Price & Hecht LLP Attorney-Client Agreement

gives its express consent and agreement that Attorney may represent other clients in matters in which Attorney does not represent Client even if the interests of the other clients are adverse to Client (including the appearance on behalf of another client adverse to Client in litigation or arbitration), provided that the other matter is not substantially related to Attorney's representation of Client in this matter and that in the course of representing Client Attorney has not obtained confidential information from Client material to the representation of the other clients. The countersignature to this letter on behalf of Client constitutes Client's agreement that Attorney has made disclosure to Client that: (i) the representation of other clients adverse to Client may have adverse effects on the performance of Attorney's duties as attorneys to remain loyal to Client, to maintain Client's confidences, and to render legal services with vigor and competence; and that (ii) notwithstanding Client's consent, it is possible that Attorney might be required to withdraw or disqualify from representing Client by reason of Attorney's representation of another client and, further, that if in such circumstances Attorney does not continue or is required to withdraw from this Engagement, Client may incur delay, prejudice, or additional cost associated with acquainting new counsel with the Engagement.

6. **Legal Fees**

Attorney will only be compensated for legal services rendered if a recovery is obtained for Client.

The fee to be paid to Attorney will be a percentage of the "net recovery," depending on the stage at which the settlement, arbitration award, or judgment is reached. The term "net recovery" means: (1) the total of all amounts received by settlement, arbitration award or judgment, including any award of attorney's fees, (2) minus all costs and disbursements incurred by Attorney in connection with the Engagement. If another party is ordered by the court to pay Client's attorney's fees and/or costs, that award will be part of Client's net recovery and the contingent fee will be based on the Client's total recovery, including the amount of the court-ordered award of attorney's fees and/or costs. Net recovery will also include the reasonable value of any non-monetary proceeds.

Attorney's fees will be calculated as follows, with respect to each lawsuit or arbitration filed in the United States:

> Twenty (20%) of the net recovery; and attorneys' fees awarded by the Court according to law pursuant to fee application made to Court by Attorney

In the event of Attorney's discharge, or withdrawal with justifiable cause, as provided in Section 12, Client agrees that, upon payment of the settlement, arbitration award or judgment in Client's favor in this matter, Attorney will be entitled to be paid by Client a reasonable fee for the legal services provided. Such fee will be determined by considering the following factors:

(1) The amount of the fee in proportion to the value of the services performed;

(2) The relative sophistication of the Attorney and the Client;

(3) The novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly;

(4) The likelihood, if apparent to the Client, that the acceptance of the particular employment will preclude other employment by the Attorney;

(5) The amount involved and the results obtained;

(6) The time limitations imposed by the Client or by the circumstances;

(7) The nature and length of the professional relationship with the Client;

(8) The experience, reputation, and ability of the Attorney;

(9) The time and labor required;

(10) The informed consent of the Client to the fee.

7. **Negotiability of Legal Fees**
   Client understands that the rates set forth above are not set by law, but are negotiable between Attorney and Client.

8. **Costs and Other Charges**
   Attorney will advance all costs and expenses incurred in connection with this Engagement.

9. **Fees and Costs Awarded to Opposing Party**
   Client understands that if Client's case proceeds to court action or arbitration, the court may award attorney's fees as well as costs and expenses to the other party or parties. Payment of such attorney fees and costs shall be the sole responsibility of Client.

10. **Client Approval Necessary for Settlement**
    Attorney will not make any settlement or compromise of any nature of any of Client's claims without Client's prior approval. Client retains the absolute right to accept or reject any settlement.

11. **Our Lien on Any Recovery Client Obtains**
    Client hereby grants Attorney a lien as security for the payment of fees and costs due and owing to Attorney under this agreement. This lien will attach to any recovery Client may obtain, whether by arbitration award, judgment, settlement, or otherwise, in connection with the Engagement, and Attorney may use this lien to enforce its right of payment. This lien could delay payments to Client or receipt by Client of some or all of any recovery Client may obtain as a result of our services until any dispute over the amounts to be paid to Attorney is resolved.

    Client may seek the advice of an independent lawyer of your choice about this lien provision and its consequences. Client also has the right to ask any questions about Attorney's understanding of the lien. By signing this agreement, Client acknowledges that it has been advised of the terms of this lien agreement and of its right to consult independent counsel. Client also acknowledges that it has

been given reasonable opportunity both to see such advice and to ask Attorney any questions that it has prior to signing.

## 12. Discharge and Withdrawal

Client may discharge Attorney at any time. Attorney may withdraw with Client's consent or for good cause or if permitted under the Rules of Professional Conduct of the State Bar of California or applicable law. Among the circumstances under which Attorney may withdraw are: (a) with the consent of Client; (b) Client's conduct renders it unreasonably difficult for the Attorney to carry out the employment effectively; or (c) Client fails to pay Attorney's fees as required by this Agreement. Notwithstanding the discharge, Client will remain obligated to pay Attorney its fees as set forth in this Agreement.

## 13. Conclusion of Services

When Attorney's services conclude, whether by completing the services covered by this Agreement, or by discharge or withdrawal, all unpaid charges for fees or costs will be due and payable immediately.

Client may have access to Client's case file at Attorney's office at any reasonable time. At the end of the engagement, Client may request the return of Client's case file. If Client has not requested the return of Client's file, and to the extent Attorney has not otherwise delivered it or disposed of it consistent with Client's directions, Attorney will retain the case file for a period of seven years, after which Attorney is authorized by this agreement to have the case file destroyed. If Client would like Attorney to maintain Client's case file for more than seven years after the conclusion of Attorney's services for Client on a given matter, a separate written agreement must be made between Attorney and Client, which may provide for Client to bear the cost of maintaining the file. In the event Client requests that Attorney transfer possession of Client's case file to Client or a third party, Attorney is authorized to retain copies of the case file at Attorney's expense. The case file includes Client papers and property as defined in Rule 3-700(D)(1) of the California Rules of Professional Conduct.

Attorney's representation of Client will be considered terminated at the earlier of: (a) Client's termination of the representation; (b) Attorney's withdrawal from the representation; or (c) the completion of Attorney's substantive work for Client, which, in the absence of a letter notifying Client of the completion of the Engagement, shall be presumed to occur six months after the rendition of the matter.

14. **Other Litigation Proceedings**

If, as a result of this Engagement, and even if the Engagement has ended, Attorney is required to produce documents or appear as witnesses in any governmental or regulatory examination, audit, investigation, or other proceeding or any litigation, arbitration, mediation, or dispute involving Client or related entities, Client shall be responsible for the costs and expenses Attorney reasonably incurs (including professional and staff time at Attorney's then standard hourly rates). Similarly, if Attorney is sued or subject to legal or administrative proceedings as a result of Attorney's representation of Client in this matter, Client agrees to indemnify Attorney for any attorney's fees and expenses (including Attorney's own professional and staff time at our then-standard hourly rates) Attorney incurs as a result. This section is not intended to apply to any claim brought by or on behalf of Client alleging wrongdoing by Attorney.

15. **Arbitration**

Although unlikely, it is possible that a dispute may arise between Client and Attorney regarding some aspect of the Engagement and Attorney's representation of Client. If the dispute cannot be resolved amicably through informal discussions, Attorney believes that most, if not all, disputes can be resolved more expeditiously and with less expense by binding arbitration than in court. This provision will explain under what circumstances such disputes shall be subject to binding arbitration.

**CALIFORNIA AGREEMENT TO ARBITRATE**

15.1. Any dispute between Attorney and Client as to attorney's fees or costs in connection with the Engagement shall be resolved as follows:

**15.1.1.** If any such fee or cost dispute arises, Attorney shall provide Client with written notice of Client's right to arbitrate under the California State Bar Act (Bus. & Prof. Code § 6200, *et seq.*). Those procedures permit a trial after arbitration, unless the parties agree in writing, after the dispute has arisen, to be bound by the arbitration award.

**15.1.2.** If Client exercises its rights under the California State Bar Act, Client and Attorney may thereafter agree that the arbitration will be binding.

**15.1.3.** If Client exercises its rights under the California State Bar Act, and Client and Attorney do not agree that the arbitration is binding, then Client and Attorney agree that the dispute will be subject to mandatory arbitration as described in Section 15.2 below.

**15.1.4.** If after receiving notice of its right to arbitrate, Client does not exercise its rights under the California State Bar Act by filing a request for fee arbitration within 30 days, Client and Attorney agree that the dispute will be subject to mandatory arbitration as described in Section 15.2 below.

**15.1.5.** Any other dispute arising under the Engagement or in connection with the provision of legal services by Attorney including, without limitation, any claim for breach of contract, professional negligence or breach of fiduciary duty, shall be resolved by confidential, binding arbitration as described in Section 15.2 below.

**15.1.6.** By initialing below and signing this Engagement Letter, Client and Attorney confirm that they have read and understand these sections concerning arbitration and voluntarily agree to binding arbitration. In doing so, Client and Attorney voluntarily give up important constitutional rights to trial by judge and jury, as well as rights

to appeal; depending on the rules of the arbitration program, both also may be giving up their rights to discovery. If Client later refuses to submit to arbitration after agreeing to do so, Client may be ordered to arbitrate pursuant to the provision of California law. Client is advised that it has the right to have an independent lawyer of its choice review these arbitration provisions, and this entire agreement, prior to initialing this provision or signing this Agreement.

_____
(Client's initials)

Pierce Bainbridge Beck
Price & Hecht LLP

### 15.2. Arbitration Procedures

In the event of any dispute that is subject to arbitration pursuant to Section 15.1 above, the initiating party will provide a written demand for arbitration to the other party setting forth the basis of the initiating party's claim and the dollar amount of damages sought.

The parties further agree that if arbitration is necessary, each arbitration will:

**15.2.1.** Be heard and determined by a panel of three arbitrators (all of whom will be retired state or federal judges with at least five years judicial experience), with one selected by each party of the arbitration, and the third selected by the first two from the panel of arbitrators of JAMS (or its successor); provided, however, that if the dispute has been submitted to mediation, the JAMS arbitrator will not be the mediator who presided over the mediation.

**15.2.2.** Take place in Los Angeles;

15.2.3. Be conducted in accordance with JAMS Streamlined Arbitration Rules and Procedures (or any successor rules and procedures), in effect at the time the initiating party delivers to the other party the demand for arbitration required hereunder.

15.2.4. Apply the laws of California. The arbitration proceedings and the decision of the arbitrator will be confidential. Notwithstanding anything to the contrary contained in this agreement, the prevailing party in any arbitration, action or proceeding to enforce any provision of this agreement will be awarded attorneys' fees and costs incurred in that arbitration, action or proceeding, including, without limitation, the value of the time spent by Attorney to prosecute or defend such arbitration, action or proceeding (calculated at the hourly rate(s) then normally charged by Attorney to clients which it represents on an hourly basis), except that the foregoing shall not apply to any mediation as described above, and the parties will split the fees of the arbitrator; and

15.2.5. Be final and binding on all parties, will not be subject to de novo review, and that no appeal may be taken. The ruling of the arbitrator(s) may be entered and enforced as a judgment by a court of competent jurisdiction. The arbitration provisions of this Agreement may be enforced by any court of competent jurisdiction, and the party seeking enforcement shall be entitled to an award of all costs, fees and expenses, including attorneys' fees, to be paid by the party against whom enforcement is ordered.

16. **Disclaimer of Guarantee and Estimates**
Nothing in this Agreement and nothing in Attorney's statements to Client will be construed as a promise or guarantee about the outcome of the matter. Attorney makes no such promises or guarantees. Attorney's comments about the outcome of the matter are expressions of opinion only, are neither promises nor guarantees, and will not be construed as promises or guarantees. Any deposits made

by Client or estimates of fees given by Attorney are not a representation of a flat fee and will not be a limitation on fees or a guarantee that fees and costs will not exceed the amount of the deposit or estimate. Actual fees may vary significantly from estimates given.

17. **Professional Liability Insurance Disclosure**

Pursuant to California Rule of Professional Conduct 3-410, Attorney is informing you in writing that Attorney has professional liability insurance.

18. **No Tax Advice**

Attorney has not been retained to provide Client with any tax advice concerning any of the services described in Section 2. Any documents prepared by Attorney may have specific tax ramifications. To be sure Client understands and is certain of all the potential tax consequences, Client should consult with tax advisors regarding these matters.

19. **Entire Agreement**

This Agreement contains the entire agreement of the parties. No other agreement, statement, or promise made on or before the effective date of this Agreement will be binding on the parties.

20. **Severability in Event of Partial Invalidity**

If any provision of this Agreement is held in whole or in part to be unenforceable for any reason, the remainder of that provision and of the entire Agreement will be severable and remain in effect.

21. **Modification by Subsequent Agreement**

This Agreement may be modified by subsequent agreement of the parties only by an instrument in writing signed by both of them.

22. **Billing Agreement**

By signing below, Client agrees that it has had enough time to review this letter, that Attorney has advised Client that it has the right to consult another, independent lawyer about the provisions relating to the waiver of conflicts of interest and any other aspect of this Agreement as to which Client may wish to avail itself of such

advice, and that Client is satisfied that it understands this Agreement. Client also agrees that it has the freedom to select and engage the counsel of its own choice and accordingly that this is an arms-length agreement between parties of equal bargaining strength and that Client has freely determined, without any duress, to sign and agree to these terms.

**23. Effective Date**

This Agreement will govern all legal services performed by Attorney on behalf of Client commencing with the date Attorney first performed services. The date at the beginning of this Agreement is for reference only. Even if this Agreement does not take effect, Client will be obligated to pay Attorney the reasonable value of any services Attorney may have performed for Client.

The parties have read and understood the foregoing terms and agree to them as of the date Attorney first provided services. If more than one client signs below, each agrees to be liable, jointly and severally, for all obligations under this Agreement. Client will receive a fully-executed copy of this Agreement.

Dated: _____

_____
Lenwood Hamilton

Dated: March 19, 2018          Pierce Bainbridge Beck Price &
                                Hecht LLP

                                *John M. Pierce*

                                By: _____
                                    Managing Partner

# Exhibit G

4400 North Scottsdale Rd. Suite 9277
Scottsdale, AZ 85251
Tel. 844.772.8284
Fax. 480.648.0971



# Pravati Capital

### Law Firm Legal Funding Contract & Security Agreement

This Law Firm Legal Funding Contract & Security Agreement (as may be amended from time to time, including all Exhibits and Schedules hereto, this "Agreement") is made and entered into by and between Pravati Capital, LLC, a Delaware limited liability company (including its successors and assigns and each affiliate or partner providing funding under this Agreement, "PRAVATI"), and Pierce Bainbridge Beck Price & Hecht, LLP, a California Corporation (including its successors and permitted assigns, "LAW FIRM). PRAVATI and LAW FIRM are each herein sometimes referred to as a "Party" and collectively as the "Parties".

**By this Agreement, PRAVATI is making a legal funding to LAW FIRM secured by the contingency fees and expense reimbursements earned in connection with the outcomes of Cases in a Portfolio of Cases. If LAW FIRM is unsuccessful and receives no Proceeds of any kind on the Portfolio of Cases and is not in Default under this Agreement (excepting a Default under clause "(xiv)" of the definition thereof), then LAW FIRM will owe no money to PRAVATI under this Agreement. As collateral security, LAW FIRM is granting to PRAVATI, among other protections, a perfected first priority security interest in and to all potential future Proceeds from the Portfolio of Cases, but PRAVATI has absolutely no right to and will not make any decisions with respect to LAW FIRM's services or counseling provided or the strategy in representing its Clients in connection with the Portfolio of Cases. The right and responsibility to make all such legal and strategic decisions relating to the handling and/or settlement of the Cases in the Portfolio of Cases remains solely with LAW FIRM and its lawyers. This Agreement defines all the terms and conditions of the legal funding between LAW FIRM and PRAVATI.**

## RECITALS

Whereas, LAW FIRM has been retained (and/or will be retained) as legal counsel with respect to the Cases included in the Portfolio of Cases and has signed and/or will sign a Contingent fee agreement with each of its Clients in connection with each such Case in the Portfolio of Cases; and

Whereas, LAW FIRM has reviewed and considered the terms and conditions of this Agreement and is aware of the various fees associated with the legal funding arrangement hereunder, and LAW FIRM has considered all other alternative avenues of commercial funding for operating its law practice and prosecuting the Cases, including loans from banks and other entities that lend money; and

Whereas, LAW FIRM desires to obtain the legal funding hereunder from PRAVATI pursuant to the terms of this Agreement in connection with operating LAW FIRM's law practice, and LAW FIRM has determined that it can and desires to encumber the Collateral in favor of PRAVATI pursuant to this Agreement; and

Whereas, PRAVATI has agreed to provide legal funding to LAW FIRM in consideration of the fees and protections hereunder, including, without limitation the lien on, security interest in, and assignment of, the Collateral, the Proceeds and any and all payment intangibles that arise from time to time in connection with any settlement, judgment or other resolution of any Case in the Portfolio of Cases and/or any Relating Proceedings being represented by LAW FIRM. PRAVATI acknowledges that the outcome of any future settlement, judgment or other resolution of the Portfolio of Cases is uncertain, unpredictable, and involves risks beyond the Parties' control and

could result in no payment or recovery of Proceeds by LAW FIRM against any Defendant or others arising out of the Portfolio of Cases or Related Proceedings.

## COVENANTS AND AGREEMENTS

1.  CONSIDERATION: Now, therefore, in consideration of the sums advanced to LAW FIRM hereunder (as described in Schedule A), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, PRAVATI and LAW FIRM do hereby agree to the terms, provisions and conditions of this Agreement (including the Exhibits and Schedules hereto and thereto).

2.  DEFINITIONS: Supplementing the terms defined elsewhere in this Agreement, the following terms
    (including other forms of such terms) used throughout this Agreement shall have the following meaning:

    "Account" means a right to payment of a monetary obligation, whether or not earned by performance, and any "account" as defined in the applicable version of Article 9 of the Uniform Commercial Code.

    "Assignment" means the total and immediate transfer of all of LAW FIRM's rights, title and interest in and to any and all Proceeds from any and all Cases in the Portfolio of Cases and all Related Proceedings.

    "Cases" means any Lawsuits, Proceedings, Things in Action, and/or any other claims for damages that is now or hereafter included (or that should be included or is deemed to be included) on Schedule B and all derivative or related claims of any Client of LAW FIRM arising from or relating to the injury/incident/event directly or indirectly involving any Defendant.

    "Client" means any individual and/ or business who signs (or has signed) a retainer agreement with LAW FIRM relating to a Case.

    "Collateral" means all Accounts, instruments, chattel paper, contract rights, General Intangibles, Payment Intangible  (all as defined in the applicable version of Article 9 of the Uniform Commercial Code, and as supplemented under this Agreement), all bank accounts (other than LAW FIRM's client trust accounts) holding any Collateral or Proceeds, and all similar rights that LAW FIRM may have of every nature and kind in connection with any Client and/or any Case (including specifically and without limitation, all of LAW FIRM's rights to receive payment or otherwise, for legal and other services rendered and to be rendered, and for costs and expenses advanced and to be advanced, and all other rights and interest that LAW FIRM may have in and with respect to each and every Client and each and every Case).

    "Default" means the occurrence of any one or more of the following:

    i.   (a) Non-disclosure or concealment by LAW FIRM or any of its lawyers of any material information about a Case or any other material information about LAW FIRM or any of its lawyers that could have an adverse effect on the outcome of any Case; or

    ii.  (a) LAW FIRM, voluntarily or involuntarily, transfers or encumbers in favor of anyone, other than PRAVATI, LAW FIRM's interest in any Case (including, without limitation, its right to any fees in connection with any Case) or (b) if anyone other than PRAVATI, otherwise obtains any right, title or interest in or to LAW FIRM's interest in any Case

2

(including, without limitation, its right to any fees in connection with any Case), provided, however, it will not constitute a Default under clause "(b)" of this section to the extent that a Client grants another law firm (unrelated and unaffiliated with LAW FIRM and/or any of its partners) a contingency fee with respect to such Client's Case after LAW FIRM abandons such Case or after such Client terminates the attorney-client relationship with LAW FIRM relating to such Case so long as LAW FIRM continues thereafter in good faith and in a commercially reasonable manner to pursue collection of the contingency fee earned by LAW FIRM in connection with such Case prior to such abandonment or termination; or

iii. LAW FIRM (or any of its lawyers), directly or indirectly, takes any action (or fails to take appropriate action the effect of which is) to waive, compromise, reduce, discount, negate, settle or otherwise forego LAW FIRM's interest (including, without limitation, its right to any fees in connection with any Case) in (a) Cases representing in the aggregate ten percent (10%) or more of the Proceeds in the Portfolio of Cases as estimated by LAW FIRM as of the Effective Date, provided however, it will not constitute a Default of this section to the extent that a Client waives, compromises, reduces, discounts, negates, settles or otherwise foregoes its claim and such action thereby results in a reduction of the dollar amount of LAW FIRM's Proceeds associated with such Case; or

iv. (a) Failure of LAW FIRM to deposit all proceeds and other payments received by LAW FIRM in connection with any Case into LAW FIRM's client trust account within three (3) business days after receipt thereof by LAW FIRM or (b) failure of LAW FIRM to remit to PRAVATI its share of the Proceeds received by LAW FIRM within three (3) business days after Receipt of Proceeds by LAW FIRM (as Receipt of Proceeds is defined in Section 6), provided that such failure to deposit or remit will not constitute a Default under this section if (a) the failure results from an administrative oversight or mistake in processing by LAW FIRM , (b) the respective deposit or remittance is made within ten (10) business days, and (c) no more than two (2) such failures occur within any twelve (12) month period; or

v. Failure of LAW FIRM to timely notify PRAVATI of any Notice of Eligibility issued in connection with any Case in the Portfolio of Cases within three (3) business days after the issuance thereof, provided that such failure to notify will not constitute a Default under this section if (a) the failure results from an administrative oversight or mistake in processing the notice, (b) the respective notice is provided within ten (10) business days, and (c) no more than two (2) such failures occur within any twelve (12) month period; or

vi. Failure of LAW FIRM to timely and promptly make or remit any payment in accordance with the provisions of this Agreement, provided that such failure to remit will not constitute a Default under this section if (a) the failure results from an administrative oversight or mistake in processing the payment, (b) the respective payment is made within ten (10) business days, and (c) no more than two (2) such failures occur within any twelve (12) month period; or

vii. (a) The commencement of any bankruptcy or insolvency proceeding by or against LAW FIRM or any of its partners, or (b) LAW FIRM or any of its partners otherwise become insolvent, or (c) the appointment of a receiver to manage any assets of LAW FIRM or any of its partners; or

viii. Any judgment is entered against LAW FIRM or any of its partners in excess of $250,000.00; or

3

ix. (a) PRAVATI, for any reason, at any time does not have a perfected, first priority security interest in all of the Collateral, or (b) LAW FIRM fails, refuses or is otherwise unable to grant PRAVATI a perfected, first priority security interest in all of LAW FIRM 's personal property and other assets upon any conversion of Nonrecourse Advances into Recourse Obligations; or

x. LAW FIRM or any of its partners does not hold a valid license to practice law in the relevant jurisdiction(s) or fails to maintain sufficient malpractice insurance in the amount of at least 400,000.00; or

xi. LAW FIRM or any of its partners is suspended or disbarred from the practice of law; or

xii. (a) The indictment, conviction or arrest of any partner of LAW FIRM or (b) LAW FIRM or any of its partners is found by a court of competent jurisdiction to have engaged in any fraudulent activity or that of any deceit; or

xiii. LAW FIRM ceases to operate the practice of law; or

xiv. Any breach of any covenant, agreement, or warranty contained in this Agreement by LAW FIRM or any inaccuracy as to any representation or statement in this Agreement or in any report in connection herewith by LAW FIRM that is not cured or corrected by LAW FIRM within thirty (30) days after the earlier of (a) the date on which LAW FIRM or any of its partners become aware of such breach or non-compliance and (b) the date on which PRAVATI notifies LAW FIRM in writing of the occurrence of such breach or non-compliance.

"Defendant" means any and all defendants in the cases listed in Schedule B - LAW FIRM LIST OF CASES AND RELATED PROCEEDINGS of this agreement, including successors, assignees and/or other third-party (including any trust and any insurer) who is obligated to make any payments in connection therewith.

"General Intangible" means any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter of credit rights, letters of credit, money, oil, gas, or other minerals before extraction. The term includes payment intangibles and software.

"Guarantor" means, individually and collectively, each person (if any) identified on Schedule A as a Guarantor of the Recourse Obligations (if any) under this Agreement.

"Lawsuit" means a claim for damages that any Client possesses against any Defendant or the action that Client has filed to collect damages from any Defendant or any Related Proceedings.

"Legal Funding" means all money paid or otherwise advanced to or on behalf of LAW FIRM (including any expenses incurred by or on behalf of PRAVATI, as specifically identified in the Term Sheet attached as Schedule A) in anticipation of LAW FIRM's recovery of certain future and pending Proceeds that may arise from any settlement, judgment or other resolution resulting from any Proceedings or Lawsuit.

"Monetary Obligation" means an obligation to pay or receive money.

"Nonrecourse Advances" means the obligations of LAW FIRM under this Agreement as to which PRAVATI's only recourse under this Agreement is to the Proceeds and the Collateral.

4

"Payment Intangible" means a general intangible under which the account debtor's principal obligation is a monetary obligation and the contractual right to payment is sufficiently liquidated.

"Portfolio of Cases" means the collection of Cases that are now or hereafter included (or that should be included or are deemed to be included) on Schedule B.

"Proceeds" means all money or other things of value that LAW FIRM hereafter recovers (or has the right to recover), with the right to retain, directly or indirectly from any Defendant (or any trust, insurer or other third party) in connection with any Case in the Portfolio of Cases or any Related Proceeding. For avoidance of doubt, the term "Proceeds" does not include any portion of a recovery collected by LAW FIRM from any Defendant in connection with a Case that is owed (a) to the associated Client for such Case, (b) to any unrelated external referring attorney or law firm for such Case, or (c) to any unrelated third-party consultant for such Case that provided services therefore on a Contingent fee basis.

"Proceedings" means any legal or civil claim for damages that any Client of LAW FIRM possesses against any Defendant, including any action LAW FIRM files on behalf of any Client to collect damages from any Defendant and/or otherwise in connection with any Case in the Portfolio of Cases or any Related Proceedings

"Related Proceedings" means any claim, case, or causes of action with the same or substantially the same operative facts or allegations arising out of the events, Lawsuit, or Proceedings under any Case, including without limitation, the filing in a different jurisdiction, adding additional parties, and/or asserting a claim for malpractice, fraud, or breach arising from the handling or mishandling of the underlying Case.

"Recourse Obligations" means any and all obligations of LAW FIRM under this Agreement (including all Nonrecourse Advances) as to which LAW FIRM is fully liable and PRAVATI has recourse to all assets of LAW FIRM beyond just the Proceeds and the Collateral, but if, and only if, there occurs any Default under this Agreement (other than a Default under clause "(xiv)" of the definition thereof).

"Thing In Action" means any claim or debt upon which a future recovery may be made in a Lawsuit, including any causes of action.

3.   ADVANCES AND PAYMENTS. All advances of Legal Funding by PRAVATI to LAW FIRM under this Agreement will be made by PRAVATI as provided on Schedule A, subject to the terms and conditions otherwise set forth in this Agreement. All payments and repayments to PRAVATI under this Agreement (a) will be made by LAW FIRM as and when provided on Schedule A, subject to the terms and conditions otherwise set forth in this Agreement, and (b) in all instances, will be made by LAW FIRM to PRAVATI unconditionally and in full in immediately available funds of U.S. dollars (without any setoff or deduction). So long as no Default occurs under this Agreement (other than a Default under clause "(xiv)" of the definition thereof), the advances, and other obligations of LAW FIRM under this Agreement will be Nonrecourse Advances; and if any Default occurs under this Agreement (other than a Default under clause "(xiv)" of the definition thereof), all advances, and other obligations of LAW FIRM under this Agreement will be Recourse Obligations.

4.   USE OF FUNDS: LAW FIRM acknowledges and agrees that the Legal Funding provided herein shall be used by LAW FIRM (a) to pay costs and expenses associated with operating a law practice, and/or (b) to refinance all or a portion of LAW FIRM's existing indebtedness, which indebtedness was incurred to finance costs and expenses associated with operating a law practice, and/or (c) to pay federal, state and/or local taxes owed by LAW FIRM or its

principals, and/or (d) to make one or more arms' length loans to one or more partners of LAW FIRM, in an aggregate amount collectively not to exceed $300,000.00, and/or (e) to make distributions to one or more shareholders of LAW FIRM in an aggregate amount collectively not to exceed $300,000.00 (provided that such distributions are made in accordance with LAW FIRM's organic documents and applicable law, are made at a time that LAW FIRM is not insolvent and do not result in LAW FIRM becoming insolvent or having insufficient capital to operate LAW FIRM).

5.   SECURITY INTEREST:   LAW FIRM hereby also grants to PRAVATI a security interest (which shall have a first lien priority) in all Collateral (including all Accounts and Payment Intangibles), whether now or hereafter existing, associated with or arising from each Case in the Portfolio of Cases, any Related Proceedings, and all future Cases or Related Proceedings as collateral and security for the full and timely repayment and performance of all obligations of LAW FIRM under this Agreement. In the event LAW FIRM is engaged to represent or otherwise acquires any additional future Cases or Related Proceedings, LAW FIRM shall revise Schedule B to set forth each such newly acquired Cases or Related Proceedings and shall notify PRAVATI of the revisions to Schedule B in a timely manner. LAW FIRM hereby authorizes PRAVATI to file a UCC 1 Financing Statement (and any amendments thereto) as may be desired by PRAVATI to perfect or further protect PRAVATI's security interest in all such Collateral. LAW FIRM acknowledges and agrees that this Agreement creates a contractual right for PRAVATI to receive payment of the future Proceeds (including Accounts and Payment Intangibles) from the Portfolio of Cases or other Related Proceedings whenever any such Case or Proceeding settles or is reduced to a judgment  and, as such, at that time, automatically and immediately becomes a perfected security interest in such Proceeds (including Accounts and Payment Intangibles) regardless of whether any UCC-1 Financing Statement is filed.

LAW FIRM understands the above-mentioned legal funding provided by PRAVATI to be a prepayment of LAW FIRM's possible recovery of future Proceeds and Collateral. PRAVATI acknowledges it is providing legal funding for certain future Proceeds that may arise from the Portfolio of Cases or other Related Proceedings and, as such, PRAVATI understands that if there is no recovery of Proceeds or Collateral by LAW FIRM against any Defendant in the Portfolio of Cases or other Related Proceedings and LAW FIRM is not in Default under this Agreement (other than a Default under clause "(xiv)" of the definition thereof), then, and only then, LAW FIRM shall not owe PRAVATI any repayment of the funds advanced under this Agreement.

LAW FIRM also understands, acknowledges and agrees that LAW FIRM shall not assign, dispose of, encumber, or pledge as security or otherwise all or any portion of the Proceeds or Collateral, or any other interest in any Case in the Portfolio of Cases or other Related Proceedings unless and until PRAVATI is first unconditionally and finally paid in full in immediately available funds of U.S. dollars (without any setoff or deduction) with respect to all amounts owed to PRAVATI under this Agreement.

6.   DEPOSIT & DISTRIBUTION OF PROCEEDS: LAW FIRM agrees, covenants and warrants that all payments (including the payment of all Proceeds) made by or on behalf of any Defendant (including any payments made by the settlement claims administrator) in connection with any Case will be delivered directly to LAW FIRM and will be immediately deposited by LAW FIRM (within three (3) business day after receipt thereof by LAW FIRM) into LAW FIRM's client trust account. LAW FIRM also agrees, covenants and warrants that LAW FIRM

will not at any time make any payment to any Client, to LAW FIRM or to any other person or party from LAW FIRM's client trust account relating to any Case unless LAW FIRM also concurrently therewith pays and remits to PRAVATI its portion of the Proceeds with respect to such Case (as such portion owed to PRAVATI is determined in accordance with this section).

So long as LAW FIRM and the Portfolio of Cases satisfies each of the "Enhanced Distribution Conditions" (defined below) and no Default has occurred, then LAW FIRM will be entitled to retain fifty percent (50%) of the Proceeds earned on each Case and shall remit to PRAVATI the remaining fifty percent (50%) of such Proceeds earned on each Case within three (3) business days after Receipt of Proceeds by LAW FIRM. However, if LAW FIRM is not in compliance with the Enhanced Distribution Conditions, then LAW FIRM will be entitled to retain only twenty-five percent (25%) of the Proceeds earned on each Case and shall remit to PRAVATI the remaining seventy-five percent (75%) of such Proceeds earned on each Case within three (3) business days after Receipt of Proceeds by LAW FIRM.

The foregoing notwithstanding, if a Default has occurred or if a Material Adverse Litigation Development (defined below) occurs, then (a) LAW FIRM will not be entitled to retain any of the Proceeds earned on any Case unless and until PRAVATI has been paid in full in immediately available funds of U.S. dollars the entire amount owed to PRAVATI under this Agreement, and (b) LAW FIRM shall remit to PRAVATI one hundred percent (100%) of such Proceeds earned on each Case within three (3) business days after Receipt of Proceeds by LAW FIRM until such payment in full of the amounts owed to PRAVATI, provided that, if a Material Adverse Litigation Development has occurred but no Default has otherwise occurred, then LAW FIRM may nevertheless retain a portion of such Proceeds (not to exceed twenty five percent (25%)) with respect to any Case for which LAW FIRM owes and pays an internal referral fee to an attorney employed by LAW FIRM other than Pierce Bainbridge Price & Hecht, LLP, John Pierce.

For purposes of this Section 6, the term "Receipt of Proceeds" shall mean the date on which any payment received by LAW FIRM in connection with any Case has been deposited by LAW FIRM and recognized by LAW FIRM's financial institution as available funds.

For purposes of this Section 6, the term "Material Adverse Litigation Development" means any holding, order or ruling by a court of competent jurisdiction after the effective date of this Agreement that PRAVATI determines (acting in good faith and in a commercially reasonable manner) is likely to have a material adverse effect on the collectability of or the likelihood of LAW FIRM collecting the Proceeds estimated by LAW FIRM with respect to a portion of the Cases in the Portfolio of Cases deemed meaningful by PRAVATI.

7.  AUTHORIZATION TO SHARE CASE INFORMATION WITH PRAVATI: LAW FIRM hereby represents and warrants to PRAVATI that LAW FIRM is authorized to release to PRAVATI any/all information, files, records and documents for the duration of this Agreement regarding the subject matter and status of each Client's Cases and other Related Proceedings. PRAVATI shall treat such information as confidential and shall receive and review these materials solely in the limited capacity necessary for the initial review and underwriting process as well as the ongoing execution and maintenance of this Agreement. LAW FIRM shall make available to PRAVATI, within forty-eight (48) hours after any request by PRAVATI, the files for all of the Cases so that PRAVATI can perform an onsite audit of each Case.

8.  REPORTING: Within five (5) days after the end of each month during the term of this Agreement, LAW FIRM shall send a report to an attorney of PRAVATI's choice detailing all the pledged Cases in the Portfolio of Cases and other Related Proceedings, which monthly report shall accurately identify the following information as of the end of the immediately preceding month: (a) the current status of each Case, including without limitation, the eligibility and approval of all Cases and Client claims submitted by LAW FIRM or otherwise on behalf of any Client, and (b) any other information regarding the Cases that PRAVATI may reasonably request from time to time. LAW FIRM further agrees to provide PRAVATI annual financial statements (audited or unaudited) within ten (10) days after LAW FIRM's receipt thereof for each year during the term of this Agreement. Within fourteen (14) days after receipt of any request by PRAVATI, LAW FIRM will provide PRAVATI with copies of all related bank statements and trust accounts for each month that legal funding is outstanding under this Agreement.

9.  RETAINER AGREEMENTS; CONTROL OVER CASES: LAW FIRM warrants, represents and covenants (a) that it has (and at all times during the term of this Agreement, will have) a valid and legally enforceable retainer agreement with each Client, and (b) that it has (and at all times during the term of this Agreement, will have) an enforceable lien on the proceeds of each Case in the Portfolio of Cases identified on Schedule B or otherwise pledged to PRAVATI under this Agreement, and (c) that all amounts owed to LAW FIRM by each Client are valid. The Parties acknowledge and agree that this Agreement is expressly intended to transfer, convey, Assign, encumber and relinquish control over the Proceeds and Collateral that may result from the Cases in the Portfolio of Cases and other Related Proceedings. PRAVATI, however, shall have no right to and will not make any decisions with respect to the conduct of the underlying civil actions or Claims or make any decisions with respect to any settlements or resolution thereof; the right and obligation to make those decisions remains solely with LAW FIRM and its lawyers.

10.  DISCHARGES: LAW FIRM understands and agrees that if it is (a) discharged, (b) acquires co-counsel with or without PRAVATI's written permission, and/or (c) is otherwise relieved of its responsibilities with respect to any Client(s) in any of the Cases or other Related Proceedings, LAW FIRM's obligations under this Agreement shall remain in full force and effect. PRAVATI's security interest in the Collateral shall also continue unaffected by any such discharge of LAW FIRM. Within three (3) business days after LAW FIRM being informed that it is being discharged or relieved of its responsibilities, LAW FIRM shall provide written notice thereof by certified mail to PRAVATI, which notice shall include (to the extent known by LAW FIRM) the name, address, telephone number, facsimile number and email of the replacement attorney. PRAVATI shall have the right to protect its interest in this Agreement through all legal remedies, including, without limitation, by notifying any attorneys or parties involved in the continuation of the Client's Case ensuring that PRAVATI automatically and immediately receives any fees and costs payable to LAW FIRM. LAW FIRM shall also take any action and sign any document reasonably requested by PRAVATI to enable PRAVATI to protect and enforce PRAVATI's rights under this Agreement with respect to any new attorney or creditor of any such Client(s). LAW FIRM irrevocably agrees to associate as counsel Lowell Finson, Esq. on all Cases listed in Schedule B in the form provided by such counsel, provided that from time to time, upon written notice to LAW FIRM, PRAVATI may substitute other counsel as the associated counsel hereunder. The association of such counsel will only become effective or operative in the event LAW FIRM is disbarred, suspended or is otherwise unable or unavailable to represent Clients in connection with the Cases or to practice law for any reason.

8

11. ERRORS AND OMISSIONS COVERAGE BY LAW FIRM: LAW FIRM shall maintain errors and omissions insurance coverage, commonly known as malpractice insurance, applicable to the services to be rendered in association with or arising from the Portfolio of Cases, and any Related Proceedings, in a minimum amount of at least $400,000.00 per partner in LAW FIRM and at least $600,000.00 in the aggregate (or such other minimum amount as may be expressly provided in Schedule A).

12. FEES AND EXPENSES: Any fees or expenses paid pursuant to this Agreement by PRAVATI on behalf of LAW FIRM shall accrue interest under this Agreement at the same rate as any additional money paid directly to LAW FIRM. PRAVATI's fees shall also accrue interest on the aggregate amount of all monies, directly or indirectly, received by or otherwise paid on behalf of LAW FIRM. Fees and expenses paid on behalf of LAW FIRM may include, without limitation, legal fees and costs, independent consultants, other funding companies or lien holders, cashier's checks or other banking fees, and any other fees paid as outlined in Schedule A of this Agreement. LAW FIRM shall pay PRAVATI per the terms of this Agreement as reflected on Schedule A.

13. INDEPENDENT CONSULTANTS: To the extent that any advisor, broker or consultant has assisted either LAW FIRM or PRAVATI in obtaining the legal funding pursuant to this Agreement, LAW FIRM agrees that such advisor, broker or consultant is an independent contractor and not an employee of PRAVATI, has no right or authority to bind PRAVATI, and PRAVATI is not liable for any statements made by such advisor, broker or consultant. All commissions due to any such advisor, broker or consultant engaged by LAW FIRM are the responsibility of and owed independently by LAW FIRM, not PRAVATI. If so directed by LAW FIRM, so long as LAW FIRM is not in Default hereunder, PRAVATI will pay LAW FIRM's obligations owed to such advisor, broker or consultant by adding it to and/or deducting it from the total legal funding hereunder, and such payment shall be included in the total amount owed and to be funded to LAW FIRM.

14. INCORPORATION BY REFERENCE: Each of the Recitals to this Agreement is hereby incorporated herein by reference as if fully set forth herein. Moreover, all schedules attached hereto (as such schedule may be amended and supplemented from time to time) are hereby incorporated herein by reference and made a part of this Agreement. LAW FIRM and PRAVATI also agree to execute and deliver each such Schedule where indicated and required and each Party does so voluntarily, freely, and without duress.

15. BANKRUPTCY: LAW FIRM warrants, represents, and covenants to PRAVATI that (a) neither LAW FIRM nor any of its partners has filed a personal or business bankruptcy within the previous two years; (b) neither LAW FIRM nor any of its partners is currently contemplating the filing for relief under any chapter of the Bankruptcy Code; and (c) neither LAW FIRM nor any of its partners has consulted with a bankruptcy practitioner within the previous 180 days regarding the filing of relief under any chapter of the Bankruptcy Code. In the event that LAW FIRM or any of its partners files any bankruptcy proceeding subsequent to entering into this Agreement, LAW FIRM shall promptly notify PRAVATI of that fact in writing. In addition, if LAW FIRM files bankruptcy proceedings prior to the payoff of all amounts required to be paid to PRAVATI pursuant to this Agreement, LAW FIRM agrees to notify the bankruptcy court that the LAW FIRM previously assigned the Proceeds and Collateral in the Portfolio of Cases to the extent of the maximum amount referenced in Schedule A, that LAW FIRM no longer owns those Proceeds, and that those Proceeds and Collateral relating to the Cases, to the extent of the maximum amount referenced in Schedule A, are not available as part of any bankruptcy estate, and that PRAVATI is a secured creditor

and has a first priority perfected security interest in the Collateral superior to any other creditor as a result of this Agreement. LAW FIRM acknowledges and agrees that PRAVATI has provided legal funding and LAW FIRM's assignment of the Proceeds relating to the Cases in the Portfolio of Cases and obligations to PRAVATI pursuant to this Agreement shall not be discharged, voided, or reduced in any way as a result of any bankruptcy proceeding.

16.   CONSTRUCTION: LAW FIRM acknowledges and agrees that, while PRAVATI may have prepared the initial drafts of this Agreement (and all supporting documentation) (collectively, the "Documents"), LAW FIRM is a law firm with resources and legal knowledge much greater than PRAVATI. LAW FIRM also acknowledges and agrees that all terms of the Documents were subject to negotiation in good faith between the Parties, with the final terms representing a mutual meeting of the minds. PRAVATI thus is not to be deemed the drafter of the Documents and the rule of construction that ambiguities be resolved against the drafter do not apply to any of the Documents between PRAVATI and LAW FIRM.

17.   GOOD FAITH NATURE OF CLAIMS AND LAW FIRM REPRESENTATIONS: LAW FIRM represents, warrants, and covenants unto PRAVATI that, as of the date of this Agreement, (a) LAW FIRM believes the Portfolio of Cases and other Related Proceedings to be meritorious and filed in good faith; and (b) LAW FIRM has complete right, title and interest in and to the Proceeds with respect to the Portfolio of Cases and other Related Proceedings, that all of the Cases including on Schedule B are pending in the settlement process and LAW FIRM has received no money, anything else of value, entered into an undisclosed agreement or taken any undisclosed action that would diminish the value of the Cases; and (c) LAW FIRM has not and shall not assign or encumber the Proceeds or Collateral or any other similar rights or assets from the Portfolio of Cases or other Related Proceedings, except as expressly permitted in this Agreement; and (d) LAW FIRM stipulates that no amounts required to be paid to PRAVATI pursuant to this Agreement are, and shall not be, subordinated to any other liens or claims of any other party; and (e) all current liens, assignments, encumbrances or security interest of any kind or nature in or relating to the Proceeds, Collateral, or any other similar rights or assets relating to the Portfolio of Cases or other Related Proceedings are listed on Schedule B; and (f) all financial terms for each Case is accurately reflected on Schedule B; and (g) LAW FIRM has paid all of its federal, state, and local taxes through the date of execution of this Agreement or has made provisions for the payment; and (h) there are no bankruptcy or insolvency in progress or contemplated involving LAW FIRM or any of its partners; and (i) all financial disclosure made to PRAVATI are true, accurate, complete and fairly characterize the financial position of LAW FIRM; and (j) LAW FIRM and all of its partners hold a valid license to practice law and are not aware of any disciplinary proceedings commenced or about to be commenced by any State Bar Association; and (k) LAW FIRM (and the representative of LAW FIRM who signs this Agreement) has full power and authority to make, execute, and perform this Agreement.

18.   WAIVER: LAW FIRM hereby waives any defenses to payment of ANY amounts required to be paid to PRAVATI pursuant to this Agreement. LAW FIRM understands its instructions regarding payments due PRAVATI under this Agreement are irrevocable without which PRAVATI would not have agreed to provide the legal funding. LAW FIRM hereby agrees not to seek to avoid payment of any such amounts by encouraging, cooperating with, instructing, or authorizing any party to pay or distribute any proceeds from the Portfolio of Cases or other Related Proceedings to any party except in full and complete compliance with this Agreement. LAW FIRM agrees to cooperate with PRAVATI in good faith and to use all

best efforts in procuring payment of all amounts required to be paid to PRAVATI under this Agreement.

19. <u>LIQUIDATED DAMAGES:</u> In the event that LAW FIRM terminates, defaults or otherwise breaches the covenants, conditions or terms of this Agreement, in addition to the usual contract damages, LAW FIRM shall pay liquidated damages to PRAVATI in the amount of twenty percent (20%) of the outstanding amount of the principal and interest of the Legal Funding provided to LAW FIRM pursuant to this Agreement. LAW FIRM expressly acknowledges that in the event of termination or other breach of the covenants, conditions and terms of this Agreement, the anticipated loss to PRAVATI in such an event will be estimated to be the amount set forth in this liquidated damages provision and such estimated value is reasonable and not imposed as a penalty.

20. <u>DEFAULT RATE:</u> During the occurrence of any Default by LAW FIRM under this Agreement, to the maximum extent not prohibited by applicable law, all amounts owed to PRAVATI hereunder will accrue interest at a rate of 6% per annum (i.e., 0.5% per month) in excess of the rate otherwise applicable to Nonrecourse Advances hereunder.

21. <u>DISPUTED CLAIMS — MANDATORY ARBITRATION:</u> To the maximum extent not prohibited by applicable law, any and all claims, counterclaims, demands, causes of action, disputes, or other controversies under this Agreement or the alleged breach of any provision hereof (each, a "Disputed Claim"), whether any such Disputed Claim arises at law or in equity, under state or federal law, or the law of any other nation, for damages or any other relief, shall be resolved in the manner set forth below:

DISPUTE RESOLUTION PROCEDURES:

(a)     Each Party to this Agreement agrees that all Disputed Claims, which shall include any dispute, controversy or claim that may arise between or among them in connection with, arising out of, or otherwise relating to this Agreement or the application, implementation, validity or breach of this Agreement or any provision of this Agreement (including, without limitation, claims based on contract, tort or statute), shall be finally, conclusively and exclusively settled by binding arbitration in the State of Arizona in accordance with the arbitration rules (the "Rules") of the American Arbitration Association (AAA) or any successor thereto then in effect. **Each Party hereby expressly waives its right to seek remedies in court, including the right to a trial by jury, with respect to any matter subject to arbitration pursuant to this Agreement. Each Party agrees that there shall be no authority for any claims to be arbitrated on a class action or private attorney general basis.**

Furthermore, arbitration can only decide each Party's claims and may not consolidate or join the claims of other persons that may have similar claims. Any Party may bring an action, including, without limitation, a summary or expedited proceeding in any court having jurisdiction, to compel arbitration of any dispute, controversy or claim to which the provisions hereof apply. The initiation and conduct of arbitration shall be as set forth in the Rules, which Rules are incorporated in this Agreement by reference with the same effect as if they were set forth in this Agreement.

(b)     The arbitration shall be administered by the AAA. If the AAA is unable or legally precluded from administering the arbitration, then the Parties shall agree upon an alternative arbitration organization, provided that, if the Parties cannot agree, such

11

organization shall be selected by a judge of the United States District Court in the State of Arizona.

(c)    All arbitration hearings shall be commenced within thirty (30) days after arbitration is initiated pursuant to the Rules, unless, upon a showing of good cause by a Party to the arbitration, the arbitrator permits the extension of the commencement of such hearing; provided, however, that any such extension shall not be longer than thirty (30) days.

(d)    All claims presented for arbitration shall be particularly identified and the Parties to the arbitration shall each prepare a statement of their position with recommended courses of action. These statements of position and recommended courses of action shall be submitted to the arbitrator. The arbitrator shall not be empowered to make decisions beyond the scope of the position papers

(e)    The arbitration proceeding will be governed by the substantive laws of the State of Arizona and will be conducted in accordance with such procedures as shall be fixed for such purpose by the arbitrator. Each Party shall preserve its right to assert and to avail itself of the attorney-client and attorney-work product privileges, and any other privileges to which it may be entitled pursuant to applicable law. No Party to the arbitration or any arbitrator may compel or require mediation and/or settlement conferences without the prior written consent of all such Parties and arbitrator.

(f)    The arbitrator shall make an arbitration award as soon as possible after the later of the close
of evidence or the submission of final briefs, and in all cases the award shall be made not later than thirty (30) days following submission of the matter. The finding and decision of the arbitrator shall be final and shall be binding upon the Parties. Judgment upon the arbitration award or decision may be entered in any court having jurisdiction thereof or application may be made to any such court for a judicial acceptance of the award and an order of enforcement, as the case may be. The arbitrator shall have the authority to assess liability for pre-award and post-award interest on the claims, attorneys' fees, expert witness fees and all other expenses of arbitration as such arbitrator shall deem appropriate based on the outcome of the claims arbitrated. Unless otherwise agreed by the Parties to the arbitration in writing, the arbitration award shall include findings of fact and conclusions of law.

(g)    Each Party understands that this Agreement contains an agreement to arbitrate with respect
to any dispute or need of interpretation of this Agreement. After signing this Agreement, each Party understands that it will not be able to bring a lawsuit. There shall be no authority for any claims to be arbitrated on a class action or private attorney general basis. Furthermore, arbitration can only decide the Parties' claims and may not consolidate or join the claims of other persons that may have similar claims.

(h)    LAW FIRM understands that the "choice of laws", "forum", and "venue" clauses are critical
in nature, and are essential to this Agreement, and have not been entered into this Agreement as mere "form" insertions and recitals.

In the event of a dispute under the terms of this Agreement, LAW FIRM agrees to retain all Proceeds from the Collateral within its trust account going forward (not to be less than 110% of

the amount in controversy). The prevailing party in the dispute shall be entitled to recover reasonable attorney fees, filing fees and costs associated with litigating the dispute. The proceeds retained within the trust account pursuant to this section shall be distributed in accordance with this Agreement.

22. ASSIGNMENT: PRAVATI's rights and obligations under this Agreement may be assigned in its sole discretion without the consent of LAW FIRM. LAW FIRM's rights and obligations under this Agreement may not be assigned or transferred (whether voluntarily, by operation of law or otherwise) without the written consent of PRAVATI, except for transfer by intestate due to LAW FIRM'S death in which case LAW FIRM's heirs, estate, executors and personal representatives will be bound by this Agreement. LAW FIRM agrees that PRAVATI may share information that PRAVATI obtained about LAW FIRM (whether from LAW FIRM or any other person or entity) with potential assignees to whom PRAVATI may assign its rights and obligations under this Agreement, where such information is reasonably necessary to allow a potential assignee to make an informed decision whether to take assignment from PRAVATI, provided that PRAVATI enters into an appropriate confidentiality agreement with any such potential assignee.

23. USURY SAVINGS: Notwithstanding any provision of this Agreement, LAW FIRM shall not and will not be required to pay interest at a rate or any fee or charge in an amount prohibited by applicable law. If interest or any fee or charge payable on any date would be in a prohibited amount, then such interest, fee or charge will be automatically reduced to the maximum amount that is not prohibited, and any interest, fee or charge for subsequent periods (to the extent not prohibited by applicable law) will be increased accordingly until PRAVATI receives payment of the full amount of each such reduction. To the extent that any prohibited amount is actually received by PRAVATI, then such amount will be automatically deemed to constitute a repayment of principal indebtedness hereunder.

24. CHOICE OF LAW; VENUE & JURISDICTION: LAW FIRM understands and agrees that this Agreement and the relationship established hereby will be governed, interpreted and enforced under the laws of the State of Arizona (excluding the conflicts of law rules thereof) and that absent LAW FIRM's agreement to Arizona law as governing, PRAVATI would not have entered into this Agreement. Any litigation in any way related to this Agreement, or any course of conduct, course of dealing, statements (whether verbal or written), actions or inactions of PRAVATI or LAW FIRM shall be brought and maintained exclusively in the courts of the State of Arizona or in a United States District Court in the State of Arizona; provided, however, that any suit seeking enforcement hereof against LAW FIRM or any property may also be brought (at PRAVATI's option) in the courts of any other jurisdiction where such property may be found or where LAW FIRM may be subject to personal jurisdiction. LAW FIRM and PRAVATI each hereby expressly and irrevocably submits to the jurisdiction of the courts of the State of Arizona and of the United States District Courts in the State of Arizona for the purpose of any such litigation as set forth above and irrevocably agrees to be bound by any final and non-appealable judgment rendered thereby in connection with such litigation. LAW FIRM and PRAVATI each further irrevocably consents to the service of process by registered or certified mail, postage prepaid, or by personal service within or outside the State of Arizona. LAW FIRM and PRAVATI each hereby expressly and irrevocably waives (to the fullest extent permitted by law) any objection that it at any time may have to the laying of venue of any such litigation brought in any such court referred to above and any claim that any such litigation has been brought in an inconvenient forum. PRAVATI and LAW FIRM each hereby knowingly, voluntarily and intentionally waives any rights it may have to a trial by jury in respect of any

13

litigation (whether as claim, counter-claim, affirmative defense or otherwise) in any way related to this Agreement or any course of conduct, course of dealing, statements (whether verbal or written), actions or inactions of PRAVATI or LAW FIRM.

25.  INDEMNITY: LAW FIRM agrees to protect, hold harmless, defend and indemnify PRAVATI, and its partners, equity holders, members, managers, officers, directors, employees, financing sources, agents and assigns (each, an "Indemnified Party"; collectively, the "Indemnified Parties") from and against any and all liability, penalties, costs, losses, damages, expenses, causes of action, claims and/or judgments (including each Indemnified Party's attorney's fees, costs and expenses), directly or indirectly, resulting from, arising out of or is in any way connected with the transactions contemplated or the relationship established by this Agreement, or any act, omission or event occurring in connection therewith. LAW FIRM's indemnity obligations under this section shall apply, without limitation, to any and all third-party claims and all other clams against any Indemnified Party but shall not apply with respect to any Indemnified Party to the extent such liability was caused by the gross negligence, willful misconduct or fraud of such Indemnified Party. With respect to any claim, action or proceeding as to which LAW FIRM is required to protect, hold harmless, defend and indemnify an Indemnified Party under this section, PRAVATI shall be entitled to control the defense thereof and to select counsel to represent the Indemnified Party. In addition, subject to LAW FIRM's receipt from each applicable Indemnified Party of an undertaking to reimburse should any such claim, action or proceeding ultimately be determined by a court of competent jurisdiction not to be covered by the indemnification required under this section, then LAW FIRM shall fully and timely advance to the Indemnified Parties the costs and expenses of any such claim, action or proceeding during the pendency thereof. These indemnification obligations under this section shall survive any termination of this Agreement, regardless of the reason for any such termination.  Notwithstanding the foregoing, Law Firm shall not be responsible for any claims related to the origination of this advance.

26.  LITIGATION TO ENFORCE CONTRACT: In the event that litigation or other legal process, including arbitration, or any other action is necessary to enforce or interpret the terms of this Agreement, the prevailing Party in such action shall be entitled to attorney's fees and costs incurred in connection therewith. In addition, interest on any and all outstanding balances determined to be due hereunder will accrue at the rate provided for pursuant to this Agreement until all such outstanding amounts are paid in full in immediately available funds.

27.  **LIMITATION ON LIABILITY: LAW FIRM agrees that PRAVATI (and its directors, officers, employees, agents, counsel and affiliates) shall have no liability to LAW FIRM (whether sounding in tort, contract or otherwise) for losses or cods suffered or incurred by LAW FIRM in any way related to the transactions contemplated or the relationship established by this Agreement, or any act, omission or event occurring in connection therewith, except for foreseeable actual losses resulting directly from PRAVATI's own gross negligence, willful misconduct or fraud. Moreover, whether or not such damages relate to a claim that is subject to the waiver effected above and whether or not such waiver is effective, PRAVATI (and its directors, officers, employees, agents, counsel and affiliates) shall have no liability with respect to any special, indirect, consequential, punitive or non-foreseeable damages suffered by LAW FIRM (or any of its partners or clients) that are in any way related to the transactions contemplated or the relationship established by this Agreement, or any act, omission or event occurring in connection herewith or therewith.**

14

28. <u>NOTICE.</u> All notices or other written communications hereunder shall be deemed to have been properly given (a) upon delivery, if delivered in person or by facsimile transmission with confirmation of transmission received by sender, and (b) one (1) Business Day after having been deposited for overnight delivery with any reputable overnight courier service, and (c) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed to the addresses set forth below in this section or as such party may from time to time designate by written notice to the other parties. Either Party by notice to the other in the manner provided herein may designate additional or different addresses for subsequent notices or communications Any notice to legal counsel or a Person other than the primary addressee for LAW FIRM or PRAVATI below shall be a courtesy copy only and shall not affect the timeliness or effectiveness of delivery to LAW FIRM or PRAVATI.

> To LAW FIRM:  Pierce Bainbridge Beck Price & Hecht, LLP
> Attn: John Pierce
> 600 Wilshire Blvd., 5th Floor
> Los Angeles, CA 90017

> To PRAVATI:  Pravati Capital, LLC
> Attn: Alexander Chucri
> 4400 N. Scottsdale Rd., Ste. 9277
> Scottsdale, AZ 85251

29. <u>ENTIRE AGREEMENT:</u> This Agreement constitutes the entire agreement between the Parties. There are no representations, warranties, covenants, or obligation except as set forth herein. This Agreement supersedes all prior agreements, understandings, negotiations and discussions, written or oral, of the Parties, relating to any transaction contemplated by this Agreement. This Agreement shall be binding on and inure to the benefit of the Parties, their heirs, trustees, executors or any other successor-in-interest including co-counsel who may obtain or assert control over the LAW FIRM's assets for any reason including but not limited to disability (physical or mental), a decline in health or death. Also by executing this agreement, LAW FIRM, at the request of PRAVATI, agrees at the request of PRAVATI to exercise a Power of Appointment with which LAW FIRM and/or any representative of LAW FIRM will be empowered to the extent necessary to complete the Transfer that is the subject of this agreement. In the event one or more of the covenants, terms or conditions of this Agreement shall for any reason be held to be invalid or unenforceable in any respect, such invalidity or unenforceability shall not affect the validity, ability, or enforceability of any other covenant, term or condition in this Agreement.

***Signature Page to Follow***

Do not sign this Agreement before you read it completely or if it contains any blanks spaces. You are entitled to a completely filled in version of this Agreement. Before you sign this Agreement, you should obtain the advice of an attorney or legal counsel. Depending on your circumstances, you may also want to consult a tax, public or private benefit planning, or financial professional. LAW FIRM and PRAVATI each has reviewed this Agreement in its entirety prior to signing and hereby acknowledges that it (and its authorized representative who is signing on behalf of it) understands all of the terms and provisions of this Agreement.

In witness whereof, PRAVATI and LAW FIRM hereby execute and deliver this Law Firm Legal Funding Contract & Security Agreement effective immediately upon the receipt of Legal Funding by LAW FIRM from PRAVATI as set forth herein.

PIERCE BAINBRIDGE BECK
PRICE & HECHT, LLP ("LAW FIRM")

PRAVATI CAPITAL, LLC
ON BEHALF OF
PRAVATI SPV II, LLC ("PRAVATI")

By: _John M. Pierce_

By: _____

Name: _JOHN M. PIERCE_

Name: _____

Title: _MANAGING PARTNER_

Title: _____

Date: _MARCH 20TH_, 2018

Date: _____, 2018

STATE OF ~~CALIFORNIA~~ _PENNSYLVANIA_
~~County of Los Angeles~~ _COUNTY OF PHILADELPHIA_

On this _20th_ day of _March_, 2018, before me, came _JOHN M PIERCE_, the _MANAGING PARTNER_ of LAW FIRM and known to me personally to be such, and personally executed the foregoing Law Firm Legal Funding Contract & Security Agreement on behalf of LAW FIRM, and acknowledged that the above execution is his/her fully authorized act and deed on behalf of LAW FIRM, and that the facts stated herein are true, accurate and complete.

_Louise M Martino_
Notary Public

My Commission Expires: _1-16-22_

Commonwealth of Pennsylvania – Notary Seal
LOUISE M MARTINO – Notary Public
Philadelphia County
My Commission Expires Jan 16, 2022
Commission Number 1103403

16

## Schedule A — TERM SHEET

The following fully executed Term Sheet attached hereto is subject to the Law Firm Legal Funding Contract & Security Agreement (as may be amended from time to time, including all Exhibits and Schedules thereto, the "Agreement") between Pravati Capital, LLC and LAW FIRM: **Total Advanced To Law Firm Per This Agreement:  $327,700, Total Amount Funded Thus Far Per All Prior Agreements Against the Collateral List of Cases in Schedule B - $1,172,200.00**

## Schedule B – LAW FIRM LIST OF CASES AND RELATED PROCEEDINGS

The following Cases and Related Proceedings attached hereto are subject to the Law Firm Legal Funding Contract & Security Agreement (as may be amended from time to time, including all Exhibits and Schedules thereto, the "Agreement") between Pravati Capital, LLC and LAW FIRM:

| Signature Resources Capital Management | Commercial |
|---|---|
| SGVC Venture Capital Fund | Commercial |
| Art Zito Patent Matter | Commercial |
| Competitor Group, Inc. | Commercial |
| Estate of C. Ray Johnson | Estate |
| Pompliani | Commercial |
| Queen, Grove/Stiletto | Commercial |
| Gabbard | Commercial |
| Bigfoot Ventures | Commercial |
| Barrier | Commercial |
| Barton | Commercial |
| Calendar Research | Commercial |
| Juno Biomedical | Commercial |
| Michaels | Commercial |
| Guidice | Commercial |
| Mitcheles | Commercial |
| Laveau | Commercial |
| Rahimi | Commercial |
| Rusak | Employment |

18

## Schedule C – LAW FIRM LIST OF ENCUMBRANCES AND LIENS

The following Encumbrances and Liens attached hereto are subject to the Law Firm Legal Funding Contract & Security Agreement (as may be amended from time to time, including all Exhibits and Schedules thereto, the "Agreement") between Pravati Capital, LLC and Pierce Bainbridge Beck Price & Hecht, LLP:

## SCHEDULE D - LIMITED GUARANTEE AGREEMENT

This Limited Guarantee Agreement (as may be amended from time to time, "Guarantee") dated as of the _20th_ day of March, 2018 is made and entered into by _John M. Pierce_ ("GUARANTOR"), in favor Pravati Capital, LLC, a Delaware limited liability company ("PRAVATI").

WHEREAS Pierce Bainbridge Beck Price & Hecht, LLP a corporation incorporated or a legal entity duly organized under the laws of California, and having its principal place of business located at 600 Wilshire Blvd., 5th Floor, Los Angeles, CA 90017 ("LAW FIRM") has entered into an agreement dated the _____ day of March, 2018, with PRAVATI wherein PRAVATI agreed to provide legal funding to LAW FIRM secured by the contingency fees and expense reimbursements earned in connection with the outcomes of Cases in a Portfolio of Cases (such agreement, as amended from time to time, being herein called the "Agreement"); and

WHEREAS PRAVATI has requested that GUARANTOR guarantee LAW FIRM's Recourse Obligations under and as defined in the Agreement (the "Guaranteed Obligations") in accordance with the terms of the Agreement and this Guarantee.

NOW THEREFORE, in consideration of the premises, the agreement of PRAVATI to provide Legal Funding to LAW FIRM pursuant to the Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by GUARANTOR, GUARANTOR hereby covenants and agrees with PRAVATI as follows:

1.      GUARANTEE. Subject to the provisions hereof, GUARANTOR hereby absolutely, irrevocably and unconditionally guarantees the due and punctual satisfaction, payment and discharge of the Guaranteed Obligations to PRAVATI in accordance with the Agreement. If LAW FIRM fails to pay any Guaranteed Obligations, GUARANTOR shall forthwith pay to PRAVATI the amount due in the same currency and manner provided for in the Agreement. This Guarantee shall constitute a guarantee of payment and not of collection. GUARANTOR shall have no right of subrogation with respect to any payments it makes under this Guarantee until all of the Guaranteed Obligations have been indefeasibly paid in full in immediately available funds. GUARANTOR's liability hereunder shall be and is specifically limited to payments of Recourse Obligations expressly required to be made in accordance with the Agreement (even if such payments are deemed to be damages) and, except to the extent specifically provided in the Agreement, in no event shall GUARANTOR be subject hereunder to consequential, exemplary, equitable, loss of profits, punitive, tort or any other damages or, subject to this Guarantee, costs. GUARANTOR's obligations under this Guarantee hereunder shall be absolute and unconditional, shall not be subject to any counterclaim, set-off, reduction or defense based upon any claim GUARANTOR may have against PRAVATI and shall remain in full force and effect without regard to, and shall not be released, discharged or in any way affected for any reason whatsoever until the complete performance of the Guaranteed Obligations, including without limitation by reason of:

(a)      Any amendment or modification of any provision of the Agreement or any of the Guaranteed Obligations or any assignment or transfer thereof, including any extension of the time for payment of or compliance with any of the Guaranteed Obligations, whether or not consented to by GUARANTOR;

(b)     Any waiver, consent, extension, granting of time, forbearance, indulgence, renewal or other action or inaction under or in respect of the Agreement or any of the Guaranteed Obligations, or any exercise or non-exercise of any right, remedy or power in respect thereof, whether or not consented to by GUARANTOR;

(c)     Any informality in, omission from, invalidity or unenforceability of, or any misrepresentation, irregularity or other defect in, the Agreement, any of the Guaranteed Obligations or any other agreement or instrument;

(d)     Any lack or limitation of capacity, status, power or authority of GUARANTOR or LAW FIRM, and/or any defect or failure to comply with a formal legal requirement in the execution or delivery of any document;

(e)     Any transfer of any assets to or from GUARANTOR or LAW FIRM, or any consolidation, amalgamation or merger of GUARANTOR or LAW FIRM with or into any person, or any change whatsoever in the name, objects, capital structure, corporate or other legal existence, membership, constitution, or business control of GUARANTOR or LAW FIRM;

(f)     Any failure on the part of GUARANTOR or LAW FIRM or any other person to perform or comply with any terms of the Agreement, any of the Guaranteed Obligations or any other agreement or instrument;

(g)     The assignment of all or any of the part of the benefits of this Guarantee, the Agreement or any other agreement or instrument; and

(h)     Any other circumstance which might otherwise constitute a defense available to or a discharge of GUARANTOR or LAW FIRM or any other person in respect of the Guaranteed Obligations, or GUARANTOR in respect of this Guarantee.

2.     DEMAND. If LAW FIRM at any time and/or from time to time fails to pay or cause to be paid all or any portion of the Guaranteed Obligations, as and when the same shall become due and payable pursuant to the Agreement, then PRAVATI shall be entitled, by notice to GUARANTOR, to make a demand upon GUARANTOR for the payment of the Guaranteed Obligations or that portion thereof which GUARANTOR has failed to pay (hereinafter referred to as a "Payment Demand"). A Payment Demand shall be in writing and shall briefly specify in reasonable detail what amount LAW FIRM has failed to pay and an explanation of why such payment is due, with a specific statement that PRAVATI is calling upon GUARANTOR to pay under this Guarantee. A Payment Demand satisfying the foregoing requirements shall be deemed sufficient notice to GUARANTOR that it must pay the Guaranteed Obligations. A single written Payment Demand shall be effective as to any specific failure to pay during the continuance of such failure to pay, until LAW FIRM or GUARANTOR has cured such failure to pay, and additional written Payment Demands concerning such failure to pay shall not be required until such failure to pay is cured. The amount specified in a Payment Demand shall become immediately due and payable by GUARANTOR under this Guarantee upon delivery of such Payment Demand to GUARANTOR.

3.     RECOURSE. PRAVATI may, at its option, proceed against GUARANTOR to enforce any of the Guaranteed Obligation when due without first proceeding against any other person and without first resorting to any other remedy.

4.    TERM. This Guarantee shall remain in full force and effect so long as there may be any obligations outstanding by LAW FIRM under the Agreement or until they are earlier terminated by the written agreement of PRAVATI. When this Guarantee is terminated in accordance with the foregoing, GUARANTOR shall have no further liability hereunder, except as provided in the last sentence of this section. No such termination shall affect GUARANTOR's liability with respect to any Guaranteed Obligations arising prior to the effective date of such termination.

5.    REPRESENTATIONS AND WARRANTIES. GUARANTOR represents and warrants to PRAVATI that:

(a)    It has the power and authority to execute, deliver and carry out the terms and provisions of this Guarantee;

(b)    None of the execution, delivery and performance of this Guarantee violates or conflicts with any law applicable to it, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(c)    This Guarantee has been duly authorized by all necessary action on the part of GUARANTOR and no authorization, approval, consent or order of, or registration or filing with, any court or other governmental body having jurisdiction over GUARANTOR is required on the part of GUARANTOR for the execution and delivery of this Guarantee or for the performance by GUARANTOR of its obligations hereunder;

(d)    This Guarantee constitutes a valid and legally binding agreement of GUARANTOR enforceable against GUARANTOR in accordance with its terms, subject to any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity;

(e)    There is not pending or, to its knowledge, threatened against it any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Guarantee or its ability to perform its obligations under this Guarantee; and

(f)    GUARANTOR is familiar with the business of LAW FIRM.

6.    SETOFFS. PRAVATI may at any time set-off and apply indebtedness owing by PRAVATI to or for the credit of GUARANTOR against that portion of the Guaranteed Obligations owing pursuant to a Payment Demand. The rights of PRAVATI in this section are in addition to any rights and remedies, including other rights of set-off, that it may have.

7.    EFFECT OF BANKRUPTCY. GUARANTOR's obligations under this Guarantee shall not be prejudiced or affected in any way by the bankruptcy or insolvency of LAW FIRM or GUARANTOR or by any bankruptcy, reorganization, moratorium or similar insolvency proceeding relating to LAW FIRM or GUARANTOR or other relief sought or obtained in respect of LAW FIRM or GUARANTOR under any bankruptcy or insolvency law affecting creditor's rights or a petition for LAW FIRM's or GUARANTOR's winding-up or liquidation, including any discharge of any of the Guaranteed Obligations as a result of any bankruptcy or insolvency proceeding. In the case of liquidation, winding-up or bankruptcy of LAW FIRM (whether voluntary or compulsory) or any composition with creditors or scheme or arrangement relating to

22

LAW FIRM, PRAVATI shall have the right to rank in priority to GUARANTOR for its full claims in respect of the Guaranteed Obligations and receive all dividends and other payments in respect thereof until its claims in respect of the Guaranteed Obligations have been paid in full, and GUARANTOR shall continue to be liable for any balance which may be owing to PRAVATI by LAW FIRM or GUARANTOR in respect of the Guaranteed Obligations.

8.     AMENDMENT. No term or provision of this Guarantee shall be amended, modified, altered, waived, or supplemented except by an agreement in writing signed by GUARANTOR and PRAVATI.

9.     WAIVERS. GUARANTOR hereby unconditionally waives:

(a)     Notice of acceptance of this Guarantee and, except as otherwise specifically provided in this Guarantee, any other notices whatsoever;

(b)     Presentment and demand concerning the liabilities of LAW FIRM and/or GUARANTOR, except as set forth in section 2;

(c)     Any right to require that any action or proceeding be brought against LAW FIRM, GUARANTOR or any other person or against the assets of any person, or except as expressly hereinabove set forth, to require that PRAVATI seek enforcement of any performance against LAW FIRM, GUARANTOR or any other person, prior to any action against GUARANTOR under the terms hereof. Without limiting the foregoing, GUARANTOR hereby expressly waives any and all surety ship defenses affecting the enforcement of this Guarantee and the right to require marshalling of assets with respect to the assets of LAW FIRM, GUARANTOR or any other person.

Except as to applicable statutes of limitation relevant to the enforcement of this Guarantee against GUARANTOR, no delay of PRAVATI in the exercise of, or failure to exercise, any rights or remedy hereunder shall operate as a waiver of such right or remedy, or a waiver of any other rights or a release of GUARANTOR from any obligations hereunder. Nor shall any single or partial exercise of any right or remedy under this Guarantee preclude any other or further exercise thereof or the exercise of any right or remedy, nor shall any waiver of one provision be deemed to constitute a waiver of any other provision. No waiver of any of the provisions of this Guarantee shall be effective unless it is in writing duly executed by the waiving party.

GUARANTOR consents to the renewal, compromise, extension, acceleration or other changes in the time of payment of or other changes in the terms of the Guaranteed Obligations, or any part thereof or any changes or modifications to the terms of the Agreement, and none of the foregoing shall in any way release GUARANTOR from any obligations hereunder.

10.     EXPENSES. GUARANTOR shall pay for or reimburse PRAVATI for any and all reasonable fees and expenses (including without limitation all legal fees) incurred in connection with the successful enforcement of its rights under this Guarantee.

11.     INTEREST. Any obligation of GUARANTOR not paid when due will bear interest at the rate set forth in the Agreement payable on demand from the date it becomes due to the date of payment in full, unconditionally and in immediately available funds.

12.   ASSIGNMENT. GUARANTOR shall not assign this Guarantee without the express written consent of PRAVATI. PRAVATI shall be entitled to assign its rights under this Guarantee in its sole discretion.

13.   NOTICE. Any Payment Demand, notice, request, instruction, correspondence or other document to be given hereunder by any party to another (herein collectively called "Notice") shall be in writing and delivered personally or mailed by certified or registered mail, postage prepaid and return receipt requested, or by facsimile, as follows:

| | |
|---|---|
| To PRAVATI: | Pravati Capital, LLC |
| | Attn: Alexander Chucri |
| | 4400 N. Scottsdale Rd., Ste. 9277 |
| | Scottsdale, AZ 85251 |
| | |
| To GUARANTOR: | Pierce Bainbridge Beck Price & Hecht, LLP |
| | Attn: John Pierce |
| | 600 Wilshire Bolvd, 5th Floor |
| | Los Angeles, CA90017 |

Notice given by personal delivery or mail shall be effective upon actual receipt.

14.   GOVERNING LAW. This Guarantee shall in all respects be governed by, and construed in accordance with, the laws of the State of Arizona. GUARANTOR hereby attorns and irrevocably submits to the non-exclusive jurisdiction of the courts of the State of Arizona in respect of any legal action or proceeding commenced in respect of this Guarantee. GUARANTOR, to the fullest extent permitted by law, hereby waives its rights to a trial by jury.

15.   MISCELLANEOUS.

(a)   This Guarantee shall be binding upon GUARANTOR, its successors and assigns and inure to the benefit of and be enforceable by PRAVATI, its successors and assigns.

(b)   Notwithstanding the terms of the Agreement, this Guarantee embodies the entire Guarantee and understanding between GUARANTOR and PRAVATI and supersedes all prior agreements and understandings relating to the subject matter hereof.

(c)   The headings in this Guarantee are for purposes of reference only, and shall not affect the meaning hereof.

(d)   The rights, remedies and recourse of PRAVATI under this Guarantee are cumulative and do not exclude any other rights, remedies and recourse that it may have.

(e)   If any payment of GUARANTOR or LAW FIRM in respect of Guaranteed Obligations is rescinded or must otherwise be returned for any reason whatsoever, GUARANTOR shall remain liable hereunder in respect of such Guaranteed Obligations as if such payment had not been made.

(f)   The provisions of this Guarantee are intended to be severable. If any provision of this Guarantee shall be held invalid or unenforceable in whole or in part in any jurisdiction, such provision shall, as to such jurisdiction be ineffective only to the extent of such invalidity or

24

unenforceability without in any manner affecting the validity or enforceability thereof in any other jurisdiction or the remaining provisions hereof in any jurisdiction.

IN WITNESS WHEREOF this Guarantee has be executed by GUARANTOR as of the day and year first above written.

GUARANTOR:

By: _John M. Pierce_

Name: _JOHN M. PIERCE_

Title: _MANAGING PARTNER_

Date: _MARCH 20TH_ , 2018

## Schedule E - NON-DISCLOSURE AGREEMENT

The following Non-Disclosure Agreement attached hereto is subject to the Law Firm Legal Funding Contract & Security Agreement (as may be amended from time to time, including all Exhibits and Schedules thereto, the "Agreement") between Pravati Capital, LLC and LAW FIRM:

This agreement is entered into the March 19, 2018 between and among PRAVATI CAPITAL, LLC located at 4400 N Scottsdale Rd # 9277 Scottsdale, Arizona 85251 and its related entities ("Pravati"), and Pierce Bainbridge Beck Price & Hecht, LLP (together with its officers, directors, employees, assigns, affiliates, advisors, investors, potential financing sources and related funds, "Interested Parties").

**Introduction:** In connection with a contemplated business relationship between Pravati and Interested Parties, Pravati may disclose certain Proprietary Information and Confidential Information as defined below. Interested Parties agree to make no other use of such Proprietary Information and Confidential Information or any portion thereof for any purpose other than as expressly set forth herein. All Proprietary Information will be and will remain the sole property of Pravati and the Interested Parties.

Interested Parties agree to maintain mutual confidentiality that is shared to determine future business relationships.

In consideration of any disclosure and any negotiations concerning the contemplated business relationship, Pravati and Interested Parties agree as follows:

1. **Confidential Information.** PRAVATI and Interested Parties entities acknowledge and confirm that certain data from and other information that comes into its possession or knowledge and which was obtained from Pravati or Interested Parties (the "Confidential Information") is secret, confidential property. This Confidential Information includes, but is not limited to:

   (a) Lists or other identification of sources or prospective sources of capital, plaintiffs and law firms.

   (b) The identity of the clients with whom Pravati & Interested Parties do business and with whom both entities have entered into confidentiality agreements.

Notwithstanding the foregoing, the term Confidential Information shall not consist of any data or other information which has been made publicly available or otherwise placed in the public domain.

2. Interested Parties understand that this writing does not obligate either party to disclose any information or to negotiate or enter into any agreement or relationship.

3. The parties acknowledge that Proprietary Information and Confidential Information is unique and valuable, and that disclosure in breach of this agreement may result in irreparable injury to both parties for which monetary damages alone would not be an adequate remedy.

4. The terms of this agreement will remain in effect with respect to any particular Proprietary Information or Confidential Information for one (1) year after the date hereof.

5. This agreement is governed by the internal laws of the State of Arizona and may be modified or waived only in writing. If any provision is found to be unenforceable, such provision will be limited or deleted to the minimum extent necessary so that the remaining terms remain in full force and effect.

6. This agreement is the complete and exclusive statement of the understanding of the parties and supersedes and cancels all previous written and oral agreements and communications with respect to the subject matter of this agreement.

7. This agreement can only be changed or modified if it is in writing and signed by both parties.

27

# Exhibit H



promoCode=TAL&source=https%3A%

SUBSCRIBE (HTT
PROMOCODE=TAL&SOURCE=HTTPS:
BIG-LAW-PARTNERS!



# Ex-Big Law Partner's Boutique Has Both a New Name, Office

John Pierce, a former litigator at K&L Gates and Quinn Emanuel Urquhart & Sullivan who launched Pierce Sergenian year, is headed to New York. But two recent partnership splits have the Los Angeles-based firm rolling out its third r in less than a year.

By **Meghan Tribe** (/author/profile/Meghan Tribe/)  |  March 26, 2018 at 07:33 PM





INTRODUCING
MID-MARKET REPORT

Finally, a focus on the market law firms!

Get insights and business intelligence
to keep your firm competitive and on
its next Featured Q&As and events
with experts in the market law.

SHOW ME MORE

John Pierce.

A litigation boutique **founded last year (http://www.law.com/almID/1202776068666/)** by former K&L Gates and Quinn Emanuel Urquhart & Sullivan partner John Pierce has a new name, a new office and several new faces.

Founded in January 2017 by Pierce and his ex-Quinn Emanuel colleague David Sergenian, Pierce Sergenian—now known as Pierce Bainbridge Beck Price & Hecht—has set up shop in New York after adding former Jones Day and Quinn Emanuel associate Maxim Price and ex-Paul, Weiss, Rifkind, Wharton & Garrison associate and current on-air legal analyst Caroline Polisi.

The Los Angeles-based boutique has also brought on Beverly Hills-based solo practitioner James Bainbridge for its California operation.

"From the time we launched, our goal [and] our vision has always been to basically create the Quinn Emanuel for the digital age," said Pierce, who joined the firm in 2006 from Pittsburgh-based Cohen & Grigsby.

After nearly eight years at Quinn Emanuel, **Pierce jumped to Latham & Watkins (http://www.law.com/americanlawyer/almID/1202658887772/)** in 2014, spending nearly two years at the firm **before moving to K&L Gates (http://www.law.com/therecorder/almID/1202748549251/)** in early 2016 to serve as co-head of the firm's litigation group. **Pierce abruptly left K&L Gates (http://www.law.com/sites/almstaff/2016/06/06/a-new-kl-gates-hire-quickly-and-quietly-departs/)** after less than four months at the firm, but re-emerged as managing partner and co-founder of Pierce Sergenian, a boutique seeking to make a name for itself on several high-stakes contingency matters, including a **battle against Snapchat parent Snap Inc (http://www.law.com/litigationdaily/almID/1202782989916/)**.

Pierce Sergenian also made several notable additions, including former Kirkland & Ellis litigation partner Darin Beffa and ex-Quinn Emanuel of counsel Joseph Ashby. Only a few months after opening up shop, the firm **struck a deal with Scottsdale, Arizona-based litigation financier Pravati Capital (http://www.law.com/americanlawyer/almID/1202785191902/)** to become perhaps the first public example of a litigation funder investing in a firm's current and future contingency fee cases that it has against large companies like Snap.

But as the litigation boutique grew it became apparent that some lawyers at the firm didn't quite share the same vision of rapid growth in terms of head count and geographic expansion, said Pierce, noting that "being very aggressive in taking big contingency cases using litigation funding in a pioneering way, which we're doing."

So in mid-November, Sergenian and Ashby left Pierce Sergenian to form **Sergenian Ashby (http://sergenianashby.com/)** as their former firm changed its name to **Pierce Burns (http://www.pierceburnsllp.com/)** following its addition of former Quinn Emanuel associate Julian Burns King. But the latter, who had also spent time as an associate at Paul Weiss and Los Angeles-based Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, left Pierce Burns in February. Neither Burns nor Sergenian immediately returned requests for comment about their split with Pierce.

Pierce said that he and Burns are still working together to take to trial an upcoming matter. Despite its departures, the latest iteration of his new firm, Pierce Bainbridge, expects to continue to expand, Pierce said in touting its recent additions of Bainbridge, Polisi and Price. In the coming months, he hopes to add offices in San Francisco and Washington, D.C.

"We're looking for Navy Seal, Army Ranger types—really aggressive litigators who want to be on a great platform and be a part of the team and litigate great cases," said Pierce, himself a former tank platoon leader in the First Cavalry Division of the U.S. Army.

Polisi is joining Pierce Bainbridge as of counsel in New York, while Price is coming aboard as a partner in the city. Price, who previously worked alongside Pierce in representing Samsung Electronics Co. in its **high-profile intellectual property war (http://www.law.com/sites/almstaff/2016/08/31/trade-agency-sanctions-quinn-**

## Today's Mortgage Rate

# 3.75%
### APR 15 Year Fixed

Select Loan Amount

# $225,000

## Trending Stories

**1   Who Owns E-Discovery's Largest Companies? (/legaltechnews/2018/04/04 owns-e-discoverys-largest-companies/)**

LEGALTECH NEWS (/LEGALTECHNEWS/)

**2   Judge Declares Mistrial in Ford Case (/dailyreportonline/2018/04/ declares-mistrial-in-ford-case**

DAILY REPORT ONLINE (/DAILYREPORTONLINE/)

**3   Allen & Overy, O'Melveny Ey Potential Trans-Atlantic Unic (/americanlawyer/2018/04/0 big-firms-eye-a-potential-trans-atlantic-union/)**

THE AMERICAN LAWYER (/AMERICANLAWYER/)

**4   Philadelphia Family Court Judge Has a History of Violating Parents' Rights (/thelegalintelligencer/2018/ family-court-judge-has-a-history-of-violating-parents-rights/)**

THE LEGAL INTELLIGENCER (/THELEGALINTELLIGENCER/)

**5   Q&A: Jim Walden on His 'Icarus' Cameo, Creating a N Drama Law Firm (/americanlawyer/2018/03/0 jim-walden-on-his-icarus-cameo-creating-a-no-drama-law-firm/)**

emanuel-for-pervasive-problems-in-samsung-apple-case/) with Apple Inc., joined what is now Pierce Bainbridge in February from his own startup, Unifi Biotechnologies.

Price said that the structure of Pierce Bainbridge offers clients a new kind of access to justice that isn't available in traditional litigation funding and treats cases much like that of a startup, which have a lot of potential value.

"[But if a startup] doesn't find the funding it needs, it sort of gets lost in this valley of death where it can't really move forward," Price said.

With Pierce Bainbridge's new approach to litigation funding, the firm can take on a number of cases that are a little more risky than traditional litigation would be able to handle, Price said. In order to do this, the firm needs to used streamlined technology akin to what one would find in Silicon Valley.

"I see in [Pierce] the same qualities that are sort of innate to a startup founder," Price said. "I really value those qualities in a person, so I think he can move this frontier forward for this new firm."

NEW YORK LAW JOURNAL
(/NEWYORKLAWJOURNAL/)

f  SHARE ON FACEBOOK    🐦  SHARE ON TWITTER

## Meghan Tribe

Meghan Tribe is a reporter covering the changing face of Big Law, from lateral moves and work-from-home programs to diversity initiatives. Contact her at mtribe@alm.com. On Twitter: @TribeMeghan

 ( /author/profile/Meghan Tribe/)

More from this author › (/author/profile/Meghan Tribe/)

## Dig Deeper

Global Law Firms (/topics/global-law-firms/)     Law Firm Partners (/topics/law-firm-partners/)

Law Firms - Large (/topics/law-firms-large/)     Law Firms - Small (/topics/law-firms-small/)

Litigation (/topics/litigation/)     Litigators (/topics/litigators/)

Law Firm Technology (/topics/law-firm-technology/)     Legal Services (/topics/legal-services/)



## Recommended Stories



## Featured Firms

**Law Offices of Mark E. Salom**

2 OLIVER ST #608
BOSTON, MA 02109
857-444-6468www.marksalomone.co

# Exhibit I





# PIERCE BAINBRIDGE
T R I A L   L A W Y E R S

The Firm   The Team   Practices   News   Careers   Contact Us

## John M. Pierce

John M. Pierce is a trial lawyer and Managing Partner of Pierce Bainbridge Beck Price & Hecht LLP. He was described by *Benchmark Plaintiff Litigation 2012* as "one of the most esteemed jury trial lawyers" at the world's largest business litigation law firm, and *The Legal 500 United States 2015* praised his "real trial presence." In 2008, he won two multi-million dollar jury verdicts within a span of two months, including the 67th highest jury verdict in the United States in 2008 as determined by the *VerdictSearch Top 100* list, as well as a victory in a major film financing trial in Los Angeles featured in *The Hollywood Reporter.*

A graduate of Harvard Law School, where he was an editor of the *Harvard Law Review*, Mr. Pierce is often retained by major corporations and financial institutions in the most difficult, high-profile business disputes. He has successfully represented clients in complex disputes involving, among others, hedge funds, private equity, structured finance, real estate finance, financial fraud, insurance coverage, intellectual property, legal malpractice, false advertising, First Amendment claims, government contracts, and film financing.

Mr. Pierce has played a managerial role in some of the most high-profile complex commercial litigations in recent U.S. history, including *Apple vs. Samsung, TCW vs. Gundlach,* and *Allergan vs. Valeant.* In the course of doing so, Mr. Pierce has developed knowledge of best practices regarding the discovery, review and management of Electronically Stored Information and related litigation support technology and practices in a complex commercial litigation setting. He is also an experienced appellate advocate.

Mr. Pierce has successfully handled contingent and alternative fee matters, often working with third party litigation funders who assist individual and corporate clients to finance large, meritorious plaintiff-side claims. In addition, he has published an article in *The Hedge Fund Journal* on the emergence of third party litigation funding as an uncorrelated asset class for institutional investors.

On behalf of institutional clients and individuals suing as plaintiffs, Mr. Pierce has obtained verdicts, pre-trial judgments and settlements amounting to more than $292 million. On behalf of corporate defendants, he has obtained verdicts, pre-trial judgments, and settlements successfully defending over a billion dollars in claims.

Prior to founding Pierce Bainbridge Beck Price & Hecht LLP, Mr. Pierce was a partner at Quinn Emanuel Urquhart & Sullivan, LLP and Latham & Watkins LLP. He also served as co-Global Practice Area Leader for Litigation and Dispute Resolution at K&L Gates LLP. He continues to serve as outside General Counsel for the SGVC family of technology venture capital funds.

Prior to law school, Mr. Pierce was an M1A1 Abrams tank platoon leader in the U.S. Army's 1st Cavalry Division at Fort Hood, Texas. He attended the Army's Airborne School at Fort Benning, Georgia and participated in two rotations at the National Training Center at Fort Irwin, California.

In addition to his studies at Notre Dame and Harvard Law School, Mr. Pierce has taken courses on cyber security at Stanford University as well as mergers and acquisitions at the University of Chicago's Booth Graduate School of Business.

### IN THE NEWS

Read the latest about California's reaction to the anti-litigation law firm

*LAW.com : Litigation Funding: The Dam Is About to Break*
Managing Partner John Pierce on the potentially explosive impact of litigation funding.

*Bloomberg Law / Canon : Reducing E-Discovery Costs: Two Solutions That Can Help Meet the Challenge*
Managing Partner John Pierce to comment on how artificial intelligence can reduce the cost of electronic discovery.



PRACTICE AREAS



# PIERCE BAINBRIDGE
### T R I A L   L A W Y E R S

The Firm | The Team | Practices | News | Careers | Contact Us

## NOTABLE REPRESENTATIONS

Won a jury verdict of $30 million for an LA-based real estate group in a two-week trial against the town of Mammoth Lakes, California in a contract dispute over development of a large hotel and condominium project at the Mammoth Yosemite Airport. Affirmed in full by the California Court of Appeal in a 66 page published opinion at 191 Cal. App. 4th 435 (2010). Over $2 million in attorneys' fees awarded for trial and over $1 million in attorneys' fees awarded for appeal. This was the 6th largest jury verdict in the United States in 2008 as determined by the Verdict Search Top 100 List, was the largest verdict in the history of Mono County, California, and was described as a "staggering verdict" by local media. The case was featured in Quinn Emanuel's selection to the 2009 *National Law Journal's* Plaintiffs' Hot List.

Pierce's firm represented banks in the parallel state and federal court involving $55 million in bankruptcy litigation. Our result in the litigation aided in the company's right to exit.

Represented a major financial institution in legal malpractice case against an AmLaw 15 law firm. Case settled for high eight-figure amount in mediation with the law firm and its insurers prior to claims being filed.

Represented Marvell Technology and several of its executives against Jasmine Networks in summary judgment phase of highly publicized Silicon Valley trade secret litigation. After substituting in as counsel, Mr. Pierce led a team that secured voluntary dismissal of all individual defendants within a matter of weeks. Client ultimately prevailed at trial.

Prior to Mr. Pierce's involvement, a product comparison advertisement for prison mattress manufacturer against competitors resulted in a suit brought under the Lanham Act for false advertising. Decision reported at 2012 U.S. Dist. LEXIS ____ (S.D.N.Y.)

Obtained a favorable settlement after six weeks of jury trial in Fresno County Superior Court on behalf of a large security company and its CEO accused of fraud, breach of partnership, and breach of contract. Mr. Pierce examined six of the final seven witnesses at trial immediately prior to the case settling.

Represented Trust Company of the West against former portfolio manager Jeffrey Gundlach and his new company DoubleLine Capital. After a two month trial in Los Angeles, obtained a jury verdict finding in favor of TCW on its claims for theft of trade secrets, breach of fiduciary duty, and tortious interference with contractual relations. The jury also rejected Gundlach's oral contract claim for nearly half a billion dollars.

The month immediately following trial against the Town of Mammoth Lakes, won a jury verdict of $5 million including seven figure punitive damages for prolific Hollywood producer Robert Cort (producer of *Mr. Holland's Opus, Runaway Bride, Save the Last Dance, Herbie: Fully Loaded* and others) who had his three-week trial against a hedge fund and its principals for breach of a term sheet agreement under which defendants committed to provide millions of dollars in financing for Cort's film development agreement with Paramount. Affirmed in full by the California Court of Appeal at 2010 WL 332723. Approximately $1 million in attorneys' fees were awarded collectively for both trial and appeal. The result of this trial was featured in *The Hollywood Reporter*.

Represented Allstate and Prudential in a suite of residential mortgage-backed securities ("RMBS") cases against major banks, including Bank of America, JP Morgan, Credit Suisse, Nomura, UBS, Royal Bank of Scotland and Barclays involving billions of dollars of securities. Cases settled prior to trial.

Represented TOUSA, Inc. in litigation in New York and Florida concerning completion and carve-out guaranties provided in connection with a $675 million structured mezzanine real estate financing. This was the largest real estate finance transaction in Florida history at the time. Case settled prior to trial.

Represented Gliard Industries Inc. against Oakbrook Corporation and other defendants in an insurance coverage and



# PIERCE BAINBRIDGE
### T R I A L   L A W Y E R S

The Firm    The Team    Practices    News    Careers    Contact Us

Defended pharmaceutical injunction sought under the Lanham Act by a patent mattress manufacturer against competitor addition to video client advertising producer comparison Division reported at 232 F. Supp. 2d 818 (N.D. Ind. 2007).

Represented Parker Hannifin Corporation in insurance coverage and bad faith dispute with multiple insurance carriers regarding millions of dollars in historical asbestos liabilities. Case settled following a lengthy mediation for recovery of $38,000,000 and an agreement to pay future costs.

Represented Greer Industries, Inc. against Chubb Corporation and other defendants in insurance coverage and bad faith suit for first-party property loss and business interruption losses arising from an underground limestone mine roof collapse. Following a mediation, the insurer agreed to a settlement that was over five times greater than the insurer's original adjustment of the loss.

NOTABLE CLIENTS

Allergan

Fifth Third Bank

Morgan Stanley

Parker Hannifin

Trust Company of the West

Charles Schwab

Google

Motorola

Prudential

Vossloh-Schwabe, Inc.

Allstate

Marvell Technology

Oracle

Samsung

Waste Management



# PIERCE BAINBRIDGE
T R I A L   L A W Y E R S

The Firm   The Team   Practices   News   Careers   Contact Us

Trust Company of the West

Vossloh-Schwabe, Inc.

Waste Management

## EDUCATION

J.D., Harvard Law School, 2000 Editor, *Harvard Law Review*

B.B.A., University of Notre Dame, 1994 *summa cum laude*

## ADMISSIONS

State Bar of California
Supreme Court of the United States
United States Court of Appeals for the Third Circuit
United States District Courts
Central District of California
Eastern District of California
Northern District of California
Western District of Pennsylvania

## THOUGHT LEADERSHIP

# PIERCE BAINBRIDGE
T R I A L   L A W Y E R S

**DTLA**
600 Wilshire Blvd., Suite 500, Los Angeles, CA 90017

**NYC**
20 West 23rd Street, Fifth Floor, New York, New York 10010

**Washington, D.C.**
One Thomas Circle NW, Suite 700, Washington, DC 20005

© 2018 Pierce Bainbridge Beck Price & Hecht LLP. All rights reserved. Attorney Advertising. Prior results do not guarantee similar outcomes.

# Exhibit J



**Portfolio Media. Inc.** | 111 West 19th Street, 5th floor | New York, NY 10011 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# Pierce Bainbridge Ends Partnership With Funder Pravati

By **Sam Reisman**

Law360 (May 17, 2019, 7:48 PM EDT) -- Litigation boutique Pierce Bainbridge has concluded its partnership with litigation funder Pravati Capital, whose investment helped fuel the young firm's rapid national expansion over the past two years, the parties confirmed Friday.

The partnership's ending was first made public two days after Pierce Bainbridge Beck Price & Hecht LLP and a former partner, Donald Lewis, lobbed cross-complaints of misconduct at each other Wednesday.

Managing partner John Pierce said the events were wholly unconnected, and both Pierce and Pravati spokesperson John Lovallo said the investment had been paid out in full.

"The firm's repayment of the Pravati-invested funds was completed long ago for ordinary-course business reasons that are entirely unrelated to Lewis's complaint," Pierce said Friday in a statement. "Pravati provided invaluable start-up capital that played a meaningful role in our growth, and the firm paid down that debt regularly over the course of many months. The final payoff arrangements were made prior to any threatened litigation by Lewis or his attorneys."

Among his numerous allegations against Pierce Bainbridge and its partners, Lewis contends that the firm, and specifically Pierce, misappropriated funds from Pravati and regularly milked the funder for much-needed capital infusions, according to a complaint initially filed Wednesday in New York state court.

Pierce vigorously denied Lewis' claims in a statement Friday.

"Pravati is a sophisticated litigation funder that has been in business for years. They perform their own robust diligence on each case they fund, and they know what they're doing," Pierce said. "The notion that they could have been hoodwinked into making a bad investment is nonsense."

In its own complaint, filed Wednesday in California state court, Pierce Bainbridge paints a picture of Lewis as a disgruntled former partner who was ousted after he allegedly attempted to obstruct an investigation into "credible" accusations of sexual assault brought by a legal assistant.

Pierce Bainbridge said Lewis' 96-page complaint, replete with numerous alleged copies of internal firm communications, is "frivolous and defamatory," and was used as leverage to extort the firm into forking over millions of dollars as part of a purported "settlement."

Neal Brickman, an attorney for Lewis, said Friday the parties had attempted to reconcile their dispute privately through mediation before the complaints were filed in quick succession Wednesday, after talks broke down.

In a public LinkedIn post on Friday afternoon, Pierce addressed the allegations against Lewis.

"When there is a credible allegation of sexual assault at Pierce Bainbridge, we will ferociously protect our employees. Period. Full stop. Forever. We also enjoy earning millions of dollars for the amazing litigation funders we have worked with, and we always will. We will NOT negotiate with terrorists, we

will NOT be extorted and we are NEVER stopping," the post read.

On Friday, Pierce declined to disclose details about the size of the investment from Pravati, citing the confidentiality of the firm's relationship with the funder.

"We continue to have a healthy relationship with the Pravati team, and leave open the possibility of collaborating with them in the future," Pierce said.

Pravati and Pierce originally announced their partnership in 2017, touting a hefty portfolio deal of **potentially eight figures**. It was one of the first and still relatively uncommon agreements to be disclosed in the often secretive world of litigation finance.

Pierce Bainbridge is represented in the California case in-house by John M. Pierce and Denver G. Edwards.

Donald Lewis is represented in the New York case by Neal Brickman of The Law Offices of Neal Brickman PC.

The New York case is Donald Lewis v. Pierce Bainbridge Beck Price & Hecht LLP et al., case number 652931/2019, in the Supreme Court of the State of New York, County of New York.

The California case is Pierce Bainbridge Beck Price & Hecht LLP v. Donald Lewis, case number 19STCV16890, in Superior Court for the State of California, County of Los Angeles.

--Additional reporting by Natalie Rodriguez. Editing by Amy Rowe.

All Content © 2003-2019, Portfolio Media, Inc.

JS 44 (Rev. 02/19)

AB

# CIVIL COVER SHEET

20-CV-1338

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Law Offices of Bruce J. Chasan, LLC and Bruce J. Chasan, Esq.

### DEFENDANTS
Pierce Bainbridge Beck Price & Hecht, LLP, John M. Pierce, Esq., James Bainbridge, Esq., Carolynn Beck, Esq., Maxim Price, Esq., David L. Hecht, Esq., and Pravati Capital LLC

**(b)** County of Residence of First Listed Plaintiff **Philadelphia**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant **Los Angeles, CA**
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)* Bruce J. Chasan, Esq., 1500 JFK Blvd., Ste. 312, Phila., PA 19102 (tel. 215-567-4400) and Clifford E. Haines, Esq., (see attachment)

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1.  U.S. Government Plaintiff
- ☐ 2.  U.S. Government Defendant
- ☐ 3   Federal Question *(U.S. Government Not a Party)*
- ☒ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☒ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*
- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
28 U.S.C. Sec. 1332
Brief description of cause:
Tortious Interference with Contract, Restatement (2d) of Torts, Sec. 766; and Unjust Enrichment

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $ 319,240.78
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions)*
JUDGE Brody
DOCKET NUMBER 18-cv-5399-AB

DATE MARCH 9, 2020

SIGNATURE OF ATTORNEY OF RECORD Bruce N Chasan

**FOR OFFICE USE ONLY**

RECEIPT #           AMOUNT           APPLYING IFP           JUDGE           MAG. JUDGE

**Attachment to Civil Cover Sheet for**

Law Offices of Bruce J. Chasan, LLC

Bruce J. Chasan, Esq.

                         Plaintiffs

                  vs.

Pierce Bainbridge Beck Price &
    Hecht, LLP

John M. Pierce, Esq.

James Bainbridge, Esq.

Carolynn Beck, Esq.

Maxim Price, Esq.

David L. Hecht, Esq.

Pravati Capital LLC

                      Defendants

**Section 1(c) – Plaintiffs' Attorneys:**

        Bruce J. Chasan, Esq. (Atty I.D. No. 29227)
        1500 JFK Boulevard, Suite 312
        Philadelphia, PA 19102
        215-567-4400
        bjchasan@brucechasanlaw.com

        Clifford E. Haines, Esq. (Atty. I.D. No. 9882)
        Haines & Associates, P.C.
        The Widener Building – 5th Floor
        1339 Chestnut Street
        Philadelphia, PA 19107-3520
        215-246-2201
        chaines@haines-law.com

        *Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

$\partial 0$-$1338$

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 1500 JFK Boulevard, Suite 312, Philadelphia, PA 19102 _____

Address of Defendant: _____ (see attached sheet) _____

Place of Accident, Incident or Transaction: _____ Philadelphia, PA _____

---

**RELATED CASE, IF ANY:**

Case Number: __18-cv-5399__    Judge: __Brody__    Date Terminated: __05/02/2019__

Civil cases are deemed related when *Yes* is answered to any of the following questions:

| | | | |
|---|---|---|---|
| 1. | Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court? | Yes ☑ | No ☐ |
| 2. | Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court? | Yes ☑ | No ☐ |
| 3. | Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court? | Yes ☐ | No ☐ |
| 4. | Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual? | Yes ☐ | No ☐ |

I certify that, to my knowledge, the within case ☑ is / ☐ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: __MAR 9, 2020__    _signature_    29227
*Attorney-at-Law / Pro Se Plaintiff*    *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.** **Federal Question Cases:**

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☐ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☐ 11. All other Federal Question Cases
  *(Please specify):* _____

**B.** **Diversity Jurisdiction Cases:**

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):* _____
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☑ 9. All other Diversity Cases
  *(Please specify):* __Tortious Interference; Unjust Enrichment__

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, __Bruce J. Chasn__, counsel of record *or pro se plaintiff*, do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs.

☐ Relief other than monetary damages is sought.

DATE: __MAR 9, 2020__    _signature_    29227
*Attorney-at-Law / Pro Se Plaintiff*    *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

*Civ. 609 (5/2018)*

**ADDRESSES OF DEFENDANTS FOR DESIGNATION
FORM CIV. 609 (5/2018)**

Pierce Bainbridge Beck Price &
    Hecht, LLP
355 S. Grand Avenue, 44th Floor
Los Angeles, CA 90071

John M. Pierce, Esq.
c/o Pierce Bainbridge Trial Lawyers
355 S. Grand Avenue, 44th Floor
Los Angeles, CA 90071

James Bainbridge, Esq.
c/o Pierce Bainbridge Trial Lawyers
355 S. Grand Avenue, 44th Floor
Los Angeles, CA 90071

Carolynn Beck, Esq.
c/o Pierce Bainbridge Trial Lawyers
601 Pennsylvania Avenue NW
South Tower, Suite 700
Washington, DC 20004

Maxim Price, Esq.
c/o Pierce Bainbridge Trial Lawyers
277 Park Avenue, 45th Floor
New York, NY 10172

David L. Hecht, Esq.
c/o Pierce Bainbridge Trial Lawyers
277 Park Avenue, 45th Floor
New York, NY 10172

Pravati Capital LLC
7154 E. Stetson Drive, Suite 210
Scottsdale, AZ 85251

Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

Law Offices of Bruce J. Chasan, LLC and                  :         CIVIL ACTION
Bruce J. Chasan, Esq.                                     :
                        v.                                :
Pierce Bainbridge Beck Price & Hecht, LLP, John M. Pierce, James        :
Bainbridge, Carolynn Beck, Maxim Price, David L. Hecht, Pravati        NO. 20-1338
Capital LLC

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                    (  )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                         (  )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   (  )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                                  (  )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court.  (See reverse side of this form for a detailed explanation of special
    management cases.)                                                                     (X)

(f) Standard Management – Cases that do not fall into any one of the other tracks.         (  )

MAR 9, 2020
MAR 09, 2020          Bruce J. Chasan          PLAINTIFF
_____        _____    _____
**Date**                **Attorney-at-law**          **Attorney for**
215-567-4400           215-565-2882              bjchasan@brucechasanlaw.com
_____        _____    _____
**Telephone**            **FAX Number**               **E-Mail Address**

(Civ. 660) 10/02