**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

Law Offices of Bruce J. Chasan, LLC
1500 JFK Boulevard, Suite 312
Philadelphia, PA 19102

Bruce J. Chasan, Esq.
1500 JFK Boulevard, Suite 312
Philadelphia, PA 19102

        Plaintiffs

        vs.

Pierce Bainbridge Beck Price &
    Hecht, LLP
355 S. Grand Avenue, 44th Floor
Los Angeles, CA 90071

John M. Pierce, Esq.
c/o Pierce Bainbridge Trial Lawyers
355 S. Grand Avenue, 44th Floor
Los Angeles, CA 90071

James Bainbridge, Esq.
c/o Pierce Bainbridge Trial Lawyers
355 S. Grand Avenue, 44th Floor
Los Angeles, CA 90071

Carolynn Beck, Esq.
c/o Pierce Bainbridge Trial Lawyers
601 Pennsylvania Avenue NW
South Tower, Suite 700
Washington, DC 20004

Maxim Price, Esq.
c/o Pierce Bainbridge Trial Lawyers
277 Park Avenue, 45th Floor
New York, NY 10172

...continued...

Civil Action No. 2020-cv-1338-AB

**<u>JURY TRIAL DEMANDED</u>**

**<u>AMENDED COMPLAINT</u>**

1

David L. Hecht, Esq.
c/o Pierce Bainbridge Trial Lawyers
277 Park Avenue, 45th Floor
New York, NY 10172

Pravati Capital LLC
7154 E. Stetson Drive, Suite 210
Scottsdale, AZ 85251

Defendants

## AMENDED COMPLAINT

1.      Nature of Action:  This action is brought in federal court based on diversity of citizenship and an amount in controversy greater than $75,000.    Plaintiffs seek damages for Defendants' tortious interference with contractual relations and for unjust enrichment.

## PARTIES

2.      Law Offices of Bruce J. Chasan, LLC ("BJC Law") is a Pennsylvania limited liability company organized in 2012.  BJC Law has offices at 1500 JFK Boulevard, Suite 312, Philadelphia, PA 19102.

3.      Bruce J. Chasan, Esq. ("Chasan") is an attorney at law licensed in Pennsylvania since 1979, and a resident of Pennsylvania.  Chasan was first admitted to the bar in Massachusetts in 1972.  Chasan is the sole member of BJC Law and has offices at 1500 JFK Boulevard, Suite 312, Philadelphia, PA 19102.

4.      Pierce Bainbridge Beck Price & Hecht, LLP ("PBBPH Law") is a California limited liability partnership, formed in 2018.  PBBPH Law has its

main offices at 355 S. Grand Avenue, 44th Floor, Los Angeles, CA 90071. PBBPH Law also has had offices in Ohio, Massachusetts, New York City, and Washington, D.C. (but not in Pennsylvania).

5.     John M. Pierce, Esq. ("Pierce") is the global managing partner of PBBPH Law and has offices at 355 S. Grand Avenue, 44th Floor, Los Angeles, CA 90071.  Pierce is a resident of California.

6.     James Bainbridge, Esq. ("Bainbridge") is a co-managing partner at PBBPH Law and has offices at 355 S. Grand Avenue, 44th Floor, Los Angeles, CA 90071.  Bainbridge is a resident of California and uses the name "Jim."

7.     Carolynn Beck, Esq. ("Beck") is or was a co-managing partner at PBBPH Law's Washington, D.C. location, and had offices at 601 Pennsylvania Avenue NW, South Tower, Suite 700, Washington, DC 20004.  Beck served as the general counsel of PBBPH Law.  She is a resident of the District of Columbia or Maryland or Virginia (not Pennsylvania).  Beck separated from PBBPH Law after the original Complaint in this Action was filed.

8.     Maxim Price, Esq. ("Price") is or was a founding partner at PBBPH Law and served as co-partner in charge of the firm's New York City office.  Price had offices at 277 Park Avenue, 45th Floor, New York, NY 10172.  Price is a resident of New York or New Jersey (not Pennsylvania).  Price separated from PBBPH Law after the original Complaint in this Action was filed.

9.     David L. Hecht, Esq. ("Hecht") is or was a founding partner at PBBPH Law and served as co-partner in charge of the firm's New York City office.  Hecht had offices at 277 Park Avenue, 45th Floor, New York, NY 10172.  Hecht is a resident of New York or New Jersey (not Pennsylvania). Hecht separated from PBBPH Law after the original Complaint in this Action was filed.

10.    Pravati Capital LLC ("Pravati") is a Delaware limited liability company, founded in 2013, with principal offices and a place of business at 7154 E. Stetson Drive., Suite 210, Scottsdale, AZ 85251.  Pravati has offices in Arizona, California, Florida and New York City (but not Pennsylvania). Pravati is a third-party litigation funding company and, as described below, it has or had a contractual relationship with PBBPH Law at the relevant time.

## BACKGROUND

### I.  THE CONTRACT AND INTERFERING TERMINATION

11.    Lenwood "Skip" Hamilton ("Hamilton") contracted with BJC Law on December 31, 2016 by signing an "Engagement Letter" drafted by Chasan on December 30, 2016, whereby Hamilton retained BJC Law to represent him in a "right of publicity" case in which Hamilton would allege that the creators of the Gears of War ("GOW") video game series used his voice and likeness without authority and without compensation.  A true copy of the Engagement Letter signed by Hamilton is attached as **Exh. A**.

12.    The Engagement Letter (**Exh. A**) contemplated a lawsuit against

the creators of the GOW video games, namely Epic Games, Inc. and Microsoft, Inc. (*i.e.*, Microsoft Corporation), and certain Microsoft affiliates, and Lester Speight, whom the creators of the GOW video games had publicly identified as the voiceover actor for the avatar Augusts Cole ("Cole Train") depicted in the GOW video games.

13.    In ¶ 2 of the Engagement Letter, BJC Law recited that Chasan's hourly rate for litigation matters was $450, but added: "HOWEVER, WE HAVE AGREED TO TAKE THIS MATTER ON A CONTINGENT FEE BASIS OF 40%, PROVIDED YOU [HAMILTON] ARE RESPONSIBLE FOR ALL COSTS AND EXPENSES."  The Engagement Letter did not require or obligate BJC Law or Chasan to provide any unreimbursed expenses, or to search for a litigation funder to fund Hamilton's case.

14.    Also, ¶ 4 of the Engagement Letter stated BJC Law would bill Hamilton on a monthly basis (albeit Hamilton was not required to pay the monthly bills due to the contingent nature of the representation).

15.    Paragraphs 10-11 of the Engagement Letter stated in part:

10.    Special Considerations.    As stated above, this case is being handled on a contingent fee basis, with the attorney's fee being 40 percent of the net recovery (if any) obtained by verdict or settlement.  If funds are obtained in settlement or via verdict, all expenses will be reimbursed off the top.  The net left over sum will be split 60-40.    Should you reject a reasonable settlement offer against our recommendation, we reserve the right to withdraw, while retaining a quantum meruit interest in whatever verdict or settlement is later obtained.

11.    Commencement and Termination.  This engagement may be terminated at any time by any party, subject to our

obligations under the Rules of Professional Conduct.  If our engagement terminates, you remain obligated to pay us in full at our regular hourly rates and/or fixed fees for all of our past services and expenses, in accordance with the terms of this letter.

16.     Paragraph 11 of the Engagement Letter also requested Hamilton to advance a $1000 retainer for costs and expenses (in connection with the filing fee and service fees for the complaint that was being contemplated, and other expenses), and as a further condition of his agreement to the terms of the Engagement Letter, Hamilton remitted a cashier's check to BJC Law for $1000 on or about 1/8/2017.

17.     From time to time until March 2018, Hamilton remitted an additional $2100 to BJC Law to cover expenses for the services of a copy service and other vendors, that were utilized by BJC Law in the handling of Hamilton's case.  However, some of these funds were contributed by Hamilton's friends, Dr. Ray Abdallah, a Doctor of Chiropractic ("Abdallah"), and Kevin Conrad, Esq. ("Conrad"), as Hamilton often did not have the cash.

18.     As will be elaborated below, Hamilton lacked resources to fund retention of expert witnesses, pay for depositions, and/or otherwise fund the litigation through trial.

19.     BJC Law provided Hamilton with monthly invoices for several reasons, including but not limited to (a) accounting for expenses;  (b) apprising Hamilton of the tasks, time and effort expended by Chasan on his behalf;  and (c) supporting any potential claim for attorney's fees that might

be made in the litigation pursuant to any fee-shifting statute, such as the

Lanham Act.   Chasan used his customary billing rate of $450 per hour.

20.    On March 28, 2018, Beck, at the request of Pierce, emailed to

Chasan a copy of a "Termination Letter" signed by Hamilton, dated March

27, 2018 (**Exh. B** hereto).   The body of this letter stated in full:

> Dear Mr. Chasan,
>
> This letter is to terminate my engagement with you, effective
> as soon as substitution of counsel Pierce Bainbridge Beck
> Price & Hecht can be finalized.  Thank you for your efforts to
> date in my matter.
>
> Please send a copy of my legal file as soon as possible to
> Pierce Bainbridge Beck Price & Hecht LLP 600 Wilshire Blvd.,
> Suite 500, Los Angeles, CA 90017 [former address of PBBPH
> Law in Los Angeles].  This should include all hard copy
> materials, including any thumb drives and documents you
> have retained in my case.  Please send all electronic
> materials to john@piercebainbridge.com,
> carolynn@piercebainbridge.com and
> grace@piercebainbridge.com.

21.    As of 3/28/2018, when Beck forwarded the "Termination Letter,"

neither Hamilton nor PBBPH Law nor Pierce nor Beck had paid BJC Law

anything for the value of Chasan's time (then over $300,000 according to

invoices and timesheets), or discussed quantum meruit, or discussed a

division of any proceeds that might be received via settlement or judgment.

22.    As will be elaborated in the following paragraphs, any value of

Hamilton's case as of 3/28/2018 was due solely to the advocacy of BJC Law

and Chasan on Hamilton's behalf.

23.    As will be elaborated below, PBBPH Law and Pierce and his

partners saw an opportunity to take over the handling of Hamilton's case and seized it, without concern for fair compensation of BJC Law and Chasan.

## II. BJC LAW'S HANDLING OF HAMILTON'S CASE BEFORE THE ARRIVAL OF PIERCE AND PBBPH LAW

24.     Hamilton first met with Chasan on 12/29/2016 at the offices of BJC Law to discuss Hamilton's case.  Chasan and Hamilton were strangers at the time.  Hamilton was referred to Chasan by another attorney.

25.     Hamilton presented Chasan with a thumb drive which included, *inter alia*, background information on his Soul City Wrestling organization (which had been active between 1996 and 2011), the involvement of Lester Speight with Soul City Wrestling in 1998, and a report by a forensic voice examiner, Tom Owen, dated 4/29/2016, concluding that the voice of "Cole Train" in the GOW video games was Hamilton's voice.

26.     The next day Chasan conferred further with Conrad, who had been advising and assisting Hamilton.  Chasan decided he would take the case and drafted an Engagement Letter.

27.     In the next few days Chasan conferred further with Conrad and Abdallah and determined that Hamilton had first discovered the use of his voice in the GOW video games on January 11, 2015.  Several tort claims that might serve as a basis for Hamilton's lawsuit had a two-year statute of limitations, which meant that Chasan would have to file Hamilton's Complaint no later than January 11, 2017 to avoid a time bar of certain tort claims.

28.     On 1/11/2017, Chasan filed Hamilton's Complaint in Federal

Court in Philadelphia, relying on the Lanham Act and diversity of citizenship

for Federal Court jurisdiction.  The Complaint was captioned *Lenwood*

*Hamilton v. Lester Speight, Epic Games, Inc., Microsoft, Inc., Microsoft*

*Studios, and The Coalition, a division or subsidiary of Microsoft, Inc.*, No. 17-

cv-0169-AB.   The Complaint was assigned to Hon. Anita B. Brody, U.S.

District Judge.

29.     In preparing the Complaint, Chasan received information and

materials from Hamilton, Attorney Conrad, and Abdallah.

30.     It was apparent that Conrad and Abdallah were mentoring and

assisting Hamilton in every way possible.

31.     Hamilton, Conrad and Abdallah all mentioned to Chasan that

Hamilton had solicited a number of attorneys in Philadelphia and elsewhere

before approaching Chasan, and all had declined his case.  Law firms that

had been solicited included, but were not limited to: Panitch Schwarze

Belisario & Nadel, LLP; Duane Morris LLP; Caesar Rivise, P.C.; Buchanan

Ingersoll & Rooney, P.C.; Zarwin Baum DeVito Kaplan Schaer Toddy, P.C.;

Boies Schiller Flexner LLP; Gibson Dunn & Crutcher LLP; Sprague and

Sprague; McCausland Keen + Buckman; Braverman Kaskey, P.C.; and

Charles Campbell, Esq.  Some, but not all, of these law firms were disclosed

to Chasan at the time of his first meeting with Hamilton.

32.     The Complaint filed by Chasan on 1/11/2017 alleged six Counts:

(I) Unauthorized Use of Name or Likeness (Including Voice) in Violation of 42 Pa. C. S. A. § 8316; (II) Lanham Act, § 43(a)(1)(A); (III) Lanham Act, § 43(a)(1)(B); (IV) Unjust Enrichment; (V) Misappropriation of Publicity (*i.e.*, a common law right of publicity claim); and (VI) Invasion of Privacy (*i.e.* common law invasion of privacy count).  The Complaint alleged that Hamilton's voice was used in the GOW video game series and was supported by the 4/29/2016 expert report by forensic voice examiner Tom Owen, included as an exhibit to the Complaint.

33.    The Complaint alleged that the GOW video games had achieved over $1,000,000,000 in sales worldwide between 2006 and 2017.   This was based on publicly available information.

34.    Chasan promptly arranged service of process on the Defendants.

35.    Beginning 1/12/2017, Chasan began to contact third-party litigation funders to discuss funding the expenses of the case, as Hamilton lacked funds to do it himself.

36.    Also beginning 1/12/2017, Chasan began contacting damages experts to discuss how they would go about analyzing damages and what they expected the probable expense of their services was likely to be.

37.    On 1/16/2017, Chasan discussed with Hamilton and Abdallah by telephone how third-party litigation funding works, and how third-party funders invest in cases.  On that date, Hamilton signed a non-disclosure agreement with Rembrandt IP Management, LLC ("Rembrandt"), a potential

third-party litigation funding organization.  Chasan, with promotional literature from Rembrandt, had explained to Hamilton how third-party litigation funders typically finance cases, on a non-recourse basis, but seek a 300 percent return on their investment from the settlement or judgment. Hamilton was supportive of getting a third-party litigation funder on board.

38.   On 1/19/2017, Chasan prepared an estimated budget for anticipated litigation expenses (including expert witness fees, but nothing for attorney's fees) to submit to Rembrandt.  At the time, Chasan's preliminary, good-faith estimate was $358,000.

39.   On 1/23/2017, Chasan had a telephone conversation with Abdallah in which the subjects of attorney-client privilege and waiver were discussed.  Chasan informed Abdallah that communications to Hamilton through Abdallah had to be curbed because Abdallah was neither the client nor an attorney, and his involvement almost certainly risked waiver of the attorney-client privilege.  Chasan also mentioned this concern to Hamilton.

40.   Efforts to restrict communications through Abdallah were short-lived for numerous reasons including (1) Hamilton was a frequent visitor to Abdallah's chiropractic offices in Bridgeport, PA;  (2) Hamilton did not have a computer or an email address, so numerous communications from Chasan to Hamilton, and *vice versa*, were sent back and forth via emails to and from Abdallah (who would print the emails and attachments and provide them to Hamilton), and also send information to Chasan;  and (3) Hamilton wanted

Abdallah involved and frequently sought Abdallah's layman's counsel, as Hamilton viewed Abdallah as a trusted friend and advisor.   Hamilton conversed regularly with Abdallah (and others) about his case.

41.     On 1/24/2017, Chasan made an initial contact to Wes Anson and his colleagues at CONSOR, of La Jolla, California.  Anson and CONSOR are perhaps the most experienced U.S. experts with regard to damages in "right of publicity" cases.  Anson and colleagues had testified as expert witnesses numerous times in the prior 30 years and had written and published on the principles of valuation in "right of publicity" cases.

42.     Anson and CONSOR were interested in working on Hamilton's case, especially since the commercial success of the GOW video games hinted at a possible respectable large damages assessment.

43.     Anson and CONSOR estimated the cost of evaluating discovery, preparing expert reports, appearing at expert depositions, and appearing at trial, was likely to be between $175,000 and $250,000.  Of course, they could not predict damages with any precision before doing the work.

44.     Anson and his CONSOR colleagues forwarded to Chasan their curricula vitae, which Chasan in turn forwarded to Rembrandt.

45.     Chasan met with Hamilton and various witnesses at Abdallah's Bridgeport, PA offices on 1/24/2017.  (Chasan would later meet with Hamilton again at Abdallah's offices on at least the following dates: 2/11/2017; 2/13/2017; 2/18/2017; 3/4/2017; 3/18/2017; 1/13/2018;

1/27/2018; 3/3/2018; and 3/10/2018, always driving there in his own car).

46.    On 1/27/2017, Chasan sent information to Rembrandt concerning Wes Anson and CONSOR, and stated he would submit a revised estimated budget.

47.    On 1/30/2017, Chasan was contacted by retained counsel for Microsoft and Lester Speight, namely Elizabeth McNamara, Esq. ("McNamara"), who requested an extension until March 8, 2017 to respond to Hamilton's Complaint.  Chasan agreed.   On 1/31/2017, Chasan was contacted by retained counsel for Epic Games, namely Robert Van Arnam, Esq. ("Van Arnam") who also requested an extension until March 8, 2017. Chasan agreed.

48.    On 1/31/2017, Chasan sent Rembrandt a revised estimated litigation budget of $570,000 to handle all expert witnesses and depositions and bring the case to trial.

49.    On 2/7/2017, a representative of Rembrandt advised Chasan that it was a "No" for Rembrandt, but he also provided contacts for four other third-party funders that might be interested.  Chasan began to reach out to other third-party funding organizations.

50.    On 2/14/2017, Chasan filed an Amended Complaint (ECF 16)[1] which was based on additional information he had obtained from Hamilton,

---

[1] All references to "ECF___" in this Complaint are to docket filings in *Hamilton v. Speight, et al.*, No. 17-cv-0169-AB, assigned to Judge Brody.

and additional research into the GOW video games, and additional legal research.   The Amended Complaint included the same six counts set forth in the original complaint.  The Amended Complaint expanded the liability claims by alleging that the GOW video games either used Hamilton's actual voice or a "sound-alike" voice.

51.    On 2/24/2017, through an attorney friend, Chasan was introduced to another attorney who provided names of attorneys in other law firms who might be interested in serving as co-counsel with Chasan and bringing financing to the case.  Chasan began to pursue these contacts while at the same time speaking with several third-party funding organizations, in order to arrange financing for Hamilton's case.

52.    On 3/8/2017, Chasan served Hamilton's First Sets of Requests for Production of Documents to Epic Games, Microsoft, and Speight.  Among other things, the Requests included: "10.  All recordings, including outtakes, of the 'Cole Train' voice that were used in the making of GOW-1, GOW-2, GOW-3, GOW-J, and GOW-4."

53.    Also on 3/8/2017, Defendants Epic Games, Microsoft and Speight filed a Motion to Dismiss the Amended Complaint (ECF 25) pursuant to Fed. R. Civ. P. 12(b)(6).

54.     Judge Brody had scheduled a pre-trial conference with counsel to be held on March 29, 2017.  Her procedures required Hamilton to submit a settlement demand to Defendants.

55.    On 3/22/2017, Defendants Epic Games, Microsoft, and Speight filed a motion to stay discovery (ECF 28).

56.    Notwithstanding that it was difficult to frame a settlement demand in Hamilton's case before discovery had occurred, Chasan, with Hamilton's authorization, sent a letter to Van Arnam and McNamara on 3/24/2017, communicating Hamilton's settlement demand of $7,500,000, without prejudice to revision after discovery had occurred.  Chasan stated in his letter that he believed the Defendants' motion to dismiss would be denied in part and granted in part, but with leave to amend.  Chasan predicted the case would proceed.

57.    On 3/28/2017, McNamara responded in writing to Chasan's and Hamilton's 3/24/2017 settlement demand letter on behalf of Defendants Epic Games, Microsoft and Speight.  Among other things, McNamara stated the $7,500,000 settlement demand had taken them aback, that their motion to dismiss had merit, and that they had not found any evidence whatsoever that Hamilton had anything to do with the development of the "Cole Train" character in the GOW video games.  McNamara concluded her letter, stating, "we do not believe it would be constructive to respond with an offer in response to a $7.5 million demand."

58.    Also on 3/28/2018, Chasan filed a brief in opposition (ECF 30) to the Defendants' Motion to Dismiss.   Chasan stated in the brief that Hamilton intended to amend the complaint again, assuming leave to amend would be

granted.

59.     Counsel appeared before Judge Brody in her Chambers on 3/29/2017 for the scheduled pre-trial conference.   McNamara and Van Arnam also appeared and outlined the Defendants' position as to why they believed the Amended Complaint should be dismissed.  McNamara stated the parties were very far apart regarding settlement, and that trying to force negotiations at that stage would not be productive.  Judge Brody said she would grant Hamilton leave to amend his amended complaint again, and the Defendants could then decide if they wanted to renew their motion to dismiss.  She also stated that she would stay discovery.  After considering the parties' scheduling concerns, she issued a revised scheduling order (ECF 31) that memorialized her rulings in Chambers and set new deadlines.

60.     Chasan filed Hamilton's Second Amended Complaint ("SAC") on 4/14/2017 (ECF 33).  The SAC asserted five counts, as Hamilton, on Chasan's recommendation, decided to withdraw the Lanham Act count based on § 43(a)(1)(B).   But significantly, the SAC added allegations that Microsoft had sold the GOW video games bundled with the Xbox One console, relying on the image and voice of "Cole Train."   This allegation of commercial exploitation was devised solely by Chasan, based on research done by Chasan, and without any input from Hamilton, Conrad, Abdallah or anyone else.

61.     Defendants filed a Motion to Dismiss the SAC on 4/28/2017 (ECF

35).  Chasan filed Hamilton's opposition brief (ECF 36).  The Defendants filed a reply brief (ECF 39), and with leave of court, Chasan filed Hamilton's sur-reply brief (ECF 42).

62.     During the months Defendants' Motion to Dismiss the SAC was pending, Chasan suspended efforts to enlist a third-party litigation funder and/or a co-counsel who could bring financing to the case because, obviously, everyone wanted to know what the ruling would be on the motion to dismiss.

63.     In an Order entered December 18, 2017, Judge Brody denied the motion to dismiss (ECF 43), and she issued another order setting case management and discovery deadlines (ECF 44).  In a footnote in ECF 43, Judge Brody held there were factual issues regarding Defendants' two main contentions (First Amendment, and laches), and they could not be decided on a motion to dismiss.  Judge Brody did not dismiss any of the five counts in the SAC.

64.     Beginning 12/19/2017, Chasan reactivated his efforts to enlist a third-party litigation funder and/or a co-counsel who could bring funding to the case.

65.     To the extent Chasan sought to enlist a co-counsel, it was always on the basis that the 40 percent contingency of any settlement or judgment would be split on an equal basis (20/20), with BJC Law and the co-counsel splitting the work evenly going forward.

66.     On 12/28/2017, Chasan had a conference call with defense counsel.  It was agreed that Defendants could have an extension until 1/8/2018 to answer the SAC; that the parties would exchange their initial Rule 26(a) disclosures on 1/17/2018; that Defendants would respond to Hamilton's First Sets of Requests for Production of Documents by 1/17/2018, and that Defendants would take the lead in drafting a confidentiality order for submission to the court.

67.     On 1/7/2018, counsel for the parties participated in a conference call with U.S. Magistrate Judge David Strawbridge (who had been designated by Judge Brody to oversee settlement discussions).  Microsoft's counsel, McNamara, stated the Defendants had strong defenses, and they were interested in pursuing discovery at that point, not an early settlement conference.  Magistrate Judge Strawbridge declined to set up an early settlement conference.

68.     On 1/8/2018, the Defendants filed their Answers and Affirmative Defenses (ECF 47, ECF 48).  Generally, they asserted Lester Speight was the voice actor for the "Cole Train" video game character, and that Hamilton was not involved and was unknown to both Epic Games and Microsoft.

69.     On 1/9/2018, Defendants served their First Set of Interrogatories and First Set of Requests for Production of Documents to Hamilton.  In the ensuing weeks, Chasan met with Hamilton several times to prepare responses to the Defendants' discovery requests.

70.    On 1/17/2018, the parties served their Initial Rule 26(a) disclosures.

71.    Also on 1/17/2018, Defendants served their objections and responses to Hamilton's First Set of Requests for Production of Documents, but no documents were physically produced at that time to Plaintiff.

72.    On 1/19/2018, Chasan served Hamilton's Second Set of Requests for Production of Documents to Lester Speight.

73.    On 1/25/2018, Van Arnam and McNamara emailed a "nasty" letter to Chasan which asserted, *inter alia*, that Hamilton's case was baseless, that Hamilton and the forensic voice expert (Tom Owen) were falsely or fraudulently asserting that Hamilton's voice was used in the GOW video games, and that Hamilton and Chasan should dismiss the case or face sanctions and/or possibly a later case for wrongful use of civil proceedings. This letter is attached hereto as **Exh. C**.

74.    On 1/26/2018, Chasan emailed a responsive letter to Van Arnam and McNamara, bluntly telling them, *inter alia*, they were a pair of bullies, that they were embarrassed because they lost their motion to dismiss, that Hamilton was sincere in his belief that it was his voice in the video games, that the forensic voice expert Mr. Owen was also sincere in his opinions, that neither Hamilton nor the voice expert was guilty of any fraud, that the threats against Hamilton and Chasan were baseless, that Defendants could challenge the voice expert's opinions at trial, that Chasan had done nothing

wrong in representing Hamilton so he could have his day in court, and that it was Defense Counsel who elected to pursue expensive discovery rather than explore an early settlement.  Further, Chasan complained that their baseless threats of sanctions and/or an action for wrongful use of civil proceedings had caused him to put his malpractice carrier on notice of a potential claim. This letter is attached hereto as **Exh. D**.

75.    Later, but also on 1/26/2018, one of Microsoft's counsel sent Chasan an email with a draft confidentiality order.

76.    On 1/27/2018, Chasan met with Hamilton in Bridgeport and Norristown, PA to work on responses to the Defendants' discovery requests. At that time Chasan showed Hamilton the 1/25/2018 letter by McNamara and Van Arnam (**Exh. C**) and Chasan's 1/26/2018 reply letter (**Exh. D**). Hamilton read the correspondence and expressed his gratitude that Chasan had defended him forcefully.

77.    Between 1/29/2018 and 2/15/2018, counsel for the parties negotiated their differences on the draft confidentiality order, eventually coming to agreement and submitting it to the Court on 2/15/2018.   Judge Brody entered it as an Order of the Court on 2/20/2018 (ECF 50), clearing the way for the parties to exchange their document productions, with "Confidential" or "Confidential – Attorney's Eyes Only" designations.

78.    On 2/7/2018, Chasan served Hamilton's Objections and Answers to Defendant's First Set of Interrogatories and First Set of Requests for

Production of Documents.  In Hamilton's Answer to Interrogatory No. 3,
Hamilton identified over 50 witnesses who would testify that when they hear
the voice of "Cole Train," they are hearing Hamilton.

79.    On 2/15/2018, Chasan served Hamilton's Second Set of
Requests for Production to Microsoft.   This set of document requests
focused mainly on the volume and value of sales of the GOW video games
bundled with the Xbox One console, and also "Cole Train" merchandise and
memorabilia, such as figurines.

80.    During February 2018, counsel for the parties discussed a
proposed extension of discovery deadlines.  There was agreement that there
should be an extension, but disagreement as to how much of an extension
there should be.  Plaintiff Hamilton sought more generous extensions, and
the Defendants wanted them shorter.

81.    On 2/16/2018, Chasan mailed a letter to Judge Brody with a
proposal for an extension of discovery deadlines (also stating Defendants'
position), and emailed copies to the Judge's law clerk and opposing counsel.

82.    On 2/20/2018, Speight served responses to Hamilton's Second
Set of Requests for Production of Documents to Speight.

83.    On 2/22/2018, Defendants filed a letter agreeing to the
proposed extensions suggested by Chasan (ECF 52).  Their agreement was
motivated in part by the fact that Chasan had fractured a rib on 2/19/2018
in a fall while skiing.

84.     On 2/26/2018, the parties exchanged their document productions.  Chasan sent identical thumb drives of Hamilton's and the voice expert's materials to counsel for Epic Games and Microsoft, and also to their local counsel.  Van Arnam sent a thumb drive with Epic Games' document production.   Microsoft counsel sent an external hard drive with Microsoft's document production.  All parties marked numerous documents "Confidential" under the Confidentiality Order.

85.     On 2/27/2018, Chasan reviewed Epic Games' document production and was concerned that Epic Games had not made a complete production.

86.     On 2/28/2018, Chasan prepared Hamilton's Second Set of Requests for Production to Epic Games and served it.

87.     On 2/28/2018, Judge Brody entered an amended scheduling order (ECF 53) which set June 29, 2018 as the close of fact discovery, and July 16, 2018 as the deadline for Plaintiff's expert reports.  These were the dates suggested by Chasan and agreed to by Defendants.

88.     On 3/1/2018, Chasan sent a "meet and confer" letter to Van Arnam complaining about perceived deficiencies in Epic Games' document production.

89.     On 3/2/2018, Chasan began reviewing Microsoft's document production, but needed assistance in navigating the materials on the external hard drive.  Chasan arranged a conversation on 3/5/2018 with a

paralegal working for Microsoft to discuss accessing Microsoft's documents. The materials produced included hundreds of recordings by Lester Speight of "Cole Train" dialogue in the GOW video games.

90.     As of 3/2/2018, Chasan had contacted numerous third-party litigation funders about funding Hamilton's case, and had provided pertinent case materials including pleadings, the briefing on the motion to dismiss, the order denying the motion to dismiss, information about CONSOR and Wes Anson as the potential damages experts, and the parties' non-confidential discovery responses.

91.     Chasan could not tell the third-party litigation funders exactly what the potential damages were because the expert analysis had not yet been done.  This made it difficult for the third-party litigation funders to evaluate the risk-reward potential of the case.

92.     As of 3/2/2018, Chasan had been turned down by the following third-party litigation funders:  Rembrandt, Lake Whillans, Burford, Therium, Bentham IMF, Lex Shares, Contractor Litigation Funding, Woodsford, and Bench Walk.  Bench Walk had been located through Hamilton's own efforts.

93.     As of 3/2/2018, Chasan had discussed bringing in co-counsel with funding with approximately seven different law firms, on the basis of evenly splitting the contingency fee of any settlement or judgment but had been unsuccessful.  But as of 3/2/2018, one of the law firms was still considering it, and was doing its due diligence investigation.

94.     Between 12/19/2017 and 3/2/2018, Chasan concentrated efforts on soliciting five different law firms across the United States, including:  (a) Diamond McCarthy LLP;  (b) Massey & Gail LLP;  (c) Susman Godfrey LLP;  (d) Siprut P.C.;  and (e) Ruyak Cherian, LLP.   As of 3/2/2018, the only one of these five law firms still considering it was Ruyak Cherian, LLP.

95.     To assist the solicited law firms in their due diligence evaluations, Chasan arranged for separate conference calls for three of them with Wes Anson and other CONSOR personnel to discuss how CONSOR would go about evaluating damages in Hamilton's case, based on discovery to be produced by the Defendants, if CONSOR was retained.

96.     As of 3/2/2018, and to the best of Chasan's knowledge, the Defendants were totally unaware of his efforts to enlist a third-party litigation funding company and/or co-counsel who could provide funding for Hamilton's case, and were also unaware of his lack of success.

97.     On 3/3/2018, Chasan met with Hamilton at Abdallah's office and discussed the status of discovery and other matters.

98.     On 3/7/2018, an attorney from Ruyak Cherian, LLP contacted Chasan and advised they were declining, but he gave Chasan the name of Eva Shang at Legalist, Inc. (and her email address), another third-party litigation funder, who he thought might be interested.

99.     Chasan sent Eva Shang an email on 3/7/2018 stating he was referred to her by the attorney at Ruyak Cherian, LLP and wanted to set up a

phone call to discuss Hamilton's matter.

100.  Also on 3/7/2018, Chasan received an unsolicited voice mail message and an unsolicited email from an in-house attorney at Microsoft, Isabella Fu, Esq., who wanted to discuss the case with Chasan.

101.  Chasan returned the call to Isabella Fu.  Ms. Fu stated she wanted to open a dialog about resolving the case.  She was apologetic about the "nasty" letter sent by Van Arnam and McNamara on 1/25/2018, and she wanted to put it behind and start fresh.  She stated that if a reasonable number could be agreed to, there was a possibility of Microsoft settling the case.  She also stated that if the Plaintiff wanted an excessive number, there would be no choice but to keep litigating.   The conversation was cordial and productive, and Chasan stated he would meet with his client the next Saturday (March 10) and get back to Fu the next week.

102.  Later, also on 3/7/2018, Chasan received an email from Eva Shang inquiring about setting up a telephone call the next day.  Chasan responded by email, confirming his availability, and sent Shang and her Senior Legal Assistant, Shannon Lingren, PDF copies of the SAC (and all of its exhibits) (ECF 33), the order denying the motion to dismiss (ECF 43), and the revised case management order (ECF 53).

103.  On 3/8/2018, Shannon Lingren contacted Chasan by phone and discussed Hamilton's case.  As a result of the conversation, Chasan emailed additional materials to Lingren including BJC Law's Engagement Letter with

Hamilton, Wes Anson's CV and other information about CONSOR, all the
memoranda of law in support of and opposing the motion to dismiss (ECF
35, ECF 36, ECF 39, ECF 42), Hamilton's Rule 26(a) Initial Disclosures and
discovery responses, the Defendants' Answers (ECF 47, ECF 48), and the
"nasty" correspondence exchanged between counsel on Jan. 25-26, 2018
**(Exhs. C and D)**.

104.  On 3/10/2018, Chasan met with Hamilton in the presence of
Abdallah at Abdallah's chiropractic offices in Bridgeport, PA.  Chasan
explained that the overture from Microsoft's in-house counsel presented a
chance to settle the case and get something for it, especially since up until
then Chasan had had no success in enlisting the aid of a third-party funding
company.  Chasan also explained that without funding, there was no chance
of getting a competent expert witness on damages before the close of
discovery, and then Hamilton would be facing summary judgment and/or
outright dismissal of his case.  Chasan proposed submitting a demand to
Microsoft's in-house counsel of $950,000, explaining he doubted it would be
accepted, but he felt it would be low enough to invite a counteroffer, and the
parties could negotiate something in between.

105.  Hamilton, in Abdallah's presence, was not receptive to Chasan's
analysis or suggestions.  Hamilton stated his case was worth millions and
millions, and he would not authorize any settlement demand of less than
$7,500,000.  Chasan said that that was the prior demand in March 2017,

and it was promptly rejected then, and it would be rejected again, and there would be no counter-offer.  Chasan stressed that the demand had to be low enough to invite a counter-offer, as otherwise the settlement negotiations would shut down immediately, and Hamilton would have no path forward. Chasan stressed that Microsoft had opened the door to settlement, and Hamilton's posturing would slam it shut.

106.  The discussion between Chasan and Hamilton (in Abdallah's presence) got heated and palpably angry.  Chasan thought Hamilton was being foolish and said so.  Chasan threatened to write a letter to Judge Brody asking for permission to withdraw based on a "fundamental disagreement" with his client (as permitted by Pa. R. Prof. C. 1.16(b)).

107.  Later, also on 3/10/2018, Chasan did draft a letter to Judge Brody and sent the draft via email to Abdallah to give to Hamilton. However, Chasan never did send it to Judge Brody, and hoped the draft letter by itself would encourage Hamilton to be more realistic.

108.  Soon after the 3/10/2018 argument between Chasan and Hamilton, Hamilton began to "pound the pavement" in the Philadelphia area in search of another attorney who would step in and take his case to trial, seeking the millions and millions he thought it was worth.  This effort by Hamilton began immediately after the 3/10/2018 meeting with Chasan and continued until March 19, 2018.  He did not get anyone.

109.  On 3/12/2018, Chasan wrote another letter (**Exh. E** hereto) to

Hamilton, which he emailed to Abdallah to give to Hamilton, to memorialize the discussion and argument they had had on Saturday, March 10, regarding settlement.  Portions of the letter were blunt.  But among other things, Chasan said he would not seek to withdraw because Legalist, Inc. still had the request for financing under consideration.  The letter also stated that if Hamilton had an expert report stating his damages were $10 or $15 million, it might be justifiable to submit a high settlement demand.  But without funds to hire an expert, his case was worth zero.   Abdallah advised that Hamilton did not pick up the letter for several days.

110.  Notwithstanding the friction between Chasan and Hamilton, Chasan, in pursuit of diligent efforts on Hamilton's behalf, reached out to Legalist, Inc. personnel on Monday, 3/12/2018 to ascertain the status of their evaluation.

111.  Also, on 3/12/2018, Chasan had another telephone call with Eva Shang and Shannon Lingren of Legalist, Inc. regarding details of Hamilton's case.  Shang said she had in mind introducing Chasan to another attorney to partner with.

112.  Also, on 3/12/2018, Chasan emailed a message to Isabella Fu, Microsoft's in-house counsel, stating the he did not yet have a number from Hamilton.  What Chasan meant, but did not actually write, was that he did not have a number from Hamilton that would further settlement negotiations.

### III.  THE COMING OF JOHN PIERCE AND PBBPH LAW

113.  On 3/13/2018, Eva Shang sent an email to Chasan, stating:
"Just introducing you to John Pierce.  He's got an impressive resume and has
dealt with many high-profile cases in the past.

www.pierceburnsllp/team/john-m-pierce.php.  I'll let you two connect from
here."  Shang copied Pierce on the email.   As reflected in Pierce's email
address, he was with Pierce Burns LLP.

114.   Later, also on 3/13/2018, Chasan had a 20-minute phone call
with Pierce and his partner Beck about Hamilton's case and the need for
third-party funding.  Chasan stated he was willing to work with a co-counsel
on the basis of a 20/20 split of the 40 percent contingency if the co-counsel
could bring funding for the case.  Pierce said he was interested, and also
stated he would contact Shannon Lingren to request that she forward the
materials that Chasan had sent to Legalist, Inc.

115.  On 3/14/2018, Pierce sent Chasan an email, stating: "We are
definitely interested in partnering up with you on this case.  Do you have
time for a call around 4 pm or so to discuss further?  I can definitely help on
the litigation finance front working with Legalist and/or other funders."

116.  Chasan responded he was available at 4 PM, and Pierce replied,
copying his partners Price and Beck, who would likely join the call.

117.   As a result of Pierce's interest, Chasan shelved the dispute he
had had with Hamilton over settlement possibilities, and intended to join the

call with Pierce, Price and Beck to present Hamilton's case favorably, but also with honesty and objectivity in view of the risks.

118.   At the time of the 4 PM conference call with Pierce, Price and Beck on 3/14/2018, it was clear that Pierce and colleagues had read a lot of materials forwarded by Chasan to Legalist, Inc.   Pierce and colleagues were enthusiastic to get on board.  Price mentioned that he was familiar with the GOW video games and the "Cole Train" character.  Chasan discussed the need for a top-notch damages expert and mentioned his contacts with Wes Anson and CONSOR.  Chasan said that CONSOR needed a $25,000 retainer, albeit the work on an expert report might run between $175,000 and $250,000.   Chasan said he estimated the expenses to bring the case to trial were between $400,000 and $500,000.  Chasan also mentioned the case management order and discovery deadlines and emphasized there was no time to lose.  Chasan and Pierce agreed to get back in touch with Eva Shang at Legalist, Inc.

119.  On 3/15/2018, Chasan emailed a message to Eva Shang that he and Pierce were ready to move forward, and they wanted to finalize arrangements with Legalist, Inc.  Chasan copied Pierce on the email.

120.  Later, on 3/16/2018, Eva Shang responded with an email apologizing for the confusion, and stating "We [Legalist, Inc.] are at present not able to fund the case because of the uncertain damages proposition and the high request, which is why we made the introduction to John, who would

be able to help lift some of the burden off you as co-counsel instead."
Shang copied Pierce on the email.

121.   Later, on 3/16/2018, Pierce emailed Chasan stating that his firm
could advance the funding, and that he had other sources of funding as well,
and he would draft an Engagement Agreement to reflect this.

122.   Chasan was very pleasantly surprised by Pierce's enthusiasm,
especially because in the 48 hours that Pierce had been looking into
Hamilton's case, he could not have had the time to do the extensive due
diligence that five other law firms did in declining Chasan's efforts to recruit
their participation as co-counsel.  For example, Pierce did not speak with
Wes Anson and CONSOR personnel to get their insights into the damages
evaluation.

123.   Later, on 3/16/2018, Pierce and Chasan had a telephone
conversation.  Pierce said he would be in New York City on March 19 for a
mediation, and he would like to go to Philadelphia on March 20 to meet with
Chasan and Hamilton and get an Engagement Agreement signed.

124.   Chasan followed the conversation with an email on 3/16/2018
supplying Pierce with some sample motions for *pro hac vice* admission to the
Federal Court in Philadelphia, and he urged speedy preparation of the *pro
hac vice* motions, in view of the 6/29/2018 discovery deadline.   Chasan
said he was looking forward to reviewing with Hamilton the draft
Engagement Agreement that Pierce would send.   Chasan mentioned the

necessity of sending a $25,000 retainer to CONSOR, so that the damages experts could get started.

125.  Pierce responded with an email on 3/16/2018 stating he intended to send a draft Engagement Agreement that day, and that he could get the $25,000 retainer wired to CONSOR by the end of the month, if not before.

126.  At 7:08 PM EDT on 3/16/2018, Pierce emailed the draft Engagement Agreement to Chasan.  A copy is attached as **Exh. F**.  It stated it was an engagement between Hamilton and Pierce Bainbridge Beck Price & Hecht LLP.  Pierce stated in his email: "Looking forward to getting on board with you!"  Pierce followed with another email, explaining: "Note our firm name is changing due to our extraordinary growth.  The new web site will go live next weekend."

127.  Chasan emailed the draft PBBPH Law Engagement Agreement to Abdallah and Conrad and requested that Abdallah supply it to Hamilton, and let Hamilton know that there is now a source of funding, and that Chasan needed to meet with Hamilton on 3/17/2018.

128.  After a preliminary review of the draft PBBPH Law Engagement Agreement, Chasan emailed some comments to Pierce on 3/16/2018, including that it "should probably state how it dovetails with my agreement with Hamilton."  This was mentioned because the draft Engagement Agreement stated PBBPH Law would get a 20% contingency of the net

recovery, but it made no mention of BJC Law's Engagement Letter with Hamilton.  Pierce followed with another email stating that changes could be made easily, and it could specify dovetailing.   He added: "Feel free to redline."

129.   Chasan sent Pierce an email on 3/17/2018 with detailed comments on the draft Engagement Agreement and attached copies of BJC Law's Engagement Letter with Hamilton, and the Court's Confidentiality Order (ECF 50).  Chasan made the following comments (among others):

> 1.  It's really a three-way agreement, not a two-way agreement.  Reading my EL [Engagement Letter] and your EA [Engagement Agreement] together, Skip gives up 40 percent to me and 20 percent to you.  Now that is not what we intend.  So we have to make it read like we intend…..

> 2.  One area of conflict is Para. 10.  You provide the client has the absolute right to accept or reject a settlement.  My EL states that if he refuses a settlement offer that I recommend, I have the right to withdraw.  So we have to harmonize this…..

> 5.  On communications with the client, Skip does not own a computer, and does not have an email account.  He has a smart phone, but all email communications are routed thru Ray Abdallah's chiropractic office.

> 6.  Who is the primary contact with Skip going forward?  Me or you?  This is something on which we have to be on the same page.  We don't want disputes based on Skip saying Chasan told me X but Pierce told me Y.  (See para. 4 of your draft EA.)….

> 8.  On paragraph 8, costs and expenses, Hamilton to date has paid out about $6700 in costs.  Would you reimburse that?  If not, probably you should have a sentence excluding his advances (but noting he gets his expenses reimbursed from a settlement or judgment off the top).

9.  Also on paragraph 8, I think you should mention that estimated expenses to take the case to trial are $400,000 to $500,000.  If I were you, I would ask for a 150 percent return on your advances to compensate for the risk.  Frankly, I think Skip would accept that, because he knows litigation funders get 300 percent return.

10.      You should probably put in a term that you reserve the right to transfer the expense disbursements to any willing third-party funder, and the client should expect the third party funder to expect a return of 300 percent.

11.      You should probably have a sentence that the advances of expenses are without recourse if (unhappily) the case goes south.

12.      On conclusion of services, you should probably mention that client is not entitled to receive the defendants' confidential documents that are produced in discovery under the Confidentiality Agreement.  See attached Confidentiality Agreement.

130.  Chasan did not meet with Hamilton on 3/17/2018 and was unable to reach him by phone.  However, Conrad was able to reach Hamilton on 3/19/2018, and advised Chasan that Hamilton wanted to bring his friend John Henderson (who is not an attorney) to the meeting with Pierce on 3/20/2018, but Henderson was unavailable, so Hamilton wanted the meeting postponed.   Chasan requested Conrad to tell Hamilton that Pierce was coming from California, that the meeting could not be postponed, and he should not bring anyone to the meeting who was not his attorney.  Conrad relayed this message.

131.  Microsoft's in-house counsel Isabella Fu emailed Chasan on 3/19/2018, requesting whether there was any update from Hamilton.

Chasan, aware of the scheduled meeting with Pierce on Tuesday, March 20, responded to Fu: "Nothing yet. There may be something by Wednesday or Thursday."

132. Chasan reached Hamilton by phone at about noon on 3/20/2018. Hamilton confirmed he would be at the meeting with Pierce later that afternoon but stated he might bring someone. Chasan said he should not bring anyone who was not his attorney.

133. Hamilton arrived at Chasan's office at about 3:00 PM on 3/20/2018, accompanied by his friend Troy Davis. Davis is not an attorney, but Hamilton said he wanted Davis there to take notes. Davis had been listed as a potential lay person voice identification witness in Hamilton's answers to interrogatories.

134. Pierce arrived at Chasan's office approximately a half hour after Hamilton and Davis, and all four met in the office suite conference room for approximately 90 minutes. Particulars of Hamilton's case were discussed, and particulars of the Engagement Agreement were discussed. Pierce stated his firm was capable of advancing $400,000 to $500,000 for litigation expenses, even if a third-party litigation funder was not located. Pierce stated his firm would likely reimburse Hamilton for the $6700 in expenses that Hamilton had funded to date. (The $6700 included over $3500 that Hamilton had paid his voice identification expert, Tom Owen.) Hamilton reacted well to Pierce, and Pierce acknowledged the Engagement Agreement

needed revision.   Davis listened, but did not take any notes.

135.   After Hamilton and Davis left Chasan's offices, Pierce asked if there was a notary present in the suite who could attest his signature on a contract.   There was, and the notary did attest Pierce's signature on the contract that Pierce provided.  Chasan was present when the contract was signed and attested.  Pierce asked Chasan to scan the contract and email it to him as a PDF, and Chasan did so.     The particular contract is attached as **Exh. G**.  It is a contract between Pravati Capital, LLC and PBBPH LLP, and is titled "Law Firm Legal Funding Contract & Security Agreement."  Chasan did not read it at the time.  Soon thereafter, Pierce left for the Philadelphia airport.

136.   Later in the evening on 3/20/2018, Microsoft's counsel served Microsoft's Objections and Answers to Hamilton's Second Set of Requests for Production of Documents to Microsoft.   Chasan did an initial review of Microsoft's responses, and then forwarded the document via email to Pierce, stating he was not satisfied with Microsoft's responses to Requests Nos. 2, 6, 7, 18 and 19, as Microsoft stated it would not fully respond to those requests.

137.   On 3/21/2018, Chasan drafted a "Meet-and-Confer" letter to Microsoft's counsel, in connection with Microsoft's objections to Hamilton's Second Set of Requests for Production, as a preliminary to any discovery motion.  Chasan emailed the draft letter to Pierce, stating he wanted to send

it out by March 23, but he also wanted to give Pierce an opportunity to review it and make comments, as they would be working together.

138.  Hamilton left Chasan two voicemails early on 3/22/2018, stating he wanted to have another conference with Pierce and Chasan and his "team," which would include John Henderson, his publicist, Jonathan Bridges (a financial advisor), and his friend Nicholas Epps.  After discussing all issues in a conference call or another meeting, he wanted to make the decisions relating to his case.   He also said he had left a voice mail for Pierce.

139.  Later, on 3/22/2018, Chasan spoke by phone with Pierce, and expressed concern about Hamilton wanting to bring in his "team" of non-lawyers.  They also talked about revising the engagement agreement, and getting it finalized, and Pierce said he intended to make revisions that day.

140.  Later, on 3/22/2018, Chasan reached Hamilton by phone. Hamilton confirmed he wanted his "team" involved, but Chasan stated he should rely solely on his lawyers.  Hamilton said he would be able to sign the revised engagement agreement as soon as Pierce sent it.

141.  As of 3/23/2018, Chasan had not received a revised engagement agreement from Pierce, nor had he received any comments on the draft "meet and confer" letter to Microsoft counsel.  Chasan emailed Pierce requesting the status, and Pierce responded late in the day that he was swamped but would get to it later that evening or the next day.

142.  Also on 3/23/2018, Isabella Fu emailed Chasan again asking if

they could talk Monday (March 26).  She stated: "I think it would be good to talk before further investment in this case."  Following exchange of emails on scheduling, Chasan and Fu agreed to speak at 11:30 AM EDT on Tuesday, March 27.

143.  On 3/24/2018 at 12:50 EDT, Pierce emailed Chasan, stating: "I need to be out on the East Coast again next week.  Can I swing by your office first thing Monday to nail everything down?  Will review meet and confer letter this weekend."   Chasan responded that he had an appointment Monday morning, but he was available beginning at 2 PM, and asked Pierce to send the revised draft engagement agreement ASAP.

144.  Chasan sent Pierce another email on 3/25/2018, stating: "We need to finalize the agreement.  We cannot expect any agreement from defendants on another discovery extension.  Just over three months to go. No more time to lose.  Make it short and simple.  Incorporate my engagement letter and put in the bare minimum to make it work.  Thanks."

145.  Pierce responded via email on 3/25/2018: "I will look at letter today so we can get [it] out tomorrow but let's nail down engagement stuff in afternoon in person. Can we meet at your office at something like 2 pm just me and you for a couple hours?"  Chasan replied, "Yes."

146.  Pierce arrived at Chasan's office shortly after 2 PM EDT on March 26.  He did not have a revised engagement agreement.  He stated he had had telephone conversations with Hamilton, and Hamilton wanted him to

take over the lead on the case. It was unclear whether Chasan would remain as local counsel, but that possibility was discussed, and various scenarios were discussed concerning the division of the contingent fee. Chasan explained to Pierce that Hamilton's recent dissatisfaction with Chasan stemmed from their disagreement over how to posture a settlement demand in response to the overture from Microsoft's in-house counsel. Chasan allowed Pierce to listen to a number of voice mail messages from Hamilton in which Hamilton complained that a million dollars was not good enough, and he needed a much more substantial sum. Chasan also gave Pierce a copy of his 3/12/2018 letter to Hamilton (**Exh. E,** hereto), and discussed it with Pierce, stating that it had evolved as a result of the settlement overture from Microsoft's General Counsel's office.

147. Chasan also explained to Pierce the considerable professional efforts he had made on behalf of Hamilton, and he provided Pierce with the BJC Law monthly invoice to Hamilton, dated 3/8/2018, for accrued fees as of 2/28/2018, showing $295,127.35 owed to BJC Law.

148. Chasan stated that despite his disagreement with Hamilton on how to posture settlement negotiations, he had diligently presented Hamilton's case to Legalist, Inc., and to Pierce, in an effort to secure litigation funding.

149. Chasan told Pierce he had solicited approximately 10 third-party litigation funders, and all had turned him down. Chasan named many of the

third-party litigation funders, and Pierce said he was unfamiliar with Bench Walk, and wrote it down for future reference.

150.   On the merits of the case, Chasan told Pierce that the Defendants had evidence that Speight was the actual voice over actor for "Cole Train," and thus Hamilton's case most likely had to be postured as a "sound alike" case, alleging that Speight had imitated Hamilton's voice. However, anyone could see that if the "Cole Train" voice was not actually Hamilton's, as alleged in the original Complaint, the case would have much less jury appeal.

151.   The engagement agreement was not finalized.  The "meet-and-confer" letter was not finalized.

152.   Chasan mentioned that he had a scheduled call to Microsoft's in-house counsel, Isabella Fu, the next day, and suggested he needed to postpone it.

153.   Chasan and Pierce walked over to the Marathon Grill at 16th and Sansom Streets in Philadelphia to get a bite to eat.  Pierce discussed working with Chasan on other matters in the future.   Pierce invited Chasan to consider joining his growing firm as a contract attorney or employee.  Pierce stated he was looking to bolster his staff of attorneys with additional experienced litigators.

154.   Pierce departed Chasan's offices later in the afternoon on 3/26/2018, stating he was taking Uber to the Philadelphia airport.

155.  Later, on 3/26/2018, at 7:33 PM, *The American Lawyer* posted an article online, titled "Ex-Big Law Partner's Boutique Has Both a New Name, Office," by Meghan Tribe (**Exh. H**).  The article featured a photograph of Pierce and described his prior sojourns with K&L Gates and Quinn Emanuel, and stated his new firm, now known as Pierce Bainbridge Beck Price & Hecht "has set up shop in New York after adding former Jones Day and Quinn Emanuel associate Maxim Price...."   It stated Pierce's boutique had "brought on Beverly Hills-based solo practitioner James Bainbridge."

156.  *The American Lawyer* article also stated Pierce had left K&L Gates in 2016 to form Pierce Sergenian, "a boutique seeking to make a name for itself on several high stakes contingency matters, including a battle against Snapchat....."

157.  *The American Lawyer* article also stated Pierce Sergenian had "struck a deal with Scottsdale, Arizona-based litigation financier Pravati Capital to become perhaps the first public example of a litigation funder investing in a firm's current and future contingency fee cases that it has against large companies like Snap."

158.  *The American Lawyer* article quoted Pierce: "[We're] being very aggressive in taking big contingency fee cases using litigation funding in a pioneering way, which we're doing."

159.  *The American Lawyer* article also quoted Pierce on the expansion plans of PBBPH Law: "We're looking for Navy Seal, Army Ranger types –

really aggressive litigators who want to be on a great platform and litigate great cases."

160.   The "Pierce Bainbridge Trial Lawyers" web site went "live" on or about 3/26/2018.   Pierce's biography on the web site (**Exh. I**) stated he was the managing partner and quoted several articles extolling his acumen as a trial lawyer.  It also stated: "Mr. Pierce has successfully handled contingent and alternative fee matters, often working with third party litigation funders who assist individual and corporate clients to finance large, meritorious plaintiff-side claims."

161.   On 3/27/2018, Chasan emailed Isabella Fu, stating that he had to postpone their scheduled conference call due to an emergency.  It was a pretext, but Chasan had nothing to propose.   Chasan also emailed to Pierce, stating, *inter alia*, he had postponed the call with Ms. Fu, and adding: "Of course, I still did not send the Meet-and-Confer letter that I had intended to send last Friday.  Getting a speedy resolution of the representation issues with Skip Hamilton is an absolute necessity, as every minute of delay prejudices his ability to complete discovery [to] put on an effective case."

162.   Later, on 3/27/2018, Chasan sent another email to Pierce stating: "I am still his only counsel of record.  I am well aware of the case management deadlines and discovery deadlines.  I would have sent the Meet and Confer letter to Microsoft last Friday, but delayed to give you an opportunity to review and provide any input.  I wasn't expecting a lot of

input, but I wanted to give you the courtesy....   So tomorrow I am sending [Microsoft trial counsel] Ambika Doran the Meet and Confer letter and I will remind her that the document production is overdue.   I see no reason to delay any more, especially when I have no idea how long it will take to sort out Plaintiff's arrangements."

163.   Pierce responded that evening with an email of his own, stating: "Hi Bruce. Sorry for the delay in responding.  Skip has actually decided to cut ties altogether.  He has signed a letter terminating the engagement and would like us to take things over, including revising and sending the meet and confer letter.  He has asked me to send the termination letter along, which I will do tonight or first thing in the morning."   He followed that with another email that he copied to Beck, stating:  "Carolynn, can you please send to Bruce?"

164.   The next morning, 3/28/2018, Beck emailed Chasan, attaching Hamilton's termination letter (**Exh. B**).  *See ante*, ¶ 20.

165.   Upon information and belief, Beck met with Hamilton on March 26 or 27, 2018, somewhere in the Washington, D.C.-Philadelphia-New York corridor, alone or with others, to get his signature on the termination letter that was prepared by PBBPH Law.

166.  Per the Wayback Machine, the 3/28/2018 PBBPH Law web site, https://web.archive.org/web/20180328034703/http//:www.piercebainbridge.com (last visited May 7, 2020) listed only eight persons in the PBBPH law firm "Team":

Pierce; Bainbridge; Beck; Price; Caroline Polisi; Allen Ho; Stacey Villagomez; and Grace Chang.  Upon information and belief, Chang was Chief of Operations and Paralegal in Los Angeles;  Allen Ho and Stacy Villagomez were associate attorneys at Pierce Burns LLP and PBBPH Law in Los Angeles in 2017-2018, who separated from the PBBPH Law in April 2018 and joined other law firms; and Caroline Polisi was an attorney in the New York Office.

167.  Interestingly, name partner Hecht was not listed in the "Team" on 3/28/2018.  However, in a published written interview in *Above the Law* on Jan. 8, 2019 (**Exh. M**), Hecht wrote that he and Max Price together had approached Pierce about launching the New York office of PBBPH Law where they would serve as co-chairs of the IP group.  In addition, Hecht, in disciple fashion, set forth Pierce's "10 Commandments" that reflected the firm's "core values," including, among others: "4. Every case is the entire firm's case and the case of every lawyer in it." and "8. We gang tackle, swarm, and crowd-source.  The firm is a matrix."   Near the end of the written interview, Hecht wrote: "At Pierce Bainbridge, there are no secrets and there is no curtain.  We bring in business through sheer force of will."

168.  Upon information and belief, Pierce kept his co-managing partner Bainbridge and the other name partners fully informed about developments in Hamilton's "right of publicity" case, including the March 20 and 26, 2018 meetings at offices of BJC Law, and also about information received from Chasan, including Chasan's 3/12/2018 letter to

Hamilton (**Exh. E**).  Pierce routinely sought their input and counsel.

169.   On information and belief, on 3/26/2018 and 3/27/2018, Pierce misrepresented to Hamilton that Chasan was no longer interested in representing him, and failed to mention that after Chasan had learned that financing would be forthcoming, Chasan had been aggressively urging Pierce to send a $25,000 deposit to CONSOR to get the damages experts on board in view of the short fact discovery deadline, and had drafted a "meet-and-confer" letter to Microsoft's counsel regarding insufficient discovery responses, and was urging quick *pro hac vice* motions to accelerate entry of the PBBPH Law attorneys into the case to work jointly on discovery.

170.   Hamilton's termination letter made no provision for payment of BJC Law.

171.   In transmitting Hamilton's termination letter, neither Pierce, Beck, nor PBBPH Law made any provision for any payment to BJC Law.

172.   Neither Hamilton, Pierce, Beck nor PBBPH Law made any provision for division of a contingency fee with BJC Law in the event of a verdict or settlement of Hamilton's case.

173.   On 3/28/2018, after receipt of Hamilton's termination letter, Chasan sent the following email to Beck and Pierce:

Carolynn and John,

1.     Most of my file is electronic.   Probably the way to do this is to copy it to an external hard drive and send you the hard drive.  However, there is a problem.  My file includes the defendants' confidential document productions.  I cannot forward

those materials to you until you have entered your appearances. Otherwise I would be in violation of the Confidentiality Order.  In any event, I would want payment for my time and expenses.

2.      There are some paper materials that can be boxed and shipped.  But again, I want payment for my time and expenses.

3.      There is another problem, and a bigger problem.  Per my Engagement Letter with Mr. Hamilton (copy attached), he is "obligated to pay us in full at our regular hourly rates and/or fixed fees for all of our past services and expenses."  See paragraph 11.  Skip's Termination Letter does not address how he will accomplish this.   In my meeting with John on Monday [March 26], we discussed in general terms a buyout, but did not put anything down in writing.  So we need to discuss this, and very fast.   I may be amenable to releasing all claims against Skip and Pierce Bainbridge in return for full payment of my law firm's outstanding invoices and current billings (currently estimated to be between $320,000 and $330,000).

4.      I anticipate that even after you receive my file, you will need to speak to me about particulars in the file for a period of time, perhaps a month or more.  That could be very time consuming on my part.  I am amenable to working with you as needed, but at sufficient hourly rates.

So, John, let's continue the discussion we started on Monday, and work this out.   Thanks.

174.  It was unknown to Chasan at the time, but Chasan learned later from Conrad that Pierce had had a meeting with Hamilton and his "team" (reportedly including John Henderson, Troy Davis, Nicholas Epps and others) at the Marriott in West Conshohocken, PA on or about 3/26/2018.  Pierce did not mention this to Chasan.

175.  Conrad also reported to Chasan in due course that Pierce had paid Hamilton approximately $6700 for his litigation costs (including reimbursement of the $3500+ fee paid to Tom Owen, the forensic voice

expert), and had set him up with an email account (and presumably a computer), and paid for rental housing for Hamilton in the Los Angeles area, where he could work with Hamilton near his offices.   Chasan would learn much later that the rental property was in Thousand Oaks, CA, that Hamilton's son David also moved in, and Pierce hired David to work in the PBBPH Law offices in Los Angeles.

176.   On 3/29/2018, Isabella Fu emailed Chasan again about possible settlement, and invited Chasan to get in touch.  Chasan responded to the email that day as follows: "Thank you for your patience.  I am sorry I have to be so obtuse (assuming 'obtuse' is a word that fits the situation).  At this time Mr. Hamilton has not authorized me to communicate a settlement demand.  I don't know what else to say."

177.   On 4/2/2018, Chasan emailed Pierce and Beck a copy of Hamilton's invoice for the month of March 2018, showing an outstanding cumulative indebtedness of $319,240.78.  In another email sent that day, Chasan again requested Pierce and Beck to resolve the issues mentioned in Chasan's 3/28/2018 email.  *See ante*, ¶ 173.

178.  On 4/4/2018, Pierce sent an email to Chasan, with a copy to Beck, stating: "I have an idea for wrapping up your engagement, and we need to get admitted and substituted in. We will reach out to Microsoft's counsel as well.  What time works for you prior to 12:30 pm Eastern?"

179.  Pierce called Chasan later on 4/4/2018.  He said PBBPH Law did

not have the money to pay Chasan's fees, but he had an idea.  The idea was to purchase an insurance policy that would fund Chasan's fees at the conclusion of the case.

180.  To Chasan, Pierce's statement, that his firm did not have the money to pay the attorney's fees of BJC Law, was inconsistent with his representation at the 3/20/2018 meeting that the firm would fund $400,000 to $500,000 in litigation expenses to take Hamilton's case to trial.

181.  After the call, Pierce sent an email to Brett McDonald and James Blick of The Judge Global Group, copying Chasan, and stating: "Would like you to explain ATE products to him [Chasan]. We are taking a case over from him (that Gears of War case I sent you the WaPo article on), and I want to help client find a way to make sure the value of his time is compensated.  I think an ATE policy may be at least a part of a potential solution here.  Also, can you please shoot to Bruce some literature on ATE insurance generally and perhaps on The Judge as well?"

182.  On 4/5/2018, Chasan had a brief conference call with Van Arnam and McNamara in response to their request to discuss the next steps in discovery.  McNamara advised she had received a voice mail message several days before from Carolynn Beck advising that there would be a substitution of counsel.  Chasan stated it was his understanding that it would be a complete substitution.

183.  On 4/5/2018, Chasan had a 45-minute telephone call with

Messrs. McDonald and Blick and came away with the impression that the types of insurance they marketed were not a solution for payment of Chasan's legal fees.  But they mentioned that Pierce had not yet submitted an application, so nothing had been submitted to underwriting.

184.   Later, on 4/5/2018, Chasan sent an email to Pierce with a memo summarizing the outcome of his conversation with Messrs. McDonald and Blick.  As the insurance avenue did not look promising, Chasan suggested that PBBPH Law and its partners pay the $319,240.78 in unpaid fees, but on an instalment basis over 12 months, and with personal guarantees of the partners.   Chasan offered to give PBBPH Law and its partners a full release.  Chasan also proposed venue for any collection suit in Philadelphia, with the creditor having the right to be awarded reasonable attorney's fees.

185.   Chasan stated in the 4/5/2018 memo that if PBBPH Law was willing to finance the case with $400,000 to $500,000 of funding, for a 20 percent stake in the contingency, then the firm should be willing to pay an additional $320,000 to BJC Law for a full 40 percent stake in the contingency.

186.   On 4/9/2018, Chasan emailed Pierce regarding the status of the request for payment of attorney's fees, but Pierce did not respond.

187.   On 4/11/2018, McNamara emailed Chasan that she had had a conversation on 4/9/2018 with Beck, and Beck confirmed there would be a

substitution of counsel.

188.   On 4/12/2018, Brett McDonald emailed Chasan, in response to Chasan's inquiry, that Pierce had not yet submitted an insurance application, and he (McDonald) believed the attorney's fee indebtedness would not be insurable.

189.   On 4/12/2018, Chasan emailed Pierce and Beck inquiring, *inter alia*, about payment of his attorney's fees, when they intended to enter their appearances in Hamilton's case, and requesting to set up a telephone call. Neither Pierce nor Beck responded.

190.   On 4/19/2018, Chasan emailed Pierce and Beck again, inquiring whether they intended to resolve the attorney's fees issue amicably.  This time Pierce responded, stating that his firm had no contractual relationship with Chasan, and anything he did to assist Chasan in getting paid was "gratuitous."  As a result of this exchange, which was obviously impolite, Chasan concluded that Pierce and PBBPH Law had no intentions of paying his attorney's fees.

191.   On 4/20/2018 two attorneys from Stradley Ronon Stevens & Young, LLP (Joe N. Nguyen, partner, and Benjamin E. Gordon, associate), of Philadelphia, entered appearances for Lenwood Hamilton (ECF 54, ECF 55).

192.   Based on custom and practice, it is inferable that the Stradley Ronon attorneys would not be working on contingency, but instead at hourly rates, and would earn substantial attorney's fees while working as local

counsel for Hamilton.

193.   According to their respective law firm web sites biographies, both Joe N. Nguyen and Beck are members of the National Asian Pacific American Bar Association, and it is thus inferred that their participation in that organization led to the referral of the Hamilton case to Nguyen.

194.   Hamilton has no resources to pay hourly rates; it is therefore inferred the Stradley Ronon lawyers were retained directly by PBBPH Law.

195.  On 4/26/2018, the Stradley Ronon attorneys filed motions for *pro hac vice* admission in Hamilton's "right of publicity" case for Pierce, Beck and Price (ECF 56, ECF 57, and ECF 58), respectively.  Later they would do so for other PBBPH lawyers, including Hecht (ECF 93, 94).

196.  On 4/26/2018, Chasan filed his Withdrawal of Appearance on behalf of Hamilton (ECF 59).

### IV.  THE PRAVATI — PBBPH LAW AGREEMENT

197.  While the Pravati - PBBPH Law Agreement (**Exh. G**) is attached as an exhibit to this Complaint, and speaks for itself, certain key provisions are summarized here, without prejudice to the entire Agreement, to give greater context to Plaintiffs' claims.

198.  It is assumed that Pravati countersigned the Agreement (which is obviously one of its own forms) after Pierce affixed his signature on 3/20/2018 in Philadelphia before a public notary.

199.  Based on *The American Lawyer* article (**Exh. H**), the Pravati —

PBBPH Law Agreement appears to be a re-do of similar agreements that Pravati had with Pierce's prior law firms, including Pierce Sergenian and Pierce Burns.

200.   In the Agreement (**Exh. G**), Pravati agreed to make legal funding to PBBPH Law secured by contingency fees and expense reimbursements in connection with a portfolio of current and future cases. (**Exh. G**, p. 1; p. 6, ¶ 5).  PBBPH Law granted Pravati a perfected first priority security interest in the proceeds from the portfolio.  (*Id.*).  PBBPH Law had the right and responsibility to make all legal and strategic decisions in the handling or settlement of the portfolio.  (*Id.*).

201.   Page 18 of the Agreement had "Schedule B" which comprised a list of 19 matters (clients) then being handled by PBBPH Law that were subject to Pravati's security interest and said list could be amended from time to time.  In fact, PBBPH Law was required to revise and update Schedule B when it acquired additional future cases.   (**Exh. G**, p. 6, ¶ 5).

202.  Pages 3-4 of the Agreement defined circumstances (i – xiv) when PBBPH Law would be in default.  No. (ii) refers to circumstances when PBBPH Law transfers or encumbers its interest in any case to another law firm, including the right to fees; but it is not a default if PBBPH Law abandons a client, or if the client terminates PBBPH Law and grants to another law firm a contingency fee, provided PBBPH Law "continues thereafter in good faith and in a commercially reasonable manner to pursue

collection of the contingency fee earned by [PBBPH Law] in connection with such Case prior to such abandonment or termination."

203.    Page 8, ¶ 10 further specified Pravati's remedies in the event PBBPH Law is discharged from a case.  It states "PRAVATI shall have the right to protect its interest … in the continuation of the Client's case ensuring that PRAVATI automatically and immediately receives any fees and costs payable to [PBBPH Law]."

204.    Page 5, ¶¶ 3-4 of the Agreement made clear that advances and payments from Pravati to PBBPH Law may be used for, *inter alia*, the law firm's operating expenses, or to refinance the law firm's existing debt, or to pay federal, state and/or local taxes.

205.    At pages 6-7, ¶ 6, the Agreement provided that PBBPH Law and Pravati each receive 50 percent of the proceeds earned on each case.

206.    At page 14, ¶ 25, the Agreement specified that PBBPH Law will indemnify and defend Pravati, and hold Pravati harmless "against any and all liability….damages….causes of action, claims and/or judgments …"

207.    Schedule A ("Term Sheet"), at p. 17 of the Agreement, listed the total advanced to PBBPH Law as $327,700 "Per This Agreement," and "Total Amount Funded Thus Far Per All Prior Agreements Against the Collateral List of Cases in Schedule B - $1,172,200.00."

208.    Pages 20-25 of the Agreement was Schedule D, a "Limited Guarantee Agreement" signed by Pierce.

209.   Pages 26-27 of the Agreement was Schedule E, "Non-Disclosure Agreement."

210.   On information and belief, based on published materials which became known to Chasan much, much later, Pierce and Beck provided Pravati Capital with a memorandum on or about May 6, 2018, stating that Hamilton's "right of publicity" case was worth a huge sum of money, possibly $1,000,000,000 ($1 billion) in damages.   Pierce used this memorandum to solicit funding from Pravati Capital to support the financing of Hamilton's case, and also to fund salaries of attorneys then at PBBPH Law and also attorneys that PBBPH Law intended to hire.

211.   Also on information and belief, based on published materials which became known to Chasan much, much later, Pierce and partners used the May 6, 2018 memorandum to Pravati Capital as a recruitment tool in soliciting other attorneys to join PBBPH Law.

212.   In Chasan's view, and upon information and belief, the May 6, 2018 memorandum that Pierce submitted to Pravati Capital grossly exaggerated the merit and value of Hamilton's "right of publicity" case.   Also on information and belief, Pierce did not provide Pravati Capital with more sober assessments of the case, such as the Van Arnum-McNamara "nasty" letter dated January 25, 2018 (**Exh. C**), or Chasan's March 12, 2018 letter addressed to Hamilton (**Exh. E**).

## IV.   FAILED SETTLEMENT NEGOTIATIONS; THREATS; ETC.

213.  On 4/27/2018, Chasan notified Pierce by email that he and BJC Law were preparing to file a complaint against at least PBBPH Law to recover legal fees for BJC Law's representation of Hamilton.

214.   On 4/30/2018, Pierce initiated settlement negotiations to dissuade Chasan from filing suit.   His email began with a threat: "This e-mail is to advise you that Skip Hamilton has now authorized Pierce Bainbridge to file, on his behalf, a multi-million dollar, eight-figure legal malpractice action against you."

215.  On 4/30/2018, Chasan responded to Pierce's email, stating: "If you are not already aware, a malpractice case in Pennsylvania has to be supported by a certificate of merit.  I am doubtful you will ever be able to get such a certificate from a detached, qualified professional."  But further, Chasan outlined specific terms for a settlement.

216.  On 5/1/2018, Pierce sent a lengthy email to Chasan which included a counter-proposal for settlement.   However, the email also made mention of "Mr. Hamilton's [potential] malpractice and breach of fiduciary duty lawsuit against you [Chasan]."   There was no explanation by Pierce at that time what he meant by "malpractice" or "breach of fiduciary duty."

217.  On 5/5/2018, Beck emailed Chasan, copying Pierce and Price, requesting transfer of Hamilton's complete file by 5/8/2018.  On 5/6/2018, Chasan responded to Beck, copying Pierce and Price, stating that he believed

he could have the paper files assembled and inventoried in 8 to 10 boxes by 5/11/2018, and that the boxes and electronic files could all be transferred to the Stradley Ronon attorneys on that date.  However, it was estimated that the work, including preparation of inventories of the boxes, would require approximately 8 hours of attorney time, and Chasan requested to be compensated at a $450 hourly rate for the labor involved, with a wire deposit of $3600.00 to the BJC Law IOLTA account in advance.

218.  On 5/8/2018, Chasan followed up with an email to Pierce, copying Beck and Price, advising of the IOLTA account routing number and account number.  Pierce responded by email that he would handle it that day, copying Beck and Price.  In another email that day, Pierce instructed one of the office employees to handle the deposit, copying Chasan, Beck and Price.

219.  As of 5/10/2018, the deposit still had not been made.  Chasan sent several emails on 5/10/2018 to Pierce, Beck and Price inquiring what the delay was, and also attached a photograph of the boxes that were assembled for transfer.

220.  On 5/11/2018, at 6 AM, Chasan sent Pierce an email, copying Beck and Price, stating the deposit still had not been made, and it had to be made before the transfer could occur.  Beck sent Chasan an email at 9:18 AM, copying Pierce and Price, stating that the PBBPH Law office was in the process of arranging the deposit, but notwithstanding, Chasan was required

to complete the transfer that afternoon as scheduled.   Chasan responded to all three at 9:22 AM: "Make this simple and easy and right.  Get me the $3600 before 2 PM.  I devoted substantial work to the project this week (over 8 hours) in view of John Pierce's several emails since Sunday that a wire transfer would be made.  IT IS OVERDUE."  Price responded at 9:47 AM, copying Beck and Pierce, stating that three partners had promised to make the payment, and Chasan should ethically transfer the file at 2 PM to the Stradley Ronon attorneys "with the understanding that the $3600 will come when we are able and ready to pay it."  Chasan responded to Price, Beck and Pierce at 9:50 AM: "I AM NOT CHASING THIS MONEY.  GET STRADLEY TO ADVANCE THE FUNDS TODAY AND YOU CAN REIMBURSE THEM.  DON'T LECTURE ME ABOUT ETHICS."  At about 10:45 AM, Pierce made the wire transfer himself and sent confirmation to Chasan shortly after.

221.  On 5/11/2018, at 2 PM, per agreement and appointment with PBBPH Law, Chasan met with attorneys from Stradley Ronon to transfer his paper and electronic files relating to Hamilton's case.  At that point, *pro hac vice* admissions had been granted, and the PBBPH Law and Stradley Ronon attorneys were all bound by the Confidentiality Order (ECF 50).

222.  Over the next several weeks, Chasan and Pierce traded differing settlement proposals regarding Chasan's demand for attorney's fees.  In a memo to Chasan dated 5/21/2018, Pierce outlined another threat if the

parties did not settle:  "[W]e will likely defend against you by filing a cross-complaint, claiming, among other things, that your failure to bring the critical causes of action for fraud, intentional concealment, and negligent misrepresentation with a concomitant demand for disgorgement of unjust enrichment (profits), plus pre-judgment interest – all based on these three new causes of action – combined with your failure to discover critical information through the discovery process, has seriously harmed the case and overall recovery," and thus, Chasan would be "entitled to nothing." While this explained what Pierce meant by "malpractice," it did not explain what he meant by "breach of fiduciary duty."

223.  Chasan responded via email on 5/21/2018: "if you and Hamilton believe that Epic Games, Microsoft and/or Speight are guilty of fraud, intentional concealment, and/or negligent misrepresentation, you are welcome to serve discovery to them now to obtain evidence (and take depositions) to support those theories of recovery, and you are welcome to file a motion for leave to amend the Second Amended Complaint once again. I am not stopping you.  Discovery is still open.  Good luck with those far-fetched theories."

224.  After 5/21/2018, Chasan and Pierce continued to trade settlement proposals.

225.  On 6/15/2018, just 14 days before the fact-discovery cut-off date, Pierce filed a motion and declaration in Hamilton's "right of publicity"

case seeking an extension of discovery deadlines for several months to enable himself and his PBBPH Law colleagues to develop evidence that would support a Third Amended Complaint alleging fraud, intentional concealment and negligent misrepresentation.  (ECF 63, ECF 63-1, ¶¶ 4-5).

226.  In the Memorandum of Law in support of the motion for discovery extensions, Pierce argued, *inter alia*, that Hamilton's request was occasioned by an injury to his former counsel (Chasan): (1) "In late February 2018, former counsel for the plaintiff notified the court that he had suffered an injury, could not engage in discovery, and requested a short continuance to accommodate his condition."  (ECF 63-2 at page 4 of 9); and (2) "[T]he defendants were not disabled...from continuing to engage in discovery while plaintiff's prior counsel was disabled for approximately 70 days..."  (ECF 63-2 at page 5 of 9).

227.  Pierce also argued: "The plaintiff's new counsel believes there is much needed evidence that will be obtained from discovery that is related to the above-stated three new causes of action, *which plaintiff's prior counsel [Chasan] had not directly explored*."   (ECF 63-2 at page 8 of 9) (italics added).

228.  Pierce's statements that Hamilton was hampered in discovery for 70 days due to Chasan's injury were knowingly false.

229.  Chasan had proposed an extension of discovery deadlines via a letter to Judge Brody on 2/16/2018.  (ECF 51 at pages 3, 4, and 5).  *See*

*ante*, ¶¶ 80-81.   On 2/21/2018, Chasan notified Judge Brody and opposing counsel via email that he suffered a broken rib in a skiing accident on Monday, 2/19/2018.  (ECF 51 at page 1 of 5).  Chasan's email said he had some pain, but it did not say he was disabled from participating in discovery. (*Id.*).  Per letter dated 2/22/2018, counsel for defendants agreed to the revised proposed deadlines in Chasan's 2/16/2018 letter to Judge Brody. (ECF 52).  *See ante*, ¶ 83.

230.   Chasan produced Hamilton's document production on 2/26/2018 and sent a "meet and confer" to counsel for Epic Games on 3/1/2018.   *See ante* at ¶¶ 84-85, 88.  Chasan also drafted a "meet and confer" letter to Microsoft's counsel on 3/21/2018.  *See ante* at ¶¶ 136-137.  Chasan met with Pierce in person on 3/20/2018 and again on 3/26/2018.   *See ante* at ¶¶ 134, 146.  Chasan was not in any disabling condition due to the broken rib he suffered on 2/19/2018, and Pierce could readily see that.   In fact, on 3/26/2018, Chasan and Pierce left Chasan's office at 1500 JFK Boulevard and walked to the Marathon Grill at 16th and Sansom Streets, where they ordered food.  *See ante* at ¶ 153.   The representation to the court by Pierce that Chasan was "disabled for approximately 70 days" was entirely and knowingly false.

231.   Chasan did no further work on discovery as of the time he was terminated by Hamilton on 3/28/2018.   In fact, later that day, Microsoft emailed Chasan with directions for accessing Microsoft's documents "in the

cloud" produced in response to Hamilton's Second Set of Requests for Production of Documents and Things, which Chasan had served on 2/15/2018.  *See ante* at ¶ 79.  Chasan saved the 3/28/2018 email message from Microsoft in his "Hamilton" file but did not look at the documents produced by Microsoft because he had been terminated.   Chasan's decision not to look at the documents had nothing to do with his non-disabling fractured rib, which was healing as expected.

232.   Pierce's seeking a discovery extension only two weeks before the cut-off of fact discovery was premised on his false statement that Chasan was unable to work on discovery due to his rib fracture, and on an implicit argument that Chasan had been negligent in not pursuing discovery relevant to fraud, intentional concealment, and negligent misrepresentation, and thus Hamilton was prejudiced by Chasan's alleged negligence (in addition to the skiing injury), in the event Judge Brody did not grant the requested, belated extension of discovery deadlines.

233.   Pierce's motivation in falsely representing that Chasan was physically disabled from pursuing discovery for 70 days was to cover his own failure to pursue discovery promptly upon Chasan's termination by Hamilton, while he searched for a new local counsel, moved for his own *pro hac vice* admission, and arranged the transfer of Chasan's "Hamilton" file.

234.   Had Pierce wanted to work with Chasan, as Chasan had invited in March 2018, his *pro hac vice* application could have been filed by Chasan

before the end of March 2018.

235.   Any prejudice to Hamilton due to Pierce's weeks-later retention of Stradley Ronon, and his weeks-later filing for *pro hac vice* admission, and his weeks-later acquisition of Hamilton's file transferred by Chasan, was due solely to litigation choices made by Pierce.

236.  On 6/26/2018, a recently hired PBBPH Law attorney in the New York office, Vanessa Biondo, left a voice mail for Chasan requesting information about discovery in Hamilton's case.  Chasan did not return the call.  Upon information and belief, Biondo was assigned to work on the case by Beck.

237.  On June 28, 2018, Judge Brody entered an Order granting in part Hamilton's motion for an extension of discovery deadlines (ECF 65), and on July 2, 2018, she entered an amended scheduling order (ECF 66) extending the deadline for fact discovery to September 28, 2018.

238.   Thereafter PBBPH Law and Beck assigned numerous additional attorneys to conduct depositions of Lester Speight and past and present employees of Epic Games and Microsoft, and to aggressively pursue additional document discovery from the Defendants.  Newly hired PBBPH Law attorneys Vanessa Biondo, Jonathan Sorkowitz, and Yi Wen Wu, applied for *pro hac vice* admission on 8/1/2018 (ECF 67, ECF, 68, ECF 69), and were duly admitted.  Another new PBBPH Law attorney, Claiborne Hane applied on 8/31/2018 (ECF 76) and was duly admitted.   Upon information and belief,

the average annual salary of Biondo, Sorkowitz, Wen Wu and Hane was over $200,000.

239.    In a brief in support of a discovery motion, filed on 8/31/2018, Pierce and PBBPH Law asserted "the damages … are therefore in the nine figures," especially in view of sales of the GOW video games with bundled products.   (ECF 77-16 at 15).

240.   On September 15, 2018, it appeared that Chasan and Pierce had agreed to settle Chasan's claim for attorney's fees for $160,000.  Pierce tasked Bainbridge to work with Chasan to wrap things up "swiftly." However, in later weeks, this "settlement" foundered allegedly over disagreements about mutual releases.

241.   On September 25, 2018, Judge Brody held a hearing on Hamilton's discovery motion to obtain an extensive review of Microsoft's and Epic Games' electronic files, which the defendants were resisting on the basis of cost and lack of good cause.  Vanessa Biondo was the principal spokesperson on behalf of Hamilton.  During the arguments, counsel commented on the results of about 10 depositions, and Judge Brody remarked to Biondo, "I haven't seen anything that says to me you have a scintilla of a case.  That's the problem."  Judge Brody then said she would not order the full extent of what Biondo requested and would not extend the discovery deadline beyond October 5, 2018.

242.  On October 25, 2018, after the close of fact discovery, Pierce,

Beck, Price and Hecht filed Hamilton's Motion for Leave to File a Third

Amended Complaint (ECF 95) and included a Memorandum of Law (ECF 95-

1) and Affidavit by Pierce (ECF 95-2) with a mark-up of Hamilton's First

Amended Complaint that was proposed as the Third Amended Complaint.

The mark-up deleted the Lanham Act counts and proposed the addition of a

new Count for "Intentional Non-Disclosure."  The proposed Third Amended

Complaint also included language regarding Microsoft's sale of GOW games

bundled with Xbox One consoles, as had been alleged in the SAC.   Upon

information and belief, attorneys Biondo and Sorkowitz did not support the

filing of this motion for leave to amend, and their names were not

subscribed to the motion.

243.    The proposed new Count for "Intentional Non-Disclosure" was

akin to the cause of action for "intentional concealment" that Chasan had

allegedly negligently failed to plead, as outlined in Pierce's May 21, 2018

email to Chasan ("failure to bring the critical causes of action for fraud,

intentional concealment, and negligent misrepresentation"), *ante at* ¶ 222.

The proposed Third Amended Complaint did not include counts for "fraud" or

"negligent misrepresentation," presumably because the discovery conducted

by PBBPH Law did not develop evidence to support such claims.

244.    On October 30, 2018, in exchanging emails with Chasan about

mutual releases regarding payment by PBBPH Law of $160,000 to BJC Law,

to settle Chasan's claims for attorney's fees, Bainbridge proposed that

Chasan kickback $30,000 to Hamilton to make the deal more palatable to Hamilton, and to secure Hamilton's signature on a mutual release.

245.  Chasan regarded the $30,000 kickback suggestion as meritless and ridiculous, as Chasan did not consider that Hamilton had any viable claim for malpractice against him.  Nevertheless, in an effort to move the matter to a conclusion, on November 2, 2018, Chasan emailed to Bainbridge that he was willing to pay Hamilton a $10,000 kickback just to get it done, and asked Bainbridge to propose this to Hamilton.

246.   On November 15, 2018, Pierce emailed Chasan advising that the settlement negotiations had failed, seemingly confirming that Hamilton supposedly refused to sign a mutual release.  He wrote Bainbridge would follow up with more details.   He added he might see Chasan again in court if PBBPH Law needed to sue Chasan for "repeated breached of fiduciary duty" to Hamilton.  He copied Bainbridge, Beck and one other partner, Douglas Curran.

247.  Later in the afternoon on Nov. 15, 2018, Bainbridge sent Chasan a lengthy email which, for the first time, elaborated on the "breach of fiduciary duty" allegation.  Bainbridge wrote:  "Pierce Bainbridge believes that you breached your fiduciary duties to Skip when you sent him your March 12, 2018, letter that clearly attempted to unduly pressure Skip into either accepting your general thinking about a framework for settlement discussions or accepting that you would no longer be putting your energies

into Skip's case and that you might even write to Judge Brody seeking leave to withdraw, even though you had signed an engagement agreement with Skip whereby you accepted to diligently represent Skip to the end of the case on a contingency-fee basis."

248.    Bainbridge's analysis was flawed by deliberate omission of pertinent facts including:  (a) Chasan was not contractually obligated to fund Hamilton's case – it was Hamilton's responsibility;  (b) as of March 12, 2018, diligent efforts by Chasan to find a third party funder had failed;  (c) without funding, there was no way to hire experts to support Hamilton's case or even engage in significant fact discovery;  (d) there was a fact discovery deadline of June 29, 2018, less than four months away, and Microsoft and Epic Games had signaled they would oppose further extensions;  (e) Chasan believed that the settlement overture by Microsoft made sense to pursue and was in Hamilton's best interests as well as his own, and any suggestion of conflict of interest was ill-founded because Chasan was not pursuing the agenda of some other client that had a conflict with Hamilton;  (f) the Pennsylvania Rules of Professional Conduct permit an attorney to seek leave to withdraw if there is a "fundamental disagreement" with the client;  (g) Chasan never presented Microsoft and its co-defendants with a settlement demand that Hamilton did not authorize;  and (h) Chasan did in fact continue to pursue third party funding with Legalist, Inc. on Hamilton's behalf.

249.  Upon information and belief, Bainbridge and Pierce were the co-

architects of the "breach of fiduciary duty" allegation, and they used it to influence Hamilton not only to drop Chasan, but to threaten Chasan with an eight-figure malpractice case, and it also served as a pretext for backing out of the $160,000 settlement that Pierce himself had proposed in September 2018.   Upon information and belief, Beck, Price and Hecht were also co-architects of the allegation, or ratified it.

250.   Pierce's threat to sue Chasan on behalf of Hamilton for "breach of fiduciary duty" was baseless because: (a) Chasan's efforts with Legalist, Inc. and Pierce in fact resulted in getting Hamilton funding for his case, which Hamilton needed and wanted; (b) after Chasan was terminated, the outcome of Hamilton's "right of publicity" case was entirely within the handling of Pierce and PBBPH Law; and (c) in view of the foregoing, Hamilton had no provable damages to assert against Chasan, assuming he could allege "breach of fiduciary duty."

251.  On December 18, 2018, Judge Brody heard oral argument in open court on Hamilton's motion for leave to file a Third Amended Complaint.  Hecht argued the motion for Hamilton.  Chasan attended the arguments.  Judge Brody requested or directed Hecht to speak with Chasan about resolving the settlement enforcement action filed by BJC Law and Chasan on December 14, 2018.  During the conversation, Hecht threatened to tarnish Chasan by exposing the "pig letter" (**Exh. E**).  Hecht and Chasan did not resolve anything.

252.   On January 10, 2019, Judge Brody entered an Order and Memorandum Opinion holding that Hamilton was granted leave to drop the Lanham Act count in the SAC, but denying leave to amend to add a count for "Intentional Non-Disclosure," as Hamilton had not shown there was evidence to meet all the elements of such a claim.  (ECF 105, 106).

253.   On February 1, 2019, the Defendants filed a Motion for Summary Judgment.  (ECF 109, 110, 111).  One of the attachments was the transcript of the September 21, 2018 deposition of Lenwood Hamilton (ECF 110-6).  Pierce had defended Hamilton's deposition.

254.   Disclosures in Hamilton's deposition included that Pierce was paying him $1000 periodically to serve as his "driver" (pp. 38, 42, 257-258). Also, he didn't have any money and had started a GoFundMe page when he was looking for an attorney to take his case (pp. 259, 314).  It took him nearly two years to find an attorney and he wouldn't have had anything filed without Mr. Chasan (pp. 143-144, 253-254).  Chasan introduced him to Pierce and he moved to Los Angeles after he retained Pierce (pp. 38-42, 257-258).   He fired Chasan because Chasan "brought me a document saying Microsoft wanted to settle with me for a million dollars and ….. I didn't trust him anymore" (p. 256).

255.  PBBPH Law filed Hamilton's opposition to the summary judgment motion.   One of the items submitted was a Declaration by Dr. Ray Abdallah (ECF 113-4), which stated, *inter alia*: "8.  I believe Cole's voice sounds

exactly like Hamilton's voice."   Also, approximately 16 fact and expert

depositions were submitted by the parties in support of or in opposition to

the summary judgment motion, and from the ones not filed under seal,

there was considerable travel involved because the venues for the

depositions included diverse cities such as Philadelphia, Detroit, Washington,

D.C., Raleigh NC, Bellevue, WA, and Los Angeles.

256.  Judge Brody heard oral argument in open court on September

25, 2019 on the Defendants' motion for summary judgment.  Hecht argued

on behalf of Hamilton.

257.  Judge Brody entered an Order and Memorandum Opinion on

September 26, 2019 granting the Defendants' motion for summary

judgment on First Amendment grounds and dismissing Hamilton's SAC.

(ECF 123, 124).  Her Memorandum Opinion quoted admissions made by

Hamilton in his deposition.

258.  The filings in support of and in opposition to the Speight-Epic

Games-Microsoft motion for summary judgment included excerpts of

depositions of at least nine fact witnesses, and at least three expert

witnesses.  The expert witnesses retained by PBBPH Law to support

Hamilton's case included Dr. Benham Bavarian, M.D. (facial recognition

expert), Edward Primeau (voice identification expert), and Barbara Carole

Luna (damages expert).  PBBPH Law did not use Hamilton's original self-

selected voice identification expert, Tom Owen, or the damages expert

recommended by Chasan (Wes Anson of CONSOR).

259.  Hamilton filed a timely notice of appeal on October 25, 2019 (ECF 128).

260.  Hamilton filed his appellate brief in the Third Circuit Court of Appeals on February 20, 2020, represented by PBBPH Law.  Per the Certificate of Compliance in his brief, the word count was 8755, considerably less than the 13,000 allowed by Federal Rule of Appellate Procedure 32(a)(7)(B).

261.  Hamilton did not appeal the denial of his motion for leave to amend the SAC to add a count for "Intentional Non-Disclosure," as Judge Brody had ruled on January 10, 2019 (ECF 105, 106), even though he had "space" in his brief in view of the applicable word limit.  As such, Hamilton (and PBBPH Law) waived their ability to assert a claim for "Intentional Non-Disclosure," which was the only remaining basis of Attorney Chasan's alleged "malpractice" touted by Pierce in his May 21, 2018 email to Chasan (*see ante* at ¶ 222).

262.  However, Hamilton's appeal brief argues that Judge Brody erred in granting summary judgment on First Amendment grounds, and it relies on the same arguments crafted by Attorney Chasan in the Memorandum of Law filed by Chasan in Opposition to the Motion to Dismiss the SAC (ECF 36-1), including many of the same case authorities.

263.  Of particular interest is that Hamilton's appeal brief argues that

Judge Brody erred because Hamilton's likeness was used by the defendants (especially Microsoft) for commercial purposes, such as promoting the bundled sale of Xbox One consoles, and the First Amendment does not protect exploitation of someone's likeness for commercial purposes.   This argument germinated out of allegations that Attorney Chasan (and Chasan alone) inserted into the SAC, and Chasan advocated in the brief opposing dismissal of the SAC (ECF 36-1).  For example, Hamilton's appeal brief relies heavily on the case of *Jordan v. Jewel Food Stores*, 743 F.3d 509 (7th Cir. 2014), which Chasan had cited in the brief opposing dismissal of the SAC.

264.    PBBPH Law and its partners have profited and continue to seek to profit from Attorney Chasan's legal work on Hamilton's behalf, without having paid Chasan or BJC Law a single penny for Chasan's labors.

## V.  PIERCE FORMS TALON LF, LLC - LITIGATION FUNDING.

265.  On September 14, 2018, Pierce registered or caused to be registered a limited liability company in Delaware named Talon LF, LLC ("Talon LF"). Upon information and belief, the purpose of Talon LF was to conduct a third-party litigation funding business.

266.  On March 6 and 7, 2019, Pravati filed UCC liens against PBBPH Law, Bainbridge, and Pierce, for more than $9 million, secured by the PBBPH Law litigation and case portfolio, including the "Gears of War" case.

267.  On April 1, 2019, Pravati filed notices of termination of its UCC liens against PBBPH Law and its partners.

268.  On July 24, 2019, Pierce formed two more Delaware-registered entities: (a) Talon LF GP, LLC, and (b) Talon LF Fund I, L.P.   The purpose of these two entities was to solicit investors for the litigation funding ventures of Talon LF.

269.  In about August 2019, Talon LF issued prospectuses and solicitations for investors.  Attached as **Exhibit N** is a Talon LF document titled "Talon LF Litigation Funding Investor Presentation."  The next to last page describes the "Team" of "Elite Trial Lawyers Who Know How Cases Are Won," including John M. Pierce (Chief Investment Officer), currently the global managing partner of PBBPH Law, and two other PBBPH Law partners, Douglas S. Curran and Thomas D. Warren.

270.  **Exhibit O** is another Talon LF document (albeit one page) which lists nine "bullet points" regarding Talon LF, hyping its business model and acumen, including:

> • Litigation finance has achieved **returns uncorrelated to the markets** exceeding other asset classes. Talon aims to **achieve over 100% returns on investment**.

> • Talon partners with **leading law firms** and focuses on litigation-only law firms to obtain early access to their most profitable litigations.

> • Talon has **unique access to deal flow** due to its relationship with Pierce Bainbridge Beck Price & Hecht LLP, an elite litigation-only law firm, which provides early access to high-stakes cases. Talon will also partner with other law firms that require financing, diversifying its investment portfolio
> .
> • Talon's leadership is drawn from Pierce Bainbridge, which has seen **explosive growth** in size (over 60 lawyers in under three years) and case value (projected fee recoveries as high as $500 million). Both

Talon and Pierce Bainbridge are comprised **of elite trial lawyers trained at the best law schools and law firms in the world**.

• Pierce Bainbridge has **a perfect record returning capital to its investors**.  In under three years, Pierce Bainbridge estimates that its financiers have achieved **annualized internal rates of returns of nearly 100%**.

271.  **Exhibit P** is another Talon LF document titled "Funding Track Record Pierce Bainbridge Beck Price & Hecht LP."   It has a table including a column for "Funder's Investment" listing funds received periodically from Legalist and from Pravati,  another column labeled "Repayment by Firm," another column listing the "Duration of Investment," and a final column labeled "IRR," which is believed to be an acronym for "Internal Rate of Return."  Upon information and belief, this "Funding Track Record" was prepared by Talon LF to show potential investors that PBBPH Law produced "annualized internal rates of returns of nearly 100%" to its investors.

272.  **Exhibit Q** is a bar chart prepared by Plaintiffs based on the "Funding Track Record" (**Exh. P**), the Pravati-PBBPH Law Agreement (**Exh. G**), and the public information regarding Pravati's UCC liens asserted against PBPPH Law and its partners.   It also includes a narrative of a timeline of certain events in the Hamilton "right of publicity" case.   As can be appreciated from the bar chart, Pravati significantly and dramatically increased its funding to PBBPH Law soon after receipt of the "Billion Dollar" memo submitted to Pravati by PBBPH Law on May 6, 2018, concerning Hamilton's case, and coinciding with PBBPH Law's hiring of additional attorneys to work on discovery in Hamilton's case.  Based on **Exh. P**, the

"Funding Track Record" document, Pravati enjoyed substantial profits in a short time for its investment in PBBPH Law.

## JURSIDICTION AND VENUE

273.  Jurisdiction is based on 28 U.S.C. § 1332(a)(1) because all of the Plaintiffs are Pennsylvania citizens, and none of the Defendants are Pennsylvania citizens or residents, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

274.  The Court has personal jurisdiction over PBBPH Law and its partners because they voluntarily came to the Eastern District of Pennsylvania to litigate Hamilton's "right of publicity" case in this District, No. 17-cv-0169-AB.  The Court also has personal jurisdiction over Pravati because Pravati has or had an agreement with PBBPH Law to split the net recovery in Hamilton's "right-of-publicity" case on a 50-50 basis, and thus Pravati is or was financially interested in the result in Hamilton's lawsuit in Philadelphia.

275.  Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §§1391(b)(2) and (c)(2) because, among other things, the contract between BJC Law and Lenwood Hamilton was made in Philadelphia, Pennsylvania; Hamilton's "right of publicity" lawsuit was filed in the Eastern District of Pennsylvania, No. 2017-cv-0169-AB; Plaintiffs BJC Law and Chasan maintain their principal place of business in this District; and Plaintiff Chasan and Defendant Pierce had two meetings at the offices of BJC Law in

Philadelphia, including one in which Hamilton was present.

## COUNT I – TORTIOUS INTERFERENCE WITH CONTRACT
### (Against PBBPH Law, Pierce, Bainbridge, Beck, Price and Hecht)

276.  All of the foregoing averments are incorporated by reference and realleged as if fully set forth.

277.  This Count is based on the Restatement (Second) of Torts, § 766, which was adopted by the Pennsylvania Supreme Court in *Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 393 A.2d 1175, 1181-82 (Pa. 1978), *cert. den.*, 442 U.S. 907 (1979).

278.  There is (or was) a contract between Plaintiff BJC Law and a third party, Lenwood Hamilton (**Exh. A**), as described above in ¶¶ 11-16.

279.  Defendants PBBPH Law, Pierce, Bainbridge, Beck, Price and Hecht intentionally interfered with Hamilton's performance of the contract by inducing or otherwise causing Hamilton to terminate Plaintiffs' representation and make a new contract with PBBPH Law, as described in **Exh. B**, and above in ¶¶ 20, 163-164.

280.  Plaintiffs BJC Law and Chasan suffered damages as a result of Hamilton's termination of the representation in that BJC Law lost the value of Chasan's billable hours ($319,240.78) as of 3/31/2018, and also lost a potentially greater sum amounting to the 40 percent contingency of any verdict or settlement in Hamilton's "right of publicity" case.

281.  Defendants PBBPH Law, Pierce, Bainbridge, Beck, Price and Hecht are liable to Plaintiffs for damages for their tortious interference with

contract because their actions in causing or inducing Hamilton to terminate Chasan's representation were improper for numerous reasons, as described below, without limitation.   These actions by Defendants are not sanctioned by the "rules of the game" which society has adopted.

282.   Defendants' actions were improper because Chasan invited Pierce and his law firm to be co-counsel with BJC Law on the condition that BJC Law and Pierce's law firm would split the 40 percent contingency on a 20/20 basis, provided Pierce's law firm could bring financing and complete future litigation work on a roughly 50-50 basis going forward (where Hamilton had fully supported Chasan's search for a third-party funder). Instead, Pierce and his law firm persuaded Hamilton to discharge BJC Law and go completely with PBBPH Law.  Had Chasan and BJC Law had a crystal ball and foreseen what Pierce and PBBPH Law would do, in derogation of the condition that was the basis for the invitation to Pierce, Chasan would never have introduced Pierce to Hamilton.

283.   Defendants' actions were improper because they induced Hamilton to discharge Chasan without any payment for Chasan's considerable legal work on behalf of Hamilton, as invoiced by BJC Law. Although a client has a right to discharge a lawyer at any time, that right is subject to liability for payment of the lawyer's services.  Defendants knew Hamilton lacked resources to compensate BJC Law and Chasan.  Defendants nevertheless facilitated Hamilton's discharge of Chasan by hiring

replacement attorneys from the Stradley Ronon law firm, at Defendants' own expense, to serve as local docket counsel for Hamilton, without making arrangements for any payment to BJC Law.

284.   Defendants' actions were improper because they have made no arrangement for a division of any contingent fee with a quantum meruit portion, or any appropriate percentage, going to BJC Law and Chasan. Plaintiffs are certainly entitled to a portion, as Plaintiffs filed Hamilton's Complaint when no other law firm would do so and avoided a time bar as to certain tort claims; Plaintiffs also amended the Complaint twice and defeated the motion to dismiss the SAC filed by Epic Games, Microsoft and Speight; and Plaintiffs also initiated discovery on behalf of Hamilton and marshaled Hamilton's responses to the discovery served by Epic Games, Microsoft and Speight.  But for the efforts of BJC Law and Chasan, Hamilton would have had no case at all.  Notably, the Pravati - PBBPH Law Agreement provides that if PBBPH Law is substituted out of a contingent fee case, PBBPH Law is required to take commercially reasonable steps to secure its portion of any contingent fee earned by settlement or judgment.  *See ante*, ¶ 202.  But here, with the shoe on the other foot, PBBPH Law and its partners have made no effort to allocate any portion of a potential recovery to BJC Law and Chasan, or to compensate BJC Law and Chasan for their considerable efforts of Hamilton's behalf.

285.   Defendants' actions were improper because Hamilton's upset at

Chasan over their dispute regarding what settlement demand to convey to Microsoft does not provide cover to Defendants for simultaneously agreeing to represent Hamilton and pushing out Chasan and BJC Law.  There are disputes every day in the United States between plaintiffs with jackpot expectations and their contingent fee lawyers who take a more sober view of the evidence, the legal issues and the risks of litigation.   Instead of stroking Hamilton with money and benefits, the proper course for Defendants would have been to remind Hamilton of all that Chasan had accomplished for him, to remind him that Chasan had detailed knowledge of the case (as opposed to Defendants' then-superficial knowledge), and most importantly, that despite their disagreement as to how to posture a settlement negotiation, Chasan, in fact, had continued to work diligently to find a third-party funder for the case, and had succeeded!   Moreover, Chasan was agreeable in March 2018 to going forward with Pierce and PBBPH Law, as proposed, on the basis of a 20/20 split of the 40 percent contingency, with PBBPH Law arranging the financing of the litigation expenses.

286.   Pierce was motivated to take over the whole case because if PBBPH Law had a 20/20 split with BJC Law on the contingency, PBBPH Law would have to split its share with Pravati on a 50-50 basis, such that PBBPH Law would net only 10 percent of any settlement or judgment, net of expenses.

287.   Pierce was motivated to take over the whole case for his own

marketing purposes, as he likes portraying himself as an aggressive trial counsel and "Goliath-slayer" of mammoth defendants such as Epic Games and (especially) Microsoft.

288.   Pierce was motivated to take over the whole case because he did not want to share decision-making with Chasan.  Pierce wanted to be "Captain of the Ship" and avoid strategy disputes with Chasan on discovery, selection of experts, trial tactics, settlement and everything else.

289.   Pierce was motivated to take over the whole case because he had law firm funding from Pravati, win or lose, and thus he was more prone to risk it all at trial than Chasan.  This is another reason he wanted to avoid disputes with Chasan over any settlement posture of the case.

290.  Pierce was motivated to take over the whole case because he wanted to use it as a marketing tool to attract litigation funding and new hires for PBBPH Law, and partners Bainbridge, Beck, Price and Hecht went along with this plan and participated in it and supported it.

291.  Pierce and PBBPH Law had no knowledge let alone investment in Hamilton's "right of publicity" case prior to 3/13/2018, when Eva Shang of Legalist, Inc. introduced Pierce and Chasan via an email sent to both.

292.   Pierce, being a stranger to Chasan, had little or no inhibition about offending Chasan by taking over Hamilton's case.  It is unlikely he would have done such a thing with another attorney he knew well for 10 or 15 years, or that he would have threatened a long-time attorney

acquaintance with an eight-figure malpractice action.

293.    Bainbridge, Beck, Price, and Hecht, being the partners in PBBPH

Law and partners with Pierce on 3/27/2018 when Hamilton "terminated"

Chasan and BJC Law, and retained PBBPH Law, are equally liable with Pierce

regardless of their degree of involvement in the decision making, and

regardless of the extent of their involvement in taking steps and measures

to effectuate the termination of BJC Law and Chasan.  They all participated

in the decision and conduct.  Defendants were all agents for one another,

and they all ratified Chasan's termination.

294.    The conduct of Defendants was and is outrageous, and subjects

them to appropriate punitive damages.

WHEREFORE, on Count I, Plaintiffs demand judgment in their favor

and against Defendants PBBPH Law, Pierce, Bainbridge, Beck, Price and

Hecht, jointly and severally, or on any appropriate fair share basis, for a sum

of at least $319,240.78, being the value of Plaintiffs' legal services on behalf

of Hamilton, or a quantum meruit share of any settlement or judgment

obtained by Hamilton in his "right of publicity" case, if greater, plus punitive

damages to be assessed by a jury, plus costs and expenses and any other

appropriate relief.

### COUNT II – COMMON LAW UNJUST ENRICHMENT
### (Against PBBPH Law, Pierce, Bainbridge,
### Beck, Price, and Hecht)

295.    All of the foregoing averments are incorporated by reference

and realleged as if fully set forth.

296.   By taking over the value of Chasan's and BJC Law's labors on behalf Hamilton, Defendants PBBPH Law, Pierce, Bainbridge, Beck, Price, and Hecht, have been unjustly enriched to the substantial detriment of Plaintiffs; Plaintiffs have a claim for unjust enrichment against Defendants under the holding of *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone and Middleman, P.C.*, 179 A.2d 1093 (Pa. 2018).

297.   Benefits conferred by Plaintiffs include at least all of the following:   (a) taking Hamilton's case when at least ten other law firms declined it;  (b) filing Hamilton's complaint on 1/11/2017, just one day before a time bar of two of Hamilton's tort claims, based on discovery on 1/11/2015;  (c) doing research into the history of the Gears of War videogames, and legal research, and amending the Complaint twice, to allege alternative grounds for liability based on "sound-alike," and for additional damages based on sales of "Cole Train" memorabilia and merchandise, and also bundled sales of the GOW videogames with Xbox One consoles;  (d) opposing and defeating the motion to dismiss filed by Speight, Epic Games, and Microsoft;  (e) initiating discovery to Speight, Epic Games and Microsoft, by requesting production of documents; and (f) responding to discovery served to Hamilton, including interrogatories and requests for production of documents and things.

298.   In particular, Plaintiffs (and Plaintiffs alone) added substantial

potential value to Hamilton's claims for damages by virtue of the amendments in the SAC relating to sales of "Cole Train" memorabilia and merchandise, and the bundled sales of the GOW videogames with Xbox One consoles.

299.   In particular, Plaintiffs (and Plaintiffs alone) added substantial potential value to Hamilton's claims in the Amended Complaint and in the SAC, by virtue of amendments to allege "sound-alike" liability, and by including the internet post by Robert Geary.

300.   The motions for *pro hac vice* admission filed on behalf of Pierce, Beck and Price were granted on 4/30/2018 by Judge Brody.   On 5/5/2018, Beck emailed Chasan seeking expeditious transfer of BJC Law's and Chasan's entire Lenwood Hamilton file.   PBBPH Law recognized the benefits it would receive from transfer of Chasan's voluminous file and work product on behalf of Hamilton, and Chasan was agreeable and obligated to transfer the file.

301.   Chasan was agreeable to an expeditious transfer of his entire Hamilton file and estimated that it would take approximately 8 hours of work to assemble boxes and prepare inventories of items in the boxes, and ready his electronic files for transfer by copying.

302.   Chasan requested PBBPH Law to compensate BJC Law for the 8 estimated hours at Chasan's customary hourly rate, and PBBPH Law agreed. This compensation was solely for the labor involved in transferring the voluminous file, and it did not reflect the value of the work product in the

file.

303.   The transfer of Chasan's complete Hamilton files was effectuated on 5/11/2018 at the premises of BJC Law in a two-hour meeting between Chasan and Stradley Ronon's Benjamin Gordon (Hamilton's "new" local counsel).   Nine boxes were transferred, and the inventory of each box was reviewed by Gordon.  Also, Chasan's electronic file for Hamilton was copied to an external hard drive supplied by Gordon.

304.   PBBPH Law benefitted from the receipt of Chasan's work product, which included, *inter alia*, written materials pertaining to witness interviews, contacts with potential expert witnesses, legal research files, contacts with Kevin Conrad, Esq. and Ray Abdallah, case-related documents, discovery materials, and much more.

305.   Further, as a result of Chasan's labors, and settlement overtures by the General Counsel's office of Microsoft in March 2018, Hamilton's "right of publicity" case had settlement value, albeit not the damages bonanza Hamilton hoped for.

306.   Defendants have retained the benefits of Chasan's and BJC Law's labors under such circumstances as make it unjust and inequitable to retain them without paying Plaintiffs the value of the benefits they unjustly acquired.

WHEREFORE, on Count II, Plaintiffs BJC Law and Chasan request that this Court enter judgment in their favor and against Defendants PBBPH Law,

Pierce, Bainbridge, Beck, Price and Hecht, together with an award of all

compensatory damages, but not less than $319,240.78, being the value of

Plaintiffs' legal services on behalf of Hamilton on the basis of hourly rates

and hours worked, or a quantum meruit share of any settlement or

judgment obtained by Hamilton in his "right of publicity" case, if greater, up

to a maximum of 20 percent of the total settlement or judgment net of

expenses, plus costs and expenses of this case, and any other appropriate

relief.

## COUNT III – COMMON LAW UNJUST ENRICHMENT
## (Against Pravati)

307.   All of the foregoing averments are incorporated by reference

and realleged as if fully set forth.

308.   Pravati has benefitted as well from Chasan's labors and

Chasan's work product, as reflected in Chasan's Hamilton file, by virtue of its

arrangement with PBBPH Law.

309.   By virtue of the Pravati-PBBPH Law Agreement (**Exh. G**),

Pravati had a 50-50 agreement with PBBPH Law regarding the profits from

cases Pravati funded for PBBPH Law.

310.   In or about April or May 2019, Pravati and PBBPH Law

terminated their relationship, and Pravati received repayment of litigation

funding monies advanced to PBBPH Law, plus a return on investment,

yielding a significant profit.  Pierce was quoted in an online article published

by Portfolio Media, Inc.'s LAW360, on May 17, 2019, as stating the

repayment to Pravati "was completed long ago" (**Exh. J**).

311.  Upon information and belief, a significant percentage of Pravati's return on investment for the litigation funding monies that it advanced to PBBPH Law were and are attributable to Hamilton's "right of publicity" case.

312.   Pravati has retained the benefits of Chasan's and BJC Law's labors under such circumstances as make it unjust and inequitable to retain them without paying Plaintiffs the value of the benefits they unjustly acquired.

WHEREFORE, on Count III, Plaintiffs BJC Law and Chasan request that this Court enter judgment in their favor and against Defendant Pravati Capital together with an award of all compensatory damages, but not less than $319,240.78, being the value of Plaintiffs' legal services on behalf of Hamilton on the basis of hourly rates and hours worked, or a quantum meruit share of any settlement or judgment obtained by Hamilton in his "right of publicity" case, if greater, up to a maximum of 20 percent of the total settlement or judgment net of expenses, plus costs and expenses of this case, and any other appropriate relief.

## JURY DEMAND

313.   Plaintiffs demand a trial by jury as to all issues triable to a jury.

Respectfully submitted,


/s/ Bruce J. Chasan

_____
Bruce J. Chasan, Esq. (Atty I.D. No. 29227)
1500 JFK Boulevard, Suite 312
Philadelphia, PA 19102
215-567-4400
bjchasan@brucechasanlaw.com



/s/ Clifford E. Haines

_____
Clifford E. Haines, Esq. (Atty. I.D. No. 9882)
Haines & Associates, P.C.
The Widener Building – 5th Floor
1339 Chestnut Street
Philadelphia, PA 19107-3520
215-246-2201
chaines@haines-law.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, Bruce J. Chasan, hereby certify that on May 18, 2020, I caused a true and correct copy of the foregoing Amended Complaint with exhibits to be filed via the Court's electronic filing system, which constitutes service upon counsel of record for the parties:

Eitan D. Blanc, Esq.
Zarwin Baum DeVito Kaplan Schaer Toddy
2005 Market Street, 16th Floor
Philadelphia, PA19103
edblanc@zarwin.com

*Attorney for the Pierce Bainbridge Parties*

Edward D. Altabet, Esq.
5 Penn Plaza, 23 rd Floor
New York, NY 10001
ealtabet@altabetlaw.com

*Attorney for Pravati Capital LLC*

Carl L. Engel, Esq.
Cohen Seglias Pallas Greenhall & Furman, P.C.
30 South 17th Street, Floor 19
Philadelphia, PA 19103

cengel@cohenseglias.com

*Attorney for Pravati Capital LLC*

/S/ Bruce J. Chasan
_____

Bruce J. Chasan