# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Law Offices of Bruce J. Chasan, LLC<br>Bruce J. Chasan, Esq.<br><br>Plaintiffs<br><br>vs.<br><br>Pierce Bainbridge Beck Price &<br>    Hecht, LLP<br>John M. Pierce, Esq.<br>James Bainbridge, Esq.<br>Carolynn Beck, Esq.<br>Maxim Price, Esq.<br>David L. Hecht, Esq.<br>Pravati Capital LLC<br><br>Defendants | **Civ. No. 2:20-cv-1338-AB**<br><br><br><br><br><br><br><br><br><br><u>**JURY TRIAL DEMANDED**</u> |

**PLAINTIFFS' SURREPLY MEMORANDUM OF LAW IN OPPOSITION TO
THE PIERCE BAINBRIDGE PARTIES' MOTION TO DISMISS
THE AMENDED COMPLAINT UNDER RULE 12(b)(6)**

Plaintiffs, by undersigned counsel, respectfully submit this Surreply

Brief in opposition to the Pierce Bainbridge Parties' Motion to Dismiss the

Amended Complaint (ECF 23).

**ARGUMENT**

**I.    RES JUDICATA.**

**A. Reliance on *Davis v. Wells Fargo* is misplaced.**

In their reply brief (ECF 38) at 3-4, the PB Parties mistakenly

contend *Davis v. Wells Fargo*, 824 F.3d 333 (3d Cir. 2016) should bar

Plaintiffs' lawsuit.  As pointed out in *Davis*, the "focus is on the facts, not the

1

legal theories." *Id.* at 342.  In Chasan Parties' prior action to enforce

settlement, the only material fact was whether Chasan and Pierce had

reached agreement to settle in September 2018.  None of the earlier events

in March 2018 wherein Chasan introduced Pierce to Hamilton, the

partnering, the fee sharing, etc., were material to the settlement

enforcement action (albeit they were "background").   As the Third Circuit

wrote in its decision: "Chasan's appeal can be distilled to a single question:

under Pennsylvania law, did the months-long exchanges among Chasan,

Pierce, and PBBPH create a binding settlement agreement?"   *Law Offices of*

*Bruce J. Chasan, LLC v. Pierce Bainbridge Beck Price & Hecht, LLP*, 792 Fed.

Appx. 195, 198 (3d Cir. 2019).    The tortious interference claim and the

unjust enrichment claim in Action II are simply not the "same cause of

action" as the settlement enforcement claim in Action I, **in either legal**

**theory or facts, or same conduct, transactions or occurrence**, and

therefore *res judicata* is not a bar in light of applicable precedents.  *Lubrizol*

*Corp. v. Exxon Corp.*, 929 F.2d 960, 963 (3d Cir. 1991); *United States v.*

*Athlone Industries, Inc.*, 746 F.2d 977, 984 (3d Cir. 1984); *Blunt v. Lower*

*Merion School District*, 767 F.3d 247, 277 (3d Cir. 2014).

Davis's case was entirely different.  His first action against the bank

stemming from the lockout and foreclosure alleged (a) trespass and (b)

violation of the Servicemembers Civil Relief Act.   *Davis*, 824 F.3d at 340.

His second action sought relief from the lockout and foreclosure by adding

additional claims for "breach of contract (Count II), negligence (Count IV), fraud (Count VI), breach of the implied covenant of good faith and fair dealing (Count X), and violation of the anti-tying provision of the Bank Holding Company Act, 12 U.S.C. §§ 1972, et seq. (Count XI)" and setting aside the mortgage assignments as fraudulent (Count IX). *Id.*  The Court held all facts to support the additional claims in the second action were known to Davis when he filed the first action, so *res judicata* applied.  *Id.* at 342-344.[1]

But in *Davis*, the first action was not an action to enforce a settlement that would have avoided the second action.  While one of the central purposes of *res judicata* is the judicial preference to avoid piecemeal litigation, there is another judicial policy to encourage settlement.   The policy of encouraging settlement was not in play in *Davis*, and in fact, the PB Parties never discuss or even acknowledge it in their reply brief.  The Court should not apply the "avoid piecemeal litigation" policy if it means disregarding the policy of encouraging settlement.

Chasan had a legitimate belief there was a settlement in September 2018 based on Pierce's unambiguous offer of $160,000 with no further

---

[1]  As discussed *infra*, it is more important in the analysis to determine whether the claims in the second action are "essentially similar" to those in the first action, rather than whether they were known at the time of the first action.

payment of any kind regardless of the outcome of Hamilton's case.[2] Chasan (a) did not deem getting Hamilton's assent or release to be a material term, (b) was willing to take the remote risk that Hamilton would sue him for malpractice, and (c) viewed the threat of a malpractice suit as a bargaining ploy and/or pretext for weaseling out to the settlement that Pierce himself had proposed.  Indeed, more than 2 years have now passed since Pierce made the threat on behalf of Hamilton (Am. Complaint ¶¶ 214, 216, 222), and no malpractice suit has been filed.

But Chasan was entitled to test his belief that a settlement was achieved in the Court of Appeals.  The purpose of the settlement was to take less than a full measure of damages (*i.e.*, a compromise) to avoid a more burdensome suit, and importantly, mutual releases contemplated non-disparagement.   These were legitimate judicial objectives, no less so than avoiding piecemeal litigation.

Chasan parties believed there was a settlement agreement and that PB Parties breached it (albeit the PB Parties dispute this).  But regardless, the settlement agreement was clearly not part of the same conduct, transactions and/or occurrences that comprise the material facts of the

---

[2]  Although, as noted by the Third Circuit, Pierce's 9/10/2018 offer did not specifically mention a "release," *Law Office of Bruce J. Chasan, LLC*, *supra*, 792 Fed. Appx. at 197 ("No mention was made of releases."), the proviso in the offer that there would be no further payment of any kind certainly implied there would be a release.  Whoever heard of a settlement without the defendant getting a release in return for the payment?

tortious interference claim or the unjust enrichment claim in Action II.   The claim for breach of the settlement agreement did not accrue until the alleged agreement was made and then breached.   Also, the consideration is different, in that in Action I, Chasan Parties agreed to compromise number and to release any further claims and non-disparagement.   Chasan Parties believed there was a settlement, and if enforced, Chasan Parties' claims for tortious interference and unjust enrichment would be extinguished.   Thus, hypothetically to sue for both breach of a settlement agreement and also the matters settled (tortious interference and unjust enrichment) were not just inconsistent, they were incompatible, diametrically opposed, against self-interest, and against the bargain that Chasan Parties had made with the PB Parties.

Whether two suits arise from the same conduct, transactions or occurrence should be determined pragmatically.   According to the Restatement of Judgments (Second) § 24(2)[3], this considers "whether the facts are related in time, space, origin or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding of usage."   *E.g., see Towns v. Northeast Miss. Elec. Power Ass'n*, 2011 U.S. Dist. LEXIS 23212 at *4-6 (N.D. Miss. March 8, 2011) (plaintiff's prior suit against employer for Fair

---

[3]   Third Circuit *res judicata* jurisprudence has cited the Restatement (Second) of Judgments § 24.   *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 261 (3d Cir. 2010).

Labor Standard Act benefits was not a *res judicata* bar to her later suit for benefits under the Family Medical Leave Act, as the two actions did not overlap), *rev'd on other grounds*, 478 Fed. Appx. 244, 248 n.2 (5th Cir. 2012) (but affirming that *res judicata* did not bar the second action.)

Clearly the "time, space, [and] origin" of the Chasan Parties' two actions are different.  The "motivation" of the settlement enforcement action was compromise, release of claims, reduction of burden and risk of litigation, and minimizing or eliminating burden on the courts.  Both parties stood to get the reciprocal benefit of avoiding litigating the underlying claims.

And surely combining the two actions in one proceeding would not be "a convenient trial unit."  Assuming there was a Complaint for (a) tortious interference, (b) unjust enrichment, and (c) breach of settlement agreement, the evidence on the third claim would have to be excluded from the trial of the first two claims under F.R.E. 408.   There would have to be a severance and two separate trials.   So the objective of avoiding "piecemeal" litigation would be illusory.    Likewise, amending Action I after dismissal of the settlement enforcement action would result in serial claims, not avoidance of piecemeal litigation.

In doing the *res judicata* analysis, the Court should "scrutinize the totality of circumstances in each action" to determine if there is "essential similarity" of the claims in the two actions.  *CoreStates Bank, N.A. v. Huls America, Inc.*, 176 F.3d 187, 202 (3d Cir. 1999).  In a number of instances,

after careful scrutiny, the Third Circuit has held the "essential similarity" test
was not met, and *res judicata* could not be applied.  *See United States v.
Athlone Industries, Inc.*, 746 F.2d 977, 984-986 (3d Cir. 1984); *Zackim v.
C.I.R.*, 887 F.2d 455, 457-460 (3d Cir. 1989); *Facchiano Construction Co.,
Inc. v. U.S. Dept. of Labor*, 987 F.2d 206, 211-213 (3d Cir. 1993); *Duhaney
v. Attorney General*,  621 F.3d 340, 346-352 (3d Cir. 2010) ("Under this
transactional approach, the focus of the inquiry is "'whether the acts
complained of were the same, whether the material facts alleged in each suit
were the same, and whether the witnesses and documentation required to
prove such allegations were the same.' " *Id.* (quoting *Athlone*, 746 F.2d at
984)).

In their reply brief at 5, n.1, the PB Parties state: "Seeking to amend the
underlying Complaint would have delayed, not extinguished, Plaintiffs'
appellate rights."   But consider this **hypothetical**:  After dismissal of the
settlement enforcement action, Chasan Parties timely seek leave to amend
to add counts for tortious interference and unjust enrichment.  The Court
amends the judgment of dismissal to allow Plaintiffs to amend the Complaint
as requested.  The Parties proceed through discovery and trial, and
Defendants prevail on the tortious interference and unjust enrichment
counts that were added by amendment.  Plaintiffs appeal and argue the
settlement enforcement count was wrongly dismissed.  The Court of Appeals
agrees with Plaintiffs and holds there was a valid enforceable contract to

settle.  In that event, Plaintiffs win on the settlement enforcement count; but the parties and the Court have spent a lot of time, money and effort on tortious interference and unjust enrichment; the parties have lost the mutual benefits of the settlement that Plaintiffs always maintained was enforceable; and the judicial policy of fostering settlement has been completely and thoroughly undermined.

### B. Reliance on *Gupta v. Wipro* Is Misplaced

In their reply brief at 6-7, the PB Parties rely on *Gupta v. Wipro, Ltd.*, 749 Fed. Appx. 94, 97 n.3 (3d Cir. Oct. 4, 2018) to argue that this Court's footnote 2 in the May 2, 2019 Memorandum Opinion in Action I, dismissing Chasan Parties' settlement enforcement action, is not a bar to their assertion of the *res judicata* defense in this action.  The argument is mistaken.

Footnote 2 in the Court's prior Memorandum Opinion does not control anything in this case if the "essential similarities" test is not met, and in that event, there is no *res judicata* to apply.   For all the reasons stated in the foregoing section, and in Plaintiffs' earlier response (ECF 33) to Defendants' Rule 12(b)(6) motion, there are no "essential similarities" and therefore the *res judicata* defense cannot be a bar to Chasan Parties' Action II on either a motion to dismiss or as an affirmative defense.

In their brief at p. 7, the PB Parties speculate as what the Court's comments in footnote 2 were intended to convey.  Plaintiffs think it is rather simple:  The Court's statement that Plaintiffs were free to file another action

to assert tortious interference and unjust enrichment was an intuitive insight that there were no "essential similarities" between the settlement enforcement action and claims then "on the shelf" for tortious interference and unjust enrichment.

Also, in *Gupta*, the plaintiff's first action was ***not*** a settlement enforcement case.  So, in that sense, *Gupta* is similar to *Davis v. Wells, supra*, and the arguments in the prior section about the judicial policy of fostering settlements are equally applicable in the analysis of *Gupta*.  The policy of avoiding piecemeal claims should not and cannot be allowed to trump the policy of fostering settlement.

Finally, *Gupta* is distinguishable for another reason.  Gupta did move to amend his first action, and he was denied leave to amend.   He could have appealed that order, but he did not.   In Chasan Parties' Action I, the briefing merely mentioned that the settlement was intended to avoid claims for tortious interference and unjust enrichment, and the Court's May 2, 2019 Memorandum Opinion also simply mentioned this in its footnote 2. These claims "on the shelf" were never before the Court in Action I, and there was never a motion for leave to amend.   The Court's footnote 2 provided some context, but it was not needed to support any ruling. Nevertheless, it did figure in the Chasan Parties' thinking about what options to pursue after the May 2, 2019 dismissal order was docketed.   It would be inequitable for the Court to bar Action II on *res judicata* grounds after

publishing that Action II could proceed at Plaintiff's election.    But fortunately, this "equitable" issue is merely academic because the "essential similarities" test is not met.[4]

## II.   TORTIOUS INTERFERENCE

### A.  No Contingent Fee (Yet).

Under the PB Parties' theory of the case, Chasan Parties have no pecuniary loss because Hamilton's case was dismissed on summary judgment and there has been no contingent fee earned.  Reply Br. at 1-2, 8. PB Parties thus urge dismissal of Plaintiffs' case.  *Id.*

 While Plaintiffs' do not agree that a contingent fee is the sole source of damages in this case, the PB Parties acknowledge they are handling Hamilton's case in the Third Circuit (Reply Br. at 17) and seek reversal of the summary judgment order.  Should that occur, there is a remote potential for a settlement or verdict.[5]

Chasan Parties filed this action on 3/9/2020 to assure that their claims would not be lost in view of the 2-year statute of limitations for tort actions. Assuming arguendo the PB Parties' view of damages in this case is correct,

---

[4]  The PB Parties' "collateral estoppel" argument at pp. 6-8 of their Reply Brief appears to be a "make weight" argument because Plaintiffs never invoked "collateral estoppel" in connection with the Court's footnote 2.

[5]    During the 7/1/2020 Rule 16 Conference, the Court asked Pravati's counsel whether the case should be stayed until the Third Circuit decides the pending appeal, and Pravati's counsel said yes.

they would not be entitled to a dismissal of Plaintiffs' case before the Third Circuit rules on Hamilton's appeal.

### B.  The Microsoft Settlement Overture Confirmed Value

The Court should grasp the importance of the Microsoft settlement overture even if Defendants are willfully blind to it.

After the Microsoft-Epic Games-Speight motion to dismiss Hamilton's Second Amended Complaint was denied, Magistrate Judge Strawbridge held a conference call on 1/7/2018 to discuss settlement.  Am. Complaint ¶¶ 63, 67.  Microsoft's retained counsel, McNamara, said they were not interested in an early settlement conference and wanted to engage in discovery.  *Id.* Judge Strawbridge declined to schedule a settlement conference.

 A few weeks later, on 1/25/2018, McNamara and Epic Games' counsel Van Arnam jointly sent Chasan a blistering, "nasty" letter threatening collection of attorney's fees from Hamilton under the Lanham Act, or from Hamilton and Chasan under the Dragonetti Act, if Hamilton's case were pursued.   Am. Complaint ¶¶ 59, 73 and **Exh. C**.   As recited by McNamara and Van Arnam, no one at Epic Games or Microsoft (other than Speight) had ever heard of Hamilton; Hamilton's claims had no basis in law or fact; Hamilton had nothing to do with the Gears of War video games;  Speight was the true voice over actor for the "Cole Train" avatar, not Hamilton, and Epic Games and Microsoft would produce Speight's recordings; and Hamilton's and expert witness Tom Owen's assertions that it was Hamilton's voice were

fraudulent.  **Exh. C.**   On 1/26/2018, Chasan responded with his own letter, stating, *inter alia*, that Hamilton and Mr. Owen were sincere in their beliefs that it was Hamilton's voice (and they were); there was no fraud and no fraudulent intent; he (Chasan) had not done anything improper in filing Hamilton's complaint; Hamilton was entitled to his day in court; they (Van Arnam and McNamara) were embarrassed that their motion to dismiss had been denied, and they were a couple of bullies that wanted to spend hundreds of thousands of dollars in discovery rather than talk settlement; and Hamilton would not have funds to pay any recovery of attorney's fees under the Lanham Act.   Am. Complaint ¶ 74 and **Exh. D.**  Chasan showed this correspondence to Hamilton on 1/27/2018, and Hamilton was appreciative that Chasan had stood up for him.  Am. Complaint ¶ 76.

Unexpectedly, on 3/7/2018, Chasan was contacted by Isabella Fu, Esq., an attorney in Microsoft's General Counsel's office, about opening settlement discussions for a "reasonable" amount.  Ms. Fu apologized for the 1/25/2018 correspondence from McNamara and Van Arnam and wanted to start fresh.   Am. Complaint ¶¶ 100-101.

The overture from Ms. Fu was generous and magnanimous.  Microsoft has the resources to back Van Arnam and McNamara, who, as competitive litigators, were highly motivated to litigate to victory.  No doubt Ms. Fu had a settlement in mind that reflected cost of defense, not the millions and millions that Hamilton had previously demanded.   Am. Complaint ¶ 56.

Further, Ms. Fu's overture did not originate from any scheduled court-ordered settlement conference.

Chasan naturally saw Ms. Fu's settlement overture as a golden opportunity to get a resolution of the case. The alternative to settlement was not promising, especially since litigation funding had not been forthcoming.

Because of Ms. Fu's overture, the case had value in March 2018, which had been created by Chasan's efforts.  Am. Complaint ¶¶ 21-22, 305.

 The PB Parties point out in their reply brief at 9 that Chasan Parties' brief completely ignored the case law cited in their brief (ECF 26-1 at 23-24) in support of their motion to dismiss.  Frankly, the Chasan Parties did not see the relevance of the six cited cases, as they all pertained to malpractice cases by clients or non-clients against attorneys, and the present case is certainly not a malpractice case against PBBPH Law or its partners.   Also, none of the six cases was a case where the *defendant* invited settlement discussions, as Microsoft did in Hamilton's case.  But to the extent the six cases discuss whether an aggrieved client can recover "speculative" damages, they are inapposite.  As stated in *Boyer v. Walker*, 714 A.2d 458 (Pa. Super. 1998), "damages are speculative only if the uncertainty concerns the fact of damages rather than the amount."  *Id.* at 462 (citing *Rizzo v. Haines*, 555 A.2d 58, 68 (Pa. 1989)).  In March 2018, Microsoft wanted to pay some money to resolve Hamilton's case, so there was no uncertainty as to "damages" in the form of payment of a sum for settlement.   It is of no

consequence whether Microsoft's motivation was simply to save litigation expenses or because it had a fear of large verdict (which it did not).

### C.  PB Parties Overplay the "Pig Letter."[6]

In numerous sections of their reply brief, the PB Parties argue that Chasan Parties cannot prevail as a matter of law because of the content of the "pig letter."  What they are really arguing is that disputed issues of fact should be decided on a motion to dismiss, rather than by the collective wisdom of a jury after trial.

The PB Parties cite certain language in the letter without regard to the full content of the letter.  For example, the PB Parties never mention that the letter stated Hamilton's case was worth zero without an expert report on damages, and without funds to hire an expert, the situation appeared hopeless.  But Chasan also wrote that if Hamilton had an expert report that stated his damages were $10 to 15 million, then a settlement demand of $7,500,000 would be supportable.  And also, days later, when it appeared that Pierce would supply funding, Chasan repeatedly urged Pierce to send a $25,000 deposit to CONSOR so that the damages experts could be retained immediately, especially in view of the upcoming discovery deadline in three months.  Chasan was clearly pushing Hamilton's agenda, notwithstanding

---

[6]  Chasan's 3/12/2018 letter to Hamilton (**Exh. E**) was dubbed by Hecht as the "pig letter."  Am. Complaint ¶ 251. The term is not "self-described" (as asserted in the PB reply brief at 14), but simply a convenient shorthand for the PB Parties' multiple references to it.

the disagreement about settlement value.[7]   The PB Parties' argument that Chasan Parties "were either unable or unwilling to proceed with Hamilton's case as he wished" (Reply Br. at 15) is contradicted by the allegations of the Amended Complaint, which this Court must credit for purposes of deciding a motion to dismiss.   If anything, the PB Parties' arguments betray and underscore that they used the "pig letter" in a distorted way to urge Hamilton to discharge Chasan.

Also, the invitation to Pierce to partner on the case with a 50-50 split of any contingency meant, of course, that Chasan was as motivated as anyone else to get the best result possible so that his share of the contingency would be amply rewarding.   Chasan did not lose incentive to get a good result for Hamilton.

Also, the "pig letter" that the PB Parties relish citing so often is not the "vile" epistle they say it is.  The paragraph at issue in the letter stated:

> You should recognize that through my efforts, you have survived a motion to dismiss, and moved Microsoft to the point where they are willing to offer some money to settle the case. That is HUGE! But you are unrealistic, and you exaggerate the value of your case, and you also exaggerate the strength of the merits of your case. You are acting like a pig, and if I may say so, pigs get slaughtered. Passing up realistic settlement negotiations this week means you are likely to get zero.

---

[7]  The PB Parties' reply brief appears to believe time stood still on 3/12/2018 when Chasan wrote the letter.  They completely ignore the pled facts that Chasan subsequently and diligently presented Hamilton's case to Legalist, Inc. and to Pierce and his partners, and was urging action on retaining an expert, the filing of PHV motions, and sending a "meet-an-confer" letter to Microsoft's trial counsel regarding their just-received discovery response.

In context, there is nothing wrong with this paragraph.  As to the sentence beginning "You are acting like a pig," that was just a vernacular way of saying that if Hamilton adhered to a greedy, unrealistic demand[8], Microsoft would walk away from the settlement negotiations they invited, and Hamilton would wind up with nothing.  Plaintiffs are confident that when a jury reviews this letter, they will agree it is not the "abhorrent" thing the PB Parties say it is, and will conclude that the PB Parties cherry-pick things from the letter to cover up their unethical conduct[9] in interfering with the Chasan Parties' engagement agreement with Hamilton.

Also, there is no evidence that Hamilton was so "thin-skinned" that he wilted and crumbled in view of the "pig" allusion in the 3/12/2018 letter.  At the urging of Chasan and Conrad, he did attend the 3/20/2018 meeting in Chasan's office to meet with Pierce.  Am. Complaint ¶¶ 130, 132-133.  Also, in his deposition in his "right of publicity case," when he was asked why he fired Chasan, he did not say Chasan had insulted him and hurt his feelings;

---

[8] The PB Parties continue to argue that Plaintiffs' describing Hamilton as "greedy" and "unrealistic" is somehow berating Hamilton.  Reply Br. at 11. But it was true in March 2018, and it is even more true after Hamilton threatened Chasan with an 8-figure malpractice case.  Am. Complaint ¶ 214. Vigorous and capable representation of one's client does not mean counsel has to pretend his client is a saint, or that counsel cannot hit back when the client has lobbed baseless threats of a malpractice action.

[9]  The PB Parties' reply brief nowhere counters the allegations in the Amended Complaint that Pierce and partners offered financial incentives (*e.g.*, rent money, "driver" stipend, etc.) to Hamilton that violate the Rules of Professional Conduct.  Am. Complaint ¶¶ 175, 254.  *See infra* at 18-20.

instead, he said Chasan "brought me a document saying Microsoft wanted to settle with me for a million dollars and …. I didn't trust him anymore."  Am. Complaint ¶ 254.  All this goes to a disagreement about the value of his case.  And regarding that, there is nothing in the Rules of Professional Conduct that requires an attorney to obsequiously indulge unrealistic expectations of a client.  Rule 1.2(d) states:  "a lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning or application of the law."  Hence, Chasan, in view of the evidence[10] and the issues of law in Hamilton's case, was within his professional obligations and responsibilities to counsel Hamilton that unrealistic settlement demands would backfire.   The Rules recognize that clients and their attorneys may have irreconcilable disagreements.  Rule 1.2 Explanatory Comment, Para. [2].

Also, a case cited by co-defendant Pravati (namely *Joseph Q. Mirarchi Legal Services, P.C. v. Thorpe*, No. 19-3102, 2020 U.S. Dist. LEXIS (E.D. Pa. April 28, 2020) in ECF 40 at 4) shows how untenable the PB Parties' arguments based on the "pig letter" really are.  Attorney Mirarchi was

---

[10] Notably, Hamilton had read the 1/25/2018 letter by Van Arnam and McNamara (**Exh. C**) and was aware of their position that it was Speight's voice, not Hamilton's, in the GOW video games, and that Hamilton's voice expert Tom Owen was, at a minimum, mistaken, or worse, fraudulent.  Am. Complaint ¶ 76.  As of 3/2/2018, Chasan was in receipt of Microsoft's document production including "hundreds of recordings by Lester Speight of 'Cole Train' dialogue in the GOW video games."  Am. Complaint ¶ 89.

administratively suspended for two months in 2015 for non-compliance with his CLE requirement, and he failed to inform his clients, the Thorpes.  During the time of his suspension, he negotiated a settlement offer of $324,729.30 for the Thorpes from their property insurer.   After learning of the suspension, the Thorpes discharged Mirarchi and retained new counsel, who completed the settlement that Mirarachi had negotiated.   Mirarchi sued for his contingent fee.  He was denied by the trial court, but the Third Circuit reversed, holding he was entitled to quantum meruit notwithstanding his misconduct.  On remand, taking into account all relevant factors, the court awarded Mirarchi $104,000.[11]

If Mirarchi could recover quantum meruit for his fees despite his misconduct of practicing law while suspended, then Chasan can also recover his fees, as there is nothing in Chasan's 3/12/2018 letter to Hamilton that amounts to misconduct.

### D.  Public Information About Hamilton's California Rental.

When Hamilton filed his motion in his "right of publicity" case to file a Third Amended Complaint, the draft of the proposed complaint (ECF 95-3) stated in ¶ 6 that his address was "4926 Coyote Wells Circle, Thousand Oaks, CA 91362. On January 11, 2017 (the date of the original complaint in

---

[11] The BJC Law-Hamilton Engagement Letter (**Exh. A**) is entirely consistent with an attorney's right to quantum meruit in the event the client discharges the attorney.  The PB Parties' interpretation (Reply Br. at 9) of *Angino & Rovner v. Jeffrey R. Lessin & Assocs.*, 131 A.3d 502, 508 (Pa. Super. 2016), is mistaken.

this action, Hamilton's address was 1201 Willow Street, Apt. 5, Norristown, PA 19401." As noted *ante* in n.9, the PB Parties' reply brief nowhere counters Chasan Parties' allegations of unethical financial inducements to Hamilton, including paying his rent in California.

Although discovery has been stayed in this case, certain information came to public light on 7/1/2020 when the owner of the property at 4926 Coyote Wells Circle sued Pierce and Hamilton for back rent and possession of the premises. *See* Complaint, *Faysal Shaarani et al. v. John M. Pierce, et al.*, No. 56-2020-00543009-CU-BC-VTA (Ventura County, CA) (attached as **Exh. S**) and Docket Information (attached as **Exh. T**). According to the Complaint and the attached rental agreement, Pierce rented the property for $6600 per month on April 30, 2018 (term commencing 5/4/2018 and ending 5/4/2020) with the contractual proviso that he was to be the sole occupant. Nevertheless, Pierce allowed Hamilton and his family to occupy the residence without the owner's consent. Pierce and unauthorized tenants also breached the rental agreement by failing to pay rent due on March 1, 2020.[12] As of May 4, 2020, Hamilton had refused to vacate and was unlawfully occupying the premises. The property can be viewed at the URL listed below:

https://www.redfin.com/CA/Westlake-Village/4926-Coyote-Wells-Cir-91362/home/4688453

---

[12] If Pierce and/or PBBPH Law paid 22 months of rent, the arithmetic works out to at least $145,200 in housing assistance for Hamilton.

This rental property appears to be a significant upgrade from the humble apartment Hamilton formerly occupied in Norristown, PA.

This is evidence of Pierce's unethical conduct in stealing Chasan Parties' client by offering extravagant financial incentives to Hamilton that are prohibited by Rule 1.8(e) of the Pennsylvania Rules of Professional Conduct.[13]   It is probably unprecedented in American jurisprudence for any attorney to offer this type of financial assistance to a contingent fee litigant. It is for a jury to decide if the actions of the PB Parties tortiously interfered with the BJC Law-Hamilton engagement agreement, and it cannot be said as a matter of law that Hamilton's decision to leave was "not due to any action of the Pierce Bainbridge Defendants," as argued at p. 15 of their reply brief.

### E. Factual Issues Preclude Dismissal on a Rule 12(b)(6) Motion

The PB Parties' reply brief posits entitlement to dismissal based on several factual and legal issues which are wholly inappropriate for resolution on a Rule 12(b)(6) motion.

They argue there can be no interference with contract because the BJC Law-Hamilton engagement letter is an unenforceable contract.  (Reply Br. at 10).   This Court must accept that the contract is valid for purposes of a motion to dismiss.  If the PB Parties want to litigate its validity (assuming

---

[13]   Pierce signed the lease on 5/1/2018, just a few days after he applied for *pro hac vice* admission in Hamilton's case (Am. Complaint ¶ 195), obligating himself to comply with the Pa. Rules of Professional Conduct.

they have standing), they should answer the Amended Complaint and assert their affirmative defenses, which is their obligation to prove.

The PB Parties argue their conduct cannot be deemed improper because under the circumstances Chasan's conduct was allegedly improper. Reply Br. at 13.   But that is the ultimate fact issue for a jury!   The jury gets to weigh whether Chasan's 3/12/2018 letter negates all the good he attempted to do for Hamilton, including *inter alia*, diligent efforts to obtain litigation funding both before and after 3/12/2018, and whether other actions by Chasan after 3/12/2018 were also intended to advance Hamilton's interests (they were).   The jury is also entitled to weigh whether the actions of the PB parties were outside the "rules of the game."

### F. Restatement (Second) of Torts § 768 Is Inapplicable.

In their brief at 13, the PB Parties rely on § 768 and attempt to distinguish *Island Air v. La Bar*, 566 P.2d 972 (Wash. App. 1977).   They cite the non-competition agreement in *La Bar*, but they are missing the point and actually never addressed Chasan Parties' argument that there is no competition unless the rivals are working independently.   That was not the case here, as Pierce was invited to partner with Chasan, and that was the premise for the joint meeting of 3/20/2018.   Given the facts, it would be impossible for any reasonable jury to find that Pierce and PBBPH Law were working independently from Chasan Parties.

### III.   UNJUST ENRICHMENT

In their reply brief at 15-18, the PB Parties re-package many of the arguments they made in the section on tortious interference.  Principally, they argue there can be no unjust enrichment because Hamilton's case has not yet resulted in a recovery.   Even accepting the PB Parties' narrow, self-serving definition of "benefits," this Court cannot dismiss the Chasan Parties' Amended Complaint before knowing the outcome of Hamilton's appeal in the Third Circuit.    At best, the PB Parties' argument is that Chasan Parties' claims are unripe.  And yet, had the Chasan Parties let two years go by without filing the Complaint in Action II, the PB Parties no doubt would have asserted a statute of limitations defense.

At pp. 16-17, the PB Parties make a strained argument that Chasan Parties are attempting to "dictate" a case resolution by holding over the head of successor counsel a quantum meruit claim.  Their argument makes no sense.  The fact-finder would be entitled to find that the PB Parties benefitted from Chasan's work product in multiple respects:  (a) PB Parties are clearly using Chasan's work product in search of a damages bonanza, which is their own election;  (b) the Hamilton "right of publicity" case clearly had a settlement value in March 2018 in view of the Microsoft overture, in view of Chasan's efforts;  (c) it anomalous that the Stradley Ronon attorneys get paid hourly rates for serving as Hamilton's local counsel while Chasan Parties, who alone created all the value, get nothing;  (d) it is anomalous

that the PB Parties underwrite the expenses of discovery and experts without paying quantum meruit to Chasan Parties, who made the entire endeavor possible; and (e) it is anomalous that the PB Parties see fit to pay Hamilton's rental expenses and also a stipend to be a "driver" and other benefits, whilst exploiting Chasan's work product with no compensation. Under all the circumstances, the factfinder would be justified in finding that Pierce and the PB Parties obtained a benefit from Chasan's labors, and it would be unjust to let them retain that benefit without paying quantum meruit.

As to the PB Parties' arguments that the individual attorneys did not obtain a benefit, that is a matter for discovery.   It cannot be said with certainty and as a matter of law that Pierce, Bainbridge, Beck, Price and Hecht, as individuals, have not retained a benefit.

## IV.   THE "PARTICIPANT ACTOR" DOCTRINE SUPPORTS LIABILITY.

The case law cited by the PB Parties supports "participant actor" liability of Bainbridge, Beck, Price and Hecht.  See *Wicks v. Milzoco Builders, Inc.*, 470 A.2d 86, 90 (Pa. 1983), citing 3A Fletcher, Cyclopedia of the Law of Private Corporations § 1137, p. 207 (perm. ed. rev. 1975) (officer of a corporation is not liable "unless he specifically directed the particular act to be done **or participated, or cooperated therein**") (emphasis added).  The Amended Complaint includes sufficient allegations regarding the participation and cooperation of Bainbridge, Beck, Price and Hecht.  Their alleged

23

involvement is not akin to passive nonfeasance, such as simple discovery that wrongdoing was committed.  *See Wicks, supra*, 470 A.2d at 90.  As in *Wicks*, the Amended Complaint is sufficient to withstand the demurrer.  *Id.* at 90-91.

Discovery is needed to uncover the precise involvement of Bainbridge, Beck, Price and Hecht, and naturally it is expected that their involvement was not identical to Piece's or to that of one another.

It is not problematic that some averments in the Amended Complaint are based "on information and belief."   Reasonable, plausible inferences can be drawn from known facts and circumstances, subject to confirmation in discovery.  Chasan Parties reasonably believe they are entitled to discovery of the clandestine meetings between Hamilton and the PBBPH Law partners, especially since Chasan was counsel or record, had invited Pierce and his firm to be co-counsel, and, at Hamilton's request in the termination letter, he remained Hamilton's counsel of record until Pierce and his partners could be substituted (which was 4 weeks later when their Motions for *pro hac vice* admission were filed).  Am. Complaint ¶ 20 and **Exh. B**.

## V.    PUNITIVE DAMAMGES

At p. 20, of their reply brief, the PB Parties argue that the conduct cited in Plaintiffs' brief (ECF 33, pp. 54-55) is unrelated to tortious interference, and cannot support punitive damages.  Such an argument is meritless and (at best) premature before discovery.

24

Punitive damages should be for the jury in this case.   Pierce outright lied in the June 15, 2018 motion for a discovery extension in stating Chasan was disabled from participating in discovery.  Am. Complaint ¶¶ 225-235. Pierce would take this misconduct away from the jury based on his own self-serving assessment.  But a jury can valuate motive and intent from its own overall assessment of the circumstances.  A jury can decide that the lie in June was part and parcel of a plan and strategy to take over Hamilton's case without compensating Chasan, and an important step in the implementation of the plan.   It dove-tailed with Pierce's plan to relocate Hamilton to California and pay his rental housing.  These were not spur-of-the moment events that occurred with only an hour's notice.  The jury can evaluate Pierce's intent in March based upon actions he later implemented in April, May and June.

The punitive damages claim should not be dismissed on a 12(b)(6) motion.  This can be re-visited with greater clarity at a later stage of the proceedings.

## CONCLUSION

The Motion to Dismiss should be denied.

Respectfully submitted,

/s/ Clifford E. Haines

_____

Clifford E. Haines, Esq. (Atty. I.D. No. 9882)
Haines & Associates, P.C.
The Widener Building – 5th Floor
1339 Chestnut Street
Philadelphia, PA 19107-3520
215-246-2201
chaines@haines-law.com


/s/ Bruce J. Chasan

_____

Bruce J. Chasan, Esq. (Atty I.D. No. 29227)
1500 JFK Boulevard, Suite 312
Philadelphia, PA 19102
215-567-4400
bjchasan@brucechasanlaw.com

*Attorneys for Plaintiffs*

Date:  July 22, 2020

## <u>CERTIFICATE OF SERVICE</u>

    I, Bruce J. Chasan, hereby certify that on July 22, 2020, I caused a true and correct copy of the foregoing proposed Surreply Brief in Opposition to the Pierce Bainbridge Defendants' Motion to Dismiss the Amended Complaint (ECF 26), with exhibits, to be filed via the Court's electronic filing system, which constitutes service upon counsel of record for the Pierce Bainbridge Defendants and to Pravati Capital LLC, as follows:

    Eitan D. Blanc, Esq.
    Zarwin Baum DeVito Kaplan Schaer Toddy
    2005 Market Street, 16th Floor
    Philadelphia, PA19103
    edblanc@zarwin.com

    *Attorney for the Pierce Bainbridge Parties*

    Edward D. Altabet, Esq. (ID 318281)
    Carl L. Engel, Esq. (ID 316062)
    Cohen Seglias Pallas Greenhall & Furman PC
    30 South 17th Street, Floor 19
    Philadelphia, PA 19103
    ealtabet@cohenseglias.com
    cengel@cohenseglias.com

    *Attorneys for Pravati Capital LLC*

    /S/ Bruce J. Chasan

    _____

    Bruce J. Chasan

Exhibit S

1 | **LAW OFFICES OF PATRICK L. GAROFALO**
**PATRICK L. GAROFALO (State Bar No. 68921)**
2 | **3041 HEAVENLY RIDGE STREET**
**THOUSAND OAKS, CA. 91362-1178**
3 | **Telephone:      805-497-7676**
**Email:          patg@plglaw.net**
4 |

5 | Attorney for Plaintiffs, Faysal Shaarani and Rana Shaarani

6 |

7 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF VENTURA**

8 |

| | |
|---|---|
| FAYSAL SHAARANI, individually, and RANA SHAARNI, individually, | CASE NO. |
| Plaintiffs, | UNLIMITED CIVIL ACTION |
| vs. | **VERIFIED COMPLAINT FOR BREACH OF WRITTEN LEASE AGREEMENT** |
| JOHN M. PIERCE, individually; LENWOOD HAMILTON, aka SKIP HAMILTON individually; and DOES 1 through 30, Inclusive; | **[California Civil Code §1951.2]; BREACH OF CONVENANT RESTRICTING TRANSFER** |
| Defendants. | **[California Civil Code §§ 1995.010 et seq.]; FORCIBLE  DETAINER [California Code of Civil Procedure §1160]; INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE** |

## FACTS COMMON TO ALL CAUSES OF ACTION

1.  At all times relevant herein, Plaintiffs,  FAYSAL SHAARANI and RANA SHAARNI, (hereinafter referred to as "Plaintiffs"), are the owners of that certain real property located at 4926 Coyote Wells  Circle, Westlake Village, County of Ventura, State of California (hereinafter the "Property").

2.  Plaintiffs are informed and believes and thereon allege that at all times relevant herein, Defendant, JOHN M. PIERCE (hereinafter referred to as "Pierce"), is and was a resident of the

1

**VERIFIED COMPLAINT FOR BREACH OF CONTRACT, BREACH OF COVENANT,**
**FORCIBLE DETAINER AND INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC**
**ADVANTAGE**

1  County of Ventura, State of California, and the tenant at the Property pursuant to the Residential

2  Lease Agreement dated April 30, 2018, (the "Lease") executed with the Plaintiffs.  A true and

3  correct copy of said Lease is attached hereto as Exhibit A and incorporated herein by this reference

4  as though set forth in full.  Plaintiffs are informed and believes and thereon allege that at all times

5  relevant herein, Defendant, Pierce, is and was an attorney duly licensed to practice law in the State

6  of California with the California State Bar number 250443.

7

8      3.  Plaintiffs are informed and believes and thereon alleges that at all times relevant herein,

9  Defendant, LENWOOD HAMILTON, aka SKIP HAMILTON (hereinafter referred to as

10  "Hamilton"), is an individual residing in the County of Ventura.

11

12     4.  Plaintiffs are currently unaware of the true names and capacities of the defendants sued

13  herein as Does 1-30, inclusive, and therefore sue them by such fictitious names pursuant to Code of

14  Civil Procedure § 474.  Plaintiffs will seek leave to amend this complaint to add the true names and

15  capacities of these defendants when their identities become known. Whenever reference is made to

16  "Defendants Does 1 through 30 and each of them" it is understood to mean the defendants acting

17  individually, jointly, and/or severally, and to include fictitiously named defendants.

18     5.  Plaintiffs are informed and believes and thereon alleges that each of the fictitiously named

19  defendants, Does 1 through 30, are responsible in some manner for the occurrences alleged in this

20  complaint and the losses suffered by Plaintiffs, and that Plaintiffs' damages as alleged in this

21  complaint were proximately caused by their conduct.

22

23     6.  Plaintiffs are informed and believes and thereon alleges that each of the defendants were the

24  agents, employees, co-venturers, partners, bailees, or in some manner agents or principals, or both,

25  for each other and were acting within the course and scope of their agency, bailment, or

26  employment.

27

28

**VERIFIED COMPLAINT FOR BREACH OF CONTRACT, BREACH OF COVENANT,
FORCIBLE DETAINER AND INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC
ADVANTAGE**

7.  The Lease that is the subject of this litigation was entered in the County of Ventura.

## FIRST CAUSE OF ACTION AGAINST DEFENDANTS PIERCE
## AND DOES 1 THROUGH 10, INCLUSIVE
### (Breach of Written Lease Agreement)

8.  Plaintiffs refer to and incorporate by this reference paragraphs one (1) through seven (7) inclusive, as though set forth in full herein.

9.  Pierce executed the Lease dated April 30, 2018, for the Property, which Property is a single-family residence located at 4926 Coyote Wells Circle, Westlake Village, California.

10. Section 1.B provides that the Property shall not be occupied in whole or in part by any person other than the lessee, Pierce.  Plaintiff is informed and believes and alleges upon such information and belief that defendants entered into possession of the Property pursuant to the Lease.

11. Section 2 of the Lease provides that the term of the Lease commenced on May 4, 2018, and shall terminate on May 4, 2020.

12. Section 3 of the Lease provides that defendants were to pay a monthly rent of $6,600.00. Defendants paid the monthly rent due from the commencement of the Lease and through February 29, 2020.

13. On March 1, 2020, defendants breached the Lease as defendants, since that time, have failed and refused, despite demand by Plaintiffs, to pay the monthly rent due, past due, and becoming due under the terms and conditions of the Lease.

14. Paragraph 1.B. of the Lease provides that the Property shall not be occupied in whole or in part by any person other than the lessee, Pierce. Plaintiffs are informed and believes and thereon allege that this covenant has been violated in that Pierce has allowed Hamilton and his family members to reside in the Property without the landlord's consent as required by Paragraph 22.

3

15. Paragraph 22 of the Lease provides that the Property shall not be sublet or assigned to a third party without the landlord's express written consent. Plaintiffs are informed and believes and thereon alleges that this covenant has been violated in that Hamilton and his family members are occupying the Property and the landlord has not consented to any assignment or subletting to these individuals.

16. Paragraph 2 of the Lease provides that the term of Lease ended on May 4, 2020. Notwithstanding, defendants' default, Hamilton and his family members have failed and refused to vacate the Property and defendant Pierce has failed to return possession of the Property to Plaintiffs and has been unable to return possession of the Property to Plaintiffs due to the refusal of his unlawful occupants to vacate the Property.

17. Plaintiffs have performed all of the conditions, obligations, and covenants to be performed by Plaintiffs under the Lease.

18. On the Lease termination date as set forth in paragraph 2, rent due, owing, and unpaid was $14,080.00.   As defendants continue to occupy the Property and have failed and refused to return possession of the Property to Plaintiffs, Plaintiffs damages continue to accrue.

19. As a proximate result of defendants' breach and failure to pay rent due, plaintiff has been damaged in the amount of $14,080.00 plus interest on that amount at the legal rate calculated from the date rent was due.

20. As a further proximate result of defendants' breach of the lease, failure to pay rent, and breach of the Lease, Plaintiffs have been further damaged as a result of Plaintiffs inability to lease the Property following the Lease termination date.  Pursuant to California Civil Code, § 1951.2, subd. (a)(2), a landlord may also recover the worth at the time of award of the amount by which the unpaid rent that would have been earned after termination until the time of award exceeds the amount of any rental loss the tenant proves could be reasonably avoided.

4

21. Furthermore, as defendants continue to use and occupy the Property, the condition of the Property is unknown to Plaintiffs.

22. As a direct and proximate result of Defendants' breach of the Lease, Plaintiffs have been damaged in a sum to be proven at trial.  Plaintiffs are informed and believes and thereon alleges that said damages are in excess of $25,000.00.

23. Pursuant to Paragraph 43 of the Lease, the prevailing party in any action against the other arising out of or under the Lease shall be entitled to its costs of suit, including, a defined sum for attorneys' fees in said suit.  Plaintiffs have retained the services of counsel to prepare and prosecute the within action and Plaintiffs have and will continue to incur attorney's fees and costs pursuant thereto.

## SECOND CAUSE OF ACTION AGAINST DEFENDANTS PIERCE, HAMILTON,AND DOES 11 THROUGH 20, INCLUSIVE

### (Defendants' Breach of Covenant Restricting Transfer California Civil Code §§ 1995.010 et seq.)

24. Plaintiffs refer to and incorporate by this reference paragraphs one (1) through seven (7) inclusive, paragraph ten (10),  paragraphs fourteen (14) through seventeen (17), inclusive, as though set forth in full herein.

25. On a date unknown to Plaintiffs, Pierce allowed Hamilton and his family members to use and occupy the Property, apparently as subtenants of Pierce. This sublease constitutes a breach of the Lease as Pierce was to be the only occupant of the Property as provided for in Paragraph 1.B of the Lease and as Pierce has allowed Hamilton and his family members to reside in the Property without the landlord's consent as required by Paragraph 22 of the Lease.

26. Paragraph 2 of the Lease provides that the term of Lease ended on May 4, 2020.  Hamilton and his family members have failed and refused to vacate the Property and defendant Pierce has

5

1  failed to return possession of the Property to Plaintiffs due to the refusal of his unlawful occupants to

2  vacate the Property controversy as hereinabove alleged.

3      27. Plaintiffs have demanded that the defendants quit and surrender all of the leased Property to

4  Plaintiffs. Defendants have refused and failed to quit and surrender the leased Property and are now

5

6  holding the leased Property without right.

7      28. As a proximate result of defendants' breach of the Lease, Plaintiffs have been further

8  damaged as a result of Plaintiffs inability to lease the Property following the Lease termination date.

9  Plaintiffs are informed and believe and thereon allege that the daily fair market value of the Property

10  following the termination of the lease is two hundred and twenty dollars ($220.00).  As Plaintiffs

11  damages are continuing, Plaintiffs' damages will be in a sum to be proven at trial.

12

13  ### THIRD CAUSE OF ACTION AGAINST DEFENDANTS HAMILTON

    ### AND DOES 21 THROUGH 30, INCLUSIVE

14

15  **(Forcible Detainer – California Code of Civil Procedure §1160)**

16      29. Plaintiffs refer to and incorporate by this reference paragraphs one (1) through seven (7)

17  inclusive, as though set forth in full herein.

18      30.  Plaintiffs leased the Property to Pierce.  Paragraph 2 of the Lease provides that the term of

19  Lease ended on May 4, 2020, at which time Plaintiffs were entitled to possession of the Property.

20

21      31. On a date unknown to Plaintiffs, Hamilton, and his family members entered and began to

22  reside in the Property without the landlord's knowledge, consent, approval, or ratification.

23      32. As of May 5, 2020, Plaintiffs were entitled to possession of the Property. Hamilton and his

24  family members have failed and refused to vacate the Property and continue to unlawfully occupy

25  the Property.

26

27

28

6

33. Plaintiffs have demanded that the defendants quit and surrender all of the leased Property to Plaintiffs. Defendants have maintained possession and refuse to surrender for five days after demand has been made.

34. As a proximate result of defendants' forcible detainer of the Property, Plaintiffs have been damaged as Plaintiffs are unable to lease the Property.  Plaintiffs are informed and believe and thereon allege that the daily fair market value of the Property following the termination of the lease is two hundred and twenty dollars ($220.00).  As Plaintiffs damages are continuing, Plaintiffs' damages will be in a sum to be proven at trial.

35. Pursuant to the provisions of California Code of Civil Procedure, §1174, Plaintiffs seek and order of the court for possession of the Property and for damages in a sum to be proven at time of trial.

36. In committing the forcible detainer described herein, defendants have acted with malice in that said defendants have failed and refused to vacate and surrender the Property to Plaintiffs without any legal right to do so. As a result, Plaintiffs are entitled to an award of statutory damages in the amount of $600.00 in addition to actual damages, pursuant to the provisions of California Code of Civil Procedure, § 1174, subd. (b).

## FOURTH CAUSE OF ACTION AGAINST DEFENDANTS HAMILTON

## AND DOES 21 THROUGH 30, INCLUSIVE

### (Intentional Interference with Prospective Economic Advantage)

37. Plaintiffs refer to and incorporate by this reference paragraphs one (1) through seven (7) inclusive, as though set forth in full herein.

38. As Pierce allowed Hamilton and his family members to reside in the Property without the landlord's consent as required by Paragraph 22 of the Lease, Plaintiffs are informed and believes and

7

VERIFIED COMPLAINT FOR BREACH OF CONTRACT, BREACH OF COVENANT,
FORCIBLE DETAINER AND INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC
ADVANTAGE

thereon alleges that Hamilton was aware that the Property was rental, income producing Property owned by Plaintiffs.

39. Plaintiffs are informed and believes and thereon alleges that Hamilton, at all times relevant hereto, was informed and knew that the Lease expired May 4, 2020.

40. Notwithstanding said knowledge, defendants have failed and refused to vacate the Property, though demand has been made to do so, and continue to occupy the Property without any legal right to do so.

41. As a direct and proximate result of the actions of the defendants, Plaintiffs are unable to lease the Property and are being deprived of the income that Plaintiffs would otherwise be entitled to but for the defendants willful, intentional, and purposeful refusal to vacate the Property and intentional interference with Plaintiffs' prospective economic advantage.

42. Plaintiffs are informed and believe and thereon allege that the daily fair market value of the Property following the termination of the lease is two hundred and twenty dollars ($220.00). As Plaintiffs damages are continuing, Plaintiffs' damages will be in a sum to be proven at trial.

43. In committing the acts described in this cause of action, defendants were guilty of oppression, fraud, or malice in that the defendants knowingly, purposefully, and intentionally refused to vacate the Property without any legal right to do so. As a result, Plaintiffs are entitled to an award of exemplary or punitive damages against said defendants.

**WHEREFORE,** Plaintiff prays for judgment against the Defendants, and each of them, as follows:

### First Cause of Action As to Defendants Pierce and Does 1 through 10, Inclusive.

1. For loss of rent damages in the sum of $14,080.00;

2. An award of damages pursuant to California Civil Code, § 1951.2, subd. (a)(2)], in an amount to be determined at time of trial;

8

3.  For interest on all such sums at the maximum legal rate from the date each sum became due and payable;

4.  For an award of attorney's fees in accordance with paragraph 43 of the Lease.

### Second Cause of Action As to Defendants Pierce, Hamilton, and Does 11 through 20, Inclusive.

5.  An award of damages in a sum for loss of rent computed at the daily fair market value of the Property of two hundred and twenty dollars ($220.00), in an amount to be proven at trial.

### Third Cause of Action As to Defendants, Hamilton, and Does 21 through 30, Inclusive.

6.  Awarding Plaintiffs possession of the Property described in this complaint;

7.  Awarding Plaintiffs general damages in an amount according to proof;

8.  Awarding plaintiff statutory damages pursuant to the provisions of Code Civ. Proc., § 1174, subd. (b);

### Fourth Cause of Action for Intentional Interference with Prospective Economic Advantage As to Defendants, Hamilton, and Does 21 through 30, Inclusive

9.  compensatory damages in a sum to be proved at trial;

10. interest on the damages according to law;

11. exemplary damages in an amount determined by the court to be reasonable as authorized by Civ. Code § 3294;

## As to All Causes of Action

12. For costs of suit herein; and

13. Such other, further, and/or equitable relief as this Court may deem just, proper, and equitable.

Dated:  June 29, 2020                                Law Offices of Patrick L. Garofalo

By: _____

    Patrick L. Garofalo, Attorney for the
    Plaintiffs, Faysal Shaarani and Rana Shaarani

10

## VERIFICATION

I am a plaintiff in this action. I have read the foregoing complaint and it is true of my own knowledge, except as to those matters stated on information or belief, and as to those matters, I believe it to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on June _29___, 2020 at San Jose, California

/s/ _____
        Faysal Shaarani

VERIFIED COMPLAINT FOR BREACH OF CONTRACT, BREACH OF COVENANT,
FORCIBLE DETAINER AND INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC
ADVANTAGE

**EXHIBIT A**

SG ASSOCIATES

**CALIFORNIA ASSOCIATION OF REALTORS®**

**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT**
(C.A.R. Form LR, Revised 6/17)

Date __04/30/2018__ , __Faysal Shaarani, Rana Shaarani__ ("Landlord") and
__John Pierce__ ("Tenant") agree as follows:

1. **PROPERTY:**
   A. Landlord rents to Tenant and Tenant rents from Landlord, the real property and improvements described as: __4296 Coyote Wells Cir,__
   __Westlake Village, CA__ ("Premises").
   B. The Premises are for the sole use as a personal residence by the following named person(s) only: __John Pierce__

   C. The following personal property, maintained pursuant to paragraph 11, is included: _____
   or ☐ (if checked) the personal property on the attached addendum.
   D. The Premises may be subject to a local rent control ordinance _____

2. **TERM:** The term begins on (date) __May 4, 2018__ ("Commencement Date"). If Tenant has not paid all amounts then due; (i) Tenant has no right to possession or keys to the premises and; (ii) this Agreement is voidable at the option of Landlord, 2 calendar days after giving Tenant a Notice to Pay (C.A.R. Form PPN). Notice may be delivered to Tenant (i) in person; (ii) by mail to Tenant's last known address; or (iii) by email, if provided in Tenant's application or previously used by Tenant to communicate with Landlord or agent for Owner. If Landlord elects to void the lease, Landlord shall refund to Tenant all rent and security deposit paid.
   **(Check A or B):**
   ☐ A. **Month-to-Month:** This Agreement continues from the commencement date as a month-to-month tenancy. Tenant may terminate the tenancy by giving written notice at least 30 days prior to the intended termination date. Tenant shall be responsible for paying rent through the termination date even if moving out early. Landlord may terminate the tenancy by giving written notice as provided by law. Such notices may be given on any date.
   ☒ B. **Lease:** This Agreement shall terminate on (date) __May 4, 2020__ at _____ ☐ AM/ ☐ PM. Tenant shall vacate the Premises upon termination of the Agreement, unless: (i) Landlord and Tenant have extended this Agreement in writing or signed a new agreement; (ii) mandated by local rent control law; or (iii) Landlord accepts Rent from Tenant (other than past due Rent), in which case a month-to-month tenancy shall be created which either party may terminate as specified in paragraph 2A. Rent shall be at a rate agreed to by Landlord and Tenant, or as allowed by law. All other terms and conditions of this Agreement shall remain in full force and effect.

3. **RENT:** "Rent" shall mean all monetary obligations of Tenant to Landlord under the terms of the Agreement, except security deposit.
   A. Tenant agrees to pay $ __6,600.00__ per month for the term of the Agreement.
   B. Rent is payable in advance on the **1st (or** [ ] **) day** of each calendar month, and is delinquent on the next day.
   C. If Commencement Date falls on any day other than the day Rent is payable under paragraph 3B, and Tenant has paid one full month's Rent in advance of Commencement Date, Rent for the second calendar month shall be prorated and Tenant shall pay 1/30th of the monthly rent per day for each day remaining in prorated second month.
   D. **PAYMENT: (1)** Rent shall be paid by ☐ personal check, ☐ money order, ☐ cashier's check, made payable to __direct deposit instructions attached.__ , ☒ wire/electronic transfer, or ☐ other _____ ,
   **(2)** Rent shall be delivered to (name) __N/a__
   (whose phone number is) _____ at (address) __N/a__
   _____ , (or at any other location subsequently specified by Landlord in writing to Tenant)
   (and ☐ if checked, rent may be paid personally, between the hours of _____ and _____ on the following days _____ ).
   **(3)** If any payment is returned for non-sufficient funds ("NSF") or because tenant stops payment, then, after that: (i) Landlord may, in writing, require Tenant to pay Rent in cash for three months and (ii) all future Rent shall be paid by ☐ money order, or ☐ cashier's check.
   E. Rent payments received by Landlord shall be applied to the earliest amount(s) due or past due.

4. **SECURITY DEPOSIT:**
   A. Tenant agrees to pay $ __13,200.00__ as a security deposit. Security deposit will be ☒ transferred to and held by the Owner of the Premises, or ☐ held in Owner's Broker's trust account.
   B. All or any portion of the security deposit may be used, as reasonably necessary, to: **(i)** cure Tenant's default in payment of Rent (which includes Late Charges, NSF fees or other sums due); **(ii)** repair damage, excluding ordinary wear and tear, caused by Tenant or by a guest or licensee of Tenant; **(iii)** clean Premises, if necessary, upon termination of the tenancy; and **(iv)** replace or return personal property or appurtenances. **SECURITY DEPOSIT SHALL NOT BE USED BY TENANT IN LIEU OF PAYMENT OF LAST MONTH'S RENT.** If all or any portion of the security deposit is used during the tenancy, Tenant agrees to reinstate the total security deposit within five days after written notice is delivered to Tenant. Within 21 days after Tenant vacates the Premises, Landlord shall: **(1)** furnish Tenant an itemized statement indicating the amount of any security deposit received and the basis for its disposition and supporting documentation as required by California Civil Code § 1950.5(g); and **(2)** return any remaining portion of the security deposit to Tenant.
   C. Security deposit will not be returned until all Tenants have vacated the Premises and all keys returned. Any security deposit returned by check shall be made out to all Tenants named on this Agreement, or as subsequently modified.
   D. No interest will be paid on security deposit unless required by local law.
   E. If the security deposit is held by Owner, Tenant agrees not to hold Broker responsible for its return. If the security deposit is held in Owner's Broker's trust account, **and** Broker's authority is terminated before expiration of this Agreement, **and** security deposit is released to someone other than Tenant, **then** Broker shall notify Tenant, in writing, where and to whom security deposit has been released. Once Tenant has been provided such notice, Tenant agrees not to hold Broker responsible for the security deposit.

Tenant's Initials ( _JP_ ) ( _____ )          Landlord's Initials ( _FS_ ) _DRS_

© 2017, California Association of REALTORS®, Inc.

**LR REVISED 6/17 (PAGE 1 OF 7)**
**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 1 OF 7)**

EQUAL HOUSING OPPORTUNITY

Premises: *4296 Coyote Wells Cir, Westlake Village, CA*      Date: *April 30, 2018*

5. **MOVE-IN COSTS RECEIVED/DUE:** Move-in funds shall be paid by ☐ personal check, ☐ money order, or ☐ cashier's check, ☒ wire/ electronic transfer.

| Category | Total Due | Payment Received | Balance Due | Date Due | Payable To |
|---|---|---|---|---|---|
| Rent from   *05/04/2018* to   *05/31/2018*   (date) | $5,748.00 | | $5,748.00 | 04/03/2018 | |
| *Security Deposit | $13,200.00 | | $13,200.00 | 04/03/2018 | |
| Other *two months rent* | $13,200.00 | | $13,200.00 | 04/03/2018 | |
| Other | | | | | |
| Total | $32,148.00 | | $32,148.00 | | |

*The maximum amount of security deposit, however designated, cannot exceed two months' Rent for unfurnished premises, or three months' Rent for furnished premises.

6. **LATE CHARGE; RETURNED CHECKS:**
   A. Tenant acknowledges either late payment of Rent or issuance of a returned check may cause Landlord to incur costs and expenses, the exact amounts of which are extremely difficult and impractical to determine. These costs may include, but are not limited to, processing, enforcement and accounting expenses, and late charges imposed on Landlord. If any installment of Rent due from Tenant is not received by Landlord within 5 (or ☐     ) calendar days after the date due, or if a check is returned, Tenant shall pay to Landlord, respectively, an additional sum of $ *150.00*     or     % of the Rent due as a Late Charge and $25.00 as a NSF fee for the first returned check and $35.00 as a NSF fee for each additional returned check, either or both of which shall be deemed additional Rent.
   B. Landlord and Tenant agree that these charges represent a fair and reasonable estimate of the costs Landlord may incur by reason of Tenant's late or NSF payment. Any Late Charge or NSF fee due shall be paid with the current installment of Rent. Landlord's acceptance of any Late Charge or NSF fee shall not constitute a waiver as to any default of Tenant. Landlord's right to collect a Late Charge or NSF fee shall neither be deemed an extension of the date Rent is due under paragraph 3 nor prevent Landlord from exercising any other rights and remedies under this Agreement and as provided by law.

7. **PARKING: (Check A or B)**
   ☐ A. Parking is permitted as follows: _____
   The right to parking ☐ is ☐ is not included in the Rent charged pursuant to paragraph 3. If not included in the Rent, the parking rental fee shall be an additional $ _____ per month. Parking space(s) are to be used only for parking properly registered and operable motor vehicles, except for trailers, boats, campers, buses or trucks (other than pick-up trucks). Tenant shall park in assigned space(s) only. Parking space(s) are to be kept clean. Vehicles leaking oil, gas or other motor vehicle fluids shall not be parked on the Premises. Mechanical work, or storage of inoperable vehicles, or storage of any kind is not permitted in parking space(s) or elsewhere on the Premises except as specified in paragraph 8.
   OR ☐ B. Parking is not permitted on the Premises.

8. **STORAGE: (Check A or B)**
   ☐ A. Storage is permitted as follows: *garage/driveway*
   The right to separate storage space ☐ is, ☐ is not, included in the Rent charged pursuant to paragraph 3. If not included in the Rent, storage space fee shall be an additional $ _____ per month. Tenant shall store only personal property Tenant owns, and shall not store property claimed by another or in which another has any right, title or interest. Tenant shall not store any improperly packaged food or perishable goods, flammable materials, explosives, hazardous waste or other inherently dangerous material, or illegal substances.
   OR ☒ B. Except for Tenant's personal property, contained entirely within the Premises, storage is not permitted on the Premises.

9. **UTILITIES:** Tenant agrees to pay for all utilities and services, and the following charges: _____ except _____ *Gardener,Hoa,pool maintanance* _____ , which shall be paid for by Landlord. If any utilities are not separately metered, Tenant shall pay Tenant's proportional share, as reasonably determined and directed by Landlord. If utilities are separately metered, Tenant shall place utilities in Tenant's name as of the Commencement Date. Landlord is only responsible for installing and maintaining one usable telephone jack and one telephone line to the Premises. Tenant shall pay any cost for conversion from existing utilities service provider.
   ☐ A. **Water Submeters:** Water use on the Premises is measured by a submeter and Tenant will be separately billed for water usage based on the submeter. See attached Water Submeter Addendum (C.A.R. Form WSM) for additional terms.
   ☐ B. **Gas Meter:** The Premises does not have a separate gas meter.
   ☐ C. **Electric Meter:** The Premises does not have a separate electrical meter.

10. **CONDITION OF PREMISES:** Tenant has examined Premises and, if any, all furniture, furnishings, appliances, landscaping and fixtures, including smoke alarm(s) and carbon monoxide detector(s).
   **(Check all that apply:)**
   ☐ A. Tenant acknowledges these items are clean and in operable condition, with the following exceptions: _____
   ☒ B. Tenant's acknowledgment of the condition of these items is contained in an attached statement of condition (C.A.R. Form MIMO).
   ☐ C. (i) Landlord will Deliver to Tenant a statement of condition (C.A.R. Form MIMO) ☐ within 3 days after execution of this Agreement; ☐ prior to the Commencement Date; ☐ within 3 days after the Commencement Date.
   (ii) Tenant shall complete and return the MIMO to Landlord within 3 (or ☐ _____ ) days after Delivery. Tenant's failure to return the MIMO within that time shall conclusively be deemed Tenant's Acknowledgement of the condition as stated in the MIMO.
   ☐ D. Tenant will provide Landlord a list of items that are damaged or not in operable condition within 3 (or ☐ _____ ) days after Commencement Date, not as a contingency of this Agreement but rather as an acknowledgement of the condition of the Premises.
   ☐ E. Other: _____

Tenant's Initials ( *JP* ) ( _____ )      Landlord's Initials ( *FS* ) ( *DLS* )

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com      4926 coyote wells



Premises: *4296 Coyote Wells Cir, Westlake Village, CA*                                      Date: *April 30, 2018*

**11. MAINTENANCE USE AND REPORTING:**

**A.** Tenant shall properly use, operate and safeguard Premises, including if applicable, any landscaping, furniture, furnishings and appliances, and all mechanical, electrical, gas and plumbing fixtures, carbon monoxide detector(s) and smoke alarms, and keep them and the Premises clean, sanitary and well ventilated. Tenant shall be responsible for checking and maintaining all carbon monoxide detectors and any additional phone lines beyond the one line and jack that Landlord shall provide and maintain. Tenant shall immediately notify Landlord, in writing, of any problem, malfunction or damage with any item including carbon monoxide detector(s) and smoke alarms on the property. Tenant shall be charged for all repairs or replacements caused by Tenant, pets, guests or licensees of Tenant, excluding ordinary wear and tear. Tenant shall be charged for all damage to Premises as a result of failure to report a problem in a timely manner. Tenant shall be charged for repair of drain blockages or stoppages, unless caused by defective plumbing parts or tree roots invading sewer lines.

**B.** [X] Landlord [ ] Tenant shall water the garden, landscaping, trees and shrubs, except: _____

**C.** [X] Landlord [ ] Tenant shall maintain the garden, landscaping, trees and shrubs, except: _____

**D.** [ ] Landlord [ ] Tenant shall maintain _____

**E.** Landlord and Tenant agree that State or local water use restrictions shall supersede any obligation of Landlord or Tenant to water or maintain any garden, landscaping, trees or shrubs pursuant to 11B, 11C, and 11D.

**F.** Tenant's failure to maintain any item for which Tenant is responsible shall give Landlord the right to hire someone to perform such maintenance and charge Tenant to cover the cost of such maintenance.

**G.** The following items of personal property are included in the Premises without warranty and Landlord will not maintain, repair or replace them: *Outdoor BBQ*

**H.** Tenant understands that if Premises is located in a Common Interest Development, Landlord may not have authority or control over certain parts of the Premises such as roof, electrical, gas or plumbing features inside certain walls, and common areas such as shared parking structure or garage.

**I.** Tenant shall not use the premises to plant, grow, cultivate or sell marijuana.

**12. NEIGHBORHOOD CONDITIONS:** Tenant is advised to satisfy him or herself as to neighborhood or area conditions, including, but not limited to, schools, proximity and adequacy of law enforcement, crime statistics, proximity of registered felons or offenders, fire protection, other governmental services, availability, adequacy and cost of any wired, wireless internet connections or other telecommunications or other technology services and installations, proximity to commercial, industrial or agricultural activities, existing and proposed transportation, construction and development that may affect noise, view, or traffic, airport noise, noise or odor from any source, wild and domestic animals, other nuisances, hazards, or circumstances, cemeteries, facilities and condition of common areas, conditions and influences of significance to certain cultures and/or religions, and personal needs, requirements and preferences of Tenant.

**13. PETS:** Unless otherwise provided in California Civil Code §54.2, no animal or pet shall be kept on or about the Premises without Landlord's prior written consent, [X] except as agreed to in the attached Pet Addendum (C.A.R. Form PET).

**14. NO SMOKING:**

**A.** (i) Tenant is responsible for all damage caused by smoking including, but not limited to stains, burns, odors and removal of debris; (ii) Tenant acknowledges that in order to remove odor caused by smoking, Landlord may need to replace carpet and drapes and paint the entire premises regardless of when these items  were last cleaned, replaced or repainted. Such actions and other necessary steps will impact the return of any security deposit.

**B.** The Premises or common areas may be subject to a local non-smoking ordinance.

**C.** NO SMOKING of any substance is allowed on the Premises or common areas. If smoking does occur on the Premises or common areas, (i) Tenant is in material breach of this Agreement; (ii) Tenant, guests, and all others may be required to leave the Premises. [ ] Smoking of the following substances only is allowed: _____

**15. RULES/REGULATIONS:**

**A.** Tenant agrees to comply with all Landlord rules and regulations that are at any time posted on the Premises or delivered to Tenant. Tenant shall not, and shall ensure that guests and licensees of Tenant shall not, disturb, annoy, endanger or interfere with other tenants of the building or neighbors, or use the Premises for any unlawful purposes, under federal, state, or local law including, but not limited to, using, manufacturing, selling, storing or transporting illicit drugs or other contraband, or violate any law or ordinance, or commit a waste or nuisance on or about the Premises.

**B. (If applicable, check one)**

[ ] **1.** Landlord shall provide Tenant with a copy of the rules and regulations within _____ days

or _____

OR [ ] **2.** Tenant has been provided with, and acknowledges receipt of, a copy of the rules and regulations.

**16.** [X] (If checked) **CONDOMINIUM; PLANNED UNIT DEVELOPMENT:**

**A.** The Premises are a unit in a condominium, planned unit development, common interest subdivision or other development governed by a homeowners' association ("HOA"). The name of the HOA is _____. Tenant agrees to comply with all HOA covenants, conditions and restrictions, bylaws, rules and regulations and decisions ("HOA Rules"). Tenant shall reimburse Landlord for any fines or charges imposed by HOA or other authorities, due to any violation by Tenant, or the guests or licensees of Tenant or Landlord shall have the right to deduct such amounts from the security deposit.

**B.** If applicable, Tenant is required to pay a fee to the HOA to gain access to certain areas within the development such as but not necessarily including or limited to the front gate, pool, and recreational facilities. If not specified in paragraph 5, Tenant is solely responsible for payment and satisfying any HOA requirements prior to or upon or after the Commencement Date.

**C. (Check one)**

[X] **1.** Landlord shall provide Tenant with a copy of the HOA Rules within _____ *7 Days* _____ days

or _____

OR [ ] **2.** Tenant has been provided with, and acknowledges receipt of, a copy of the HOA Rules.

**17. ALTERATIONS; REPAIRS:** Unless otherwise specified by law or paragraph 32C, without Landlord's prior written consent, **(i)** Tenant shall not make any repairs, alterations or improvements in or about the Premises including: painting, wallpapering, adding or changing locks, installing antenna or satellite dish(es), placing signs, displays or exhibits, or using screws, fastening devices, large nails or adhesive materials; **(ii)** Landlord shall not be responsible for the costs of alterations or repairs made by Tenant; **(iii)** Tenant shall not deduct from Rent the costs of any repairs, alterations or improvements; and **(iv)** any deduction made by Tenant shall be considered unpaid Rent.

Tenant's Initials ( *JP* ) ( _____ )                          Landlord's Initials ( *FS* ) ( *DLS* )

**LR REVISED 6/17 (PAGE 3 OF 7)**

**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 3 OF 7)**

Premises: *4296 Coyote Wells Cir, Westlake Village, CA*          Date: *April 30, 2018*

**18. KEYS; LOCKS:**
- **A.** Tenant acknowledges receipt of (or Tenant will receive ☐ prior to the Commencement Date, or ☐ _____ ):
  - ☒ 1   key(s) to Premises,      ☒ 1   remote control device(s) for garage door/gate opener(s),
  - ☐ _____ key(s) to mailbox,      ☐ _____ ,
  - ☐ _____ key(s) to common area(s),      ☐ _____ ,
- **B.** Tenant acknowledges that locks to the Premises ☐ have, ☐ have not, been re-keyed.
- **C.** If Tenant re-keys existing locks or opening devices, Tenant shall immediately deliver copies of all keys to Landlord. Tenant shall pay all costs and charges related to loss of any keys or opening devices. Tenant may not remove locks, even if installed by Tenant.

**19. ENTRY:**
- **A.** Tenant shall make Premises available to Landlord or Landlord's representative for the purpose of entering to make necessary or agreed repairs (including, but not limited to, installing, repairing, testing, and maintaining smoke detectors and carbon monoxide devices, and bracing, anchoring or strapping water heaters, or repairing dilapidation relating to the presence of mold); providing decorations, alterations, or improvements, or supplying necessary or agreed services; or to show Premises to prospective or actual purchasers, tenants, mortgagees, lenders, appraisers, contractors and others (collectively "Interested Persons"). Tenant agrees that Landlord, Broker and Interested Persons may take photos of the Premises.
- **B.** Landlord and Tenant agree that 24-hour written notice shall be reasonable and sufficient notice, except as follows: (1) 48-hour written notice is required to conduct an inspection of the Premises prior to the Tenant moving out, unless the Tenant waives the right to such notice. (2) If Landlord has in writing informed Tenant that the Premises are for sale and that Tenant will be notified orally to show the premises (C.A.R. Form NSE), then, for the next 120 days following the delivery of the NSE, notice may be given orally to show the Premises to actual or prospective purchasers. (3) No written notice is required if Landlord and Tenant orally agree to an entry for agreed services or repairs if the date and time of entry are within one week of the oral agreement. (4) No notice is required: (i) to enter in case of an emergency; (ii) if the Tenant is present and consents at the time of entry; or (iii) if the Tenant has abandoned or surrendered the Premises.
- **C.** ☒ (If checked) Tenant authorizes the use of a keysafe/lockbox to allow entry into the Premises and agrees to sign a keysafe/lockbox addendum (C.A.R. Form KLA).

**20. PHOTOGRAPHS AND INTERNET ADVERTISING:**
- **A.** In order to effectively market the Premises for sale or rental it is often necessary to provide photographs, virtual tours and other media to Interested Persons. Tenant agrees that Broker may photograph or otherwise electronically capture images of the exterior and interior of the Premises ("Images") for static and/or virtual tours of the Premises by Interested Persons for use on Broker's website, the MLS, and other marketing materials and sites. Tenant acknowledges that once Images are placed on the Internet neither Broker nor Landlord has control over who can view such Images and what use viewers may make of the Images, or how long such Images may remain available on the Internet.
- **B.** Tenant acknowledges that prospective Interested Persons coming onto the Premises may take photographs, videos or other images of the Premises. Tenant understands that Broker does not have the ability to control or block the taking and use of Images by any such persons. Once Images are taken and/or put into electronic display on the Internet or otherwise, neither Broker nor Landlord has control over who views such Images nor what use viewers may make of the Images.

**21. SIGNS:** Tenant authorizes Landlord to place FOR SALE/LEASE signs on the Premises.

**22. ASSIGNMENT; SUBLETTING: A.** Tenant shall not sublet all or any part of Premises, or parking or storage spaces, or assign or transfer this Agreement or any interest in it, without Landlord's prior written consent. Unless such consent is obtained, any assignment, transfer or subletting of Premises or this Agreement or tenancy, by voluntary act of Tenant, operation of law or otherwise, shall, at the option of Landlord, terminate this Agreement. Any proposed assignee, transferee or sublessee shall submit to Landlord an application and credit information for Landlord's approval and, if approved, sign a separate written agreement with Landlord and Tenant. Landlord's consent to any one assignment, transfer or sublease, shall not be construed as consent to any subsequent assignment, transfer or sublease and does not release Tenant of Tenant's obligations under this Agreement. **B.** This prohibition also applies ( ☐ does not apply) to short term, vacation, and transient rentals such as, but not limited to, those arranged through AirBnB, VRBO, HomeAway or other short term rental services. **C.** Any violation of this prohibition is a non-curable, material breach of the Agreement.

**23. JOINT AND INDIVIDUAL OBLIGATIONS:** If there is more than one Tenant, each one shall be individually and completely responsible for the performance of all obligations of Tenant under this Agreement, jointly with every other Tenant, and individually, whether or not in possession.

**24.** ☐   **LEAD-BASED PAINT (If checked):** Premises were constructed prior to 1978. In accordance with federal law, Landlord gives and Tenant acknowledges receipt of the disclosures on the attached form (C.A.R. Form FLD) and a federally approved lead pamphlet.

**25. PERIODIC PEST CONTROL: (CHECK IF EITHER APPLIES)**
- ☐   **A.** Landlord has entered into a contract for periodic pest control treatment of the Premises and shall give Tenant a copy of the notice originally given to Landlord by the pest control company.
- ☐   **B.** Premises is a house. Tenant is responsible for pest control.

**26.** ☐   **METHAMPHETAMINE CONTAMINATION:** Prior to signing this Agreement, Landlord has given Tenant a notice that a health official has issued an order prohibiting occupancy of the property because of methamphetamine contamination. A copy of the notice and order are attached.

**27. BED BUGS:** Landlord has no knowledge of any infestation in the Premises by bed bugs. See attached Bed Bug Disclosure (C.A.R. Form BBD) for further information. Tenant shall report suspected bed bug infestation to Landlord or, if applicable, property manager and cooperate with any inspection for and treatment of bed bugs. Landlord will notify tenants of any units infested by bed bugs.

**28. MEGAN'S LAW DATABASE DISCLOSURE:** Notice: Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides. (Neither Landlord nor Brokers, if any, are required to check this website. If Tenant wants further information, Tenant should obtain information directly from this website.)

**29.** ☐   **RESIDENTIAL ENVIRONMENTAL HAZARDS BOOKLET:** Tenant acknowledges receipt of the residential environmental hazards booklet.

**30.** ☐   **MILITARY ORDNANCE DISCLOSURE:** (If applicable and known to Landlord) Premises are located within one mile of an area once used for military training, and may contain potentially explosive munitions.

Tenant's Initials ( *JR* ) ( _____ )          Landlord's Initials ( *FS* ) ( *DLS* )

**LR REVISED 6/17 (PAGE 4 OF 7)**

**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 4 OF 7)**

Premises: **4296 Coyote Wells Cir, Westlake Village, CA**                                      Date: **April 30, 2018**

**31. POSSESSION:**

    **A.** Tenant is not in possession of the Premises. If Landlord is unable to deliver possession of Premises on Commencement Date, such Date shall be extended to the date on which possession is made available to Tenant. If Landlord is unable to deliver possession within **5 (or** ☐ _____ **) calendar days** after agreed Commencement Date, Tenant may terminate this Agreement by giving written notice to Landlord, and shall be refunded all Rent and security deposit paid. Possession is deemed terminated when Tenant has returned all keys to the Premises to Landlord.

    **B.** ☐ Tenant is already in possession of the Premises.

**32. TENANT'S OBLIGATIONS UPON VACATING PREMISES:**

    **A.** Upon termination of this Agreement, Tenant shall: **(i)** give Landlord all copies of all keys and any opening devices to Premises, including any common areas; **(ii)** vacate and surrender Premises to Landlord, empty of all persons; **(iii)** vacate any/all parking and/or storage space; **(iv)** clean and deliver Premises, as specified in paragraph C below, to Landlord in the same condition as referenced in paragraph 10; **(v)** remove all debris; **(vi)** give written notice to Landlord of Tenant's forwarding address; and **(vii)** _____

    **B.** All alterations/improvements made by or caused to be made by Tenant, with or without Landlord's consent, become the property of Landlord upon termination. Landlord may charge Tenant for restoration of the Premises to the condition it was in prior to any alterations/improvements.

    **C. Right to Pre-Move-Out Inspection and Repairs: (i)** After giving or receiving notice of termination of a tenancy (C.A.R. Form NTT), or before the expiration of this Agreement, Tenant has the right to request that an inspection of the Premises take place prior to termination of the lease or rental (C.A.R. Form NRI). If Tenant requests such an inspection, Tenant shall be given an opportunity to remedy identified deficiencies prior to termination, consistent with the terms of this Agreement. **(ii)** Any repairs or alterations made to the Premises as a result of this inspection (collectively, "Repairs") shall be made at Tenant's expense. Repairs may be performed by Tenant or through others, who have adequate insurance and licenses and are approved by Landlord. The work shall comply with applicable law, including governmental permit, inspection and approval requirements. Repairs shall be performed in a good, skillful manner with materials of quality and appearance comparable to existing materials. It is understood that exact restoration of appearance or cosmetic items following all Repairs may not be possible. **(iii)** Tenant shall: **(a)** obtain receipts for Repairs performed by others; **(b)** prepare a written statement indicating the Repairs performed by Tenant and the date of such Repairs; and **(c)** provide copies of receipts and statements to Landlord prior to termination. Paragraph 32C does not apply when the tenancy is terminated pursuant to California Code of Civil Procedure § 1161(2), (3) or (4).

**33. BREACH OF CONTRACT; EARLY TERMINATION:** In addition to any obligations established by paragraph 32, in the event of termination by Tenant prior to completion of the original term of the Agreement, Tenant shall also be responsible for lost Rent, rental commissions, advertising expenses and painting costs necessary to ready Premises for re-rental. Landlord may withhold any such amounts from Tenant's security deposit.

**34. TEMPORARY RELOCATION:** Subject to local law, Tenant agrees, upon demand of Landlord, to temporarily vacate Premises for a reasonable period, to allow for fumigation (or other methods) to control wood destroying pests or organisms, or other repairs to Premises. Tenant agrees to comply with all instructions and requirements necessary to prepare Premises to accommodate pest control, fumigation or other work, including bagging or storage of food and medicine, and removal of perishables and valuables. Tenant shall only be entitled to a credit of Rent equal to the per diem Rent for the period of time Tenant is required to vacate Premises.

**35. DAMAGE TO PREMISES:** If, by no fault of Tenant, Premises are totally or partially damaged or destroyed by fire, earthquake, accident or other casualty that render Premises totally or partially uninhabitable, either Landlord or Tenant may terminate this Agreement by giving the other written notice. Rent shall be abated as of the date Premises become totally or partially uninhabitable. The abated amount shall be the current monthly Rent prorated on a 30-day period. If the Agreement is not terminated, Landlord shall promptly repair the damage, and Rent shall be reduced based on the extent to which the damage interferes with Tenant's reasonable use of Premises. If damage occurs as a result of an act of Tenant or Tenant's guests, only Landlord shall have the right of termination, and no reduction in Rent shall be made.

**36. INSURANCE: A.** Tenant's or guest's personal property and vehicles are not insured by Landlord, manager or, if applicable, HOA, against loss or damage due to fire, theft, vandalism, rain, water, criminal or negligent acts of others, or any other cause. **Tenant is advised to carry Tenant's own insurance (renter's insurance) to protect Tenant from any such loss or damage. B.** Tenant shall comply with any requirement imposed on Tenant by Landlord's insurer to avoid: **(i)** an increase in Landlord's insurance premium (or Tenant shall pay for the increase in premium); or **(ii)** loss of insurance. **C.** ☒ Tenant shall obtain liability insurance, in an amount not less than $**100,000.00** _____, naming Landlord and, if applicable, Property Manager as additional insured for injury or damage to, or upon, the Premises during the term of this agreement or any extension. Tenant shall provide Landlord a copy of the insurance policy before commencement of this Agreement, and a rider prior to any renewal.

**37. WATERBEDS/PORTABLE WASHERS:** Tenant shall not use or have waterbeds on the Premises unless: **(i)** Tenant obtains a valid waterbed insurance policy; **(ii)** Tenant increases the security deposit in an amount equal to one-half of one month's Rent; and **(iii)** the bed conforms to the floor load capacity of Premises. Tenant shall not use on the Premises ☐ Portable Dishwasher ☐ Portable Washing Machine.

**38. WAIVER:** The waiver of any breach shall not be construed as a continuing waiver of the same or any subsequent breach.

**39 NOTICE:** Notices may be served at the following address, or at any other location subsequently designated:

    Landlord: **3648 Rowley Dr. San Jose 95132**                              Tenant: **4926 Coyote Wells Circle**

**40. TENANT ESTOPPEL CERTIFICATE:** Tenant shall execute and return a tenant estoppel certificate delivered to Tenant by Landlord or Landlord's agent within **3 days** after its receipt (C.A.R. Form TEC). Failure to comply with this requirement shall be deemed Tenant's acknowledgment that the tenant estoppel certificate is true and correct, and may be relied upon by a lender or purchaser.

**41. REPRESENTATION**

    **A. TENANT REPRESENTATION; OBLIGATIONS REGARDING OCCUPANTS; CREDIT:** Tenant warrants that all statements in Tenant's rental application are accurate. Landlord requires all occupants 18 years of age or older and all emancipated minors to complete a lease rental application. Tenant acknowledges this requirement and agrees to notify Landlord when any occupant of the Premises reaches the age of 18 or becomes an emancipated minor. Tenant authorizes Landlord and Broker(s) to obtain Tenant's credit report periodically during the tenancy in connection with the modification or enforcement of this Agreement. Landlord may cancel this Agreement: **(i)** before occupancy begins; upon disapproval of the credit report(s); or upon discovering that information in Tenant's application is false; **(ii)** After commencement date, upon disapproval of an updated credit report or upon discovering that information

Tenant's Initials ( _JO_ ) ( _____ )                          Landlord's Initials ( _FS_ ) ( _DLS_ )

**LR REVISED 6/17 (PAGE 5 OF 7)**

**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 5 OF 7)**

Premises: **4296 Coyote Wells Cir, Westlake Village, CA**                                    Date: **April 30, 2018**

in Tenant's application is no longer true.  A negative credit report reflecting on Tenant's record may be submitted to a credit reporting agency if Tenant fails to fulfill the terms of payment and other obligations under this Agreement.

**B.  LANDLORD REPRESENTATIONS:** Landlord warrants that, unless otherwise specified in writing, Landlord is unaware of (i) any recorded Notices of Default affecting the Premise; (ii) any delinquent amounts due under any loan secured by the Premises; and (iii) any bankruptcy proceeding affecting the Premises.

**42. MEDIATION:**

**A.** Consistent with paragraphs B and C below, Landlord and Tenant agree to mediate any dispute or claim arising between them out of this Agreement, or any resulting transaction, before resorting to court action. Mediation fees, if any, shall be divided equally among the parties involved. If, for any dispute or claim to which this paragraph applies, any party commences an action without first attempting to resolve the matter through mediation, or refuses to mediate after a request has been made, then that party shall not be entitled to recover attorney fees, even if they would otherwise be available to that party in any such action.

**B.** The following matters are excluded from mediation: (i) an unlawful detainer action; (ii) the filing or enforcement of a mechanic's lien; and (iii) any matter within the jurisdiction of a probate, small claims or bankruptcy court. The filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall not constitute a waiver of the mediation provision.

**C.** Landlord and Tenant agree to mediate disputes or claims involving Listing Agent, Leasing Agent or property manager ("Broker"), provided Broker shall have agreed to such mediation prior to, or within a reasonable time after, the dispute or claim is presented to such Broker. Any election by Broker to participate in mediation shall not result in Broker being deemed a party to this Agreement.

**43. ATTORNEY FEES:** In any action or proceeding arising out of this Agreement, the prevailing party between Landlord and Tenant shall be entitled to reasonable attorney fees and costs, collectively not to exceed $1,000 (or $_____), except as provided in paragraph 42A.

**44. C.A.R. FORM:** C.A.R. Form means the specific form referenced or another comparable form agreed to by the parties.

**45. OTHER TERMS AND CONDITIONS; SUPPLEMENTS:** If checked, the following  ATTACHED documents are incorporated in this agreement:
[X] Keysafe/Lockbox Addendum (C.A.R. Form KLA); [ ] Lead-Based Paint and Lead-Based Paint Hazards Disclosure (C.A.R. Form FLD);
[X] Lease/Rental Mold and Ventilation Addendum (C.A.R. Form LRM); [ ] Landlord in Default Addendum (C.A.R. Form LID
Other _____

**46. TIME OF ESSENCE; ENTIRE CONTRACT; CHANGES:** Time is of the essence. All understandings between the parties are incorporated in this Agreement. Its terms are intended by the parties as a final, complete and exclusive expression of their Agreement with respect to its subject matter, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. Neither this Agreement nor any provision in it may be extended, amended, modified, altered or changed except in writing. This Agreement is subject to California landlord-tenant law and shall incorporate all changes required by amendment or successors to such law. This Agreement and any supplement, addendum or modification, including any copy, may be signed in two or more counterparts, all of which shall constitute one and the same writing.

**47. AGENCY:**

**A.  CONFIRMATION:** The following agency relationship(s) are hereby confirmed for this transaction:
Listing Agent: (Print firm name) _____ **SG Associates**
is the agent of (check one): [ ] the Landlord exclusively; or [X] both the Landlord and Tenant.
Leasing Agent: (Print firm name) _____ **SG Associates**
(if not same as Listing Agent) is the agent of (check one): [ ] the Tenant exclusively; or [ ] the Landlord exclusively; or [X] both the Tenant and Landlord.

**B.  DISCLOSURE:** [X] (If checked): The term of this Agreement exceeds one year. A disclosure regarding real estate agency relationships (C.A.R. Form AD) has been provided to Landlord and Tenant, who each acknowledge its receipt.

**48.** [ ] **TENANT COMPENSATION TO BROKER:** Upon execution of this Agreement, Tenant agrees to pay compensation to Broker as specified in a separate written agreement between Tenant and Broker.

**49.** [ ] **INTERPRETER/TRANSLATOR:** The terms of this Agreement have been interpreted for Tenant into the following language: _____. Landlord and Tenant acknowledge receipt of the attached interpreter/translator agreement (C.A.R. Form ITA).

**50. NOTICE OF RIGHT TO RECEIVE FOREIGN LANGUAGE TRANSLATION OF LEASE/RENTAL AGREEMENTS:** California Civil Code requires a landlord or property manager to provide a tenant with a foreign language translation copy of a lease or rental agreement if the agreement was negotiated primarily in Spanish, Chinese, Korean, Tagalog or Vietnamese. If applicable, every term of the lease/rental needs to be translated except for, among others, names, dollar amounts and dates written as numerals, and words with no generally accepted non-English translation.

**51. OWNER COMPENSATION TO BROKER:** Upon execution of this Agreement, Owner agrees to pay compensation to Broker as specified in a separate written agreement between Owner and Broker (C.A.R. Form LL or LCA).

**52. RECEIPT:** If specified in paragraph 5, Landlord or Broker, acknowledges receipt of move-in funds.

**53. REPRESENTATIVE CAPACITY:** If one or more Parties is signing this Agreement in a representative capacity and not for him/herself as an individual then that Party shall so indicate in paragraph 55 or 56 and attach a Representative Capacity Signature Disclosure (C.A.R. Form RCSD). Wherever the signature or initials of the representative identified in the RCSD appear on this Agreement or any related documents, it shall be deemed to be in a representative capacity for the entity described and not in an individual capacity, unless otherwise indicated. The Party acting in a representative capacity (i) represents that the entity for which that party is acting already exists and (ii) shall Deliver to the other Party and Escrow Holder, within 3 Days After Acceptance, evidence of authority to act in that capacity (such as but not limited to: applicable portion of the trust or Certification Of Trust (Probate Code §18100.5), letters testamentary, court order, power of attorney, corporate resolution, or formation documents of the business entity).

Landlord and Tenant acknowledge and agree Brokers: **(a)** do not guarantee the condition of the Premises; **(b)** cannot verify representations made by others; **(c)** cannot provide legal or tax advice; **(d)** will not provide other advice or information that exceeds the knowledge, education or experience required to obtain a real estate license. Furthermore, if Brokers are not also acting as Landlord in this Agreement, Brokers: **(e)** do not decide what rental rate a Tenant should pay or Landlord should accept; and **(f)** do not decide upon the length or other terms of this Agreement. Landlord and Tenant agree that they will seek legal, tax, insurance and other desired assistance from appropriate professionals.

Tenant's Initials ( _JP_ ) ( _____ )                    Landlord's Initials ( _FS_ ) ( _DLS_ )

**LR REVISED 6/17 (PAGE 6 OF 7)**

**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 6 OF 7)**

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com                    4926 coyote wells

Premises: *4296 Coyote Wells Cir, Westlake Village, CA* _____  Date: *April 30, 2018*

**54.** The Premises is being managed by Owner, (or, if checked):
☐ Listing firm in box below    ☐ Leasing firm in box below    ☐ Property Management firm immediately below

Real Estate Broker (Property Manager) _____  CalBRE Lic # _____

By (Agent) _____  CalBRE Lic # _____

Address _____  Telephone # _____

**55.** **Tenant agrees to rent the Premises on the above terms and conditions.**
☐ One or more Tenants is signing this Agreement in a representative capacity and not for him/herself as an individual. See attached Representative Capacity Signature Disclosure (For Tenant Representative) (C.A.R. Form RCSD-T) for additional terms.

Tenant _____  Date _____ 05-01-2018
Print Name *John Pierce*
Address _____  City _____  State _____ Zip _____
Telephone _____  Fax _____  E-mail _____
Tenant _____  Date _____
Print Name _____
Address _____  City _____  State _____ Zip _____
Telephone _____  Fax _____  E-mail _____

☐ **GUARANTEE:** In consideration of the execution of this Agreement by and between Landlord and Tenant and for valuable consideration, receipt of which is hereby acknowledged, the undersigned ("Guarantor") does hereby: **(i)** guarantee unconditionally to Landlord and Landlord's agents, successors and assigns, the prompt payment of Rent or other sums that become due pursuant to this Agreement, including any and all court costs and attorney fees included in enforcing the Agreement; **(ii)** consent to any changes, modifications or alterations of any term in this Agreement agreed to by Landlord and Tenant; and **(iii)** waive any right to require Landlord and/or Landlord's agents to proceed against Tenant for any default occurring under this Agreement before seeking to enforce this Guarantee.

Guarantor (Print Name) _____
Guarantor _____  Date _____
Address _____  City _____  State _____ Zip _____
Telephone _____  Fax _____  E-mail _____

**56.** **Landlord (owner or ☐ agent for owner) agrees to rent the Premises on the above terms and conditions.**
☐ One or more Landlords is signing this Agreement in a representative capacity and not for him/herself as an individual. See attached Representative Capacity Signature Disclosure (For Landlord Representative) (C.A.R. Form RCSD-LL) for additional terms.

Landlord *Faysal Shaarani*  Date 05-01-2018  Landlord *Rana Shaarani*  Date 05-01-2018
       *Faysal Shaarani*                              *Rana Shaarani*
Address _____
Telephone _____  Fax _____  E-mail _____

**REAL ESTATE BROKERS:**
**A.** Real estate brokers who are not also Landlord under this Agreement are not parties to the Agreement between Landlord and Tenant.
**B.** Agency relationships are confirmed in paragraph 44.
**C.** **COOPERATING BROKER COMPENSATION:** Listing Broker agrees to pay Cooperating Broker (Leasing Firm) and Cooperating Broker agrees to accept: **(i)** the amount specified in the MLS, provided Cooperating Broker is a Participant of the MLS in which the Property is offered for sale or lease or a reciprocal MLS; or **(ii)** ☐ (if checked) the amount specified in a separate written agreement between Listing Broker and Cooperating Broker.

Real Estate Broker (Leasing Firm) *SG Associates*  CalBRE Lic. # _____
By (Agent) *Tina Rivero*  CalBRE Lic. # _____  Date 05-01-2018
Address _____  City _____  State _____ Zip _____
Telephone _____  Fax _____  E-mail _____
Real Estate Broker (Listing Firm) *SG Associates*  CalBRE Lic. # _____
By (Agent) *Galen Callahan*  CalBRE Lic. # _____  Date 05-01-2018
Address _____  City _____  State _____ Zip _____
Telephone _____  Fax _____  E-mail _____

© 2017, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

Reviewed by _____ Date _____

**LR REVISED 6/17 (PAGE 7 OF 7)**
**RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT (LR PAGE 7 OF 7)**
Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com   *4926 coyote wells*

# Exhibit T

# THE SUPERIOR COURT OF CALIFORNIA
## COUNTY OF VENTURA

Return to Search Page

# Case Information

| Case Number: | 56-2020-00543009-CU-BC-VTA |
|---|---|
| Case Title: | Faysal Shaarani vs. John M Pierce |
| Case Category: | Civil - Unlimited |
| Filed Date: | 7/1/2020 |
| Case Type: | Breach of Contract/Warranty |
| Case Status: | Pending |
| Location: | Ventura |

# Participants

| Name | Filing Document | Role | Attorney | Filed By |
|---|---|---|---|---|
| Hamilton, Lenwood | Complaint | Defendant | | Shaarni, Rana \| Shaarani, Faysal |
| Pierce, John M | Complaint | Defendant | | Shaarni, Rana \| Shaarani, Faysal |
| Shaarani, Faysal | Complaint | Plaintiff | Garofalo, Patrick L. | Shaarni, Rana \| Shaarani, Faysal |
| Shaarni, Rana | Complaint | Plaintiff | Garofalo, Patrick L. | Shaarni, Rana \| Shaarani, Faysal |

# Past Events

No past event information found

# Future Events

| Event Type | Description | Event Status | Event Date | Event Time | Location | Department |
|---|---|---|---|---|---|---|
| MANDATORY APPEARANCE CMC/Order to Show Cause Re Sanctions/Dismissal for Failure to File Proof of Service/Default | | SCHEDULED | 3/5/2021 | 8:15 AM | Ventura | 22B |

# Register of Actions

| ROA # | Entry Date | Entry |
|---|---|---|
| 4 | 7/13/2020 | MANDATORY APPEARANCE CMC/Order to Show Cause Re Sanctions/Dismissal for Failure to File Proof of Service/Default - scheduled for 03/05/2021 at 08:15:00 AM in 22B at Ventura. |
| 3 | 7/1/2020 | Case assigned to Department 42. |
| 2 | 7/1/2020 | Civil Case Cover Sheet filed by Shaarani, Faysal; Shaarni, Rana on 07/01/2020. |
| 1 | 7/1/2020 | Complaint filed by Shaarani, Faysal; Shaarni, Rana on 07/01/2020. Filed By: Shaarni, Rana(Plaintiff) \| Shaarani, Faysal(Plaintiff) Refers To: Hamilton, Lenwood(Defendant) \| Pierce, John(Defendant) |

© 2020 Superior Court of California, Ventura County